**So Ordered.**

**Dated: May 8th, 2019**



Frank L. Kurtz
Bankruptcy Judge

---

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| IN RE:<br><br>ASTRIA HEALTH, et al.<br><br>Debtors.[1] | Lead Case No. 19-01189-11<br><br>Jointly Administered<br><br>**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED CREDIT PARTIES; (IV) MODIFYING THE AUTOMATIC STAY; (V) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH JMB CAPITAL PARTNERS LENDING, LLC; (VI) AUTHORIZING USE OF CASH COLLATERAL; (VII) SCHEDULING A FINAL HEARING AND (VIII) GRANTING RELATED RELIEF** |

---

[1] The Debtors, along with their case numbers, are as follows: Astria Health (19-01189-11), Glacier Canyon, LLC (19-01193-11), Kitchen and Bath Furnishings, LLC (19-01194-11), Oxbow Summit, LLC (19-01195-11), SHC Holdco, LLC (19-01196-11), SHC Medical Center-Toppenish (19-01190-11), SHC Medical Center-Yakima (19-01192-11), Sunnyside Community Hospital Association (19-01191-11), Sunnyside Community Hospital Home Medical Supply, LLC (19-01197-11), Sunnyside Home Health (19-01198-11), Sunnyside Professional Services, LLC (19-01199-11), Yakima Home Care Holdings, LLC (19-01201-11), and Yakima HMA Home Health, LLC (19-19-01200-11)..

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Interim DIP/Cash Collateral Order

THIS MATTER having come before the Court upon the motion (the "**Motion**")[2] of the above-captioned debtors (the "**Debtors**" or the "**Borrowers**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101 *et seq.*, as amended, the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 4001-3 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Washington ("**LBR**"), seeking entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**") granting *inter alia*:

    i.      authority, pursuant to sections 105, 363, and 364(c) and 364(d) of the Bankruptcy Code, for each of the Debtors, jointly and severally, to obtain senior secured pospetition financing ("**DIP Facility**") in an aggregate principal amount of up to $36 million (of which (x) $28 million (the "**Interim Advance**") shall be made available to the Debtors upon entry of this Interim Order upon satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents (as defined below) and may be drawn in a single draw on the Closing Date and (y) subject to entry of

---

[2] Unless stated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Loan Agreement (as defined below), as applicable.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

the Final Order, the balance shall be made available to the Debtors at intervals and in amounts set forth in the DIP Loan Agreement (as defined below));

ii.      authority (a) for the Debtors to enter into that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, among the Debtors as Borrowers, the non-filing affiliates of the Debtors party thereto as guarantors, and JMB Capital Partners Lending, LLC, as Lender (the "**DIP Lender**") in substantially the same form as attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Loan Agreement**" and, together with any ancillary, collateral or related documents and agreements, the "**DIP Loan Documents**"));

iii.      authority for the Debtors to use the DIP Facility and the proceeds thereof in accordance with the DIP Loan Documents to (a) fund the post-petition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents, (c) pay all Outstanding Prepetition Banner Bank Obligations and Outstanding Prepetition MidCap Obligations (each as defined below) and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Loan Documents (including the Budget), this Interim Order and the Final Order;

iv.      authority for the Debtors to grant to the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in the DIP Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, ("**Cash Collateral**"), to secure all DIP Obligations (as defined below), as more fully set forth in this Interim Order, subject only to the Carve-Out (as defined below);

v.     subject to and only effective upon entry of the Final Order, waiver by the Debtors of all rights to surcharge against the collateral of the DIP Lender pursuant to section 506(c) of the Bankruptcy Code;

vi.     subject to and only effective upon entry of the Final Order, waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender;

vii.     providing adequate protection to the Lapis Secured Parties to the extent set forth herein;

viii.     modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

ix.     the scheduling of a final hearing (the "**Final Hearing**") on the Motion for June 4, 2019, at 10:00 am (Pacific Time) to consider entry of the Final Order *inter*

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

*alia,* authorizing borrowings under the DIP Facility on a final basis and approving notice procedures with respect thereto; and

x.   related relief.

The Court having considered the Motion and the exhibits attached thereto, the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on May 8, 2019 (the "**Interim Hearing**") and having found that due and proper notice (the "**Notice**") of the Motion and the Interim Hearing having been served by the Debtors in accordance with Bankruptcy Rule 4001 and 9006 and LBR 2002-1 on (i) the Office of the United States Trustee for the Eastern District of Washington, (ii) counsel for the Prepetition Secured Creditors, (iii) counsel for the DIP Lender, (iv) all alleged secured creditors, (v) the thirty largest general unsecured creditors appearing on the list filed in accordance with Bankruptcy Rule 1007(d), and (vi) any parties requesting special notice; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid potential immediate and irreparable harm to the Debtors and their estates and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses and

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1  represents a sound exercise of the Debtors' business judgment; and after due

2  deliberation and consideration, and for good and sufficient cause appearing therefor;

3  **THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF**

4  **FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE**

5  **REPRESENTATIONS OF COUNSEL AND EVIDENCE SUBMITTED**

6  **PRIOR TO AND DURING THE INTERIM HEARING**:[3]

7  A.  *Petition Date*.  On May 6, 2019 (the "**Petition Date**"), the Debtors filed

8  voluntary petitions under chapter 11 of the Bankruptcy Code in the United States

9  Bankruptcy Court for the Eastern District of Washington (the "**Court**") commencing

10 these Chapter 11 Cases.

11 B.  *Debtors in Possession*.  The Debtors are continuing in the management

12 and operation of their businesses and properties as debtors in possession pursuant to

13 sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been

14 appointed in these Chapter 11 Cases.

15 C.  *Notice*.  Notice of the Interim Hearing and the relief requested in the

16 Motion has been provided by the Debtors to certain parties in interest, including on

17 (i) the Office of the United States Trustee for the Eastern District of Washington, (ii)

18 counsel for the Prepetition Secured Creditors, (iii) counsel for the DIP Lender, (iv)

19 _____

20 [3] To the extent, any findings of fact constitute conclusions of law, they are adopted
as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.

21

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

all alleged secured creditors, (v) the thirty largest general unsecured creditors appearing on the list filed in accordance with Rule 1007(d), and (vi) any parties requesting special notice.

D.    *Jurisdiction and Venue*.    This Court has core jurisdiction over the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

E.    *No Credit Available on More Favorable Terms*.    The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under §§ 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code and have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by DIP Lender pursuant to the DIP Loan Documents.

F.    *Best Interests of Estates*.    It is in the best interests of the Debtors' estates and creditors that the Debtors be allowed to enter into the DIP Facility to obtain postpetition secured financing from the DIP Lender under the terms and conditions set forth herein and in the DIP Loan Documents, as such financing is necessary to avoid immediate and irreparable harm to the Debtors' estates and for the continued operation of the Debtors' businesses.

G.    *Good Faith*.    The extension of credit and financial accommodations under the DIP Loan Documents are fair, reasonable, in good faith, negotiated at arm's

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

length, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration. Accordingly, the DIP Lender is entitled to the protections of Bankruptcy Code section 364(e).

H.    *Good Cause*. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and ongoing operations, (2) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors, and (3) avoid potential immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

I.    *Necessity of DIP Facility Terms*. The terms of the DIP Loan Documents and the Interim Order assuring that the liens and the various claims, superpriority claims, and other protections granted in the Interim Order will not be affected by any subsequent reversal or modification of the Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated in the DIP Loan Documents, are necessary in order to induce the DIP Lender to provide postpetition financing to the Debtors.

J.    *Need for Post-Petition Financing*. The Debtors do not have sufficient and reliable sources of working capital, including cash collateral, to continue to

Interim DIP/Cash Collateral Order          - 8 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

operate their businesses in the ordinary course of business without the financing requested in the Motion. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of their estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient and stable working capital and liquidity through the proposed post-petition financing arrangements with the DIP Lender as set forth in this Interim Order and the DIP Loan Documents is vital to the preservation and maintenance of the going concern value of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates in order to maximize the recovery to all creditors of the estates.

K.     *Need to Use Cash Collateral*.  The Debtors need to use Cash Collateral, in order to, among other things, preserve, maintain and maximize the value of their assets and businesses.  The ability of the Debtors to maintain liquidity through the use of Cash Collateral is vital to the Debtors and their efforts to maximize the value of their assets.  Accordingly, the Debtors have demonstrated good and sufficient cause for the relief granted herein.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

L. *Sections 506(c) and 552(b)*. As material inducement to the DIP Lender to agree to provide the DIP Facility, and in exchange for the DIP Lender's agreement to subordinate their superpriority claims to the Carve-Out, subject to entry of the Final Order, this Court approves the waiver by Debtors of any equities of the case exceptions under section 552(b) of the Bankruptcy Code and the waiver by Debtors of the provisions of section 506(c) of the Bankruptcy Code.

M. *Priming of Prepetition Liens*. The priming of the Lapis Subordinated Sunnyside Liens and Lapis Subordinated A/R Liens by the DIP Lender under section 364(d)(1) of the Bankruptcy Code, solely to the extent set forth in the DIP Loan Documents and as further described below, will enable the Debtors to obtain the DIP Facility and, among other benefits, continue to operate their businesses for the benefit of their estates and stakeholders.

N. *Pre-Petition Debt*. The Debtors were, prior to the Petition Date, party to the following agreements, with the following parties (collectively, the "**Prepetition Secured Parties**"):

    (a) *Banner Bank Prepetition Debt*.

        a. Prior to the commencement of the Chapter 11 Cases, Sunnyside Community Hospital Association ("**Sunnyside**") entered into various Business Loan Agreements, dated December 30, 2010, May 19, 2015, March 21, 2016, August 2, 2016, October 6, 2016, March 21, 2017, and May 4, 2018, each between Banner Bank and Sunnyside (as each such agreement has been amended, modified, or supplemented to date, the "**Banner Bank Loan Documents**"), providing Sunnyside with financing

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

in the aggregate principal amount of $27,006,225. The advances made pursuant to the Banner Bank Loan Documents are secured by a first priority lien (the "**Banner Senior Sunnyside Liens**") on all personal property and certain real property of Sunnyside as set forth in the Banner Bank Loan Documents and associated documents (such assets the "**Banner Bank Collateral**"). As of the Petition Date, Sunnyside is indebted to Banner Bank in the approximate principal amount of $10.6 million.

(b) *MidCap Financial Prepetition Debt.*

a. Prior to the commencement of the Chapter 11 Cases, SHC Holdco, LLC ("**Holdco**"), SHC Medical Center – Yakima ("**Yakima**"), SHC Medical Center – Toppenish "**Toppenish**", Yakima Home Care Holdings, LLC, and Yakima HMA Home Health, LLC, as co-borrowers (collectively, the "**MidCap Borrowers**"), entered into that certain Credit and Security Agreement dated September 18, 2017 (the "**MidCap Credit Agreement**") and those related loan documents (all as amended, modified, or supplemented to date, collectively with the MidCap Credit Agreement, the "**MidCap Loan Documents**"), with the lenders party thereto (the "**MidCap Lenders**") and MidCap Financial Trust as agent for the MidCap Lenders (the "**MidCap Agent**"), providing the MidCap Borrowers with a revolving loan facility in the maximum principal amount of $15 million. The advances made pursuant to the MidCap Credit Agreement are secured by a properly perfected first priority lien and security interest (the "**MidCap Senior A/R Liens**") on the assets of the MidCap Borrowers set forth in Schedule 9.1 to the MidCap Credit Agreement (such assets, the "**MidCap A/R Collateral**"). As of the Petition Date, the MidCap Borrowers are indebted to the MidCap Lenders in the approximate principal amount of $10.7 million.

(c) *Lapis Prepetition Debt.*

a. Pursuant to that certain Bond Indenture, dated as of November 1, 2017, between Washington Health Care Facilities Authority (the "**Authority**"), as issuer and UMB

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Bank, N.A. as the bond trustee (the "**Bond Trustee**") for the bondholders, certain entities affiliated with Lapis Advisers, L.P., the Authority issued $27 million of tax-exempt Washington Health Care Facilities Authority Revenue Bonds, Series 2017A (the "**Series 2017A Bonds**") and $8.4 million of tax-exempt Washington Health Care Facilities Authority Revenue Bonds, Series 2017B (the "**Series 2017B Bonds**" and, together with the Series 2017A Bonds, collectively the "**2017 Bonds**").

b.  Also on November 1, 2017, Yakima, Toppenish, Holdco, Astria Health, as co-borrowers (the "**Lapis 2017 Loan Borrowers**"), entered into a Loan and Security Agreement (the "**Lapis 2017 Loan Agreement**") with the Authority, wherein the Authority loaned the proceeds of the sale of the 2017 Bonds ($35.4 million) (the "**Lapis 2017 Loan**") to the Lapis 2017 Loan Borrowers. Sunnyside and Kitchen and Bath Furnishings, LLC, as well as certain other non-filing affiliates, as guarantors (the "**Lapis 2017 Loan Guarantors**"), entered into a Continuing Guaranty (the "**Lapis 2017 Loan Guaranty**" and together with the Lapis 2017 Loan Agreement, the "**Lapis 2017 Loan Documents**"), dated November 1, 2017, wherein the Lapis 2017 Loan Guarantors agreed to guaranty the obligations of the Lapis 2017 Loan Borrowers under the Lapis 2017 Loan. The advances made pursuant to the Lapis 2017 Loan are secured by (i) a first priority lien (the "**Lapis 2017 SHC Holdco Liens**") on the assets of the Lapis 2017 Loan Borrowers not subject to the MidCap Senior A/R Liens, (ii) a junior lien (the "**Lapis 2017 A/R Liens**") on the assets of the Lapis 2017 Loan Borrowers subordinate and subject to the MidCap Senior A/R Liens, and (iii) a junior lien (the "**Lapis 2017 Sunnyside Liens**") on the assets of the Lapis 2017 Loan Guarantors subordinate and subject to the Banner Senior Sunnyside Liens (collectively, the "**Lapis 2017 Loan Collateral**"). *See* Intercreditor and Lien Subordination Agreement, dated as of November 1, 2017 (as amended, modified, or supplemented to date), by and among the Bond Trustee, MidCap Funding IV Trust, a Delaware statutory trust, as successor-by-assignment to MidCap Financial Trust, in its capacity as the MidCap

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Agent, Astria, the Lapis 2017 Loan Borrowers and Sunnyside. As of the Petition Date, the principal amount of approximately $35.4 million of principal is outstanding under the Lapis 2017 Loan.

c. Prior to the commencement of the Chapter 11 Cases, Astria Health and Sunnyside, as co-borrowers (the "**Lapis 2019 Loan Borrowers**"), entered into a Credit Agreement dated January 18, 2019 (the "**Lapis 2019 Loan Agreement**") with Lapis Advisers LP (**"Lapis Agent"**), as agent for lenders party thereto (the "**Lapis 2019 Loan Lenders**"), whereby the Lapis 2019 Loan Lenders agreed to make advances to the Lapis 2019 Loan Borrowers in the principal amount of up to $10 million (the "**Lapis 2019 Loan**"). Holdco, Yakima, Toppenish, Glacier Canyon, LLC, Yakima Home Care Holdings, LLC, Yakima HMA Home Health, LLC, as well as certain other non-filing affiliates, as guarantors (the "**Lapis 2019 Loan Guarantors**"), entered into a Continuing Guaranty (the "**Lapis 2019 Loan Guaranty**" and together with the Lapis 2019 Loan Agreement, the "**Lapis 2019 Loan Documents**"), dated January 18, 2019, wherein the Lapis 2019 Loan Guarantors agreed to guaranty the obligations of the Lapis 2019 Loan Borrowers under the Lapis 2019 Loan. The advances made pursuant to the Lapis 2019 Loan are secured by (i) a junior lien (the "**Lapis 2019 Sunnyside Liens**" and together with the Lapis 2017 Sunnyside Liens, the "**Lapis Subordinated Sunnyside Liens**") on the assets of the Lapis 2019 Borrowers subordinate and subject to the Banner Senior Sunnyside Liens, (ii) a junior lien (the "**Lapis 2019 SHC Holdco Liens**" and together with the Lapis 2017 SHC Holdco Liens, the "**Lapis Senior Holdco Liens**") on the assets of the Lapis 2019 Loan Guarantors not subject to the MidCap Senior A/R Liens as set forth in the Lapis 2019 Loan Documents, and (iii) a junior lien (the "**Lapis 2019 A/R Liens**" and together with the Lapis 2017 Priority A/R Liens, the "**Lapis Subordinated A/R Liens**") on the MidCap Priority Collateral (such assets, the "**Lapis 2019 Collateral**" and together with the Lapis 2017 Loan Collateral, the "**Lapis Prepetition Collateral**"). As of the Petition Date, the principal amount of approximately $10

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

million of principal is outstanding under the Lapis 2019 Loan.

d. As used herein "**Prepetition Credit Liens**" shall mean the Banner Senior Sunnyside Liens, MidCap Senior A/R Liens, Lapis Senior Holdco Liens, Lapis Subordinated A/R Liens, and Lapis Subordinated Sunnyside Liens.  As used herein "**Prepetition Collateral**" shall mean the Banner Bank Collateral, <u>MidCap A/R Collateral</u>, and Lapis Prepetition Collateral.

O. *Adequate Protection*.  The Bond Trustee, on behalf of itself and the holders of the 2017 Bonds (the "**Bondholders**") and the Lapis Agent, on behalf of itself and the Lapis 2019 Loan Lenders (collectively, the "**Lapis Secured Parties**") are entitled to receive adequate protection on account of their interests in the Lapis Prepetition Collateral pursuant to sections 361, 362, and 363 of the Bankruptcy Code solely to the extent of any diminution in the value of their interests in the Lapis Prepetition Collateral (including Cash Collateral).  As part of the adequate protection provided by this Interim Order, the Lapis Secured Parties shall receive, among other things, replacement liens, superpriority claims and reporting information.  The terms of the Adequate Protection Obligations (defined herein) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and are sufficient to allow the Debtors' use of the Lapis Prepetition Collateral (including the Cash Collateral) and to permit the relief granted in this Interim Order.

P. <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      <u>DIP Facility Approval</u>.   The DIP Facility is hereby approved.   Any objections to the interim relief requested in the Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled, except as reserved on the record at the hearing on May 8, 2019.   The Debtors are authorized, pursuant to section 364 of the Bankruptcy Code, to enter into and be a party to the DIP Facility pursuant to the DIP Loan Documents (with such changes, if any, as were authorized to be made as amendments to the DIP Loan Documents in accordance with this Interim Order), to perform under the DIP Loan Documents and such other and additional documents necessary or desired to implement the DIP Facility or the DIP Loan Documents, and to obtain postpetition secured financing from the DIP Lender, to avoid immediate and irreparable harm to the Debtors' estates.

2.      <u>DIP Obligations</u>.   The DIP Loan Documents shall constitute and evidence the valid and binding effect of the Debtors' obligations under the DIP Facility, which DIP Obligations shall be legal, valid, and binding obligations of the Debtors party thereto and enforceable against the Debtors, their estates, any

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

successors thereto, including, without limitation, any trustee appointed in any of the Debtors' cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any such cases, or in any other proceedings superseding or related to any of the foregoing, any successors thereto, and any party determined to be the beneficial owner of the DIP Collateral by this Court. The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Loan Documents, together with interest thereon, at the times and in the amounts set forth in the DIP Loan Documents and all Obligations as defined and provided for in the DIP Loan Agreement (collectively, the "**DIP Obligations**"). No obligation, payment, transfer or grant of security under the DIP Loan Documents or the Interim Order, with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

3. <u>Authorization to Borrow</u>. Upon entry of this Interim Order and during the period prior to entry of the Final Order, the Debtors are immediately authorized to borrow from the DIP Lender under the DIP Facility, the Interim Advance of up to $28 million, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order. Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, the Debtors are authorized to use Cash Collateral until the earlier of (a) the Maturity Date and (b) the date upon which the Debtors' right to use

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Cash Collateral is terminated hereunder as a result of an Event of Default (as defined in the DIP Loan Agreement) which remains continuing and has not been waived by the DIP Lender. Once repaid, the DIP Facility Loans incurred may not be re-borrowed.

4.     Use of Proceeds.  The Debtors shall use advances of credit under the DIP Facility (the "**DIP Facility Loans**") only for the express purposes specifically set forth in this Interim Order and the DIP Loan Documents.  The Debtors are authorized to use the proceeds of the DIP Facility Loans to (a) fund the post-petition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents, (c) pay all Outstanding Prepetition Banner Bank Obligations and Outstanding Prepetition MidCap Obligations; and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Loan Documents (including, but not limited to, the Budget) and this Interim Order.  Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute cash collateral of the Prepetition Secured Parties.

5.     Repayment of Certain Outstanding Prepetition Secured Loan Obligations.  Upon entry of this Interim Order, the Debtors shall use the proceeds of the DIP Facility to pay (a) all outstanding obligations now due and payable to Banner Bank under the Banner Bank Loan Documents in full (including obligations that

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

accrued postpetition) (the "**Outstanding Prepetition Banner Bank Obligations**"),

in accordance with the terms, conditions, and procedures set forth in the DIP Loan

Documents, and (b) all outstanding obligations now due and payable to the MidCap

Lenders under the MidCap Loan Documents in full (including obligations that

accrued postpetition) (the "**Outstanding Prepetition MidCap Obligations**"), in

accordance with the terms and conditions of the Banner Bank Loan Documents and

MidCap Loan Documents and the terms, conditions, and procedures set forth in the

DIP Loan Documents.   In connection with the payment of the Outstanding

Prepetition Banner Bank Obligations and the Outstanding Prepetition MidCap

Obligations, the parties shall be authorized and directed to execute the Banner Bank

Payoff Letter and the MidCap Payoff Letter, attached hereto as (collectively, the

"**Payoff Letters**").   For purposes of calculating and paying the Outstanding

Prepetition MidCap Obligations, MidCap shall be entitled to apply any collections it

received after the Petition Date, and the automatic stay is hereby modified to permit

MidCap to apply such payments.  The terms and conditions contained in the Payoff

Letters shall be binding on the Debtors, their respective estates, and the Committee

(defined below) (individually or on behalf of the Debtors' estates), except as provided

below, as well as all other parties in interest with respect to the Banner Bank Loan

Documents and the MidCap Loan Documents; provided, however, notwithstanding

the foregoing nothing in this Interim Order, including paragraphs N herein, or the

payment of the Outstanding Prepetition Banner Bank Obligations and Outstanding

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Prepetition MidCap Obligations shall prejudice the rights of any official committee of unsecured creditors appointed in these Chapter 11 Case (the "**Committee**"), if subsequently formed, to assert any claims the Debtors' estates may hold against the Prepetition Secured Parties to the extent the Committee has the standing to assert such claims and provided such claims are asserted timely in accordance with the requirements of the Bankruptcy Code or as otherwise hereafter ordered by this Court; provided, further, that nothing in this Interim Order shall be construed or deemed a waiver of any claims or defenses that Banner Bank or MidCap may have in response to any claims asserted by the Committee, including, without limitation, any rights or obligation that survive the payoff of the Outstanding Petition Banner Bank Obligations and Outstanding Prepetition MidCap Obligations under the Banner Bank Loan Documents and the MidCap Loan Documents, respectively. In the event a claim is asserted against MidCap or the MidCap Lenders, including, without limitation, (a) any challenge to the validity, enforceability, or priority of the MidCap Loan Documents or the MidCap Senior A/R Liens, (b) a claim to recover any payments made to MidCap Lenders under the MidCap Loan Documents, including, without limitation, payment of the Outstanding Prepetition MidCap Obligations, or (c) any other claim arising out of, or under the MidCap Loan Documents and the MidCap Lenders' and Borrowers' relationship thereunder (collectively, a "**Challenge**"), and MidCap and the MidCap Lenders successfully defend such Challenge, Debtors shall promptly reimburse MidCap and MidCap Lenders all of

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

their reasonable fees and expenses, including their attorneys' fees and expenses, incurred in connection with responding to and defending the Challenge (the "**Challenge Claim**").  Without limiting the foregoing, the Challenge Claim shall be an allowed secured claim secured by the same assets as secure the DIP Facility under this Order and the DIP Loan Documents, subject only to the DIP Liens, and shall be an allowed administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

6. <u>Budget and Reporting</u>.  Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Loan Documents, including the Budget.  The Debtor shall comply with the reporting requirements and obligations set forth in the DIP Loan Agreement.

7. <u>Payment of DIP Fees and Expenses</u>.  The (a) Commitment Fee; (b) Funding Fee; (c) Work Fee, which shall serve as a retainer for the DIP Lender's counsel; (d) Exit Fee; and (e) Stated Maturity Fee are each hereby approved and the Debtors are hereby authorized and directed to and shall pay such fees in accordance with, and on the terms set forth in this Interim Order and the DIP Loan Documents. The Debtors are also hereby authorized and directed to pay upon demand, all other fees, costs, expenses and other amounts payable under the terms of this Interim Order and the DIP Loan Documents and all other reasonable fees and out-of-pocket costs

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

and expenses of the DIP Lender in accordance with the terms of this Interim Order and the DIP Loan Documents (including, without limitation, the reasonable and documented fees and out-of-pocket costs and expenses of Arent Fox LLP as counsel and Southwell & O'Rourke, P.S. as local counsel to the DIP Lender to the extent not covered by the portion of the Work Fee paid prior to the Petition Date), subject to receiving a written invoice therefor. None of such fees, costs, expenses or other amounts shall be subject to Court approval except as otherwise provided herein or required to be submitted in any particular format, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and the Committee; provided further, however, that such invoices provided to the Committee may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information (the "**Redactions**"), and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. If the U.S. Trustee or the Committee objects to the reasonableness of the fees and expenses of the DIP Lender, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the U.S. Trustee or the Committee may file with the Court and serve on the DIP Lender, an objection to the reasonableness of such fees and expenses (each, a "**Reasonableness Fee**

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**Objection**"). Without limiting the foregoing, if the Committee objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the DIP Lender shall file with the Court and serve on the Debtors, the Committee and the U.S. Trustee a request for Court resolution of the disputes concerning the propriety of the disputed Redactions (each, a "**Redaction Fee Objection**," and each Reasonableness Fee Objection and Redaction Fee Objection may be referred to herein generally as a "**Fee Objection**"). The Debtors shall pay, in accordance with the terms and conditions of this Interim Order and the Final Order, within ten (10) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed. All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Lender shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order, and the DIP Loan Documents.

8.    Indemnification. The Debtors are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Lender and its affiliates, directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing the DIP Lender (collectively, an "**Indemnified Party**") from and against: (a) all obligations, demands, claims, damages, losses and liabilities (including, without limitation, reasonable fees and disbursements of counsel) (collectively, "**Indemnity**

Interim DIP/Cash Collateral Order                    - 22 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1  **Claims**") as set forth in the DIP Loan Documents including those asserted by any

2  other party in connection with the transactions contemplated by the DIP Loan

3  Documents; and (b) all losses or expenses incurred, or paid by the DIP Lender from,

4  following, or arising from the transactions contemplated by the DIP Loan Documents

5  (including reasonable and documented attorneys' fees and expenses), except for

6  Indemnity Claims and/or losses directly caused by the DIP Lender's gross

7  negligence, or willful misconduct or bad faith of DIP Lender. In the case of an

8  investigation, litigation or other proceeding to which the indemnity in this paragraph

9  applies, such indemnity shall be effective whether or not such investigation, litigation

10 or proceeding is brought by any of the Debtors or any of their respective directors,

11 security holders or creditors, an Indemnified Party or any other Person or an

12 Indemnified Party is otherwise a party thereto and whether or not the transactions

13 contemplated hereby are consummated. No Indemnified Party shall have any

14 liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or

15 any of its subsidiaries or any shareholders or creditors of the foregoing for or in

16 connection with the transactions contemplated hereby, except to the extent such

17 liability is determined by a court of competent jurisdiction in a final non-appealable

18 judgment or order to have resulted solely from such Indemnified Party's gross

19 negligence or willful misconduct. All indemnities of the Indemnified Parties shall

20 constitute DIP Obligations secured by the DIP Collateral and afforded all of the

21

Interim DIP/Cash Collateral Order          - 23 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

priorities and protections afforded to the DIP Obligations under this Interim Order, the Final Order and the DIP Loan Documents.

9. <u>Use of Cash Collateral</u>. The Debtors are authorized to use Cash Collateral in accordance with and pursuant to this Interim Order and the DIP Loan Documents. Prior to the Maturity Date and until indefeasible payment in full of the DIP Obligations, the Debtors agree that they will not use or seek to use Cash Collateral other than pursuant to the terms of this Interim Order.

10. <u>DIP Superpriority Claims</u>. In accordance with section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed senior administrative expense claims against each Debtor and their estates (the "**DIP Superpriority Claims**") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order with respect to section 506(c) only), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; <u>provided</u>, <u>however</u>, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out; <u>provided</u>, <u>further</u> that the DIP Superpriority Claims shall have

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

recourse to and be payable from all prepetition and postpetition property and assets

of the Debtors and the estates and all DIP Collateral and all proceeds thereof, and (a)

any and all avoidance power claims or causes of action under sections 544, 545, 547,

548 through 551 and 553(b) of the Bankruptcy Code (the "**Avoidance Actions**") and

the proceeds thereof, (b) prepetition tort claims, including claims against the Debtors'

current and former directors and officers (if any) and the proceeds thereof; and (c)

any deposit in connection with a proposed Sale (whether terminated or otherwise)

that becomes property of the Debtors' estates (a "**Sale Deposit**") subject, however,

only to the senior lien rights of a stalking horse purchaser and such stalking horse bid

protections as may be approved by this Court.

  11. <u>DIP Liens</u>.

    (a) Effective immediately as of the entry of this Interim Order, as

security for the DIP Obligations, the DIP Lender is granted, continuing, valid,

binding, enforceable, non-avoidable, and automatically and properly perfected

security interests in and liens (collectively, the "**DIP Liens**") on all DIP Collateral as

collateral security for the prompt and complete performance and payment when due

(whether at the Stated Maturity Date (i.e. December 31, 2019), by acceleration, or

otherwise) of the DIP Obligations. The term "**DIP Collateral**" means collectively

all pre-petition and post-petition real property and all pre-petition and post-petition

tangible and intangible personal property of each Borrower, in each case wherever

located and whether now owned or hereafter acquired, including, but not limited to

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, leases and leaseholds and rents, avoidance actions under section 549 and related recoveries under section 550 of the Bankruptcy Code, together with all proceeds of each of the forgoing, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable), and, subject to Final Order, including the proceeds and recoveries from Avoidance Actions (the "**Avoidance Action Proceeds**").

(b)     Subject to the entry of the Final Order, to the fullest extent permitted by the Bankruptcy Code or applicable law, and except as otherwise set forth herein, any provision of any lease other than a real property lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any entity in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lender in accordance with the terms of the DIP Loan Documents, or this Interim Order.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

12. _Priority of DIP Liens_.

       (a)     To secure the DIP Obligations, immediately upon and effective as of entry of this Interim Order, the DIP Lender, is hereby granted on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens in the DIP Collateral as follows, in each case subject to the Carve-Out:

       (i)    _Liens Priming the Prepetition Credit Liens._ Pursuant to 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens and security interests in all DIP Collateral, regardless of where located, which senior priming liens and security interests in favor of the DIP Lender shall be senior to all Prepetition Credit Liens other than the Lapis Senior Holdco Liens. For the avoidance of doubt, as a result of the priming of the Prepetition Credit Liens (other than the Lapis Senior Holdco Liens) pursuant to this Interim Order, the DIP Lender shall have a first priority senior priming lien and security interest in, among other things, (A) all of the assets of Sunnyside and its debtor and non-debtor subsidiaries, including but not limited to, the Banner Bank Collateral, (B) the MidCap A/R Collateral, and (C) the Debtors' prepetition and postpetition commercial tort claims, including but not limited all claims and causes of action (i) against the Debtors' officers and directors, and (ii) related to accounts receivable collections, and the proceeds thereof (regardless of whether such proceeds arise from damages to the Prepetition Collateral).

       (ii)    _Liens on Unencumbered Property._ Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to any Permitted Prior Lien. As used herein, the term "**Permitted Prior Lien**" shall mean any valid, enforceable, and non-avoidable liens on and security interests in the DIP Collateral that (A) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), (B) are not subject to avoidance, disallowance, or subordination pursuant to the

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Bankruptcy Code or applicable non-bankruptcy law, and (C) are senior in priority to the DIP Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements; <u>provided</u>, <u>however</u>, that the DIP Liens shall have priority over all Prepetition Credit Liens other than the Lapis Senior Holdco Liens; provided further, that any properly perfected liens on the Debtors' assets held by (i) TIAA Commercial Finance, Inc. and (ii) Lower Valley Credit Union are Permitted Prior Liens and shall not be primed by the DIP Liens; and

(iii) *Liens Junior to Certain Other Liens.* Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Lapis Senior Holdco Liens and the Permitted Prior Liens.

(b)    Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claims shall not be made junior to or *pari passu* with (1) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal or conversion of any of the Chapter 11 Cases or any successor cases, (2) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (3) any intercompany or affiliate lien or claim; and (4) subject to entry of the Final Order, any liens arising after the Petition Date excluding any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, or board for any liability of the Debtors.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

(c) *Existing Liens.* TIAA Commercial Finance, Inc. and Lower Valley Credit Union have asserted secured claims against property of the Debtors. Notwithstanding any statement herein that is contrary to the existence or priority of such secured claims, any grant of a security interest to the DIP Lender is junior and subordinate in priority to any properly perfected liens on the DIP Collateral assets held by TIAA Commercial Finance, Inc. and Lower Valley Credit Union.

13. <u>Adequate Protection of Lapis Secured Parties</u>. The Lapis Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all the Lapis Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in value of the Lapis Secured Parties' interests in the Lapis Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code. In consideration for the foregoing, the Lapis Secured Parties, are hereby granted the following in the amount of such diminution (collectively, the "**Adequate Protection Obligations**"):

(a) *Lapis 2017 Loan Adequate Protection Liens.* The Bond Trustee, on behalf of itself and the Bondholders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any mortgages, security agreements, pledge agreements, financing statement or other agreements) in

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

the amount equal to the aggregate diminution in value of the interests in the Lapis 2017 Loan Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code (the "**Lapis 2017 Loan Adequate Protection Claim**"), a valid, perfected replacement security interest in and lien upon any and all assets subject (i) to the Lapis First Priority SHC Holdco Liens, subordinate to the Carve-Out, and (ii) to the Lapis 2017 Sunnyside Liens and Lapis 2017 A/R Liens, subordinate to (A) the DIP Liens and (B) the Carve-Out (the "**Lapis 2017 Loan Replacement Liens**").

(b)     *Lapis 2019 Loan Adequate Protection Liens.*  The Lapis Agent, on behalf of itself and the Lapis 2019 Loan Lenders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any mortgages, security agreements, pledge agreements, financing statement or other agreements), in the amount equal to the aggregate diminution in value of the interests in the Lapis 2019 Loan Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code (the "**Lapis 2019 Loan Adequate Protection Claim**"), a valid, perfected replacement security interest in and lien upon any and all assets subject (i) to the Lapis 2019 SHC Holdco Liens, subordinate to the Carve-Out, and (ii) to the Lapis 2019 Sunnyside Liens and Lapis 2019 A/R Liens, subordinate to (A) the DIP Liens and (B) the Carve-Out (the "**Lapis 2019 Loan Replacement Liens**" and together with the Lapis 2017 Loan Replacement Liens, the "**Adequate Protection Liens**").

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

(c)     *Lapis 2019 Loan 507(b) Claims.* The Lapis Agent, on behalf of itself and the Lapis 2019 Loan Lenders, is hereby granted, an allowed superpriority administrative expense claim as provided in section 507(b) of the Bankruptcy Code in the amount of Lapis 2019 Loan Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Lapis 2019 Loan 507(b) Claims**"); which the Lapis 2019 Loan 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral.  The Lapis 2019 Loan 507(b) Claims shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims and the Lapis 2017 Loan 507(b).  The Lapis Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Lapis 2019 Loan 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments terminated.

(d)     *Lapis 2017 Loan 507(b) Claims.* The Bond Trustee, on behalf of itself and the Bondholders, is hereby granted, an allowed superpriority administrative expense claim as provided in section 507(b) of the Bankruptcy Code in the amount of Lapis 2017 Loan Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

"**Lapis 2017 Loan 507(b) Claims**"); which Lapis 2017 Loan 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral. The Lapis 2017 Loan 507(b) Claims shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims. The Lapis Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Lapis 2017 Loan 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments terminated.

(e) *Lapis Secured Parties Information*. As additional adequate protection of the Lapis Secured Parties' security interests in the Lapis Prepetition Collateral, the Debtors shall contemporaneously provide the Lapis Secured Parties with any reporting provided to the DIP Lender under the DIP Loan Agreement.

14. Carve-Out.

(a) *Carve-Out*. As used in this Interim Order, the term "**Carve-Out**" means, collectively, the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) and 31 U.S.C. § 3717; (ii) the reasonable fees and expenses up to $15,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) the aggregate amount of unpaid fees and expenses of the Debtors' and the Committee (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 327(a), 328 or 1103(a) of the Bankruptcy Code (the "**Case Professionals**"), to the extent such

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

fees and expenses are allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("**Allowed Professional Fees**"), and the reimbursement of out-of-pocket expenses allowed by the Court and incurred by the members of the Committee in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members) ("**Committee Expenses**"), which amount under this clause (iii) shall not exceed the sum of: (x) an aggregate amount per week limited to the amount set forth in the Budget for Allowed Professional Fees and Committee Expenses incurred prior to the delivery of a Carve-Out Trigger Notice provided (i) the Maturity Date has not occurred or (ii) Event of Default has not occurred or continuing (the "**Pre Carve-Out Notice Trigger Cap**") *plus* (y) $75,000 for Allowed Professional Fees and Committee Expenses incurred from and after the delivery of the Carve-Out Trigger Notice (defined below) (the "**Post Carve-Out Notice Cap**" together, with the Pre Carve-Out Notice Trigger Cap, the "**Carve-Out Cap**").  No portion of the Carve-Out or any Cash Collateral may be used in violation of this Interim Order.  Nothing in this Interim Order or otherwise shall be construed to increase the Carve-Out if actual (i) Allowed Professional Fees of any Case Professional or (ii) Committee Expenses are higher in fact than Carve-Out Cap amount.

(b)     *Carve-Out Trigger Notice*.  As used herein, the term "**Carve-Out Trigger Notice**" means a written notice provided by the DIP Lender to the Debtors, counsel to the Committee, and the U.S. Trustee that the Post Carve-Out Notice

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Trigger Cap is invoked, which notice may be delivered following the occurrence and during the continuance of an Event of Default and/or acceleration of the DIP Obligations under the DIP Loan Documents. Upon delivery of the Carve-Out Trigger Notice to the Debtors (the "**Termination Declaration Date**"), the Debtors shall provide notice by email and facsimile to all Case Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) within one (1) day after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Case Professionals is subject to and limited by the Post Carve-Out Notice Trigger Cap.

(c) *Payment of Allowed Professional Fees Prior to Termination Declaration Date.* Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d) *Payment of Carve-Out on or After the Termination Declaration Date.* Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis. Any funding of the Carve-Out shall be added to, and made a part of the DIP Obligations secured by the

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

(e) *Objection Rights*. Nothing contained herein is intended to constitute, nor shall be construed as consent to the allowed of any Case Professional's fees, costs and expenses by any party and shall not affect the rights of the Debtors, the DIP Lender or any other party in interest to object to the allowance and/or payment of any such amounts incurred or requested.

15. <u>Bankruptcy Code Sections 506(c) and 552(b) Waivers</u>. Subject to entry of a Final Order, without limiting the Carve-Out, the Debtors irrevocably waive and shall be prohibited from asserting (i) any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against the DIP Lender or its claims or liens (including any claims or liens granted pursuant to this Interim Order), and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Facility.

16. <u>Application of Proceeds</u>. Subject to the entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral, and all proceeds thereof shall be received and used in accordance with this Interim Order.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

17.    Disposition of Collateral.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order, without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender) or order of this Court; provided for the avoidance of doubt the Debtors shall comply with Section 6.4 of the DIP Loan Agreement.  Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of DIP Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve-Out and the lien priorities outlined in paragraph 12 herein, be used to immediately satisfy the DIP Obligations.

18.    Restrictions on Granting Postpetition Liens.  Other than the Carve-Out or as otherwise provided in this Interim Order, the Final Order or the DIP Loan Documents, no claim or lien having a priority superior or *pari passu* with those granted by this Interim Order and the DIP Loan Documents to the DIP Lender shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, and the Debtors will not grant any such mortgages, security interests or liens in the DIP Collateral (or any portion thereof) or to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise, while (i) any portion of the DIP Facility, any DIP Facility Loans or any other DIP Obligations, are outstanding or (ii) the DIP Lender has any Commitment under the DIP Loan

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Documents.  For avoidance of doubt, there shall be no restriction and this paragraph shall not apply and excludes any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors.

19.  <u>Automatic Effectiveness of Liens</u>.  The DIP Liens shall not be subject to a challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the date of the entry of this Interim Order on a final basis, without any further action by the Debtors and the DIP Lender, respectively, and without the necessity of execution by the Debtors or the filing or recordation, of any financing statements, security agreements, deposit control agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.  All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Loan Documents, and this Interim Order.  If the DIP Lender hereafter requests that the Debtors execute and/or deliver to the DIP Lender financing statements, control agreements, mortgages, or other documents considered by the DIP Lender to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens the Debtors are hereby authorized and directed to execute and/or deliver such financing statements, control agreements, mortgages, and documents, and the DIP Lender is hereby authorized to file or record such documents in its

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of the entry of this Interim Order; provided, however, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The DIP Lender, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.[4]

20.     Protection Under Section 364(e) of the Bankruptcy Code.  The DIP Lender has acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith.  The reversal or modification on appeal of the authorizations under section 364 of the Bankruptcy Code contained in this Interim Order does not affect the validity of any DIP Obligation or the DIP Liens, or the Adequate Protection Liens whether or not the DIP Lender or Prepetition Secured Parties (as applicable) knew of the pendency of the appeal, unless such authorization and incurrence of DIP Obligations and DIP Lien and advance of the DIP Facility Loan under 364 of the Bankruptcy Code in this Interim Order and the Final Order, were stayed pending appeal.

---

[4] The provisions of section 1146(a) of the Bankruptcy Code do not apply herein.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

21.    <u>Reservation of Rights of the DIP Lender</u>.  Notwithstanding any other provision of this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (i) any of the rights of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of such parties to (a) request modification of the automatic stay of section 362 of the Bankruptcy Code, (b) request dismissal of any of these Chapter 11 Cases, conversion of any of these Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of these Chapter 11 Cases, (c) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (ii) any other rights, claims, or privileges (whether legal or equitable or otherwise) of the DIP Lender.  The delay in or failure of the DIP Lender to seek relief or otherwise exercise their respective rights and remedies shall not constitute a waiver of any of the DIP Lender's rights and remedies.

22.    <u>Right to Credit Bid</u>.

(a)    *DIP Lender.*  Pursuant to section 363(k) of the Bankruptcy Code, unless the Court orders otherwise for cause as provided under section 363(k) of the Bankruptcy Code, the DIP Lender shall have the right to credit bid the total of the DIP Obligations for any or all of the DIP Collateral at a sale, lease or other disposition of such DIP Collateral outside the ordinary course of business (including any auction or similar sales), whether pursuant to a plan of reorganization or a motion pursuant

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

to section 363 of the Bankruptcy Code or otherwise (which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner).

(b)     A credit bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such credit bid holds a perfected security interest.  The DIP Lender shall be considered a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by credit bid.

23.     <u>Remedies and Notice Upon the Occurrence of Maturity Date or Event of Default</u>.  Subject to entry of a Final Order, upon prior written notice by the DIP Lender to counsel for the Debtors, counsel for the Committee, and the U.S. Trustee of the occurrence of an Event of Default (each as defined in the DIP Loan Documents and incorporated herein by reference) and without further order of the Court, the DIP Lender may (i) declare the DIP Obligations to be immediately due and payable; (ii) terminate the DIP Lender's commitment under the DIP Facility (other than the Carve-Out) or use of Cash Collateral; (iii) charge default rate interest; and/or (iv) upon five (5) business days' notice to counsel to the Debtors, counsel to the Committee and the U.S. Trustee, exercise all default-related rights and remedies against the DIP Collateral, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, <u>provided</u> <u>however</u>, that during the five (5) business day notice period, any party in interest shall have the right to file a pleading in

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

opposition to the DIP Lender's exercise of rights and remedies including the delivery of the Carve-Out Trigger Notice; _provided_ _further_ that, unless otherwise ordered by the Court, the only issue that may be raised by any party in such pleading shall be whether in fact, an Event of Default has occurred and is continuing; _but provided_ _further that_, if an Event of Default occurs as a result of the Debtors' failure to indefeasibly satisfy the DIP Obligations by the Stated Maturity Date (as defined in the DIP Loan Documents), the above referenced five (5) day notice period shall not apply and the Debtors and all other interested parties shall not have any challenge rights.

24. _Modification of Stay_. Subject to the terms set forth herein, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order, and the DIP Loan Documents including without limitation, to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents and take any and all actions provided therein, in each case, in accordance with paragraph 23 of this Interim Order.

25. _Survival of DIP Liens, DIP Superpriority Claims, and Other Rights_. If, in accordance with section 364(e) of the Bankruptcy Code, this Interim Order does not become a final non-appealable order, if a trustee terminates this Interim Order, or if any of the provisions of this Interim Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

termination or subsequent order shall not affect the priority, validity, enforceability or effectiveness of (or subordination to the Carve-Out of) any lien, security interests or any other benefit or claim authorized hereby with respect to any DIP Obligations or Adequate Protection Obligations incurred prior to the effective date of such termination or subsequent order. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and Lapis Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted herein, including the liens and priorities granted herein, with respect to any DIP Loan and Adequate Protection Obligations, subject to the Carve-Out.

26. <u>Survival of this Interim Order</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Loan Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged or otherwise treated under a plan of reorganization, which is

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

reasonably acceptable to the DIP Lender. In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Loan Documents unless agreed to by and among the Debtors and the DIP Lender.

27. <u>Modifications of DIP Loan Documents</u>. The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications of the DIP Loan Documents without further notice, motion or application to, order of or hearing before, this Court. Any material modification or amendment to the DIP Loan Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon five (5) days' notice to the U.S. Trustee, counsel to the Committee, and counsel to the Lapis Secured Parties; <u>provided</u>, that any forbearance from, or waiver of, (i) a breach by the Debtors of a covenant representation or any other agreement or (ii) a default or an Event of Default, in each case under the DIP Loan Documents shall not require an order of this Court. In the event of any inconsistency between this Interim Order and the DIP Loan Agreement, this Interim Order shall control.

28. <u>Insurance Policies</u>. Upon entry of this Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Lender shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (ii) the DIP Lender shall be and shall be deemed to be, without any further action by or notice to any person,

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

named as loss payee for DIP Collateral on which the DIP Lien holds a first priority lien.  The Debtors are hereby authorized on a final basis, to and shall take any actions necessary to have the DIP Lender be added as an additional insured and loss payee on each insurance policy maintained by the Debtors consistent with this Interim Order and the DIP Loan Agreement which in any way relates to the DIP Collateral.

29.     _Financial Information_.  The Debtors shall deliver to the DIP Lender such financial and other information concerning the business and affairs of the Debtors and any of the DIP Collateral as may be required pursuant to the DIP Loan Documents and/or as the DIP Lender shall reasonably request from time to time.  The Debtors shall allow the DIP Lender access to the premises in accordance with the terms of the DIP Loan Documents for the purpose of enabling the DIP Lender to inspect and audit the DIP Collateral and the Debtors' books and records.

30.     _Proofs of Claim_.  Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, the DIP Lender shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein.

31.     _Immediate Effect of Order_.  The terms and conditions of this Interim Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding any potential application of Bankruptcy Rule 6004(h) or otherwise.  Furthermore, to the extent applicable, the notice requirements and/or stays imposed by Bankruptcy Rules 4001(a)(3), 6003(b), and 6004(a) are hereby

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

waived for good and sufficient cause. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

32.    Notwithstanding any other provision of this Interim Order, the findings of fact and rulings of law herein are for purposes of this Interim Order only, and are without prejudice to, and shall not constitute any waiver of, the rights, claims and defenses of the Lapis Secured Parties or the Debtors in connection with any further interim order or any Final Order on the Motion, all of which shall be and hereby are reserved.

///End of Order///

PRESENTED BY:

    /s/ James L. Day
JAMES L. DAY (WSBA #20474)
BUSH KORNFELD LLP

SAMUEL R. MAIZEL (*Pro Hac Vice* pending)
SAM J. ALBERTS (WSBA #22255)
DENTONS US LLP

*Proposed Attorneys for the Chapter 11
Debtors and Debtors In Possession*

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

# **EXHIBIT 1**

## **DIP LOAN AGREEMENT**

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

**by and among**

**the Borrowers and Guarantors party hereto**

**and**

**JMB Capital Partners Lending, LLC
as Lender**

**Dated as of May [●], 2019**

# TABLE OF CONTENTS

1. DEFINITIONS AND CONSTRUCTION ................................................................... 2
   1.1 Definitions ................................................................................................ 2
   1.2 Accounting Terms ................................................................................. 13
   1.3 UCC ..................................................................................................... 13
   1.4 Construction ........................................................................................ 13
   1.5 Schedules and Exhibits ....................................................................... 14
2. LOAN AND TERMS OF PAYMENT ..................................................................... 14
   2.1 Agreement to Lend; Delayed Draw; Security Documents and Loan Documents ............................................................................................ 14
   2.2 Borrowing Procedures ......................................................................... 14
   2.3 Payments; Reductions of the Commitment; Prepayments ................... 14
   2.4 Interest Rates and Rates, Payments and Calculations ........................ 16
   2.5 Crediting Payments; Clearance Charge ............................................... 17
   2.6 Designated Account .............................................................................. 17
   2.7 Maintenance of Loan Account; Statements of Obligations .................. 17
   2.8 Fees ..................................................................................................... 17
3. CONDITIONS; TERM OF AGREEMENT ............................................................. 18
   3.1 Conditions Precedent to Advancing the Commitment ......................... 18
   3.2 Conditions Precedent to all Extensions of Credit .............................. 18
   3.3 Maturity ............................................................................................... 19
   3.4 Effect of Maturity ................................................................................ 19
4. REPRESENTATIONS AND WARRANTIES .......................................................... 20
   4.1 Due Organization and Qualification .................................................... 20
   4.2 Due Authorization ................................................................................ 20
   4.3 Binding Obligations ............................................................................. 20
   4.4 Existing Prepetition Liens ................................................................... 20
   4.5 Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims ........ 21
   4.6 Litigation .............................................................................................. 21
   4.7 Fraudulent Transfer ............................................................................. 21
   4.8 Indebtedness ....................................................................................... 21
   4.9 Payment of Taxes ................................................................................ 21

19-01189-FLK11     Doc 82     Filed 05/09/19     Entered 05/09/19 10:30:37     Pg 48 of 133

|       | 4.10 | Budget .................................................................................... | 21 |
|       | 4.11 | Guarantor Representations ........................................................ | 21 |
| 5.    |      | AFFIRMATIVE COVENANTS ................................................... | 22 |
|       | 5.1  | Financial Statements, Reports, Certificates ............................. | 22 |
|       | 5.2  | Reporting ................................................................................ | 22 |
|       | 5.3  | Material Contracts; Sale Offers ............................................... | 22 |
|       | 5.4  | Existence ................................................................................ | 22 |
|       | 5.5  | Maintenance of Properties; Permits ......................................... | 22 |
|       | 5.6  | Taxes ...................................................................................... | 23 |
|       | 5.7  | Insurance ................................................................................ | 23 |
|       | 5.8  | Inspection ............................................................................... | 24 |
|       | 5.9  | Environmental ........................................................................ | 24 |
|       | 5.10 | Compliance with Laws ............................................................ | 24 |
|       | 5.11 | Disclosure Updates ................................................................. | 24 |
|       | 5.12 | Formation of Subsidiaries ....................................................... | 25 |
|       | 5.13 | Further Assurances .................................................................. | 25 |
|       | 5.14 | Staffing ................................................................................... | 25 |
|       | 5.15 | Budget ..................................................................................... | 25 |
| 6.    |      | NEGATIVE COVENANTS ........................................................ | 25 |
|       | 6.1  | Indebtedness ........................................................................... | 25 |
|       | 6.2  | Liens ....................................................................................... | 25 |
|       | 6.3  | Restrictions on Fundamental Changes ..................................... | 25 |
|       | 6.4  | Disposal of Assets .................................................................. | 26 |
|       | 6.5  | Change Name .......................................................................... | 26 |
|       | 6.6  | Nature of Business .................................................................. | 26 |
|       | 6.7  | Prepayments and Amendments ................................................ | 26 |
|       | 6.8  | Change of Control ................................................................... | 26 |
|       | 6.9  | Accounting Methods ............................................................... | 26 |
|       | 6.10 | Transactions with Affiliates .................................................... | 26 |
|       | 6.11 | Use of Advances ..................................................................... | 26 |
|       | 6.12 | Limitation on Capital Expenditures ........................................ | 26 |
|       | 6.13 | Chapter 11 Case ..................................................................... | 26 |
|       | 6.14 | Plan ......................................................................................... | 27 |

| 7. | GUARANTY | 27 |
|---|---|---|
| | 7.1 Guaranty | 27 |
| | 7.2 Separate Obligation | 27 |
| | 7.3 Limitation of Guaranty | 27 |
| | 7.4 Liability of Guarantors | 27 |
| | 7.5 Consents of Guarantors | 28 |
| | 7.6 Guarantor's Waivers | 29 |
| | 7.7 Continuing Guaranty | 29 |
| | 7.8 Reinstatement | 29 |
| 8. | EVENTS OF DEFAULT | 29 |
| | 8.1 Event of Default | 29 |
| | 8.2 Rights and Remedies | 31 |
| | 8.3 Application of Proceeds upon Event of Default | 32 |
| | 8.4 Remedies Cumulative | 32 |
| 9. | PRIORITY AND COLLATERAL SECURITY | 33 |
| | 9.1 Superpriority Claims; Subordination in favor of Lender Liens | 33 |
| | 9.2 Grant of Security Interest in the Collateral | 33 |
| | 9.3 Representations and Warranties in Connection with Security Interest | 34 |
| | 9.4 Covenants with Respect to Collateral | 35 |
| | 9.5 Lender's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral | 35 |
| | 9.6 Filing of Financing Statements | 36 |
| | 9.7 No Discharge; Survival of Claims | 36 |
| 10. | WAIVERS; INDEMNIFICATION | 36 |
| | 10.1 Demand; Protest; etc | 36 |
| | 10.2 Lender's Liability for Collateral | 36 |
| | 10.3 Indemnification | 36 |
| 11. | NOTICES | 37 |
| 12. | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER | 38 |
| 13. | AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION | 39 |
| | 13.1 Amendments and Waivers | 39 |
| | 13.2 No Waivers; Cumulative Remedies | 39 |
| | 13.3 Successors | 39 |

19-01189-FLK11    Doc 82    Filed 05/09/19    Entered 05/09/19 10:30:37    Pg 50 of 133

14.     GENERAL PROVISIONS ........................................................................................ 40

       14.1    Effectiveness ....................................................................................... 40

       14.2    Section Headings ................................................................................ 40

       14.3    Interpretation ...................................................................................... 40

       14.4    Severability of Provisions .................................................................. 40

       14.5    Debtor-Creditor Relationship.............................................................. 40

       14.6    Counterparts; Electronic Execution ................................................... 40

       14.7    Revival and Reinstatement of Obligations ......................................... 40

       14.8    Lender Expenses ................................................................................. 41

       14.9    Integration .......................................................................................... 41

15.     JOINT AND SEVERAL LIABILITY AMONG BORROWERS .................................... 41

       15.1    Inducement ......................................................................................... 41

       15.2    Combined Liability ............................................................................. 41

       15.3    Separate Exercise of Remedies ........................................................... 41

Exhibits

Exhibit A – Form of Compliance Certificate

Exhibit B – Budget

Exhibit C – Reporting Requirements

Exhibit D – Form of Request for Advance

Schedules

Schedule A-1 – Loan Account

Schedule A-2 – Authorized Persons

Schedule D-1 – Designated Account and Designated Account Bank

Schedule 4.1(a) –Organizational Chart

Schedule 4.1(b) – Loan Parties and Equity Ownership

Schedule 4.4 – Existing Prepetition Liens

Schedule 4.5 – Uniform Commercial Code Filing Information

Schedule 4.6 – Litigation

Schedule 4.8 – Existing Indebtedness

Schedule 4.9 – Taxes

Schedule 5.5 – Maintenance of Properties; Permits

Schedule 9.4(e) – Collateral Locations

# SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
# LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of May [●], 2019 (the "Effective Date"), by and among the borrowers signatory hereto (collectively, the "Borrowers"), the guarantors signatory hereto (collectively, the "Guarantors" and together with the Borrowers, the "Loan Parties"), and JMB Capital Partners Lending, LLC, a California limited liability company, as lender (together with its successors and assigns, the "Lender").

**WHEREAS**, on May 6, 2019 (the "Petition Date"), the Borrowers commenced voluntary bankruptcy proceedings, under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for Eastern District of Washington (the "Bankruptcy Court"), which cases shall be administratively consolidated with the lead case filed by Astria Health, Case No. [●] (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases").

**WHEREAS**, the Borrowers remain in possession of their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Guarantors have not filed petitions under the Bankruptcy Code with the Bankruptcy Court because the Loan Parties have represented that the Guarantors have no assets or no material assets, but the Guarantors are party hereto because they have guaranteed the Lapis 2017 Obligations, the Lapis 2019 Obligations, the Banner Bank Obligations and the MidCap Obligations and have granted Liens in their assets, if any, to secure such indebtedness;

**WHEREAS**, the Loan Parties have requested that Lender provide financing to Borrowers consisting of a senior secured super priority term loan in a principal amount of up to Thirty-Six Million Dollars ($36,000,000) (the "Facility") pursuant to Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code;

**WHEREAS**, Lender has indicated its willingness to agree to extend the Facility to Borrowers, all on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code, so long as the Obligations are (i) secured by Liens on the Collateral granted by the Loan Parties as hereinafter provided, and (ii) given superpriority status as provided in the Interim Order and Final Order as applicable; and

**WHEREAS**, the Loan Parties have agreed to grant to the Lender a security interest in all their assets as Collateral, and the Borrowers have further agreed that the Lender shall have Superpriority Claims in their Chapter 11 Cases for the repayment of the Obligations pursuant to the Interim Order and the Final Order, subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

# 1. DEFINITIONS AND CONSTRUCTION.

**1.1** **Definitions**. As used in this Agreement, the following terms shall having the meanings specified below:

"Acceptable Plan" means a plan of reorganization or liquidation for the Chapter 11 Case that (i) provides for the termination of the unused Commitment under this Agreement, (ii) provides for the indefeasible payment in full in cash of the Obligations, in exchange for full discharge thereof, on or prior to the effective date of the plan as a condition to the effectiveness thereof, and (iii) contains releases, exculpations, waivers and indemnification for the Lender in form and substance acceptable to the Lender in its reasonable discretion.

"Additional Documents" has the meaning specified in Section 5.13.

"Advances" has the meaning specified in Section 2.1(a).

"Affiliate" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of twenty-four percent (24%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Astria Health" means Astria Health, a Washington non-profit corporation.

"Authorized Person" means any one of the individuals identified on Schedule A-2, as such schedule is updated from time to time by written notice from Loan Parties to Lender.

"Avoidance Actions" has the meaning specified in Section 9.1(a)(i).

"Avoidance Action Proceeds" means the proceeds and recoveries from Avoidance Actions.

"Bankruptcy Code" has the meaning specified in the recitals hereto.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Banner Bank Collateral" means all personal property and certain real property of Sunnyside as set forth in the Banner Bank Loan Documents and associated documents.

"Banner Bank Loan Documents" means (i) the various Business Loan Agreements dated December 30, 2010, May 19, 2015, March 21, 2016, August 2, 2016, October 6, 2016, March 21, 2017, and May 4, 2018, each between Banner Bank and Sunnyside and each as such agreement

19-01189-FLK11   Doc 82   Filed 05/09/19   Entered 05/09/19 10:30:37   Pg 54 of 133

has been amended, modified, or supplemented to date; and (ii) each promissory note, security agreement, mortgage, or other instrument, agreement or document in connection with any obligations as described in such Business Loan Agreements owed by Sunnyside to Banner Bank.

"Banner Bank Obligations" means all amounts owed, whether principal, interest, fees or otherwise, by Sunnyside pursuant to any Banner Bank Loan Document.

"Borrowers" has the meaning set forth in the preamble to the Agreement.

"Budget" means an initial budget, prepared by Borrowers, that sets forth in reasonable detail all of the Borrowers' projected receipts and disbursements on a weekly basis, separated into line items for each category of receipt or disbursement, and is otherwise in form and substance reasonably acceptable to Lender, and is attached hereto as Exhibit B.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" has the meaning ascribed to it in the Interim Order and Final Order, as applicable.

"Cash Collateral" has the meaning ascribed to it in the Interim Order and Final Order, as applicable.

"Change of Control" means, except with respect to the consummation of a Sale, whether under a plan of reorganization or under Section 363 of the Bankruptcy Code, or as otherwise approved by Lender:

(i)     (i) the result caused by the occurrence of any event or series of events which results in Astria Health owning (beneficially, legally or otherwise), in the aggregate, less than one hundred percent (100%) of any class of the issued and outstanding equity interests of any other Loan Party;

(ii)     the pledge, hypothecation or encumbrance of any direct or indirect equity interests in any Loan Party;

(iii)     John M. Gallagher, ceases for any reason to be the President and Chief Executive Officer of Astria Health or to otherwise be involved in the day to day operation of Astria Health and each Borrower.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

19-01189-FLK11     Doc 82     Filed 05/09/19     Entered 05/09/19 10:30:37     Pg 55 of 133

"Chapter 11 Plan" means a chapter 11 plan that provides for, *inter alia*, payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnification to the extent acceptable to Lender, in its reasonable discretion.

"Closing Date" means the date upon which the first Advance is made under Section 2.1.

"Collateral" means, collectively, all pre-petition and post-petition real property and all pre-petition and post-petition tangible and intangible personal property of each Loan Party, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, leases and leaseholds and rents, avoidance actions under Section 549 of the Bankruptcy Code and related recoveries under Section 550 of the Bankruptcy Code, together with all proceeds of each of the foregoing, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable), and, subject to Final Order, including the proceeds and recoveries from Avoidance Actions.

"Commitment" means Thirty-Six Million Dollars ($36,000,000).

"Commitment Fee" means the fee of 1.50% of the amount of the Facility, which fee shall be earned and payable upon entry of the Interim Order and which shall be paid to the Lender on the Closing Date from the proceeds of the Facility.

"Compliance Certificate" means a certificate substantially in the form of Exhibit A delivered by the Authorized Person of Borrowers to Lender.

"Control Agreement" means, with respect to each Deposit Account of a Borrower, an agreement in form and substance reasonably satisfactory to the Lender, pursuant to which the depository institution maintaining such Deposit Account agrees to comply with the Lender's instructions with respect to disposition of funds in such Deposit Account without further consent by the relevant Borrower.

"Daily Balance" means, as of any date of determination and with respect to any fixed monetary Obligations, the amount of such Obligations owed at the end of such day.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Rate" has the meaning specified in Section 2.4(b).

"Deposit Account" means any deposit account, as that term is defined in the UCC.

"Designated Account" means the Deposit Account of Borrowers identified on Schedule D-1.

"Designated Account Bank" has the meaning specified in Schedule D-1.

"Dollars" or "$" means United States dollars.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral; (b) from adjoining properties or businesses of any real property that constitutes Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by any Loan Party.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on the Borrowers, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Event of Default" has the meaning specified in Section 8.1.

"Exit Fee" means the fee of 5.00%, as applicable (i) of any outstanding principal amount hereunder that is prepaid pursuant to Section 2.3(c) or (d), or (ii) without duplication of any amounts paid pursuant to clause (i), of the amount of the Commitment on the Maturity Date, in each case to be repaid in cash and without further order of the Bankruptcy Court.

"Facility" has the meaning specified in the recitals to the Agreement.

"Fees" means all fees due to the Lender under this Agreement, any Loan Document or the Interim Order or Final Order, as applicable, including the Commitment Fee, the Exit Fee, the Funding Fee, the Stated Maturity Date Fee and the Work Fee.

"Final Order" means a final order of the Bankruptcy Court authorizing and approving the Borrowers' entry into this Agreement and the other Loan Documents, in form and substance satisfactory to Lender, in its sole discretion, Borrowers, and their respective counsel, on a final basis and entered following a final hearing.

"Funding Fee" means, with respect to each Advance, 1.50% of such Advance, payable in cash upon funding of such Advance by the Lender.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guaranteed Obligations" has the meaning specified in Section 7.1.

"Guaranty" means the terms and provisions of Section 7.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified in Section 10.3.

"Indemnified Person" has the meaning specified in Section 10.3.

"Interim Funding" means an Advance in the principal amount of $28 million to be funded upon entry of the Interim Order.

6

"Interim Order" means that interim order entered by the Bankruptcy Court authorizing and approving the Borrowers' entry into this Agreement and the other Loan Documents, in form and substance satisfactory to the Lender, in its sole discretion, the Borrowers in their sole discretion, and their respective counsel.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Lapis 2017 Lenders" means the lenders under the Lapis 2017 Loan Agreement.

"Lapis 2017 Loan Agreement" means the Loan and Security Agreement dated as of November 1, 2017, by and among Regional Health (now Astria Health), SHC Holdco, LLC, SHC Medical Center – Yakima, SHC Medical Center – Toppenish, Yakima Home Care Holdings, LLC and Yakima HMA Home Health, LLC, as borrowers, and Washington Health Care Facilities Authority, as the authority / lender.

"Lapis 2017 Loan Documents" means (i) the Lapis 2017 Loan Agreement and (ii) each promissory note, security agreement, mortgage, or other instrument, agreement or document in connection with any obligations owed by the Loan Parties party thereto to any Lapis Lender or to Lapis Advisers, LP as agent for the Lapis 2017 Lenders, pursuant to the Lapis 2017 Loan Agreement.

"Lapis 2017 Loan Parties" means all the Loan Parties other than (i) Caravan Health ACO 19, LLC, dba Astria Health Clinically Integrated Network, LLC, a Missouri for-profit limited liability company and (ii) Home Supply, LLC, a Delaware for-profit limited liability company.

"Lapis 2017 Obligations" means all amounts owed, whether principal, interest, fees or otherwise, by any Lapis 2019 Loan Party under any Lapis 2017 Loan Document.

"Lapis 2019 Lenders" means the lenders under the Lapis 2019 Loan Agreement.

"Lapis 2019 Loan Agreement" means the Credit Agreement dated as of January 18, 2019, by and among Astria Health, Sunnyside and the other borrowers signatory thereto, the subsidiaries of Astria Health party thereto as credit parties, the financial institutions party thereto as lenders, and Lapis Advisors, LP, as agent for the Lapis 2019 Lenders.

"Lapis 2019 Loan Documents" means the "Loan Documents" under and as such term is defined in the Lapis 2019 Loan Agreement.

"Lapis 2019 Loan Parties" means all the Loan Parties.

"Lapis 2019 Obligations" means all amounts owed, whether principal, interest, fees or otherwise, by any Lapis 2019 Loan Party under any Lapis 2019 Loan Document.

"Lapis Senior Holdco Liens" has the meaning given to such term in the Interim Order and upon entry thereof, the Final Order.

"Lead Borrower" means Astria Health, a Washington non-profit corporation.

7

"Lender" has the meaning set forth in the preamble to the Agreement.

"Lender Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by the Borrowers under any of the Loan Documents that are paid, advanced, or incurred by Lender, including but not limited to the Work Fee paid to Lender's counsel, (b) reasonable and actual out-of-pocket fees or charges paid or incurred by Lender in connection with its transactions with the Borrowers under any of the Loan Documents, including, but not limited to, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) reasonable and actual out-of-pocket costs and expenses incurred by Lender in the disbursement of funds to Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by Lender resulting from the dishonor of checks payable by or to any Loan Party, (e) reasonable and actual out-of-pocket costs, fees (including attorneys' fees) and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable out-of-pocket audit fees and expenses of Lender (including travel, meals, and lodging) related to any inspections or audits, (g) reasonable and actual out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with the Borrowers, (h) Lender's reasonable and actual out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), or amending the Loan Documents, (i) reasonable out-of-pocket fees and expenses of Lender (including travel, meals, and lodging) related to any due diligence in connection with the Facility or meetings with Borrowers in connection with the Facility, and (j) Lender's reasonable costs and expenses (including reasonable and actual attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding concerning any Borrower or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"Lender Related Person" means, Lender, together with Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"Lender's Liens" means the Liens granted by Borrowers in and to the Collateral in favor of Lender.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other

preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan Account" means the Deposit Account of Lender identified on Schedule A-1.

"Loan Documents" means the Agreement, the Interim Order, the Final Order, the Control Agreements, the Additional Documents and any other notes, account control agreements, or mortgages executed by Borrowers in connection with the Agreement and payable to Lender, any other agreement entered into, now or in the future, by the Borrowers or Lender in connection with the Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"Material Adverse Change" means, (a) except as a result of the commencement of the Chapter 11 Case, a material adverse change in the business, operations, results of operations, assets, liabilities or financial condition of the Borrowers with respect to the Collateral (b) a material impairment of the Borrowers' ability to perform their respective obligations with respect to the Collateral under the Loan Documents or of Lender's ability to enforce the Obligations or realize upon the Collateral or (c) a material impairment of the enforceability or priority of Lender's Liens with respect to a material portion the Collateral as a result of an action or failure to act on the part of the Borrowers, all determined at the Lender's discretion.

"Maturity Date" means the earliest of (i) the Stated Maturity Date; (ii) the effective date of a plan of reorganization; (iii) if the Final Order has not been entered by the Bankruptcy Court, the date that is one day after the Final Hearing (as defined in the Interim Order) and all continuations thereof; (iv) entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Cases; (v) the closing of a Sale of all, or substantially all, the assets of all Borrowers; and (vi) the acceleration of the outstanding Obligations or termination of the Commitment as a result of the occurrence and continuation of an Event of Default.

"MidCap A/R Collateral" means the assets of the Loan Parties owing to MidCap as set forth in Schedule 9.1 to the MidCap Credit Agreement.

"MidCap Credit Agreement" means the Credit and Security Agreement dated as of September 18, 2017, by and among SHC Holdco, LLC, SHC Medical Center – Yakima, SHC Medical Center – Toppenish, Yakima Home Care Holdings, LLC and Yakima HMA Home Health, LLC, as borrowers, the MidCap Lenders and MidCap Financial Trust as agent for the MidCap Lenders.

"MidCap Lenders" means the lenders under the MidCap Credit Agreement.

"MidCap Loan Documents" means (i) the MidCap Credit Agreement, and (ii) each promissory note, security agreement, mortgage, or other instrument, agreement or document in connection with any obligations as described in the MidCap Credit Agreement owed by any Borrower to Midcap Financial Trust or any of its affiliates.

"MidCap Obligations" means all amounts owed, whether principal, interest, fees or otherwise, by Sunnyside under any MidCap Loan Document.

"Net Cash Proceeds" means with respect to any sale or disposition of Collateral by any Borrower, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Borrower, in connection therewith, after deducting therefrom only (i) amounts required to be paid to holders in respect of any Existing Prepetition Liens, to the extent applicable, (ii) reasonable (as determined by the Lender) fees, commissions, and expenses related thereto and required to be paid by such Borrower in connection with such sale or disposition and (iii) taxes paid or payable to any taxing authorities by such Borrower in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are payable to a Person that is not an Affiliate of such Borrower, and are properly attributable to such transaction; provided however for the avoidance of doubt, that such reasonable fees, commissions and expenses shall exclude fees and expenses of estate professionals.

"Obligations" means all loans, Advances, debts, principal, interest, contingent reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Loan Account pursuant to the Agreement), obligations (including indemnification obligations), Fees (including, without limitation the Commitment Fee, Work Fee, Funding Fee and Exit Fee and Stated Maturity Date Fee), Lender Expenses, guaranties, covenants, and duties of any kind and description owing by any Loan Party, to the Lender pursuant to or evidenced by the Loan Documents and/or pursuant to or in connection with any one or more documents, instruments or agreements described in clause (i) of the definition of Lender Expenses and, in each case, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, including without limitation in connection with the collection or enforcement of or preservation of rights under the Loan Documents.

"Ordinary Course" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company, and (d) any agreement between any Loan Party and its shareholders, members, partners or its equity owners, or among any of the foregoing.

"Permits" means any license, lease, power, permit, franchise, certificate, authorization or approval issued by a Governmental Authority.

"Permitted Indebtedness" means:

(a)     Indebtedness evidenced by the Agreement and the other Loan Documents;

(b)     Indebtedness outstanding as of the Petition Date;

(c)     Indebtedness, including any unsecured guarantees, incurred in the Ordinary Course with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, statutory bonds, completion guarantees and similar obligations; and

(d)     Indebtedness for purchase money obligations incurred after the Petition Date for equipment used in the ordinary course of the Borrowers' business in an aggregate principal amount not to exceed at any time $500,000.

"Permitted Prior Lien " has the meaning specified in Section 9.2(b).

"Permitted Protest" means the right of any Loan Party to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Borrower's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party in good faith and (c) Lender is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Permitted Variance" means a variance of net cash flow on the Budget of no more than 10%, which variance shall be tested on a four week cumulative basis, as opposed to a line-by-line, basis; provided that, for the avoidance of doubt, the calculation of any aforementioned Permitted Variance includes any disbursements in connection with estate professional fees.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" means May 6, 2019.

"Prepetition Credit Liens" has the meaning given to such term in the Interim Order and upon entry thereof, the Final Order.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any

pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Required Lien Priority" has the meaning set forth in Section 9.2.

"Sale" means the sale of all or substantially all of any of the assets of any Borrower or any subsidiary thereof (including any Collateral transferred to another Borrower), to any party, including the Lender, pursuant to the provisions of Section 363 of the Bankruptcy Code or pursuant to an Acceptable Plan.

"Sale Deposit" has the meaning specified in Section 9.1(a)(i).

"Schedules" means those certain schedules annexed hereto and made a part hereof.

"Security Documents" means (i) all UCC financing statements, or amendments or continuations thereof, and (ii) any other documents or filings in connection with the perfection of the Liens hereunder.

"Stated Maturity Date" means December 31, 2019.

"Stated Maturity Date Fee" means the fee of 10.00% of the Facility, which shall be due and payable in cash, without further order of the Bankruptcy Court, immediately upon the day following the Stated Maturity Date in the event that the Obligations are not indefeasibly paid in full on the Stated Maturity Date.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Sunnyside" means Sunnyside Community Hospital Association, a Washington non-profit corporation.

"Superpriority Claim" has the meaning specified in Section 9.1(a)(i).

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" means the United States of America.

"Weekly Budget Variance Report" has the meaning specified in Section 5.2.

"Work Fee" means a non-refundable fee in the amount of $50,000, to be paid to Lender's counsel for due diligence and legal services rendered.

      **1.2**    **Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; <u>provided</u>, that if Borrowers notify Lender that Borrowers requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if Lender notifies Borrowers that Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Lender and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of Lender and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers on a consolidated basis, unless the context clearly requires otherwise.

      **1.3**    **UCC**.  Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; <u>provided</u>, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

      **1.4**    **Construction**.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been paid in full in cash).  Any reference herein to any Person shall be construed to include such

Person's successors and assigns.  Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

**1.5**     **Schedules and Exhibits**.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**2.**     **LOAN AND TERMS OF PAYMENT**.

**2.1**     **Agreement to Lend; Delayed Draw; Security Documents and Loan Documents**.

(a)     Subject to the terms and conditions of this Agreement, Lender agrees, subject to the satisfaction or waiver of the conditions precedent in Section 3, to make two (2) advances to Borrowers (each, an "Advance" and collectively, the "Advances"); provided that in no event shall the Advances made by Lender exceed the Lender's Commitment.  The first Advance in the amount of the Interim Funding shall be made upon entry of the Interim Order and the second Advance in the amount of the remaining Commitment shall be made upon entry of the Final Order, subject to the satisfaction or waiver of the conditions precedent in Section 3 relating to such Advance.  The minimum amount of either Advance shall be $1,000,000.  Any Advance, or portion thereof, that is repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(b)     The Advances shall be secured by the Collateral as set forth in this Agreement, the Interim Order, the Final Order, and the other Loan Documents.  Any Advance, or portion thereof, that is repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(c)     Each Loan Party agrees that it is jointly and severally liable for the prompt payment and performance of all Obligations under the Loan Documents.  Borrowers promise to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full (including the Exit Fee) on the Maturity Date.

**2.2**     **Borrowing Procedures**.  Each Advance under Section 2.1(a) shall be made by a written request substantially in the form of the Request for Advance attached hereto as Exhibit D executed by an Authorized Person of the Lead Borrower and delivered to the Lender no later than one (1) Business Day prior to the requested funding date (or such shorter period as the Lender may permit in its sole discretion); provided, that (i) Lead Borrower shall submit such requests only after approval of the Interim Order or the Final Order as applicable, and (ii) the aggregate amount of all such Advances shall not exceed the Lender's Commitment.  Upon satisfaction or waiver of the conditions precedent specified herein, Lender shall make the proceeds of the relevant Advance available to the Borrowers on the requested funding date by causing the principal amount of the relevant Advance to be credited to the Designated Account.

**2.3**     **Payments; Reductions of the Commitment; Prepayments**.

(a)     **Payments by Borrowers**.  Except as otherwise expressly provided herein, all payments by Borrowers shall be made to the Loan Account for the account of Lender and shall be made in immediately available funds, no later than 4:00 p.m. (Eastern time) on the date specified herein.  Any payment received by Lender later than 4:00 p.m. (Eastern time) shall be deemed to

14

have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b) **Application of Payments and Proceeds**. All payments remitted to Lender and all proceeds of Collateral received by Lender shall be applied as follows (unless otherwise directed by Lender):

(i) first, to pay any Lender Expenses (including cost or expense reimbursements, such as attorneys' fees in excess of the Work Fee) then owed to the Lender or Lender Related Persons in accordance with the Interim Order or the Final Order, as applicable, or indemnities then due to Lender under the Loan Documents, until paid in full;

(ii) second, to pay any Fees then due to Lender under the Loan Documents until paid in full;

(iii) third, to pay interest due in respect of the Advances until paid in full;

(iv) fourth, to pay the principal of all Advances until paid in full;

(v) fifth, to pay any other Obligations until paid in full; and

(vi) sixth, to Borrowers (to be wired to the Designated Account) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this Section 2.3(b) and any other provision contained in any other Loan Document (except for the Interim Order or Final Order, as applicable), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(b) shall control and govern. Notwithstanding the foregoing, to the extent there is a conflict between the Interim Order or the Final Order, as applicable, and any other Loan Document, the Interim Order or the Final Order, as applicable, shall control and govern.

(c) **Optional Prepayments**. Upon three Business Days' prior notice to Lender, Borrowers may prepay any Advance, in whole or in part, at any time, provided that (i) the principal amount being prepaid shall be an amount not less than $1,000,000 and (ii) Borrowers shall also pay all accrued and unpaid interest on such principal amount and the Exit Fee as applied to the principal amount that was prepaid.

(d) **Mandatory Prepayments**.

(i) **Dispositions**. Within one (1) Business Day of the date of receipt by any Borrower of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation, confiscation, requisition, seizure or taking thereof or otherwise) of Collateral (other than sales in the Ordinary Course), such Borrower shall prepay such portion of the outstanding amount of the Obligations in accordance with Section 2.3(b) in an amount equal to 100% of the Net Cash Proceeds (including

15

insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions, plus the Exit Fee as applied to the amount of such prepayment.  Nothing contained in this <u>Section 2.3(d)(i)</u> shall permit any Borrower to sell any Collateral other than in accordance with <u>Section 6.4</u>.  In no event shall any amount paid to Lender under this <u>Section 2.3(d)(i)</u> exceed the outstanding amount of the Obligations.

(ii) **Indebtedness**.  Within one (1) Business Day of the date of incurrence by any Borrower of any Indebtedness (other than Permitted Indebtedness), such Borrower shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness plus the Exit Fee as applied to the principal amount of such prepayment.  The provisions of this <u>Section 2.3(d)(ii)</u> shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

### 2.4 <u>Interest Rates and Rates, Payments and Calculations</u>.

(a) **Interest Rate**.  Except as provided in <u>Section 2.4(b)</u>, all Advances shall bear interest on the Daily Balance thereof at a rate equal to 12.00% per annum.  For the avoidance of doubt, for the purpose of calculating interest for purposes of this <u>Section 2.4(a)</u>, the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(b) **Default Rate**.  Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to five percentage points (5%) above the per annum rate otherwise applicable hereunder upon notice from Lender of its election to impose interest at the default rate.  Any such notice may impose interest at the default rate retroactively to the date of the occurrence of the related Event of Default.  For the avoidance of doubt, for the purpose of calculating interest for purposes of this <u>Section 2.4(b)</u>, Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(c) **Payment**.  Except to the extent provided to the contrary herein, interest, all Fees payable hereunder or under any of the other Loan Documents, and all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month at any time that Obligations or the Commitment are outstanding.  Borrowers hereby authorize Lender, from time to time, without prior notice to Borrowers, to charge all interest and Fees payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all Fees provided for in <u>Section 2.8</u> (in each case, as and when due and payable), and all other payments as and when due and payable under any Loan Document to the Loan Account, which amounts thereafter shall constitute Obligations hereunder and shall accrue interest at the rate then applicable to Obligations.

19-01189-FLK11   Doc 82   Filed 05/09/19   Entered 05/09/19 10:30:37   Pg 68 of 133

(d) **Computation**. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e) **Intent to Limit Charges to Maximum Lawful Rate**. In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Loan Parties and Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Loan Parties are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Loan Parties in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

**2.5** **Crediting Payments; Clearance Charge**. The receipt of any payment item by Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Loan Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Loan Parties shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Loan Account on a Business Day on or before 5:00 p.m. (Eastern time). If any payment item is received into the Loan Account on a non-Business Day or after 5:00 p.m. (Eastern time) on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

**2.6** **Designated Account**.

(a) Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the Advances requested by Borrowers and made by Lender hereunder in such Designated Account.

(b) Borrowers agree to deposit all proceeds of sales of the Collateral into the Designated Account.

**2.7** **Maintenance of Loan Account; Statements of Obligations**. Lender shall maintain true, correct and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Borrowers to Lender, in which Lender will record (i) the amount of all Advances made under this Agreement, (ii) the amount of any principal and/or interest due and payable and/or to become due and payable from the Borrowers to the Lender under this Agreement and (iii) all amounts received by Lender under this Agreement from any Loan Party.

**2.8** **Fees**. Upon entry of the Interim Order, Borrowers shall pay from the proceeds of the Facility to the Lender, the Commitment Fee and the Funding Fee as set forth in the Interim

19-01189-FLK11    Doc 82    Filed 05/09/19    Entered 05/09/19 10:30:37    Pg 69 of 133

Order. All such fees shall be non-refundable and non-avoidable obligations of the Borrowers and shall be paid by the Borrowers in cash.

3. **CONDITIONS; TERM OF AGREEMENT**.

    **3.1**   <u>**Conditions Precedent to Advancing the Commitment**</u>. Lender shall not be required to advance the Interim Funding unless and until all of the conditions specified below in this <u>Section 3.1</u> (other than those pertaining to the second Advance) and <u>Section 3.2</u> shall have been satisfied or waived by Lender in its sole discretion. Lender shall not be required to advance the second Advance unless and until all of the conditions specified below in this <u>Section 3.1</u> and in <u>Section 3.2</u> shall have been satisfied or waived by Lender in its sole discretion. The making of any Advance by Lender is conclusively deemed to be its satisfaction or waiver of the conditions precedent contained in this <u>Section 3.1</u> or <u>Section 3.2</u> with respect to such Advance.

    (a)     Lender shall have received a copy of the Budget.

    (b)     With respect to the extension of the Interim Funding, the Bankruptcy Court shall have entered the Interim Order, and with respect to the extension of any subsequent Advance, the Bankruptcy Court shall have entered the Final Order in form and substance satisfactory to the Lender in its sole discretion and such Final Order shall be in full force and effect and shall not have been modified or amended, reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed (unless, in each case set forth above, otherwise agreed to by Lender). Borrowers and Lender shall be entitled to rely in good faith upon the Interim Order or the Final Order, as applicable, and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

    (c)     Lender shall have received evidence, in form and substance reasonably acceptable to Lender, that, Guarantors have made all necessary Uniform Commercial Code financing statements necessary to provide Lender with a valid, perfected security interest in the Collateral pledged by Guarantors in accordance with the Required Lien Priority, or (ii) to the extent such filings cannot be made until the effectiveness of this Agreement, final drafts of such Uniform Commercial Code financing statements, to be filed by Lender promptly upon the Effective Date.

    (d)     Lender shall have received copies of UCC, tax, and judgment lien searches and title reports, in each case satisfactory to Lender in its sole discretion.

    (e)     All fees required to be paid on the Closing Date under this Agreement shall have been paid or will be paid from such Advance (including, without limitation, the Work Fee).

    (f)     All other documents in connection with the transactions contemplated by this Agreement shall have been delivered or executed and shall be in form and substance reasonably satisfactory to Lender.

    **3.2**   <u>**Conditions Precedent to all Extensions of Credit**</u>. Lender shall not be required to make any Advances unless and until all of the additional conditions specified below shall have been satisfied or waived by Lender in its sole discretion (the making of any Advance by Lender

being conclusively deemed to be its satisfaction or waiver of the conditions precedent contained in this <u>Section 3.2</u> with respect to such Advance).

(a)     Borrowers shall be in compliance with the conditions precedent set forth in <u>Section 3.1</u> of this Agreement.

(b)     The representations and warranties of Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(c)     No Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

(d)     No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Loan Party or Lender; and

(e)     No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents.

**3.3     <u>Maturity</u>**.  This Agreement shall continue in full force and effect until the payment in full of the Obligations.  All Obligations, including without limitation the outstanding unpaid principal balance and all accrued and unpaid interest on the Advances shall be due and payable on the Maturity Date.

**3.4     <u>Effect of Maturity</u>**.  On the Maturity Date, the Commitment of Lender to provide any additional credit hereunder shall automatically be terminated and all Obligations immediately shall become due and payable without notice or demand.  No termination of the obligations of Lender (other than payment in full of the Obligations and termination of the Commitment) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitment has been terminated.  When all of the Obligations have been indefeasibly paid in full in immediately available funds and Lender has no further obligation hereunder to make further Advances, Lender will, at the Borrowers' expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Lender's Liens and all notices of security interests and Liens previously filed by Lender with respect to the Obligations.

19-01189-FLK11    Doc 82    Filed 05/09/19    Entered 05/09/19 10:30:37    Pg 71 of 133

**4.    REPRESENTATIONS AND WARRANTIES**.

In order to induce Lender to enter into this Agreement, each Loan Party makes the following representations and warranties to Lender.  The Loan Parties further represent that such representations and warranties shall be true, correct, and complete, in all respects, as of the Closing Date, and shall be true, correct, and complete, in all respects, as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

**4.1    Due Organization and Qualification**.

(a)    Each Loan Party (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) where the ownership of Collateral requires such qualification, is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) subject to the Bankruptcy Court's entry of the Interim Order or the Final Order, as applicable, and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.  Schedule 4.1(a) is an organizational chart showing the complete and accurate ownership structure of the Loan Parties.

(b)    Schedule 4.1(b) sets forth, for each Loan Party, its legal name (within the meaning of Section 9-503 of the UCC), jurisdiction of incorporation or formation, type of entity (for profit or non-profit), and equity owners.

**4.2    Due Authorization**.  The execution, delivery, and performance by each Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of such Loan Party and, with respect to each Borrower, is only subject to the Bankruptcy Court's entry of the Interim Order or Final Order, as applicable.

**4.3    Binding Obligations**.  Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party pursuant to the Final Order, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

**4.4    Existing Prepetition Liens**.  Except for the existing Liens of Loan Parties' pre-Petition Date lenders or creditors set forth on Schedule 4.4, each Loan Party has (i) good, sufficient and legal title to, and (ii) good and marketable title to (in the case of personal property), all of such Loan Party's right, interest and title in the Collateral.

19-01189-FLK11    Doc 82    Filed 05/09/19    Entered 05/09/19 10:30:37    Pg 72 of 133

**4.5** **Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims**.

(a) The name (within the meaning of Section 9-503 of the UCC), jurisdiction of formation, tax identification numbers and organizational identification number (if any) of each Loan Party are as set forth on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Loan Party to Lender).

(b) The chief executive office of each Loan Party is located at the address indicated on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Loan Party to Lender). Except with respect to potential claims with respect to accounts receivable collections, the Loan Parties have no actual knowledge of the existence by them of any commercial tort claims except as described on such Schedule 4.5.

**4.6** **Litigation**. There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of Loan Parties, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as set forth on Schedule 4.6, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Change.

**4.7** **Fraudulent Transfer**. No transfer of property is being made by a Loan Party and no obligation is being incurred by a Loan Party in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay or defraud either present or future creditors of any Loan Party.

**4.8** **Indebtedness**. Set forth on Schedule 4.8 is a true and complete list of all Indebtedness of each Loan Party outstanding immediately prior to the Petition Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of such date.

**4.9** **Payment of Taxes**. Except as provided on Schedule 4.9, all United States federal, state and other material tax returns and reports of each Borrower required to be filed by any of them with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted Protest. With respect to the Collateral, the Borrowers are not aware of any proposed tax assessment against a Borrower with respect to United States federal, state or municipal taxes.

**4.10** **Budget**. Attached to this Agreement as Exhibit B is a true and complete copy of the Budget. The Budget may be amended from time to time with the written consent of the Lender.

**4.11** **Guarantor Representations**. Each Guarantor represents to the Lender that it has no assets or to the extent it has any assets, they are of inconsequential value.

## 5.    AFFIRMATIVE COVENANTS.

Each Loan Party covenants and agrees that, until termination of the Commitment and payment in full of the Obligations, it shall comply with each of the following:

**5.1    Financial Statements, Reports, Certificates**.  Lead Borrower shall deliver to Lender (a) promptly upon it or any Loan Party becoming aware of any Default, notice of such default; (b) promptly upon becoming aware of any litigation threatened in writing against any Loan Party or filed (other than any adversary proceeding filed in the Chapter 11 Cases), or any event (other than events of public knowledge in the Chapter 11 Cases) which could reasonably be expected to have a Material Adverse Change; and (c) at the time of a request for any Advance, a Compliance Certificate.  In addition, the Borrowers agree to maintain a system of accounting that enables the Borrowers to produce unaudited financial statements in accordance with GAAP.

**5.2    Reporting**.  Each Loan Party shall comply with the agreements, requirements, covenants and undertakings applicable to it set forth in Exhibit C, in accordance with the terms thereof.  Each Borrower will: (a) commencing on the first Friday to occur after the entry of the Interim Order and on the Friday of each week thereafter, prepare and deliver to Lender (x) a report showing actual cash receipts and disbursements of the entities covered by the Budget for the preceding Saturday through Friday certified in writing by an Authorized Person of Lead Borrower as being true and accurate, and (y) a written explanation of all material variances (the "Weekly Budget Variance Report"); (b) update and roll-forward the proposed Budget no less frequently than every four (4) weeks or at such other interval as agreed to by the Lender and the Borrowers, each such amended Budget to be delivered to Lender no later than the third Business Day of each week for the week immediately prior; and (c) participate in a weekly conference call, if required, commencing on the third Business Day of each week following the Petition Date regarding the Budget, management issues, sale process, and other matters.

**5.3    Material Contracts; Sale Offers**.  Lead Borrower shall deliver to Lender (a) promptly upon any Loan Party becoming aware of any default (other than filing of the Chapter 11 Case) under any material contract to which any Loan Party is a party, notice of such defaults, and (b) promptly notify Lender upon any written offer by a third party to purchase substantially all of the assets of the Borrowers, or to purchase the equity of the Borrowers or to refinance the Facility.  If requested by Lender, the chief restructuring officer or the chief financial officer  of the Borrowers shall participate in a conference call with Lender (as long as no Event of Default has occurred and is continuing, such call shall be no more often than weekly), following the Petition Date regarding management issues and other matters.

**5.4    Existence**.  At all times, each Borrower shall (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of incorporation or formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits could not reasonably be expected to result in a Material Adverse Change.

**5.5    Maintenance of Properties; Permits**.  Except where the failure to do so could not be expected to result in a Material Adverse Change, each Loan Party shall (a) maintain and preserve the Collateral that is necessary to the proper conduct of its business in good working order

and condition, ordinary wear, tear, and casualty excepted, (b) comply with the material provisions of all material leases, if any, related to the Collateral pledged by it, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest; and (c) maintain, comply with and keep in full force and effect its Permits with respect to the Collateral pledged by it, except as could not be expected to result in a Material Adverse Change.  Except as set forth on Schedule 5.5, each Borrower is in compliance with, and has, all Permits required for the operation of its business as it relates to the Collateral except for any noncompliance which could not reasonably be expected to have a Material Adverse Change, and for the execution, delivery and performance by, and enforcement against, such Borrower of each Loan Document.  Except as set forth in Schedule 5.5, no Borrower is in breach of or default under the provisions of any such Permit, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing, which in each case could reasonably be expected to have a Material Adverse Change.

     **5.6**    **Taxes**.  Each Loan Party shall cause all assessments and taxes imposed, levied, or assessed after the Petition Date against any Collateral to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that any such assessments and taxes shall be paid as part of a plan of reorganization approved by Lender.

     **5.7**    **Insurance**.  At the relevant Borrower's expense, each Borrower shall maintain insurance with respect to the Collateral in which such Borrower has any right, interest or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses and consistent with Borrower's insurance policies in effect on the Petition Date. Each Borrower shall maintain general liability, director's and officer's liability insurance, fiduciary liability insurance, employment practices liability insurance, title insurance as well as insurance against larceny, embezzlement, and criminal misappropriation.  All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to Lender.  All property insurance policies and title insurance policies covering the Collateral are to be made payable to Lender for the benefit of Lender, in case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as Lender may reasonably require to fully protect Lender's interest in the Collateral and to any payments to be made under such policies.  All certificates of property and general liability insurance are to be delivered to Lender, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Lender and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Lender of the exercise of any right of cancellation.  If any Borrower fails to maintain the insurance required by this Section 5.7, Lender may arrange for such insurance, but at such Borrower's expense and without any responsibility on Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Each relevant Borrower shall give Lender prompt notice of any loss covered by its casualty or business interruption insurance.  Upon the occurrence and during the continuance of an Event of Default, Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may

be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

**5.8** **Inspection**. Each Loan Party shall permit Lender and each of its duly authorized representatives or agent to visit any of its properties and inspect any of its Collateral or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Lender may reasonably require and, so long as no Default or Event of Default exists, with reasonable prior notice to the applicable Loan Party. Such inspections shall not occur more than once every three (3) months; provided that no such limitation shall apply in the event that a Default or Event of Default exists.

**5.9** **Environmental**. Each Loan Party shall:

(a) Keep the Collateral owned or operated by it free of any Environmental Liens,

(b) Comply with all applicable Environmental Laws, except where the failure to so comply could not reasonably be expected result in a Material Adverse Change.

(c) Promptly notify Lender of any release of which such Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party that could reasonably be expected to result in a Material Adverse Change, and

(d) Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Lender with written notice of any of the following: (i) written notice that an Environmental Lien has been filed against any of the Collateral, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan Party, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

**5.10** **Compliance with Laws**. Each Loan Party shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

**5.11** **Disclosure Updates**. Each Loan Party shall promptly and in no event later than three (3) Business Days after obtaining actual knowledge thereof, notify Lender if any written information, exhibit, or report (other than materials marked as drafts and forward-looking information and projections and information of a general economic nature and general information about such Loan Party's industry) furnished to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material

fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

**5.12** **Formation of Subsidiaries**. No Loan Party may form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the consent of Lender, in its sole discretion. Any Subsidiary that is formed after the Closing Date shall be considered a Borrower and execute any documentation reasonably requested by Lender.

**5.13** **Further Assurances**. Upon reasonable written notice from Lender, each Borrower shall execute or deliver to Lender any and all financing statements, fixture filings, endorsements of certificates of title, mortgages, deeds of trust, and all other documents (collectively, the "Additional Documents") that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

**5.14** **Staffing**. Each Borrower shall maintain at all times an appropriate and necessary staff to carry out its business with respect to the Collateral in compliance with all other applicable laws and with training and experience and in number equal to or greater than would be customarily maintained by businesses engaging in similar activities, except where the failure to maintain such staff could not, after taking into account any formal or informal compliance deadline extensions granted by applicable regulatory authorities in effect, reasonably be expected to result in a Material Adverse Change.

**5.15** **Budget**. Borrowers shall comply with the Budget and the Permitted Variance.

**6.** **NEGATIVE COVENANTS**.

Each Loan Party covenants and agrees that, until termination of the Commitment and payment in full of the Obligations, such Loan Party will not do any of the following without the prior consent of Lender in its reasonable discretion:

**6.1** **Indebtedness**. Except for Permitted Indebtedness, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral.

**6.2** **Liens**. Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Liens (a) created by the Loan Documents, (b) set forth on Schedule 4.4 and (c) any other Lien that is the subject of a Permitted Protest.

**6.3** **Restrictions on Fundamental Changes**. Except in connection with a plan of reorganization or a Sale or Sales approved by the Bankruptcy Court or otherwise with the prior written consent of Lender:

(a) no Loan Party shall enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests,

25

(b)     no Borrower shall liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), and

(c)     no Borrower shall suspend or close a substantial portion of its business.

**6.4     Disposal of Assets**.   Convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral held by any Loan Party, other than in the Ordinary Course.  For the avoidance of doubt, any proceeds of such disposed Collateral shall be used to satisfy the Obligations consistent with Section 2.3(d)(i).

**6.5     Change Name**.   Change any Loan Party's name, state of organization, organizational identity or, to the extent applicable, organizational identification number.

**6.6     Nature of Business**.  Make any change in the nature of any Loan Party's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent any Loan Party from (i) engaging in any business that is reasonably related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code.

**6.7     Prepayments and Amendments**.   Change or modify the material terms of any material lease or contract in connection with Collateral except in a manner that could not reasonably be expected to result in a Material Adverse Change, or materially alter any Organizational Documents, except, in each case, with the prior written consent of Lender.

**6.8     Change of Control**.   Cause, permit, or suffer, directly or indirectly, any Change of Control.

**6.9     Accounting Methods**.   Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

**6.10     Transactions with Affiliates**.   Directly or indirectly enter into or permit to exist any transaction with any other Loan Party or any Affiliate of any Loan Party, except for transactions that are in the Ordinary Course of such Loan Party's business, including intercompany transactions among Loan Parties and their Affiliates.

**6.11     Use of Advances**.   Use the proceeds of the Advances for any purpose other than to pay (i) the Fees and Lender's Expenses, (ii) to pay in full the Banner Bank Obligations and the MidCap Obligations, and (iii) such other costs, expenses and fees for Borrowers' conduct of their respective businesses and operations and other post-Petition Date expenses, including the fees and expenses of the administration of the Borrowers' Chapter 11 Cases in accordance with the Budget.

**6.12     Limitation on Capital Expenditures**.   Except for Permitted Indebtedness, make or incur any Capital Expenditure.

**6.13     Chapter 11 Case**.   Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Interim Order or the Final Order, as applicable; (ii) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any

26

Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of Lender in respect to the Collateral; and (iii) any Lien on Collateral having a priority equal or superior to the Liens in favor of Lender in respect of the Obligations, other than as required under a purchase agreement with respect to the good faith deposit thereunder.

**6.14** **Plan**.  Propose and/or support any plan or reorganization that fails to pay in full in cash all Obligations on the effective date of said plan or is otherwise not reasonably acceptable to Lender.

## 7.    GUARANTY.

**7.1** **Guaranty**.  Each Guarantor unconditionally and irrevocably guarantees to the Lender the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations (the "Guaranteed Obligations").

**7.2** **Separate Obligation**.  Each Guarantor acknowledges and agrees that, in providing benefits to Borrowers, the Lender is relying upon the enforceability of this Section 7 and the Guaranteed Obligations.  The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of Borrowers and Guarantors and shall in no way impair or adversely affect the rights or benefits of the Lender under this Section 7.

**7.3** **Limitation of Guaranty**.  To the extent that any court of competent jurisdiction shall impose by final judgment under applicable Laws (including Sections 544 and 548 of the Bankruptcy Code) any limitations on the amount of any Guarantor's liability with respect to the Guaranteed Obligations that the Lender can enforce under this Section 7, Lender accepts such limitation on the amount of such Guarantor's liability hereunder only to the extent needed to make this Section 7 fully enforceable and non-avoidable.

**7.4** **Liability of Guarantors**.  The liability of each Guarantor under this Section 7 shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that might constitute a discharge of a surety or Guarantor other than the indefeasible payment and performance in full of all Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    such Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Guarantor and shall not be contingent upon the Lender 's exercise or enforcement of any remedy it may have against Borrowers or any other Person, or against any Collateral or any security for any Guaranteed Obligations;

(b)    this guarantee is a guaranty of payment when due and not merely of collectability;

(c)    such Guarantor's payment of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(d)      such Guarantor's liability with respect to the Guaranteed Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Guarantor be exonerated or discharged by, any of the following events:

(i)      any proceeding under the Bankruptcy Code (except to the extent set forth in Section 7.3);

(ii)      any limitation, discharge, or cessation of the liability of Borrowers or any other Person for any Guaranteed Obligations due to any applicable law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Loan Documents;

(iii)      any merger, acquisition, consolidation or change in structure of Borrowers, any Subsidiary thereof or any other Guarantor or Person, or any sale, lease, transfer or other disposition of any or all of the assets of Borrowers or any other Person;

(iv)      any assignment or other transfer, in whole or in part, of the Lender's interests in and rights under this Agreement (including this Section 7) or the other Loan Documents;

(v)      any claim, defense, counterclaim or setoff, other than that of prior performance, that Borrowers, such Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Loan Documents;

(vi)      the amendment, modification, renewal, extension, cancellation or surrender of any Loan Document or any Guaranteed Obligations; or

(vii)      the Lender's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations.

**7.5**      **Consents of Guarantors**.  Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Guarantor:

(a)      the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of Borrowers under the Loan Documents may be incurred and the time, manner, place or terms of any payment under any Loan Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Loan Document or otherwise;

(b)      the time for Borrowers' (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Loan Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as the Lender may deem proper;

(c)      the Lender may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend

28

such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(d)     the Lender may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against Borrowers.

7.6     **Guarantor's Waivers**.  Each Guarantor waives and agrees not to assert:

(a)     any defense arising by reason of any lack of corporate or other authority or any other defense of Borrowers, such Guarantor or any other Person;

(b)     any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations.  The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty.  Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon Borrowers, each Guarantor or any other Person with respect to the Guaranteed Obligations.

7.7     **Continuing Guaranty**.  This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Guarantor until termination of the Commitment and payment and performance in full of the Guarantied Obligations.

7.8     **Reinstatement**.  This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guarantied Obligations by or on behalf of Borrowers (or receipt of any proceeds of Collateral) shall be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to Borrowers, its estate, trustee, receiver or any other Person (including under the Bankruptcy Code), or must otherwise be restored by the Lender in the Chapter 11 Cases of the Borrowers.

## 8.     EVENTS OF DEFAULT.

8.1     **Event of Default**.  Any one or more of the following events shall constitute an event of default following giving of any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "Event of Default") under this Agreement:

(a)     Any Loan Party shall fail to pay any Obligation to the Lender when due, including, but not limited to, the payment of principal, interest or any fees or costs due to the Lender under this Agreement or any Loan Document;

(b)     Any Loan Party shall fail to comply with its obligations under Sections 5.1, 5.2, 5.3, 5.4, 5.8, 5.11, 5.12, Section 6, Section 7 and/or Section 9;

(c)     Other than as set forth in any other sub-section of this Section 8.1, any Loan Party, as applicable, shall fail to perform, or otherwise breach, any of its respective covenants or obligations contained in this Agreement, which failure or breach shall continue for ten (10) Business Days after the earlier to occur of (i) the date on which such failure to comply is

known or reasonably should have become known to any officer of the relevant Loan Party, or (ii) the date on which Lender shall have notified the relevant Loan Party of such failure; provided, however, that such ten (10) Business Day period shall not apply in the case of any failure which is not capable of being cured at all or within such ten (10) Business Day period;

(d)     Any representation or warranty made by any Loan Party in this Agreement or in any agreement, certificate, instrument or financial statement or other statement delivered to the Lender pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when made or deemed made, which failure or breach shall continue for ten (10) Business Days after the date upon which such default is known or reasonably should have become known to any officer of the relevant Loan Party or it has received a written notice of such failure or breach from the Lender;

(e)     Except upon the Lender's prior written request or with the Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the Lender), any Loan Party shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim Order, the Final Order or any of the Loan Documents;

(f)     Borrowers shall file or obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization that does not propose to pay in full in cash all Obligations on the effective date of said plan;

(g)     Any Loan Party shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Lender under the Interim Order or the Final Order, as applicable, or with respect to the Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Interim Order or the Final Order, as applicable;

(h)     The Interim Order or the Final Order, as applicable, shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(i)     The occurrence of any default or event of default under the Interim Order or the Final Order, as applicable, and the continuance thereof after any grace or cure period provided in such order or granted by order of a court in the Bankruptcy Cases;

(j)     The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lender (other than any creditor having a Lien on specific equipment that is senior to the Lender), to realize upon, or to exercise any right or remedy with respect to, the Collateral;

(k)     Conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily and the Obligations are not simultaneously indefeasibly paid in full;

(l)     The Interim Order or the Final Order, as applicable, is modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(m)     A trustee or an examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code;

(n)     A chapter 11 plan is confirmed that does not provide for the payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnifications for the Lender and Lender Related Persons;

(o)     The occurrence of a Change of Control;

(p)     Following one hundred and twenty (120) days from the Petition Date, the failure of the Borrowers to have (i) filed an Acceptable Plan or (ii) presented an alternative going forward strategy for resolving the Chapter 11 Cases that is acceptable to the Lender, in its sole discretion; or

(q)     Following one hundred and eighty (180) days from the Petition Date, the failure of the Borrowers to have (i) effectuated an Acceptable Plan or (ii) obtained final court approval of an alternative transaction acceptable to the Lender, in its sole discretion.

**8.2     Rights and Remedies**.

(a)     Upon the occurrence and during the continuance of an Event of Default, and notwithstanding Section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court or the initiation of any further proceeding with the Loan Parties except as provided in this Section 8.2, in addition to any other rights or remedies provided for hereunder or under any other Loan Document (including the Interim Order or the Final Order, as applicable) or by the UCC or any other applicable law, the Lender may do any one or more of the following:

(i)     declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Loan Parties;

(ii)     upon three (3) Business Days' notice to the Loan Parties, Borrowers' lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, terminate the Borrowers' ability to use Cash Collateral other than amounts used for purposes and in a manner otherwise permitted by this Agreement and held in operating accounts subject to deposit account control agreements in favor of Lender until such time as Borrowers are no longer in possession of its hospitals and other revenue generating properties;

(iii)     charge interest at the Default Rate;

(iv)     upon five (5) days' prior written notice (which period shall be deemed to be reasonable notice) to the Loan Parties, Borrower's lead bankruptcy counsel and the

United States Trustee and lead counsel for any creditors' committee, obtain and liquidate the Collateral. If notice of disposition of Collateral is required by law, ten (10) days prior notice by the Lender to the Loan Parties designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and the Loan Parties waive any other notice. The Lender may bid for and purchase the Collateral at any public sale. The Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(v)     require the applicable Loan Party to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;

(vi)     upon five (5) days' prior written notice (which period shall be deemed to be reasonable notice) to the Loan Parties and the Borrowers' lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, take possession of all Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and

(vii)     exercise any of its other rights under the Loan Documents, any rights granted under the Interim Order or Final Order, as applicable, and applicable law.

(b)     To the extent an Event of Default occurs as a result of the Loan Parties' failure to indefeasibly satisfy the Obligations in full by the Stated Maturity Date, the Loan Parties waive any right to any notice period set forth in <u>Section 8.2</u> (except to the extent a notice period is required by operation of law) and (b) to challenge (i) whether or not the Maturity Date or an Event of Default has occurred, (ii) the Lender's exercise of its rights and remedies against the Collateral, including without limitation, any foreclosure through a state court proceeding, and (iii) the applicability of the Default Rate or the Stated Maturity Date Fee.

**8.3     Application of Proceeds upon Event of Default**. Lender shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (i) first, to Lender Expenses consisting of reasonable attorneys' fees and all expenses (including, but not limited to, court costs, advertising expenses, auctioneer's fees, premiums for any required bonds, auditor's fees, amounts advanced for taxes and other expenses) incurred by the Lender in attempting to enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; (ii) second, to the discharge of any accrued but unpaid Fees (including, but not limited to, the Exit Fee and the Stated Maturity Date Fee), (iii) third, to the discharge of any accrued but unpaid interest on the Obligations, (iv) fourth, to the outstanding principal balance of any Obligations, (v) fifth, to the satisfaction of the other security interests and liens of record which are inferior to the security interest created by this Agreement, in order of their priority; and (vi) sixth, to pay any remaining surplus to Lead Borrower, on behalf of the Loan Parties collectively.

**8.4     Remedies Cumulative**. The rights and remedies of Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by

19-01189-FLK11   Doc 82   Filed 05/09/19   Entered 05/09/19 10:30:37   Pg 84 of 133

Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

## 9. PRIORITY AND COLLATERAL SECURITY

### 9.1 Superpriority Claims; Subordination in favor of Lender Liens.

(a) Each Borrower warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the Interim Order or the Final Order, as applicable, the Obligations of any Borrower under the Loan Documents:

(i) Shall, in accordance with section 364(c)(1) of the Bankruptcy Code, constitute allowed senior administrative expense claims against each Borrower and their estates (the "Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order with respect to Section 506(c) only), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the Superpriority Claims shall be subject to and subordinate to only the Carve-Out; provided, further that the Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all Collateral and all proceeds thereof, and (a) any and all avoidance power claims or causes of action under Sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (the "Avoidance Actions") and the proceeds thereof, (b) prepetition tort claims, including claims against the Debtors' current and former directors and officers (if any) and the proceeds thereof; and (c) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "Sale Deposit") subject, however, only to the senior lien rights of a stalking horse purchaser and such stalking horse bid protections as may be approved by the Bankruptcy Court;

(ii) shall be secured by valid, enforceable, non-avoidable and perfected liens on and security interests in favor of the Lender in all Collateral in which any Borrower has any right, title or interest, in accordance with the Required Lien Priority.

(b) In the event any of the Collateral is transferred to any Borrower, such transfer shall be subject in all respects to the Lender's Liens.

(c) The Superpriority Claims referred to in this Section 9.1 shall have the priority afforded to such Superpriority Claims in the Interim Order and upon entry thereof, the Final Order.

### 9.2 Grant of Security Interest in the Collateral. To secure the payment and performance of the Obligations, each Borrower hereby grants, collaterally pledges and assigns to Lender the following:

19-01189-FLK11    Doc 82    Filed 05/09/19    Entered 05/09/19 10:30:37    Pg 85 of 133

(a) *Liens Priming the Prepetition Credit Liens*. Pursuant to Section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens and security interests in all Collateral, regardless of where located, which senior priming liens and security interests in favor of the Lender shall be senior to all Prepetition Credit Liens other than the Lapis Senior Holdco Liens. For the avoidance of doubt, as a result of the priming of the Prepetition Credit Liens (other than the Lapis Senior Holdco Liens) pursuant to this Interim Order, the Lender shall have a first priority senior priming lien and security interest in, among other things, (A) all of the assets of Sunnyside and its debtor and non-debtor subsidiaries, including, but not limited to, the Banner Bank Collateral, (B) the MidCap A/R Collateral, and (C) the Debtors' prepetition and postpetition commercial tort claims, including but not limited to all claims and causes of action (i) against the Debtors' officers and directors, and (ii) related to accounts receivable collections, and the proceeds thereof (regardless of whether such proceeds arise from damages to the Prepetition Collateral).

(b) *Liens on Unencumbered Property*. Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all Collateral that is not otherwise subject to any Permitted Prior Lien. As used herein, the term "Permitted Prior Lien" shall mean any valid, enforceable, and non-avoidable liens on and security interests in the Collateral that (A) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), (B) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (C) are senior in priority to the Lender's Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements; provided, however, that the Lender's Liens shall have priority over all Prepetition Credit Liens other than the Lapis Senior Holdco Liens; and

(c) *Liens Junior to Certain Other Liens*. Pursuant to Section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Lapis Senior Holdco Liens and the Permitted Prior Liens.

The Lien priorities set forth above shall be referred to as the "Required Lien Priorities".

**9.3** **Representations and Warranties in Connection with Security Interest**. Each Loan Party represents and warrants to the Lender as follows:

(a) Such Loan Party has full right and power to grant to the Lender a perfected, security interest and Lien, in accordance with the Required Lien Priority, on such Loan Party's respective interests in the Collateral pursuant to this Agreement and the other Loan Documents, and with respect to Borrowers upon entry of the Interim Order.

(b) Upon (i) the execution and delivery of this Agreement, (ii) with respect to any Guarantor, the filing of the necessary financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, and (iii) with respect to any Borrower, upon entry of the Interim Order, the Lender will have a good, valid and perfected Lien and security interest in the Collateral granted by the applicable Loan Party, in accordance

with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person.

(c)     As of the Closing Date, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by such Loan Party is on file in any public office except those on behalf of the Lender, other than the filings made by the Loan Parties' pre-Petition Date lenders or creditors as referenced in <u>Schedule 4.4</u>.

(d)     As of the Closing Date, such Loan Party is not party or otherwise subject to any agreement, document or instrument that conflicts with this <u>Section 9.3</u>.

**9.4     <u>Covenants with Respect to Collateral</u>.**     As long as any Obligations are outstanding, each Loan Party covenants and agrees as follows:

(a)     Such Loan Party shall not sell, transfer, give, assign or in any other manner dispose of all or any portion of, or any interest in, any of the Collateral, except to the extent permitted by this Agreement.  Such Loan Party shall not permit or suffer to exist any Liens or security interests encumbering any of the Collateral other than as permitted under this Agreement.

(b)     Lead Borrower shall inform the Lender of any default or event of default under any agreement comprising the Collateral that materially and adversely impacts the Collateral or its value as soon as practicable upon any Loan Party becoming aware of any such default or event of default, and shall exercise remedies thereunder at the instruction of, or with the prior written consent of, the Lender.

(c)     Such Loan Party shall not consolidate with or merge with or into any other corporation, or liquidate or dissolve, without the prior written consent of the Lender.  Such Loan Party shall not sell all or substantially all of its assets, except as otherwise permitted by this Agreement or otherwise with the prior written consent of the Lender.

(d)     Such Loan Party shall not change the jurisdiction of its formation without the prior written consent of the Lender.  Such Loan Party shall not change its name or the location of its principal executive office without giving the Lender thirty (30) days' prior written notice.

(e)     The Collateral shall be kept only at the locations set forth on <u>Schedule 9.4(e)</u> and shall not be moved from such locations without the prior consent of the Lender, except for ordinary course activities incidental to the operation of the Loan Parties businesses.

(f)     With respect to any Deposit Account of a Loan Party, the relevant Loan Party shall cause the depositary institution maintaining such account to enter into a Control Agreement in favor of the Lender within sixty (60) days after the funding of the first Advance, as such date may be extended by the Lender in its reasonable discretion.

**9.5     <u>Lender's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral</u>**.  The Lender shall have the right, but not the obligation, to perform on such Loan Party's behalf any or all of such Loan Party's obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account and at the sole risk of the applicable Loan Party.

19-01189-FLK11     Doc 82     Filed 05/09/19     Entered 05/09/19 10:30:37     Pg 87 of 133

**9.6** **Filing of Financing Statements**.  Each Loan Party irrevocably authorizes the Lender to prepare and file financing statements provided for by the UCC, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect the Lender's security interest in the Collateral, in all jurisdictions in which the Lender believes in its sole opinion that such filing is appropriate.  Each Loan Party also irrevocably authorizes the Lender to file such continuation statements and amendments and to take such other action as may be required or appropriate, in either case in Lender's sole judgment, in order to perfect and to continue the perfection of Lender's security interests in the Collateral, unless prohibited by law

**9.7** **No Discharge; Survival of Claims**. Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrowers hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the indefeasible payment in full in cash of the Obligations under this Agreement.

## 10. **WAIVERS; INDEMNIFICATION**.

**10.1** **Demand; Protest; etc**.  To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, each Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which such Loan Party may in any way be liable.

**10.2** **Lender's Liability for Collateral**.  As long as Lender complies with its obligations, if any, under the UCC, Lender shall not in any way or manner be liable or responsible for:  (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person.  All risk of loss, damage, or destruction of the Collateral shall be borne by the Loan Parties, except any thereof resulting from the gross negligence, bad faith or willful misconduct of Lender as finally determined by a court of competent jurisdiction.

**10.3** **Indemnification**.  Each Loan Party shall pay, indemnify, defend, and hold the Lender Related Persons (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and actual damages, and all reasonable and documented out-of-pocket fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Loan Parties' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a

party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any Collateral or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, the Loan Parties shall have no obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents.  This provision shall survive the termination of this Agreement and the repayment of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Loan Party was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Loan Party with respect thereto.  **WITHOUT LIMITATION OF THE FOREGOING, THE INDEMNITY ABOVE SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON.**

11.    **NOTICES**.

All notices or demands relating to this Agreement or any other Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith).  In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to any Loan Party:

Astria Health
1806 Yakima Valley Hwy
Sunnyside, WA 98944-1261
Attn:  Cary Rowan, Chief Financial Officer
Telephone: 509-837-1356
Email: cary@astria.health

With a copy, which shall not constitute notice to:

Dentons US LLP
1900 K Street, NW
Washington, DC 20006
Attn:  Sam Alberts
Telephone:  202-408-7004
Email:  sam.alberts@dentons.com

If to Lender:

> JMB Capital Partners Lending, LLC
> 1999 Avenue of the Stars, Suite 2040
> Los Angeles, CA 90067
> Attn: Vikas Tandon
> Telephone: 310-286-2929
> Facsimile: 310-286-6662

with copies to:

> Arent Fox LLP
> 1301 Avenue of the Americas, 42nd Fl.
> New York, NY 10019-6040
> Telephone:
>
> Attn: Rob Hirsh
> Telephone: 212-457-5430
> Email: robert.hirsh@arentfox.com
>
> Attn: Jordana Renert
> Telephone: 212-457-5476
> Email: jordana.renert@arentfox.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function. If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

## 12. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a) THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b) THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN

DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH LOAN PARTY AND LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b); PROVIDED, FURTHER, HOWEVER, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASE REMAINS PENDING.

(c) TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH LOAN PARTY AND LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH LOAN PARTY AND LENDER REPRESENT THAT EACH SUCH PARTY HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

## 13. AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION.

**13.1** **Amendments and Waivers**. No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by Lender and Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

**13.2** **No Waivers; Cumulative Remedies**. No failure by Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by Loan Parties of any provision of this Agreement. Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

**13.3** **Successors**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided that no Loan Party may assign this

39

Agreement or any rights or duties hereunder without Lender's prior written consent and such consent shall not, unless otherwise provided in such consent, release any Loan Party from its Obligations. Any assignment by Loan Party which is not explicitly permitted hereunder shall be absolutely void *ab initio*. Lender may assign all or part of its rights and duties hereunder without consent from any other party. Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder or assign any Advances or Commitment (in whole or in part) to an Affiliate without notice to or consent of any Loan Party.

## 14. GENERAL PROVISIONS.

**14.1 Effectiveness**. This Agreement shall be binding and deemed effective when executed by the Loan Parties and Lender.

**14.2 Section Headings**. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

**14.3 Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or any Loan Party, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

**14.4 Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**14.5 Debtor-Creditor Relationship**. The relationship between Lender, on the one hand, and each Loan Party, on the other hand, is solely that of creditor and debtor, as applicable. Lender does not have (and shall not be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lender, on the one hand, and Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

**14.6 Counterparts; Electronic Execution**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

**14.7 Revival and Reinstatement of Obligations**. If the incurrence or payment of the Obligations by Loan Parties or the transfer to Lender of any property should for any reason

19-01189-FLK11    Doc 82    Filed 05/09/19    Entered 05/09/19 10:30:37    Pg 92 of 133

subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable and actual out-of-pocket costs, expenses, and attorneys' fees of Lender related thereto, the liability of Loan Parties automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

**14.8** **Lender Expenses**.  Notwithstanding the Work Fee, the Borrowers agree to pay any and all Lender Expenses (exclusive of those covered by the Work Fee) promptly after written demand therefor by Lender and that such Obligations shall survive payment or satisfaction in full of all other Obligations.

**14.9** **Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

## 15.    JOINT AND SEVERAL LIABILITY AMONG BORROWERS

Each Borrower acknowledges, represents and warrants the following:

**15.1** **Inducement**.  Lender has been induced to make the Advances to Borrowers in part based upon the assurances by each Borrower that such Borrower desires that the Advances be honored and enforced as separate obligations of such Borrower, should Lender desire to do so.

**15.2** **Combined Liability**.  Notwithstanding the foregoing, the Advances and the other Obligations constitute the joint and several obligations of each and every Borrower, and Lender may at its option enforce the entire amount of the Advances and the other obligations of any Borrower against any one or more Borrowers.

**15.3** **Separate Exercise of Remedies**.  Lender may exercise remedies against each Borrower and its property separately, whether or not Lender exercises remedies against any other Borrower or its property.  Lender may enforce one or more Borrower's Obligations without enforcing any other Borrower's Obligations.  Any failure or inability of Lender to enforce one or more Borrower's Obligations shall not in any way limit Lender's right to enforce the Obligations of any other Borrower.  If Lender forecloses or exercises similar remedies on any Collateral, then such foreclosure or similar remedy shall be deemed to reduce the balance of the Advances only to the extent of the cash proceeds actually realized by Lender from such foreclosure or similar remedy or, if applicable, Lender's credit bid at such sale, regardless of the effect of such foreclosure or similar remedy on the Advances secured by such Collateral under the applicable state law.

[Signature pages follow.]

19-01189-FLK11    Doc 82    Filed 05/09/19    Entered 05/09/19 10:30:37    Pg 93 of 133

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWERS:**

**Astria Health**, a Washington non-profit corporation

By:_____
Name:  John Gallagher
Title:   President and Chief Executive Officer

**Glacier Canyon, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory

**Kitchen and Bath Furnishings, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory

**Oxbow Summit, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory

**SHC Holdco, LLC**, a Washington non-profit Limited Liability Company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory

**SHC Medical Center – Toppenish**, a
Washington non-profit corporation

By: _____
Name:  John Gallagher
Title:  Authorized Signatory

**SHC Medical Center – Yakima**, a Washington
non-profit corporation

By: _____
Name:  John Gallagher
Title:  Authorized Signatory

**Sunnyside Community Hospital Association**,
a Washington non-profit corporation

By: _____
Name:  John Gallagher
Title:  Authorized Signatory

**Sunnyside Community Hospital Home
Medical Supply, LLC**, a Washington for-profit
limited liability company

By: _____
Name:  John Gallagher
Title:  Authorized Signatory

**Sunnyside Home Health**, a Washington non-
profit corporation

By: _____
Name:  John Gallagher
Title:  Authorized Signatory

[Signature Page to Astria DIP Loan and Security Agreement]

**Sunnyside Professional Services, LLC**, a
Washington non-profit limited liability company


By:_____
Name: John Gallagher
Title: Authorized Signatory


**Yakima HMA Home Health, LLC**, a
Washington for-profit limited liability company


By:_____
Name: John Gallagher
Title: Authorized Signatory


**Yakima Home Care Holdings, LLC**, a
Delaware for-profit limited liability company


By:_____
Name: John Gallagher
Title: Authorized Signatory

**GUARANTORS:**

**Astria Health Clinically Integrated Network, LLC**, a Missouri for-profit limited liability company

By:_____
Name:  John Gallagher
Title:    Authorized Signatory

**Bridal Dreams, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:    Authorized Signatory

**Depot Plus, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:    Authorized Signatory

**Home Supply, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:    Authorized Signatory

**Kitchen Appliance, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:    Authorized Signatory

**Northwest Health, LLC**, a Delaware for-profit limited liability company

By: _____
Name:  John Gallagher
Title:    Authorized Signatory


**Pacific Northwest ASC Management, LLC**, a Delaware for-profit limited liability company

By: _____
Name:  John Gallagher
Title:    Authorized Signatory


**Sunnyside Hospital Service Corp.**, a Washington for-profit corporation

By: _____
Name:  John Gallagher
Title:    Authorized Signatory


**Sunnyside Medical Center, LLC**, a Washington for-profit limited liability company

By: _____
Name:  John Gallagher
Title:    Authorized Signatory


**Wedded Bliss, LLC**, a Delaware for-profit limited liability company

By: _____
Name:  John Gallagher
Title:    Authorized Signatory

[Signature Page to Astria DIP Loan and Security Agreement]

**LENDER:**

**JMB Capital Partners Lending, LLC**

By: _____
Name:  Vikas Tandon
Title:  Manager

# EXHIBIT A

## Form of Compliance Certificate

Date: _____, 2019

This Compliance Certificate (this "Certificate") is given to JMB Capital Partners Lending LLC, a California limited liability company (together with its successors and assigns, the "Lender" or "Agent"), by Astria Health, a Washington non-profit corporation, in its capacity as Lead Borrower, pursuant to Section 5.1 of that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Securities Agreement dated as of May ___, 2019 (as the same has been amended through the date hereof, the "Loan Agreement") among Astria Health and the other Borrowers party thereto, their Affiliates party thereto as Guarantors, and JMB Capital Partners Lending, LLC, as Lender. Capitalized terms used and not defined herein have the meanings set forth in the Loan Agreement.

The Lead Borrower hereby certifies that:

(a)    Borrowers are in compliance with the conditions precedent set forth in Section 3.1 and 3.2 of the Loan Agreement.

(b)    The representations and warranties of the Loan Parties contained in the Loan Agreement and in the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(c)    No Default or Event of Default shall have occurred and be continuing on the requested funding date, nor shall either result from the making thereof.

(d)    The Interim Order or the Final Order, as applicable, has been entered by the Bankruptcy Court in form and substance satisfactory to Lender in its sole discretion, and remains in full force and effect on the date hereof and has not been, from the time of the entry of such order, modified or amended (unless otherwise approved by the Lender), reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed.

(e)    No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, has been issued by any Governmental Authority against any Loan Party or Lender.

(f)    No action, proceeding, investigation, regulation or legislation has been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of the Loan Agreement or any of the other Loan Documents or the consummation of the transactions contemplated thereby.

**IN WITNESS WHEREOF**, the Lead Borrower has caused this Certificate to be executed this _____ day of _____, 2019.

**Astria Health**, a Washington non-profit corporation, as Lead Borrower

By:_____
Name:
Title:

# **EXHIBIT B**

## **Budget**

See attached.

**Astria Health**

*All figures in thousands of U.S. dollars*

| Week-ending date | 1 (P) 5/11 | 2 (P) 5/18 | 3 (P) 5/25 | 4 (P) 6/1 | 5 (P) 6/8 | 6 (P) 6/15 | 7 (P) 6/22 | 8 (P) 6/29 | 9 (P) 7/6 | 10 (P) 7/13 | 11 (P) 7/20 | 12 (P) 7/27 | 13 (P) 8/3 | 14 (P) 8/10 | 17 weeks ended 8/10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning operating cash balance** | 1,000 | 2,543 | 2,953 | 1,606 | 8,149 | 7,477 | 8,122 | 8,450 | 7,876 | 6,719 | 7,514 | 6,190 | 5,743 | 5,211 | 1,000 |
| **Collections** | | | | | | | | | | | | | | | |
| Yakima/Toppenish | 2,000 | 2,000 | 2,000 | 2,150 | 2,150 | 2,150 | 2,150 | 2,400 | 2,400 | 2,400 | 2,400 | 2,650 | 2,650 | 2,650 | 32,150 |
| Sunnyside | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 28,700 |
| Provider Tax | - | - | - | - | - | - | 1,000 | 100 | - | - | - | - | - | - | 1,100 |
| Debtor in Possession Loan Borrowing | 28,000 | - | - | 8,000 | - | - | - | - | - | - | - | - | - | - | 36,000 |
| **Total collections** | 32,050 | 4,050 | 4,050 | 12,200 | 4,200 | 4,200 | 5,200 | 4,550 | 4,450 | 4,450 | 4,450 | 4,700 | 4,700 | 4,700 | 97,950 |
| **Operating disbursements** | | | | | | | | | | | | | | | |
| Payroll, taxes, and other - Y/T | 2,030 | 200 | 2,205 | 240 | 2,030 | 240 | 2,030 | 240 | 2,030 | 240 | 2,030 | 240 | 2,030 | 240 | 16,025 |
| Payroll & Other ASH | 527 | 1,000 | 877 | 1,000 | 527 | 1,000 | 527 | 1,227 | 642 | 1,000 | 527 | 1,000 | 527 | 1,000 | 11,381 |
| Other Op Ex | 252 | 252 | 252 | 252 | 252 | 252 | 252 | 252 | 252 | 252 | 252 | 252 | 252 | 252 | 3,528 |
| Purchased services | 676 | 676 | 676 | 676 | 676 | 676 | 676 | 676 | 676 | 676 | 676 | 676 | 676 | 676 | 9,464 |
| Contract labor | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 1,764 |
| Rent | 106 | 131 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 1,509 |
| Medical professionals | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 1,596 |
| Utilities | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 1,428 |
| Prop Tax and Ins | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 1,106 |
| Supplies, pharmaceuticals, and dietary | 2,235 | 810 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 11,565 |
| Corporate-Overhead | - | - | - | 560 | - | - | - | 560 | - | - | - | 560 | - | - | 1,680 |
| Corporate Payroll | - | - | - | 232 | - | - | - | 232 | - | - | - | 232 | - | - | 696 |
| Provider Tax | - | - | - | - | - | - | - | - | - | - | 902 | - | - | - | 902 |
| CRO Fees | - | - | - | 100 | - | - | - | - | - | 100 | - | - | - | 100 | 300 |
| Capex | 150 | 150 | 150 | 325 | 150 | 150 | 150 | 150 | 325 | 150 | 150 | 150 | 150 | 175 | 2,475 |
| UMR Payments | - | - | - | 85 | - | - | - | - | 85 | - | - | - | - | - | 170 |
| Medicaid Repayment ASH | - | - | - | 550 | - | - | - | 550 | - | - | - | 550 | - | - | 1,650 |
| Professional Fees ( see note below) | 1,110 | - | - | 120 | - | - | - | - | - | - | - | - | - | - | 1,230 |
| Cash Out for Loan Payoff | 22,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 22,000 |
| DIP Fees and Expenses | 1,000 | - | - | 280 | - | - | - | - | - | - | - | - | - | - | 1,280 |
| DIP Interest | - | - | - | - | - | - | - | - | 360 | - | - | - | 360 | - | 720 |
| Misc | - | - | - | - | - | - | - | - | - | - | - | 250 | - | - | 250 |
| UST Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total operating disbursements** | 30,507 | 3,640 | 5,397 | 5,657 | 4,872 | 3,555 | 4,872 | 5,124 | 5,607 | 3,655 | 5,774 | 5,147 | 5,232 | 3,680 | 92,719 |
| **Total disbursements** | 30,507 | 3,640 | 5,397 | 5,657 | 4,872 | 3,555 | 4,872 | 5,124 | 5,607 | 3,655 | 5,774 | 5,147 | 5,232 | 3,680 | 92,719 |
| **NET CASH FLOW** | 1,543 | 410 | (1,347) | 6,543 | (672) | 645 | 328 | (574) | (1,157) | 795 | (1,324) | (447) | (532) | 1,020 | 5,231 |
| **DIP Borrowings** | 28,000 | 28,000 | 28,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 |
| **DIP BALANCE** | 28,000 | 28,000 | 28,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 |

Exhibit A

## EXHIBIT C

## Reporting Requirements

(a)    **Financial Reports**.  Lead Borrower shall furnish to Lender, in a form satisfactory to Lender, in its sole discretion, as soon as available and in any event within fifteen (15) days after the end of each calendar month:

(i)    unaudited consolidated financial statements for such calendar month and/or quarter, as applicable, of the Borrowers consisting of a balance sheet, and related statements of income, retained earnings, cash flows and owners' equity, all of which shall be certified on behalf of the Borrowers by an Authorized Person as being in compliance with this paragraph (a);

(ii)    an operating report for Borrowers, including a detailed comparison of the actual year-to-date operating results against the Budget; and

(iii)    solely with respect to the last month of each fiscal quarter, a management report signed by an Authorized Person of Borrowers, describing in reasonable detail the Borrowers' operations and financial condition for such month.

For the avoidance of doubt, the reports required under sub-sections (a)(i) and (a)(iii) above may consist of the monthly operating reports as filed in the Chapter 11 Case.

All financial statements shall be prepared, and shall be complete, correct and fairly presenting in all material respects, in each case in accordance with GAAP consistently applied with prior periods the financial position and results of operations of the Borrower (provided that interim financial statements shall not be required to have footnote disclosure and may be subject to normal year-end adjustments).

(b)    **Other Materials**.  The Loan Parties shall furnish to Lender, in form and substance satisfactory to Lender, as soon as available and in any event within five (5) Business Days after the preparation, receipt or issuance thereof or request therefor by Lender, (A) copies of any reports and management control letters provided by the Loan Parties' independent accountants and (B) such additional information, documents, statements, and other materials as Lender may request from time to time in its sole discretion.

(c)    **Notices**.  Lead Borrower or the Loan Parties for itself, promptly, and in any event within five (5) Business Days after any such Loan Party or any Authorized Person thereof obtains knowledge thereof, shall notify Lender in writing of:

(i)    any pending or threatened action, suit, proceeding or investigation involving a Loan Party or Subsidiary thereof, or any such Person's property to the extent the amount in controversy exceeds $250,000 in the aggregate or any injunctive relief is sought;

(ii)    (A) the receipt of any notice or request from any Governmental Authority regarding any liability or claim equal to or exceeding $250,000 in the aggregate or (B) any

Exhibit C - 1

material action taken or threatened to be taken by any Governmental Authority (or any notice of any of the foregoing);

(iii)    any notice regarding termination by the lessor of any lease of material real property (other than any such termination resulting from the scheduled expiration thereof, pursuant to the originally agreed upon terms) or of any senior officer, or the loss, termination or expiration of any material contract to which any Loan Party or its assets are bound which could reasonably be expected to result in a Material Adverse Change; and

(iv)    the filing, recording or assessment of any federal, state, local or foreign tax Lien against any Collateral (other than real estate taxes and municipal charges related to Collateral consisting of real property) or any Loan Party.

(d)    **Updates**.  The Loan Parties shall furnish to Lender revisions to the schedules to any Loan Document to the extent necessary or appropriate; <u>provided</u>, that delivery or receipt thereof by Lender shall not constitute a waiver by Lender or a cure of any Default or Event of Default resulting therefrom, or result in an amendment or modification of such schedules.

(e)    **Material Adverse Change**.  Promptly upon an Authorized Person of any Loan Party obtaining knowledge of any development or event pertaining to such Loan Party that has caused, or which could reasonably be expected to cause, a Material Adverse Change with respect to which notice is not otherwise required to be given pursuant to this <u>Exhibit C</u>, a certificate signed by an Authorized Person of Lead Borrower or the relevant Loan Party setting forth the details of such development or event and stating what action the relevant Loan Party has taken or proposes to take with respect thereto.

(f)    **Management Letters**.  Promptly after the receipt thereof by any Loan Party, copies of any management letters and any reports as to material inadequacies in accounting controls (including reports as to the absence of any such inadequacies) submitted to such Loan Party by its independent certified public accountants in connection with any audit of such Loan Party made by such accountants.

(g)    **Other Information**.  Any other information, including financial statements and computations, relating to the performance of any Loan Party that Lender may from time to time request in its sole discretion and which is reasonably capable of being obtained, produced or generated by such Loan Party.

Exhibit C - 2

**EXHIBIT D**

**Request for Advance**

JMB Capital Partners Lending, LLC                  Advance Request No. _____
1999 Avenue of the Stars, Suite 2040
Los Angeles, CA 90067
Attention:  Vikas Tandon

Ladies and Gentlemen:

The undersigned, as Lead Borrower, executes and delivers this Request for Advance ("Request") in connection with the Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement, dated as of May ___, 2019 (as amended, restated, supplemented, replaced, renewed or otherwise modified from time to time, the "Loan Agreement") by and among Astria Health and the other Borrowers party thereto, their Affiliates party thereto as Guarantors, and JMB Capital Partners Lending, LLC, as Lender.  Capitalized terms used in this Request without definition shall have the same meanings herein as they have in the Loan Agreement.  This Request constitutes a Loan Document.

Pursuant to Section 2.2 of the Loan Agreement, Borrowers hereby request an Advance in the amount of $_____ on _____, 2019.

Lead Borrower hereby represents, warrants to Lender as follows:

1.      As of this date, each Loan Party is in compliance with all of the terms and conditions of the Loan Agreement and the other Loan Documents and no default or Event of Default thereunder exists, nor shall result from the making of the Advance requested hereunder.

2.      Each Loan Party's representations and warranties set forth in the Loan Agreement, the other Loan Documents and any other related document are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

3.      As of the date of this Request, the sum of the outstanding principal under the Facility (after giving effect to the Advance and pledge to be made on such date pursuant to this Request) plus the amount requested in any outstanding but unfunded Request for Advances does not violate Section 2.1 of the Loan Agreement.

[Signature Page Follows]

19-01189-FLK11   Doc 82   Filed 05/09/19   Entered 05/09/19 10:30:37   Pg 106 of 133

**BORROWERS**:

**Astria Health**, a Washington non-profit corporation

By:_____
Name:  John Gallagher
Title:    President and Chief Executive Officer

[Signature Page to Request for Advance]

# LIST OF SCHEDULES

Schedule A-1    –    Loan Account

Schedule A-2    –    Authorized Persons

Schedule D  1    –    Designated Account and Designated Account Bank

Schedule 4.1(a)    –    Organizational Chart

Schedule 4.1(b)    –    Loan Parties and Equity Ownership

Schedule 4.4    –    Existing Prepetition Liens

Schedule 4.5    –    Uniform Commercial Code Filing Information

Schedule 4.6    –    Litigation

Schedule 4.8    –    Existing Indebtedness

Schedule 4.9    –    Taxes

Schedule 5.5    –    Maintenance of Properties; Permits

Schedule 9.4(e)    –    Collateral Locations

# Schedule A-1

## Loan Account

| Bank | Account Owner | Account No. | Account Type |
|---|---|---|---|
| First Republic Bank | Lender | _____ | Operating Account |

## <u>Schedule A-2</u>

Authorized Persons

John M. Gallagher, President and Chief Executive Officer of Astria Health

## <u>Schedule D-1</u>

Designated Account and  Designated Account Bank

| Bank | Routing No. | Account No. | Reference: |
|------|-------------|-------------|------------|
| Banner Bank | 323371076 | 500341013 | DIP Loan Account |

108916175\V-2

# Schedule 4.1(a)

## Organizational Chart[1]



---

[1] Blue boxes indicate Debtors. Orange boxes indicate Guarantors. Non-Debtor or Non-Guarantor entities not listed.

108916175\V-2

**Schedule 4.1(b)**

Loan Parties and Equity Ownership

| Borrowers | | | |
|---|---|---|---|
| | <u>Legal Name</u> | <u>Jurisdiction</u> | <u>Entity Type</u> | <u>Ownership Shareholder/Member of Entity</u> |
| 1. | Astria Health | Washington | Non-profit corporation | No Members |
| 2. | Glacier Canyon, LLC | Delaware | For-profit limited liability company | Astria Health |
| 3. | Kitchen and Bath Furnishings, LLC | Delaware | For-profit limited liability company | Home Supply, LLC |
| 4. | Oxbow Summit, LLC | Delaware | For-profit limited liability company | Sunnyside Community Hospital Association |
| 5. | SHC Holdco, LLC | Washington | Non-profit Limited Liability Company | Astria Health |
| 6. | SHC Medical Center – Toppenish | Washington | Non-profit corporation | SHC Holdco, LLC |
| 7. | SHC Medical Center – Yakima | Washington | Non-profit corporation | SHC Holdco, LLC |
| 8. | Sunnyside Community Hospital Association | Washington | Non-profit corporation | Astria Health |
| 9. | Sunnyside Community Hospital Home Medical Supply, LLC | Washington | For-profit limited liability company | Sunnyside Community Hospital Association |
| 10. | Sunnyside Home Health | Washington | Non-profit corporation | Sunnyside Community Hospital Association |
| 11. | Sunnyside Professional Services, LLC | Washington | Non-profit limited liability company | Sunnyside Community Hospital Association |
| 12. | Yakima HMA Home Health, LLC | Washington | For-profit limited liability company | Yakima Home Care Holdings, LLC |
| 13. | Yakima Home Care Holdings, LLC | Delaware | For-profit limited liability company | SHC Holdco, LLC |

| Guarantors | | | |
|---|---|---|---|
| | Legal Name | Jurisdiction | Entity Type | Ownership Shareholder/Member of Entity |
| 1. | Astria Health Clinically Integrated Network, LLC | Missouri | For-profit limited liability company | Astria Health |
| 2. | Bridal Dreams, LLC | Delaware | For-profit limited liability company | Wedded Bliss, LLC |
| 3. | Depot Plus, LLC | Delaware | For-profit limited liability company | Kitchen Appliance, LLC |
| 4. | Home Supply, LLC | Delaware | For-profit limited liability company | Sunnyside Community Hospital Association |
| 5. | Kitchen Appliance, LLC | Delaware | For-profit limited liability company | Sunnyside Community Hospital Association |
| 6. | Northwest Health, LLC | Delaware | For-profit limited liability company | Sunnyside Community Hospital Association |
| 7. | Pacific Northwest ASC Management, LLC | Delaware | For-profit limited liability company | Northwest Health, LLC |
| 8. | Sunnyside Hospital Service Corp. | Washington | For-profit corporation | Sunnyside Community Hospital Association |
| 9. | Sunnyside Medical Center, LLC | Washington | For-profit limited liability company | Sunnyside Professional Services, LLC |
| 10. | Wedded Bliss, LLC | Delaware | For-profit limited liability company | Sunnyside Community Hospital Association |

108916175\V-2

## **Schedule 4.4**

Existing Prepetition Liens

See attached chart.

108916175\V-2

**TO BE UPDATED**

## LIEN SUMMARY CHART
## BORROWERS

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| **(1) Astria Health** | | | | | | |
| 1. | | Federal Tax Liens - None Deeds of Trust - None | | | | |
| 2. | Washington / Yakima County | UCC 2019-018-4109-3 | 1/18/19 | Lapis Advisers, LP | All assets of the Debtor. | ACTIVE - EXP 1/18/24 |
| 3. | Washington / Yakima County | Mechanic Lien 8002182 | 12/19/18 | VK Powell Construction, LLC | SHC Medical Center - Toppenish for $255,944.11 (Accessor's Parcel No. 201009-14001) | ACTIVE |
| 4. | Washington / Yakima County | Mechanic Lien 8003532 | 1/4/19 | VK Powell Construction, LLC | Yakima HMA Home Health, LLC for $97,651.97 (Accessor's Parcel No. 181324-31416) | ACTIVE |
| 5. | Washington / Yakima County | Mechanic Lien 8003533 | 1/4/19 | VK Powell Construction, LLC | SHC Medical Center - Yakima for $75,636.24 (Accessor's Parcel No. 181324-31452) | ACTIVE |
| 6. | Washington / Yakima County | Mechanic Lien 8009805 | 3/19/19 | MBI Construction Services, Inc. | SHC Medical Center - Toppenish for $54,528.89 (Accessor's Parcel No. 201009-14001) | ACTIVE |
| **(2) Glacier Canyon, LLC** | | | | | | |
| 7. | Delaware | Results pending | | | | |
| **(3) Kitchen and Bath Furnishings, LLC** | | | | | | |
| 8. | Delaware | Results pending | | | | |
| **(4) Oxbow Summit, LLC** | | | | | | |
| 9. | Delaware | Results pending | | | | |
| **(5) SHC Holdco, LLC** | | | | | | |
| 10. | | Federal Tax Liens - None Mechanic Liens - None Deeds of Trust - None | | | | |
| 11. | Washington / Yakima County | UCC 2017-240-6785-4 | 8/28/17 | Lapis Advisers, LP | All assets of the Debtor. | ACTIVE - Exp. 8/28/22 |

10843175V-1

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 12. | | Amendment 2017-334-0539-5 | 11/30/17 | UMB Bank, N.A. | Assignment | ACTIVE - Exp. 8/28/22 |
| 13. | Washington / Yakima County | UCC 2017-261-2426-5 | 9/18/17 | Midcap Financial Trust | All assets of the Debtor. | ACTIVE |
| 14. | | Amendment 2017-277-6686-0 | 10/4/17 | Midcap Funding IV Trust | Assignment | ACTIVE - Exp. 9/18/22 |
| 15. | | Amendment 2017-313-5723-8 | 11/9/17 | MidCap Funding IV Trust | Collateral Restate | ACTIVE |
| 16. | Washington / Yakima County | UCC 2019-018-4110-9 | 1/18/19 | Lapis Advisers, LP | All assets of the Debtor. | ACTIVE - Exp. 1/18/24 |

**(6) SHC Medical Center - Toppenish**

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 17. | | Federal Tax Liens - None | | | | |
| 18. | Washington / Yakima County | UCC 2017-240-6784-7 | 8/28/17 | Lapis Advisers, LP | All assets of the Debtor | ACTIVE - Exp. 8/28/22 |
| 19. | | Amendment 2017-334-0541-8 | 11/30/17 | UMB Bank, N.A. as Bond Trustee | Assignment | ACTIVE - Exp. 8/28/22 |
| 20. | Washington / Yakima County | UCC 2017-261-2425-8 | 9/18/17 | MidCap Financial Trust | All assets identified in Exhibit A to the UCC | ACTIVE - Exp. 9/18/22 |
| 21. | | Amendment 2017-277-6685-3 | 10/4/17 | MidCap Funding IV Trust | Assignment - | ACTIVE - Exp. 9/18/22 |
| 22. | | Amendment | 11/9/17 | MidCap Funding IV Trust | Restate covered collateral - identified in Exhibit A to the Amendment | ACTIVE - Exp. 9/18/22 |
| 23. | Washington / Yakima County | UCC 2017-326-8753-2 | 11/22/17 | ASD Specialty Healthcare LLC | Purchase money security interest in inventory and a lien upon and security interest in all personal property, etc. | ACTIVE - Exp. 11/22/22 |
| 24. | | Amendment 2018-261-4141-4 | 9/18/18 | ASD Specialty Healthcare LLC | Change: All product purchased from ASD Specialty Healthcare LLC and any proceeds thereto | ACTIVE - Exp. 11/22/22 |
| 25. | Washington / Yakima County | UCC 2019-018-4115-4 | 1/18/19 | Lapis Advisers, LP | All assets of the Debtor | ACTIVE - Exp. 1/18/24 |
| 26. | Washington / Yakima County | Mechanic Lien 8002182 | 12/19/18 | VK Powell Construction, LLC | SHC Medical Center - Toppenish for $255,944.11 (Assessor's Tax Parcel No. 201009-14001) [Same as #2] | ACTIVE |
| 27. | Washington / Yakima County | Mechanic Lien 8009805 | 3/19/19 | MBI Construction Services, Inc. | SHC Medical Center - Toppenish for $54,528.89 (Accessor's Parcel No. 201009-14001) [Same as #5] | ACTIVE |
| 28. | Washington / Yakima County | Deed of Trust 7956252 | 8/31/17 | Fidelity Title Company | Grantors: SHC Medical Center - Yakima and SHC Medical Center - Toppenish Grantee: Lapis Advisers, LP | ACTIVE |

2

11084317SV-1

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 29. | Washington / Yakima County | Deed of Trust 8001859 | 1/22/19 | First American Title | Grantors: SHC Medical Center - Yakima and SHC Medical Center - Toppenish Grantee: Lapis Advisers, LP | ACTIVE |

**(7) SHC Medical Center - Yakima**

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 30. | | Federal Tax Liens - None | | | | |
| 31. | Washington / Yakima County | UCC 2017-240-6783-0 | 8/28/17 | Lapis Advisers, LP | All assets of the Debtor | ACTIVE - Exp. 8/28/22 |
| 32. | Washington / Yakima County | Amendment 2017-334-0538-8 | 11/30/17 | UMB Bank, N.A. | Assignment | ACTIVE - Exp. 8/28/22 |
| 33. | Washington / Yakima County | UCC 2017-261-2424-1 | 9/18/17 | MidCap Financial Trust | All assets identified in Exhibit "A" to the UCC | ACTIVE - Exp. 9/18/22 |
| 34. | Washington / Yakima County | Amendment 2017-277-6684-6 | 10/4/17 | MidCap Funding IV Trust | Assignment | ACTIVE - Exp. 9/18/22 |
| 35. | | Amendment - 2017-313-5721-4 | 11/9/17 | MidCap Funding IV Trust | Collateral change [per Exhibit "A" attached to amendment] | ACTIVE - Exp. 9/18/22 |
| 36. | Washington / Yakima County | UCC 2018-018-2492-9 | 1/18/18 | Med One Capital Funding, LLC | Equipment: Astria Regional Medical Center is also listed as an additional Debtor | ACTIVE - Exp. 1/18/23 |
| 37. | | Addendum | 1/18/18 | MD Financial Bank, N.A. | Adding an additional secured creditor | ACTIVE - Exp. 1/18/23 |
| 38. | Washington / Yakima County | UCC 2018-018-2660-2 | 1/18/18 | Olympus America, Inc. | Equipment | ACTIVE - Exp. 1/18/23 |
| 39. | Washington / Yakima County | UCC 2018-128-0854-3 | 5/8/18 | Baxter Healthcare Corporation | Equipment (Extensive list attached to UCC) | ACTIVE - Exp. 5/8/23 |
| 40. | Washington / Yakima County | UCC 2018-164-0243-3 | 6/13/18 | Corporation Service Company | Equipment | ACTIVE - Exp. 6/13/23 |
| 41. | Washington / Yakima County | UCC 2018-256-3085-8 | 9/13/18 | Navitas Credit Corp. | Equipment in Inv. #PJIN0123139 dated 9/5/18 from Hitachi Healthcare Americas Corporation | ACTIVE - Exp. 9/13/23 |
| 42. | Washington / Yakima County | UCC 2018-262-4601-0 | 9/19/18 | Baxter Healthcare Corporation | Equipment (Extensive list attached to UCC) | ACTIVE - Exp. 9/19/23 |
| 43. | Washington / Yakima County | UCC 2018-290-1688-7 | 10/17/18 | Stryker Sales Corporation | Equipment identified in Schedule A attached to UCC | ACTIVE - Exp. 10/17/23 |
| 44. | Washington / Yakima County | UCC 2018-305-5847-5 | 1/1/18 | Med One Capital Funding, LLC & MB Financial Bank, N.A. | Equipment identified in Schedule A attached to UCC | ACTIVE - Exp. 1/1/23 |
| 45. | Washington / Yakima County | UCC 2019-018-4117-8 | 1/18/19 | Lapis Advisers, LP | All assets of the Debtor | ACTIVE - Exp. 1/18/24 |

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 46. | Washington / Yakima County | Mechanic Lien 8003532 | 1/4/19 | VK Powell Construction, LLC | Yakima HMA Home Health, LLC for $97,651.97 (Assessor's Tax Parcel No. 181324-31416) [same as #3] | ACTIVE |
| 47. | Washington / Yakima County | Mechanic Lien 8003533 | 1/4/19 | VK Powell Construction, LLC | SHC Medical Center - Yakima for $75,636.24 (Accessor's Parcel No. 181324-31452) | ACTIVE |
| 48. | Washington / Yakima County | Deed of Trust 7956252 | 8/31/17 | Fidelity Title Company | Grantors: SHC Medical Center - Yakima and SHC Medical Center - Toppenish Grantee: Lapis Advisers, LP | ACTIVE |

**(7a) Astria Regional Medical Center [Liens changed to SHC Medical Center - Yakima by Amendment]**

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 49. | | Federal Tax Liens - None Deeds of Trust - None | | | | |
| 50. | Washington / Yakima County | UCC 2018-018-2492-9 | 1/18/18 | Med One Capital Funding, LLC | Equipment | ACTIVE - Exp. 1/18/23 |
| 51. | | Addendum | 1/18/18 | MB Financial Bank, N.A. | Lists SHC Medical Center - Yakima as an additional Debtor and MB Financial Bank, N.A. and an additional secured party | ACTIVE - Exp. 1/18/23 |
| 52. | Washington / Yakima County | UCC 2018-095-2482-1 | 4/5/18 | Johnson & Johnson Finance Corporation | Equipment | ACTIVE - Exp. 4/5/23 |
| 53. | Washington / Yakima County | UCC 2018-305-5847-5 | 11/1/18 | Med One Capital Funding, LLC | Equipment identified in Schedule A | ACTIVE - Exp. 11/1/23 |
| 54. | | Additional Party Statement | 11/1/18 | MB Financial Bank, N.A. | Lists SHC Medical Center - Yakima as an additional Debtor and MB Financial Bank, N.A. and an additional secured party | ACTIVE - Exp. 11/1/23 |
| 55. | Washington / Yakima County | Mechanic Lien 8003532 | 1/4/19 | VK Powell Construction, LLC | Yakima HMA Home Health, LLC for $97,651.97 (Assessor's Tax Parcel No. 181324-31416) [same as #3] | ACTIVE |
| 56. | Washington / Yakima County | Mechanic Lien 8003533 | 1/4/19 | VK Powell Construction, LLC | SHC Medical Center - Yakima for $75,636.24 (Assessor's Tax Parcel No. 181324-31452) [same as #4] | ACTIVE |

**(8) Sunnyside Community Hospital Association**

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 57. | | Federal Tax Liens - None Mechanic Liens - None | | | | |
| 58. | Washington / Yakima County | UCC 2001-036-0077 | 2/5/01 | Home Security Bank | Equipment | ACTIVE - Exp. 2/5/21 |
| 59. | | Amendment 2005-346-6444-4 | 12/12/05 | Home Security Bank | Continuation | Exp. 2/5/16 |

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 60. | | Amendment 2006-201-9319-3 | 7/20/06 | Home Security Bank | Continuation | Exp. 2/5/16 |
| 61. | | Amendment 2007-171-7820-1 | 6/20/07 | American West Bank | Assignment | Exp. 2/5/16 |
| 62. | | Amendment 2010-355-9477-3 | 12/21/10 | American West Bank | Continuation | Exp. 2/5/16 |
| 63. | | Amendment 2016-026-3339-3 | 1/26/16 | American West Bank | Continuation | ACTIVE - Exp. 2/5/16 |
| 64. | Washington / Yakima County | UCC 2004-303-5049-6 | 10/29/04 | Fleetwood Financial Corp. | Master Lease - Equipment | Exp. 10/29/14 |
| 65. | | Amendment 2007-135-6901-0 | 5/15/07 | All Points Capital Corp. | Assignment | Exp. 10/29/14 |
| 66. | | Amendment 2009-132-6578-1 | 2/12/09 | All Points Capital Corp. | Continuation | Exp. 10/29/14 |
| 67. | | Amendment 2014-177-4953-1 | 6/26/14 | All Points Capital Corp. | Continuation | ACTIVE - Exp. 10/29/19 |
| 68. | Washington / Yakima County | UCC 2006-159-6819-5 | 6/8/06 | American West Bank | All personal property assets of Debtor | Exp. 6/8/16 |
| 69. | | Amendment 2011-075-0546-1 | 3/16/11 | American West Bank | Continuation | Exp. 6/8/16 |
| 70. | | Amendment 2016-125-8054-0 | 5/4/16 | American West Bank | Continuation | Exp. 6/8/21 |
| 71. | Washington / Yakima County | UCC 2009-138-8131-8 | 5/18/09 | Bank of Nevada | All Debtors present and future accounts, excluding accounts or portions which are owed by obligors other than the patient, such as Medicare, Medicaid, HMOs, medical and workers comp insurers, sold to Secured Party under the Receivables Purchase Agreement dated 4/2/09, between Debtor, Secured Party and CSI Financial Services, LLC | Exp. 5/18/14 |
| 72. | | Amendment 2013-199-6168-0 | 7/18/13 | Riverbank | Assignment | Exp. 5/18/14 |
| 73. | | Amendment 2014-044-2842-5 | 2/13/14 | Riverbank | Continuation | ACTIVE - Exp. 5/18/19 |
| 74. | | Amendment 2014-078-0957-3 | 3/19/14 | Riverbank | Continuation | ACTIVE - Exp. 5/18/19 |
| 75. | | Amendment 2016-006-8484-7 | 1/6/16 | Riverbank | Termination | Exp. 5/18/19 |
| 76. | Washington / Yakima County | UCC 2009-152-1099-4 | 6/1/09 | McCommon Leasing Company | Accutech Cuddles Infant Security System and all related items and parts listed on Schedule A of Lease 1333A between Sunnywide and McCommon | Exp. 6/1/14 |
| 77. | | Amendment 2014-149-7977-1 | 5/19/14 | McCommon Leasing Company | Continuation | ACTIVE - Exp. 6/1/19 |

5

10843175\V-1

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 78. | Washington / Yakima County | UCC 2009-292-4689-7 | 10/19/09 | General Electric Capital Corporation | One GE Healthcare LightSpeed VCT Select System together with all substitutions, products, accessories, attachment, warehouse receipts, insurance proceeds. | Exp. 10/19/14 |
| 79. | | Amendment 2014-148-7785-5 | 5/28/14 | General Electric Capital Corporation | Continuation | ACTIVE - Exp 10/19/19 |
| 80. | Washington / Yakima County | UCC 2010-244-3165-2 | 9/1/10 | Siemens Diagnostics Finance Co., LLC | Equipment CA-1500 Standard | Exp. 9/1/15 |
| 81. | | Amendment 2010-337-5222-9 | 12/3/10 | Siemens Diagnostics Finance Co., LLC | Change - Address | Exp. 9/1/15 |
| 82. | | Amendment 2010-337-5224-3 | 12/3/10 | Siemens Diagnostics Finance Co., LLC | Assignment | ACTIVE - Exp. 9/1/20 |
| 83. | | Additional Party 2010-337-5224-3 | 12/3/10 | Siemens Diagnostics Finance Co., LLC | Additional secured party | ACTIVE - Exp. 9/1/20 |
| 84. | | Amendment 2015-123-9570-1 | 5/3/15 | Siemens Diagnostics Finance Co., LLC | Continuation | ACTIVE - Exp. 9/1/20 |
| 85. | Washington / Yakima County | UCC 2010-364-1978-5 | 12/30/10 | American West Bank | All accounts and equipment | Exp. 12/30/15 |
| 86. | | Amendment 2013-161-6946-1 | 6/10/13 | American West Bank | All financial contracts and general intangibles | Exp. 12/30/15 |
| 87. | | Amendment 2015-336-0018-1 | 12/2/15 | American West Bank | Continuation | ACTIVE - Exp. 12/30/20 |
| 88. | Washington / Yakima County | UCC 2011-052-4961-9 | 2/21/11 | McCommon Leasing Company | All equipment described in Lease No. 1370A including Stryker Chaperone Center of Gravity Bed Exit Systems listed on Schedule A of Lease Agreement | Exp. 2/21/16 |
| 89. | | Amendment 2016-046-8338-9 | 2/15/16 | McCommon Leasing Company | Continuation | ACTIVE - Exp. 2/21/21 |
| 90. | Washington / Yakima County | UCC 2012-325-8357-0 | 11/20/12 | General Electric Capital Corporation | All equipment described in Exhibit A | Expired |
| 91. | | Amendment 2017-213-0178-4 | 8/1/17 | General Electric Capital Corporation | Continuation | ACTIVE - 11/20/22 |
| 92. | | Amendment 2017-228-/4114-2 | 8/16/17 | GE HFS, LLC | Assignment | ACTIVE - Exp. 11/20/22 |
| 93. | Washington / Yakima County | UCC 2015-261-2634-6 | 9/18/15 | Hologic, Inc. | SO #2624239: Dimensions 3D Mammography System with Accessories | ACTIVE - Exp. 9/18/20 |
| 94. | Washington / Yakima County | UCC 2015-267-3811-2 | 9/24/15 | Ortho-Clinical Diagnostics, Inc. | Vistos 5600 Integrated System J56002262 | ACTIVE - Exp. 9/24/20 |

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 95. | Washington / Yakima County | UCC 2015-294-0298-0 | 10/21/15 | Ortho-Clinical Diagnostics, Inc. | Vistos 350 Chemistry System J27004426 | ACTIVE - Exp. 10/21/20 |
| 96. | Washington / Yakima County | UCC 2016-298-9514-9 | 10/24/16 | McCommon Leasing Company | All equipment, fixture and general intangibles for Lease Nos. 1387A, 1399A, 1413A, 1429A, 1434A, 1437A, 1443A | ACTIVE - Exp. 10/21/21 |
| 97. | Washington / Yakima County | UCC 2016-316-4441-4 | 11/11/16 | Ortho-Clinical Diagnostics, Inc. | Ortho Vision Analyzer 150002338 | ACTIVE - Exp. 11/11/21 |
| 98. | Washington / Yakima County | UCC 2017-230-4652-2 | 8/18/17 | Space Investment Partners | FL-4573/17 - 19-4573/17 Ramps | ACTIVE - Exp. 8/18/22 |
| 99. | Washington / Yakima County | UCC 2017-240-6787-8 | 8/28/17 | Lapis Advisers, LP | All assets of the Debtor | ACTIVE - Exp. 8/28/22 |
| 100. | | Amendment 2017-334-0543-2 | 11/30/17 | UMB Bank, N.A. | Assignment | ACTIVE - Exp. 8/28/22 |
| 101. | Washington / Yakima County | UCC 2017-240-6788-5 | 8/28/17 | Lapis Advisers, LP | All assets of the Debtor | ACTIVE - Exp. 8/28/22 |
| 102. | | Amendment 2017-251-9932-5 | 9/8/17 | Lapis Advisers, LP | Termination | Exp. 8/28/22 |
| 103. | Washington / Yakima County | UCC 2017-258-1932-2 | 9/15/17 | Leasing Associates of Barrington, Inc. | Equipment: One Vitek 2 XL Microbiology System; One Observa Ultra Lit Software for Vitek 2 XL; One Vilink Remote Access Software and One Warranty Enhance for Vitek 2XL | ACTIVE - Exp. 9/15/22 |
| 104. | | Addendum | 9/15/17 | | 12846000 Yakima | ACTIVE - Exp. 9/15/22 |
| 105. | | Amendment 2018-052-0981-4 | 2/21/18 | Wintrust Equipment Finance | Assignment | ACTIVE - Exp. 9/15/22 |
| 106. | Washington / Yakima County | UCC 2017-356-6096-9 | 12/22/17 | Leasing Associates of Barrington, Inc. | Equipment: Two Dimension Vista 500 Chemistry Immunoassay Integrated Systems with printers; software packages, etc. | ACTIVE - Exp. 12/22/22 |
| 107. | | Amendment 2017-356-6097-6 | 12/22/17 | MB Financial Bank, N.A. | Assignment | ACTIVE - Exp. 12/22/22 |
| 108. | Washington / Yakima County | UCC 2019-018-4123-9 | 1/18/19 | Lapis Advisers, LP, as Agent | All assets of the Debtor | ACTIVE - Exp. 1/18/24 |

7

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 109. | Washington / Yakima County | Deed of Trust 7511885 | 6/8/06 | AmericanWest Bank; Washington Health Care Facilities Authority; U.S. Bank National Association | Grantor: Sunnyside Community Hospital Association<br>Grantee: Americanwest Bank; Washington Health Care Facilities Authority; U.S. Bank National Association<br>Assessor's Parcel Nos. 221025-42403; 221025-42559 | |
| 110. | Washington / Yakima County | Deed of Trust 7715096 | 12/30/10 | AmericanWest Bank; AmericanWest Bank Holdings, Inc. | Grantor: Sunnyside Community Hospital Association<br>Grantee: AmericanWest Bank; AmericanWest Holdings, Inc.<br>Assessor's Parcel Nos: 221025-42403; 221025-42559; 221025-42418; 221025-42419; 221025-42420; 221025-42421 | |
| 111. | Washington / Yakima County | Deed of Trust 7732305 | 6/26/11 | Schreiner Title Company as Trustee | Grantor: Sunnyside Community Hospital Association<br>Grantee: Garold R. Butler, Patricia A. Butler (trustee - Scheriner Title Company)<br>Assessor's Parcel No. 221025-42450 | |
| 112. | Washington / Yakima County | Deed of Trust 7849352 | 9/4/14 | Fidelity Title Company as Trustee | Grantor: Yakima Valley Hearing & Speech Center<br>Grantee: Sunnyside Community Hospital Association<br>Accessor's Parcel No. 181324-34008 | |

8

10843175\V-1

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 113. | Washington / Yakima County | Deed of Trust 7956249 | 8/31/17 | Fidelity Title Company as Trustee | Grantors: Kitchen and Bath Furnishings, Inc.; Sunnyside Medical Center, LLC; Sunnyside Community Hospital Association; Yakima HMA Home Health, LLC<br>Grantee: Lapis Advisers, LP<br>Assessor's Parcel Nos. 181324-34008; 201126-43407; 201126-43408; 201126-43409; 221025-31471; 221025-42403; 221025-42418; 221025-42419; 221025-42420; 221025-42421; 221025-42441; 221025-42442; 221025-42443; 221025-42445; 221025-42444; 221025-42446; 221025-42447; 221025-42450; 221025-42453; 221025-42561; 221036-12439; 221036-12441; 221036-12496; 221036-12497; 221036-21402; 230923-13408; 230923-13409; 231031-43007; 231031-44002; 221025-42559; 181324-3146; 181324-31411 | |
| 114. | Washington / Yakima County | Deed of Trust 8004862 | 1/22/19 | First American Title Insurance Company as Trustee | Grantors: Kitchen and Bath Furnishings, Inc.; Sunnyside Medical Center, LLC; Sunnyside Community Hospital Association; Yakima HMA Home Health, LLC<br>Grantee: Lapis Advisers, LP<br>Accessor's Parcel No. 181324-34008; 201126-43407; 201126-43408; 201126-43409; 221025-31471; 221025-42403; 221025-42418; 221025-42419; 221025-42420; 221025-42421; 221025-42441; 221025-42442; 221025-42443; 221025-42445; 221025-42444; 221025-42446; 221025-42447; 221025-42450; 221025-42453; 221025-42561; 221036-12439; 221036-12441; 221036-12496; 221036-12497; 221036-21402; 230923-13408; 230923-13409; 231031-43007; 231031-44002; 221025-42559; 181324-3146; 181324-31411 | |

9

10984317S\V-1

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 115. | Washington / Yakima County | Deed of Trust 8008965 | 3/11/19 | First American Title Insurance Company | Grantors: Kitchen and Bath Furnishings, Inc.; Sunnyside Medical Center, LLC; Sunnyside Community Hospital Association; Yakima HMA Home Health, LLC<br>Grantee: Lapis Advisers, LP<br>Accessor's Parcel No. 181324-34008; 201126-43407; 201126-43408; 201126-43409; 221025-31471; 221025-42403; 221025-42418; 221025-42419; 221025-42420; 221025-42421; 221025-42441; 221025-42442; 221025-42443; 221025-42445; 221025-42444; 221025-42446; 221025-42447; 221025-42450; 221025-42453; 221025-42561; 221036-12439; 221036-12441; 221036-12496; 221036-12497; 221036-21402; 230923-13408; 230923-13409; 231031-43007; 231031-44002; 221025-42559; 181324-3146; 181324-31411 | |
| (8a) Yakima Ambulatory Surgical Center, LLC (Liens Changed to Sunnyside Community Hospital Association by 7/29/19 Amendment) | | | | | | |
| 116. | Washington / Yakima County | UCC 2014-101-7049-3 | 4/11/14 | GreatAmerica Financial Services Corporation | Equipment: Del Optiplex 3020 Computers, Dell Latitude E5540 Notebooks and all products, proceeds and attachments | Exp. 4/11/19 |
| 117. | | Amendment 2016-211-9483-7 | 7/29/16 | GreatAmerica Financial Services Corporation | Changed to Sunnyside Community Hospital Association | Exp. 4/11/19 |
| 118. | Washington / Yakima County | UCC 2014-202-0485-0 | 7/21/14 | GreatAmerica Financial Services Corporation | Equipment: 11 Lifebook Tablets, 2 Dell PowerEdge &420 Tower Servers, and all products, proceeds and attachments | ACTIVE - Exp. 7/21/19 |
| 119. | Washington / Yakima County | Amendment 2016-211-9485.1 | 7/29/19 | GreatAmerica Financial Services Corporation | Changed to Sunnyside Community Hospital Association | ACTIVE - Exp. 7/21/19 |
| (8b) Yakima HMA, LLC (Liens Changed to Sunnyside Community Hospital Association by 12/22/17 Amendment) | | | | | | |
| 120. | Washington / Yakima County | UCC 2015-132-1786-6 | 5/12/15 | U.S. Bank, N.A. | Equipment and other property: Two Dimension ExL200 Chemistry/ Immunoassay Integrated Systems provided by Siemens Healthcare Diagnostics, Inc. per Lease No. 10201000 dated October 11, 2012 | ACTIVE - Exp. 5/12/20 |

11084317SV-1

| No. | Jurisdiction | Type of Lien / Filing No. | Filing Date | Secured Party / Judgment Creditor | Collateral / Information | Status / Comments |
|---|---|---|---|---|---|---|
| 121. | | Amendment 2017-356-6091-4 | 12/22/17 | U.S. Bank, N.A. | Changed to Sunnyside Community Hospital Association | ACTIVE - Exp. 5/12/20 |
| 122. | Washington / Yakima County | UCC 2016-306-1754-9 | 11/1/16 | Leasing Associates of Barrington, Inc. | Equipment and other property identified in Lase No. 12403000 dated October 17, 2016 | ACTIVE - Exp. 11/1/21 |
| 123. | | Amendment 2017-017-9542-8 | 1/17/17 | First Midwest Bank | Assignment | ACTIVE - Exp. 11/1/21 |
| 124. | | Amendment 2017-356-6098-3 | 12/22/17 | First Midwest Bank | Changed to Sunnyside Community Hospital Association | ACTIVE - Exp. 11/1/21 |
| **(9) Sunnyside Community Hospital Home Medical Supply, LLC** | | | | | | |
| 125. | Washington | Results pending | | | | |
| **(10) Sunnyside Home Health** | | | | | | |
| 126. | Washington | Results pending | | | | |
| **(11) Sunnyside Professionals Services, LLC** | | | | | | |
| 127. | Washington | Results pending | | | | |
| **(12) Yakima HMA Home Health, LLC** | | | | | | |
| 128. | Washington | Results pending | | | | |
| **(13) Yakima Home Care Holdings, LLC** | | | | | | |
| 129. | Delaware | Results pending | | | | |
| 130. | | | | | | |

11

10843175\V-1

## Schedule 4.5

## Uniform Commercial Code Filing Information

| Borrowers | | | | | |
|---|---|---|---|---|---|
| | Legal Name | Jurisdiction | Federal Employer Identification Number[2] | State Org. No. | Chief Executive Office[3] |
| 1. | Astria Health | Washington | 81-3973675 | 604-036-953 | 1806 Yakima Valley Highway, Sunnyside, WA 98944-1261 |
| 2. | Glacier Canyon, LLC | Delaware | | 5758400 | |
| 3. | Kitchen and Bath Furnishings, LLC | Delaware | | 5877887 | |
| 4. | Oxbow Summit, LLC | Delaware | | 5758397 | |
| 5. | SHC Holdco, LLC | Washington | 82-2369193 | 604-046-555 | |
| 6. | SHC Medical Center – Toppenish | Washington | 81-4670687 | 604-067-118 | |
| 7. | SHC Medical Center – Yakima | Washington | 81-4653630 | 604-067-507 | |
| 8. | Sunnyside Community Hospital Association | Washington | 91-1286274 | 600-581-630 | |
| 9. | Sunnyside Community Hospital Home Medical Supply, LLC | Washington | | 603-417-447 | |
| 10. | Sunnyside Home Health | Washington | 81-4552945 | 604-060-329 | |
| 11. | Sunnyside Professional Services, LLC | Washington | | 603-302-392 | |
| 12. | Yakima HMA Home Health, LLC | Washington | | 602-922-173 | |
| 13. | Yakima Home Care Holdings, LLC | Delaware | | 6149776 | |

---

[2] FEIN numbers are listed only for corporate entities, not limited liability companies.
[3] All Debtors and Guarantors share a Chief Executive Office with Astria Health, located at 1806 Yakima Valley Highway, Sunnyside, WA 98944-1261.

| Guarantors | | | | | |
|---|---|---|---|---|---|
| | Legal Name | Jurisdiction | Federal Employer Identification Number[4] | State Org. No. | Chief Executive Office[5] |
| 1. | Astria Health Clinically Integrated Network, LLC | Missouri | | LC001534938 | |
| 2. | Bridal Dreams, LLC | Delaware | | 5877836 | |
| 3. | Depot Plus, LLC | Delaware | | 5875482 | |
| 4. | Home Supply, LLC | Delaware | | 5877858 | |
| 5. | Kitchen Appliance, LLC | Delaware | | 5875585 | |
| 6. | Northwest Health, LLC | Delaware | | 5989524 | |
| 7. | Pacific Northwest ASC Management, LLC | Delaware | | 5989542 | |
| 8. | Sunnyside Hospital Service Corp. | Washington | | 603 520 462 | |
| 9. | Sunnyside Medical Center, LLC | Washington | | 602 260 507 | |
| 10. | Wedded Bliss, LLC | Delaware | | 5877898 | |

Commercial tort claims: None.

---

[4] FEIN numbers are not listed for limited liability companies.
[5] All Debtors and Guarantors share a Chief Executive Office with Astria Health, located at 1806 Yakima Valley Highway, Sunnyside, WA 98944-1261.

108916175\V-2

## Schedule 4.6

### Litigation

None.

# Schedule 4.8

## Existing Indebtedness[6]

| Indebtedness | Obligations / Collateral | Principal Balance at Petition Date (apx.) |
|---|---|---|
| Banner Bank | Banner Bank Obligations secured by the Banner Bank Collateral | $10.6 million |
| Community Health Systems | Debt financing / Unsecured | $21 million |
| GE HFS, LLC | Purchase money lease obligations secured by specific equipment | $5 million |
| MidCap Financial Trust, as agent for the MidCap Lenders | MidCap Obligations secured by the MidCap A/R Collateral | $10.7 million |
| UMB Bank, N.A., as trustee under the Bond Indenture dated as of November 1, 2017, which has a collateral assignment of the Lapis 2017 Loan Documents, pursuant to a pledged by Washington Health Care Facilities Authority, the Issuer under such Bond Indenture | Lapis 2017 Obligations secured by the assets pledged in the Lapis 2017 Loan Documents | $35.4 million |
| Lapis Advisers, LP, as agent for the Lapis 2019 Lenders | Lapis 2019 Obligations secured by the assets pledged in the Lapis 2019 Loan Documents | $10 million |
| Equipment finance companies and institutional lenders shown on Schedule 4.4, titled Existing Prepetition Liens | Various equipment finance agreements / liens on related equipment as described on Schedule 4.4, titled Existing Prepetition Liens | |

---

[6] Capitalized terms have the meaning given to them in the Loan and Security Agreement.

## Schedule 4.9

### Taxes

| | Borrowers | | | | |
|---|---|---|---|---|---|
| | <u>Legal Name</u> | <u>Amount</u> | <u>Federal Employer Identification Number</u> | <u>State Org. No.</u> | <u>Taxing Authority</u> |
| 1. | SHC Medical Center – Toppenish | $203,915.00 | 81-4670687 | 604-067-118 | Washington State Health Care Authority |
| 2. | SHC Medical Center – Yakima | $238.578.28 | 81-4653630 | 604-067-507 | Yakima County Treasurer |
| 3. | SHC Medical Center – Yakima | $2,497,348.00 | 81-4653630 | 604-067-507 | Washington State Health Care Authority |
| 4. | Sunnyside Community Hospital Association | $38,426.99 | 91-1286274 | 600-581-630 | Yakima County Treasurer |

## <u>Schedule 5.5</u>

Maintenance of Properties; Permits

None.

## Schedule 9.4(e)

### Collateral Locations

Sunnyside, WA:

- 1016 Tacoma Avenue, Sunnyside, WA 98944 (Sunnyside Community Hospital Association)
- 1780 Alexander Road, Sunnyside, WA 98944
- 2780 Alexander Road, Sunnyside, WA 98944
- 812 Miller Avenue, Suite A, Sunnyside, WA 98944
- 803 E. Lincoln Avenue, Sunnyside WA 98944
- 812 Miller Avenue, Sunnyside  WA 98944
- 1806 Yakima Valley Highway, Sunnyside, WA 98944-1261

Toppenish, WA:

- 502 W. 4th Avenue, Toppenish, WA 98948 (SHC Medical Center - Toppenish)

Yakima, WA:

- 110 S. 9th Avenue, Yakima, WA 98902-3315 (SHC Medical Center - Yakima)
- 7 S. 10th Avenue, Yakima, WA 98902
- 900 W. Chestnut Avenue, Yakima, WA 98902

Zillah, WA:

- 1902 Vintage Valley Parkway, Zillah, WA 98953 (land - K&B)
- 904 Vintage Valley Parkway, Zillah, WA 98953 (land - K&B)
- 906 Vintage Valley Parkway, Zillah, WA 98953 (land - K&B)