**So Ordered.**

**Dated: December 6th, 2019**



**Whitman L. Holt**
**Bankruptcy Judge**

1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

12
13
14

15  In re:

16  ASTRIA HEALTH, *et al*.,

17      Debtors and
        Debtors in
18      Possession.[1]

Chapter 11
Lead Case No. 19-01189-11
Jointly Administered

**ORDER (A) APPROVING PROCEDURES
IN CONNECTION WITH THE SALE OF
ASSETS; (B) SCHEDULING THE
RELATED AUCTION AND HEARING TO**

19

20  [1] The Debtors, along with their case numbers, are as follows:  Astria Health (19-

21  01189-11), Glacier Canyon, LLC (19-01193-11), Kitchen and Bath Furnishings,

22  LLC (19-01194-11), Oxbow Summit, LLC (19-01195-11), SHS Holdco, LLC (19-

23  01196-11), SHC Medical Center - Toppenish (19-01190-11), SHC Medical Center

24
    - Yakima (19-01192-11), Sunnyside Community Hospital Association (19-01191-
25
    11), Sunnyside Community Hospital Home Medical Supply, LLC (19-01197-11),
26

27

28

US_Active\113755785\V-6

**CONSIDER APPROVAL OF SALE;
(C) APPROVING PROCEDURES
RELATED TO THE ASSUMPTION OF
CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES;
(D) APPROVING THE FORM AND
MANNER OF NOTICE THEREOF**

**RELATED DOCKET NOS. 765, 787, 789, 794 and 796**

This matter coming before the Court on the motion (the "Motion")[2] of Astria Health ("Astria") and the above-referenced affiliated debtors (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Chapter 11 Cases"), by and through the undersigned counsel, pursuant to §§ 105(a), 363(b) and 365 of title 11 of the United States Code (the "Bankruptcy Code"),[3] Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 5005-1, 6004-1, 6006-1, 9013-1, and 9029-1 of the Local Bankruptcy Rules

---

Sunnyside Home Health (19-01198-11), Sunnyside Professional Services, LLC (19-01199-11), Yakima Home Care Holdings, LLC (19-01201-11), and Yakima HMA Home Health, LLC (19-01200-11).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3] All references to "§" herein are to sections of the Bankruptcy Code.

2

US_Active\113755785\V-6

of the United States Bankruptcy Court for the Eastern District of Washington (the "LBR") for: (i) an order substantially in the proposed form attached thereto as Exhibit A, which has been adopted in its current form as this Order (the "Bidding Procedures Order") (a) approving procedures (the "Bidding Procedures," which are attached hereto as **Exhibit 1** in connection with one or more sales of, or other acquisition transactions for, (each a "Sale"), substantially all of the Debtors' assets (the "Assets"); (b) scheduling the related auction and hearing to consider approval of such sale; (c) approving procedures related to the assumption of certain executory contracts and unexpired leases; (d) approving the form and manner of notice thereof; and (ii) an order, substantially in the proposed form attached hereto as **Exhibit B** (the "Sale Order") (a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as otherwise may be provided in a purchase agreement memorializing such a sale (a "Purchase Agreement") and (b) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto; and, in each case, (iii) granting such other and further relief as is just and proper under the circumstances; the Court having reviewed the Motion and the Court having found that (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and (iv) notice of the

3

US_Active\113755785\V-6

Motion was sufficient under the circumstances and properly given, and it appearing that no other or further notice need be provided; and a hearing on the proposed bid and sale procedures as detailed in the Motion having been held; and after due deliberation, including consideration of the objections filed by TIAA Commercial Finance, Inc. [Docket No. 787] and Med One Capital Funding, LLC [Docket No. 789] (collectively, the "Objections") and the reply filed by the Debtors [Docket No. 796] and the arguments of counsel on the record conducted during the hearing on December 5, 2019 (the "Hearing"), the Court having determined that the relief requested in the Motion with respect to proposed bid and sale procedures is in the best interests of the Debtors, their estates, and their creditors; and good and sufficient cause having been shown;

**AND IT IS FURTHER FOUND AND DETERMINED THAT:** [4]

A.     The statutory and legal predicates for the relief requested in the Motion

---

[4]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

4

US_Active\113755785\V-6

and provided for herein are §§ 105(a), 363(b), and 365 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and LBR 2002-1, 5005-1, 6004-1, 6006-1, 9013-1, and 9029-1.

B.    In the Motion and at the hearing on the Motion, the Debtors demonstrated that good and sufficient notice of the relief granted by this Order has been given and no further notice is required.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

C.    The Debtors' proposed notice of the Bidding Procedures, the Cure Procedures, the Auction and the hearing to approve the sale of the Assets (the "Sale Hearing") is appropriate and reasonably calculated to provide all interested parties with timely and proper notice, and no other or further notice is required.

D.    The Bidding Procedures substantially in the form attached hereto as **Exhibit 1** are fair, reasonable, and appropriate and are designed to maximize the recovery from the Sale of the Assets.

E.    The Assumption and Assignment Procedures provided for herein and the Cure Notice are reasonable and appropriate and consistent with the provisions of § 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures and the Cure Notice have been narrowly tailored to provide

US_Active\113755785\V-6

an adequate opportunity for all non-Debtor counterparties to the Assumed Agreements to assert any Assumption Objection.

F.    Entry of this Order is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    The Motion is **GRANTED** as set forth herein.

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, settled or otherwise resolved at the Hearing are overruled.

3.    The Bidding Procedures attached hereto as **Exhibit 1** are **APPROVED**.[5]

4.    The Bid Deadline shall be **January 30, 2020, at 4:00 p.m. (prevailing Pacific Time)**.

5.    The Debtors, after consultation with counsel for JMB Capital Partners Lending, LLC ("JMB" or the "DIP Lender"); counsel for Lapis Advisers, LP ("Lapis") and UMB Bank, N.A. ("UMB"); and counsel for the Committee of Unsecured Creditors (the "Committee," and referred to together with JMB, Lapis and UMB as the "Consultation Parties"), shall have the exclusive right to determine

---

[5]    For the convenience of parties in interest, a chart listing important dates set forth in this Order is attached hereto as **Exhibit 2**.

US_Active\113755785\V-6

19-01189-WLH11    Doc 807    Filed 12/06/19    Entered 12/06/19 16:03:06    Pg 6 of 97

whether a bid is a Qualified Bid and shall notify Qualified Bidders whether their bids have been recognized as such as promptly as practicable after a Qualified Bidder delivers all of the materials required by the Bidding Procedures.

6. The Debtors, after consultation with the Consultation Parties, on or before the date that is one week prior to the Bid Deadline (the "Stalking Horse Bid Deadline") may (a) select one or more parties to act as a stalking horse purchaser (each a "Stalking Horse Purchaser") for some or all of the Debtors' Assets, (b) negotiate the terms of and enter into one or more purchase agreements with any Stalking Horse Purchaser (a "Stalking Horse Agreement") (subject to higher or better bids as contemplated herein), and (c) agree to provide certain bid protections to such Stalking Horse Purchaser, subject to approval of the Court after notice and an opportunity to object, as set forth below.

7. If the Debtors seek to provide bid protections to any Stalking Horse Purchaser, the Debtors shall file a supplement to the Motion (a "Supplemental Motion") seeking approval of such protections on or before the date that is one week prior to the Bid Deadline and serve such Supplemental Motion on the Procedures Notice Parties (defined below). To the extent the Debtors seek to enter into a Stalking Horse Agreement but do not seek approval of any bid protections for a Stalking Horse Purchaser, the Debtors shall file a notice of entry into a Stalking

7

US_Active\113755785\V-6

Horse Agreement(s) (a "<u>Stalking Horse Notice</u>") with the Court on or before the Bid Deadline and serve such notice on the Procedures Notice Parties.

8. Such Supplemental Motion or Stalking Horse Notice shall include a summary of the material terms of any Stalking Horse Agreement(s) and, in the case of the Supplemental Motion, the proposed bid protections, and attach the Stalking Horse Agreement(s). If no objections to the motion or notice are filed and served on the Debtors by **January 29, 2020 at 10:00 a.m. (prevailing Pacific Time)**, the Debtors shall be entitled to promptly file a certificate of no objection with the Court, after which the Court may enter an order approving the Debtors' selection of a Stalking Horse Purchaser and, if applicable, any bid protections requested, without the need for a hearing. If a timely objection is filed, an expedited hearing to consider approval of the Stalking Horse Agreement(s) and any objections thereto will be held as soon as practicable, but not later than **January 30, 2020 at 10:00 a.m. (prevailing Pacific Time)**. For the avoidance of doubt, nothing in this Order or the Bidding Procedures authorizes bid protections for any Stalking Horse Purchaser(s) or other bidders.

9. The Debtors shall further have the right, after consultation with the Consultation Parties, to extend or waive the Stalking Horse Bid Deadline and the Stalking Horse Notice Deadline or conduct the Auction without any Stalking Horse Purchaser.

US_Active\113755785\V-6

10.     The Auction, if necessary, shall be held on **February 5, 2020, at 10:00 a.m. (prevailing Pacific Time)** at the Hilton Garden Inn, Yakima, Washington, 401 E. Yakima Avenue, Yakima, WA 98901, or at such other location as shall be identified in a notice filed with the Bankruptcy Court at least 24 hours before the Auction.

11.     At such Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale, and the Auction shall be conducted openly and transcribed. Within twenty-four (24) hours following the conclusion of the Auction, the Debtors, after consultation with the Consultation Parties, shall file a notice identifying the Successful Bidder and Back-up Bidder (if any) with the Court and shall serve such notice by fax, email, or if neither is available, by overnight mail to all counterparties whose Contracts or Leases are to be assumed and assigned.

12.     The Debtors, after consultation with the Consultation Parties, shall determine which offer is the highest and otherwise best offer for the Assets, giving effect to any additional liabilities or Cure Amounts to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors.

13.     The Sale Hearing shall be held on **February 13, 2020, at 10:00 a.m. (prevailing Pacific Time)** before the Honorable Whitman Holt, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of

9

Washington, 402 East Yakima Avenue, Second Floor Courtroom, Yakima, WA 98901. Any objections to the Sale (other than an Assumption Objection (defined herein) which shall be governed by the procedures set forth below) (a "Sale Objection"), including any objections by contract counterparties to a Successful Bidder's ability to provide adequate assurance of future performance under an Assumed Agreement, must (i) be in writing; (ii) comply with the Bankruptcy Rules and the LBR; (iii) set forth the specific basis for the Sale Objection; (iv) be filed with the Court at 402 E Yakima Avenue, Suite 200, Yakima, WA 98901, together with proof of service, on or before **4:00 p.m. (prevailing Pacific Time) on February 6, 2020** (the "Sale Objection Deadline") and (v) be served, so as to be actually received on or before the Sale Objection Deadline, upon (i) Counsel to the Debtors: Dentons US LLP, 601 S. Figueroa Street, Suite 2500, Los Angeles, CA 90017, Attn: Samuel R. Maizel (samuel.maizel@dentons.com) and Sam J. Alberts (sam.alberts@dentons.com); (ii) the Debtors' Investment Banker: Piper Jaffray & Co., Teri Stratton, Attn: teri.l.stratton@pjc.com; (iii) Counsel to JMB Capital Partners Lending, LLC: Arent Fox, LLP, 1301 Avenue of the Americas, NY 10019, Attn: Robert Hirsh (robert.hirsh@arentfox.com) and Jordana Renert (jordana.renert@arentfox.com); (iv) Counsel to UMB Bank, N.A. and Lapis Advisers, LP: Mintz Levin, One Financial Center, Boston, MA 02111, Attn: William Kannel (wkannel@mintz.com) and Ian Hammel (iahammel@mintz.com);

US_Active\113755785\V-6

(v) Counsel to Lapis Advisors, LP: Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, NY 10019-6079, Attn: Michael D. Sirota (msirota@coleschotz.com) and Ryan Jareck (rjareck@coleschotz.com); (vi) the Office of the United States Trustee: 920 West Riverside, Room 593, Spokane, WA 99201, Attn: Gary Dyer (Gary.W.Dyer@doj.gov); and (vii) Counsel to the Official Committee of Unsecured Creditors: Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com) (collectively, the "Notice Parties"). If a Sale Objection is not filed and served on or before the Sale Objection Deadline, the objecting party shall be barred from objecting to the Sale and shall not be heard at the Sale Hearing, and this Court may enter the Sale Order without further notice to such party.

14. The Sale Hearing may be adjourned from time to time, after consultation with the Consultation Parties, without further notice to creditors or parties in interest, including by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, and the Debtors shall have the exclusive right, in the exercise of their fiduciary obligations and business judgment, and after consultation with the Consultation Parties, to cancel the Sale at any time subject to the terms of this Order.

US_Active\113755785\V-6

15.     The following forms of notice are approved:  (a) the Procedures Notice, in the form substantially similar to that attached hereto as **Exhibit 3** and (b) the Cure Notice, in the form substantially similar to that attached hereto as **Exhibit 4**.

16.     The Debtors shall, within one (1) business day after the entry of this Order, file with the Court and serve a copy of this Order and the Procedures Notice by first class mail, postage prepaid on:  (i) the Notice Parties, (ii) any parties requesting notices in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, (iii) all Potential Bidders, (iv) all parties known by the Debtors to assert a lien on any of the Assets, (v) all persons known or reasonably believed to have asserted an interest in any of the Assets, (vi) all non-Debtor parties to any Contracts and Leases to be assumed, (vii) the Office of the United States Attorney for the Eastern District of Washington, (viii) the Office of the Washington Attorney General, (ix) the Office of the Washington Secretary of State, (x) all taxing authorities having jurisdiction over any of the Assets, including the US Internal Revenue Service, and (xi) all environmental authorities having jurisdiction over any of the Assets (collectively with the parties specified in this paragraph, the "Procedures Notice Parties").

17.     The Debtors shall file with the Court and serve the Cure Notice (along with a copy of this Motion) upon each counterparty to the Assumed Agreements by no later than **January 3, 2020**.  The Cure Notice will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Agreement in

US_Active\113755785\V-6

order to cure any defaults that exist under such Contract or Lease (the "Cure Amounts").  The Cure Notice shall also state the date, time and place of the Sale Hearing as well as the date by which any objection to the Cure Amount (an "Assumption Objection") must be filed and served.

18.    To the extent there is a Contract or Lease added to the list of Contracts or Leases to be assumed by the Successful Bidder pursuant to the Successful Bidder's Purchase Agreement selected at the Auction, the Motion constitutes a separate motion to assume and assign that Contract or Lease to the Successful Bidder pursuant to § 365 of the Bankruptcy Code; each such Contract or Lease will be listed on an exhibit to the Successful Bidder's Purchase Agreement, and shall be given a separate Cure Notice filed and served by overnight delivery by the Debtors within five (5) business days of the conclusion of the Auction and announcement of the Successful Bidder(s).

19.    The inclusion of a Contract, Lease, or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such Contract, Lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto shall be reserved.

20.    If any counterparty to an Assumed Agreement wishes to file an Assumption Objection, such counterparty must file and serve it so as to be actually

US_Active\113755785\V-6

received by the Debtors' Counsel and the Notice Parties by no later than: (i) **January 24, 2020 at 4:00 p.m. (prevailing Pacific Time)** (ii) such later date otherwise specified in the Cure Notice, or (iii) solely with respect to those counterparties to Assumed Agreements who are not served with a Cure Notice until a date after January 24, 2020, seven (7) days after service by overnight mail of such Cure Notice (the "Assumption Objection Deadline.

21. To the extent an Assumed Agreement counterparty wishes to object to the Cure Amount, if any, set forth in the Cure Notice, its Assumption Objection must set forth with specificity each and every asserted default in any Contract or Lease and the monetary cure amount asserted by such counterparty to the extent it differs from the amount, if any, specified by the Debtors in the Cure Notice. The Objection Deadline for the Cure Amount is **January 24, 2020 at 4:00 p.m. (prevailing Pacific Time)**.

22. Any counterparty to an Assumed Agreement that fails to timely file and serve an objection to the Cure Amounts shall be forever barred from asserting that a Cure Amount is owed in an amount in excess of that set forth in the Cure Notice.

23. If a Contract or Lease is assumed and assigned pursuant to Court order, then except for Disputed Cure Amounts (as defined herein), the Assumed Agreement counterparty shall receive no later than three (3) business days following the closing of the Sale, the Cure Amount, if any, as set forth in the Cure Notice. All Cure

14

Amounts will be funded in accordance with the terms and conditions of the Stalking Horse APA and/or the Purchase Agreement(s), as applicable.

24.    Sale Objections will be resolved by the Court at the Sale Hearing. Assumption Objections will be resolved at the Sale Hearing or such later date as may be agreed to or ordered by the Court. The Debtors shall segregate from the sale proceeds any disputed Cure Amounts ("Disputed Cure Amounts") pending the resolution of any such disputes by the Court or mutual agreement of the parties.

25.    The Successful Bidder(s) shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under § 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Agreements, and the failure to provide adequate assurance of future performance to any counterparty to any Assumed Agreements shall not excuse the Successful Bidder(s) from performance of any and all of its obligations pursuant to the Successful Bidder's Purchase Agreement.

26.    Except to the extent otherwise provided in a Successful Bidder's Purchase Agreement, the Debtors and its estate shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Agreements pursuant to § 365(k) of the Bankruptcy Code.

US_Active\113755785\V-6

27. To the extent the provisions of this Order are inconsistent with the provisions of any Exhibit referenced herein or with the Motion, the provisions of this Order shall control.

28. The Court shall retain jurisdiction and power over all matters arising from or related to the interpretation and implementation of this Order.

29. Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable.

///End of Order///

US_Active\113755785\V-6

PRESENTED BY:

_/s/ Sam J. Alberts_
SAM J. ALBERTS (WSBA #22255)
SAMUEL R. MAIZEL (Admitted _Pro Hac Vice_)
DENTONS US LLP

JAMES L. DAY (WSBA #20474)
THOMAS A. BUFORD (WSBA #52969)
BUSH KORNFELD LLP

_Attorneys for the Chapter 11_
_Debtors and Debtors In Possession_

17

US_Active\113755785\V-6

## Exhibit 1

### (Bidding Procedures)

### BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") (i) to be employed in connection with the sale or sales of, or other acquisition transactions for (each a "Sale"), substantially all of the Debtors' assets (the "Assets"), in connection with these Chapter 11 bankruptcy cases (the "Cases") pending in the United States Bankruptcy Court for the Eastern District of Washington (the "Bankruptcy Court") jointly administered as Case No. 19-01189-11; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined herein); (iii) the process for negotiating the bids received; (iv) the process by which the Debtors are authorized to conduct the auction ("Auction") for the Sale of Purchased Assets (as defined herein), after consultation with the Consultation Parties (as defined herein); (v) the procedure for the ultimate selection of any Successful Bidder and Back-Up Bidder (each as defined herein); and (vi) the process for approval of a potential Sale at a Sale Hearing (each as defined herein).

On December ___, 2019, the Bankruptcy Court entered an order [Docket No. ___] (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to solicit bids and approved Bidding Procedures. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

If the Debtors receive one or more acceptable offers that seek stalking horse status (as determined by the Debtors after consultation with the Consultation Parties), the Debtors reserve the right to seek Bankruptcy Court approval, with notice and an opportunity for objections, and a hearing, if necessary, of one or more parties to serve as a stalking horse purchaser (each a "Stalking Horse Purchaser") to acquire some or all of the Assets pursuant to a purchase agreement between the Debtors and the Stalking Horse Purchaser (each a "Stalking Horse Agreement") in accordance with the procedures set forth in the Bidding Procedures Order. Notwithstanding the selection of any Stalking Horse Purchaser, the Debtors will continue to solicit bids through the Bid Deadline (as defined herein).

# I.  ASSETS TO BE SOLD

The Debtors shall offer for sale any or all of the Assets.  Potential bidders may bid on any combination of the Assets, including all of the Assets.

# II.  THE BID PROCEDURES

In order to ensure that the Debtors receive the highest and best value for the Assets, they intend to hold a sale process for the Assets pursuant to the procedures and on the timeline proposed herein.

## A.  Provisions Governing Qualifications of Bidders

1.  Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, prior to the Bid Deadline (as defined herein), each person who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to Counsel to the Debtors (as defined in paragraph II.D.10 herein), which will then deliver the same to the Consultation Parties, referred to as a "Potential Bid:"[1]

   a. a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

   b. an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtors, the Investment Banker (as defined herein) or any other agent authorized by the Debtors to a Potential Bidder) in form and substance satisfactory to the Debtors, after consultation with the Consultation Parties and, which may inure to the benefit of any purchaser of the Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

2.  A Potential Bidder that (a) delivers the documents and information described below, (b) submits a Qualified Bid and (c) the Debtors determine in their

---

[1] The Consultation Parties means 1) JMB, the DIP Lender, 2) UMB Bank, N.A., as indenture trustee, 3) Lapis Advisers, LP, as agent, and 4) the Committee (each a "Consultation Party").  Each Consultation Party retains the right to object to any decisions of the Debtors, without regard to whether or not the Debtors consulted with that Consultation Party pursuant to these bid procedures.

2

reasonable business judgment, after consultation with their advisors and the Consultation Parties, is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Sale, will be deemed a "Qualified Bidder." The Debtors will limit access to due diligence to those parties they believe, after consultation with the Consultation Parties, in the exercise of their reasonable judgment, are pursuing the transaction in good faith.

3.    As promptly as practicable after a Potential Bidder delivers all of the materials required below, and the required documents governing Qualified Bids set forth below, the Debtors will determine, after consultation with the Consultation Parties, whether the Potential Bidder is a Qualified Bidder and notify such bidder of same.

4.    In the event that any Consultation Party or a member of the Official Committee of Unsecured Creditors appointed in these Cases (the "Committee") or an affiliate of any of the foregoing participates as a potential purchaser in the sales process, any obligation of the Debtors to consult with that party is released and such party shall cease to be a Consultation Party unless and until any such party withdraws as a potential purchaser. If a member of the Committee participates as a potential purchaser in the Sale process, the Committee shall exclude that member from any discussions related to or participation in the Committee's participation in the Sale process, unless and until the Committee member irrevocably withdraws from the Sale process.

## B.    Due Diligence

5.    The Debtors will afford any Potential Bidder such due diligence access or additional information as the Debtors, after consultation with their advisors and the Consultation Parties, deem appropriate in their reasonable discretion. The due diligence period shall extend through and including the Bid Deadline; provided, however, that any Qualified Bid (defined herein) submitted shall be irrevocable until the conclusion of the Sale Hearing unless such party is the Successful Bidder or the Back-Up Bidder (both as defined herein) in which case such offer is formal, binding and unconditional and, in the case of the Back-Up Bidder, is irrevocable until the earlier of (i) the closing of the Sale with the Successful Bidder, or (ii) the date that is thirty (30) days after entry of the Sale Order.

US_Active\113755645\V-4

## C. Provisions Governing Qualified Bids

6.     Except as otherwise agreed by the Debtors after consultation with the Consultation Parties, a bid submitted will be considered a Qualified Bid only if the bid submitted by a Potential Bidder and complies with all of the following (a "Qualified Bid"):

a. it states (i) the purchase price (the "Purchase Price") to be paid by such Potential Bidder for the Purchased Assets, including what amount is to be paid in cash and what amount, if any, constitutes a credit bid, (ii) identifies the liabilities proposed to be paid or assumed by the Potential Bidder, (iii) allocates the Purchase Price among the proposed Purchased Assets[2], (iv) whether the bid is contingent upon the bidder acquiring all of the Purchased Assets listed in the bid or if the allocated Purchase Price can be treated as a stand-alone bid for the appropriate assets, and (v) that the Potential Bidder shall close the purchase within five (5) business days following the satisfaction or waiver of the conditions to closing set forth in the Potential Bidder's Purchase Agreement (as defined herein);

b. it identifies with particularity the portion of the Assets that the Potential Bidder is offering to purchase and shall specify the following items to be included in a sale transaction (collectively the "Purchased Assets"):

i. the Assets to be acquired including, but not limited to, real estate, plant, property and equipment, inventory, and accounts receivable;

ii. if the bidder intends to acquire the Medicare and Medicaid provider agreements; and

iii. any contracts or leases the bidder intends to assume, including provider agreements, payor contracts and any material vendor contracts along with any associated cure costs;

c. it includes a signed writing that the Potential Bidder's offer is formal, binding and unconditional and is irrevocable until the conclusion of the Sale Hearing unless such party is the Successful Bidder or the Back-Up Bidder  in which case such offer is formal, binding and unconditional and, in the case of the

---

[2]     Except for the Potential Bidder, any allocations set forth in any bid submitted under these Bidding Procedures shall not be binding on the Consultation Parties or any other party in interest for any purpose in the Chapter 11 Cases.

4

Back-Up Bidder, is irrevocable until the earlier of (i) the closing of the Sale with the Successful Bidder, or (ii) the date that is thirty (30) days after entry of the Sale Order;

d.  it includes confirmation that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

e.  it sets forth each regulatory and third-party approval required for the Potential Bidder to consummate the transaction and the time period within which the Potential Bidder expects to receive such approvals and establishes a substantial likelihood that the Potential Bidder will obtain such approvals by the stated time period (including, to the extent practicable, by submitting copies of draft or filed applications, as applicable, for all such approvals, provided however, that the time periods to obtain each such approval must be reasonable).  A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel (who will, in turn, consult with counsel to the Consultation Parties) to discuss and explain such Potential Bidder's analysis, strategy, and timeline for securing any such approvals as soon as reasonably practicable;

f.  it includes a duly authorized and executed copy of a purchase or acquisition agreement ("Purchase Agreement"), which should use the "Form Purchase Agreement" (defined as Exhibit [ ] attached hereto) as a template and should provide a redline against the Form Purchase Agreement, and which purchase or acquisition agreement should include the Purchase Price for some or all of the Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto;

g.  to the extent a Potential Bidder proposes to acquire any asset(s) currently listed as an "Excluded Asset" in section 1.8 of the Form Purchase Agreement, it states with particularity which previously Excluded Asset(s) such Potential Bidder proposes to acquire and provides a separate allocation of the Purchase Price for each such previously Excluded Asset;

h.  it includes written evidence of a firm, irrevocable commitment for financing or other evidence of ability to consummate the proposed transaction, that will allow the Debtors, after consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transaction contemplated by the Potential Bidder's Purchase Agreement, including evidence of availability in cash, or a

5

binding commitment for availability in cash, of an amount sufficient to complete the proposed purchase of the Purchased Assets;

i. it identifies with particularity all contracts and leases the Potential Bidder wishes to have assumed and assigned to it, and whether any cure costs required to be paid to assume and assign such contracts and leases will be the responsibility of the Potential Bidder;

j. it includes written evidence that the Debtors may reasonably conclude, after consultation with their advisors and the Consultation Parties, demonstrates that the Potential Bidder has the necessary financial wherewithal to timely consummate a Sale. Such information must include the following:

i. contact names and numbers for verification of financing sources;

ii. written evidence of the Potential Bidder's internal resources and proof of any debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Potential Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Potential Bid, in each case, as are needed to close the Sale;

iii. the Potential Bidder's most current audited (if any) and latest unaudited financial statements or, if the Potential Bidder is an entity formed for the purpose of making a Potential Bid, the current audited (if any) and latest unaudited financial statements of the equity holder(s) of the Potential Bidder or such other form of financial disclosure, and a guaranty from such equity holder(s);

iv. a description of the Potential Bidder's *pro forma* capital structure; and

v. any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, after consultation with the Consultation Parties, demonstrating that such Potential Bidder has the ability to promptly close the Sale;

k. it contains sufficient information that can be publicly filed providing adequate assurance of future of future performance with respect to all executory contracts and unexpired leases to be assumed and assigned contracts and leases; in such Sale;

US_Active\113755645\V-4

l. to the extent the Potential Bidder is a newly formed or special purpose entity, include a form of credit support reasonably acceptable to the Debtors, after consultation with the Consultation Parties, of the Potential Bidder's obligations under the Purchase Agreement by a creditworthy affiliate of the Potential Bidder;

m. it includes an acknowledgement and representation that the Potential Bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Debtors' Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Potential Bidder's Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid, or any claim under § 503(b)(3)(D) of the Bankruptcy Code, unless such expense reimbursement, break-up fee or similar type of payment has previously been approved by the Bankruptcy Court in the context of the Debtors' selection of a Stalking Horse Bid;

n. it includes evidence, in form and substance reasonably satisfactory to the Debtors, after consultation with the Consultation Parties, of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Potential Bidder's Purchase Agreement;

o. it is accompanied by a good faith deposit, in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, after consultation with the Consultation Parties, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to the lesser of $5,000,000 or ten percent (10%) of the cash portion of the Purchase Price (the "Deposit"), which Deposit shall be forfeited if such bidder is the Successful Bidder and breaches its obligation to close or is a Back-Up Bidder and breaches its obligation to close;

p. it contains a detailed description of how the Potential Bidder intends to treat current employees of the Debtors, if applicable;

US_Active\113755645\V-4

q. it is for cash or credit bid, or a combination thereof, and not subject to any contingencies, including without limitation, contingencies related to financing, due diligence or approvals by third parties, and if the Potential Bidder is a secured creditor of the Debtors with any portion of the Purchase Price constituting a credit bid such credit bid must contain evidence of the amount, priority and basis for such creditor's secured claim against the Debtors;

r. it must fully disclose any connections or agreements with the Debtors or their affiliates, any other known Qualified Bidder and/or any officer or director of the Debtors or their affiliates;

s. in the event that there is a Stalking Horse Purchaser, and the Potential Bidder wishes to bid on the same Assets that are included in the Stalking Horse Agreement, the aggregate consideration proposed by the Potential Bidder must equal or exceed the sum of the amount of (A) the purchase price under the Stalking Horse Agreement, plus (B) any break-up fee, expense reimbursement, or other bid protection provided under the Stalking Horse Agreement, plus (C) the lesser of five percent (5%) of the purchase price contained in the Stalking Horse Agreement and $250,000, subject to any modification of this subsection based on the net sale proceeds available to the Debtors' estates from the Stalking Horse Purchaser's bid or the applicable Potential Bidder's bid, as determined by the Debtors, after consultation with the Consultation Parties;

t. it contains such other information reasonably requested by the Debtors;

u. it is received prior to the Bid Deadline; and

v. it provides for the Potential Bidder to serve as the Back-Up Bidder if the Potential Bidder's bid is the next highest and best bid after the Successful Bid, in accordance with the terms of the Bidding Procedures.

7. Each Qualified Bidder must (i) submit to the jurisdiction and power of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, the Bidding Procedures, the Auction, any Purchase Agreement, or the construction and enforcement of documents relating to any Sale, (ii) waive any right to a jury trial in connection with any disputes relating to the Debtor, the Bidding Procedures, the Auction, any Purchase Agreement, or the construction and enforcement of documents relating to any Sale, and (iii) consent to the entry of a final order or judgment in any way related to the Debtors, the Bidding

Procedures, the Auction, any Purchase Agreement, or the construction and enforcement of documents relating to any Sale if it is determined that the Bankruptcy Court would lack the power under Article III to enter such a final order or judgment absent the consent of the parties.

8. The Debtors, after consultation with the Consultation Parties, may qualify any bid as a Qualified Bid that meets the requirements set forth in these Bid Procedures.

9. No later than one day following the expiration of the Bid Deadline, the Debtors, after consultation with the Consultation Parties, shall notify all Potential Bidders in writing (i) whether any bids constitute Qualified Bids, (ii) with respect to each Potential Bidder that submitted a bid, whether such Potential Bidder's bid constitutes a Qualified Bid, and (iii) with respect to each Potential Bidder that submitted a bid, whether such Potential Bidder is deemed a Qualified Bidder.

## D. Bid Deadline

10. A Potential Bidder, other than a Stalking Horse Purchaser, that desires to make a bid will deliver written copies of its bid to Counsel to the Debtors: Dentons US LLP, 601 S. Figueroa Street, Suite 2500, Los Angeles, CA 90017, Attn: Samuel R. Maizel (samuel.maizel@dentons.com) and Sam J. Alberts (sam.alberts@dentons.com), so as to be received by the same not later than **January 30, 2020, at 4:00 p.m. (prevailing Pacific Time)** (the "Bid Deadline"). The Debtors will then distribute those bids to the following parties (collectively, the "Notice Parties"): (i) the Debtors' "Investment Banker": Piper Jaffray, Teri Stratton, Attn: teri.l.stratton@pjc.com; (ii) Counsel to JMB, the DIP Lender: Arent Fox, LLP, 1301 Avenue of the Americas, NY 10019, Attn: Robert Hirsh (robert.hirsh@arentfox.com) and Jordana Renert (jordana.renert@arentfox.com); (iii) Counsel to UMB and Lapis: Mintz Levin, One Financial Center, Boston, MA 02111, Attn: William Kannel (wkannel@mintz.com) and Ian Hammel (iahammel@mintz.com); (iv) Counsel to Lapis: Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, NY 10019-6079, Attn: Michael D. Sirota (msirota@coleschotz.com) and Ryan Jareck (rjareck@coleschotz.com); (v) the U.S. Trustee: 920 West Riverside, Room 593, Spokane, WA 99201, Attn: Gary Dyer (Gary.W.Dyer@doj.gov); and (vi) Counsel to the Committee: Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman

9

19-01189-WLH11    Doc 807    Filed 12/06/19    Entered 12/06/19 16:03:06    Pg 26 of 97

(asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com).

## E. Credit Bidding

11. Any party with a valid, properly perfected security interest in any of the Assets may credit bid for the Assets in connection with the Sale pursuant to § 363(k).

12. JMB, the DIP Lender, shall be deemed a Qualified Bidder for purposes of participation in the Auction and if JMB elects to submit a credit bid, such credit bid shall not be subject to a Challenge (as defined herein). For the avoidance of doubt, such credit bid shall not be subject to a Challenge or compliance with the requirements outlined in paragraphs 14, 15, 16 or 17.

13. UMB Bank, N.A. as indenture trustee (the "Bond Trustee") and Lapis Advisors, L.P. as agent ("Term Loan Agent," and together with the Bond Trustee, the "Lenders") shall be deemed a Qualified Bidder for purposes of the participation in the Auction, subject to the Lenders' compliance with paragraphs 14 and 15 herein, *provided, however*, that the credit bid portion of their bid, if any, shall be subject to the Lender Challenge provisions set forth herein.

14. Any party that wishes to submit a credit bid (a "Credit Bid Party", and collectively, "Credit Bid Parties") either as a component or as the entirety of the consideration for its bid shall identify the amount of the secured claim and the nature, extent and priority of the lien upon which its credit bid is premised. Each Credit Bid Party agrees to provide the Debtors (which will then provide that information to the Consultation Parties) with documentation to evidence the amount, nature, extent, validity and perfection of such claim and lien to the extent it has not already done so.

15. Each Credit Bid Party must include in its bid either (i) provisions for the satisfaction of any secured claims that are senior to the secured claim that forms the basis of the credit bid (a "Senior Secured Claim") or (ii) evidence that the holder of any Senior Secured Claim has affirmatively consented to any other treatment of its Senior Secured Claim.

US_Active\113755645\V-4

16. All credit bids must comply with § 363(k), and, except with respect to JMB and the Lenders, all liens upon which any credit bids are based shall be subject to objection and challenge by the Committee (a "Challenge") prior to the Auction; *provided, however*, that the credit bid portion of any bid submitted by the Lenders shall be subject to paragraph 17 below.

17. Notwithstanding anything contained herein or in the Bidding Procedures Order, with respect to the Lenders (a "Lender Challenge"), the attachment, perfection and/or amount of the Lenders' asserted liens and/or security interests shall be subject to objection and challenge by the Committee prior to the Bid Deadline (a "Lien Challenge") and shall not otherwise be subject to later challenge by the Committee. Except as set forth above with respect to a Lien Challenge, nothing in these Bidding Procedures or the Bidding Procedures Order shall in any way limit the rights of the Committee to assert any other challenges, claims or causes of action against the Lenders, including those arising under chapter 5 of the Bankruptcy Code to the extent not constituting a Lien Challenge, and all such other claims and causes of action are expressly reserved and preserved (each an "Additional Challenge"). To the extent the Lenders are a Successful Bidder, any Sale to the Lenders shall be without prejudice to and have no effect on any Additional Challenge.

## F. Evaluation of Competing Bids

18. A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) the Qualified Bidder's plans and commitment as to continuation of the operation of the healthcare facilities subject to the Qualified Bid, (4) the Qualified Bidder's plans and commitments as to retention and treatment of Debtors' employees, and (5) any other factors deemed relevant by the Debtors in their reasonable discretion, after consultation with the Consultation Parties.

## G. No Qualified Bids

19. If the Debtors receive one or less Qualified Bid for any or all Assets, the Debtors will not hold an Auction as to such Assets.

US_Active\113755645\V-4

## H.    Auction Process

20.    If the Debtors receive more than one Qualified Bid for the same Assets, the Debtors will conduct an Auction of Purchased Assets, which shall be transcribed, at the Hilton Garden Inn, Yakima, Washington, on **February 5, 2020, at 10:00 a.m. (prevailing Pacific Time)**, or at such other location as shall be timely communicated to all entities entitled to attend the Auction.  Except as otherwise provided in these Bidding Procedures, the Auction shall run in accordance with the following procedures:

a. only the Debtors, Qualified Bidders, and the Notice Parties, and their respective attorneys and advisors may attend the Auction;

b. only the Qualified Bidders will be entitled to make any Subsequent Bids (defined herein) at the Auction;

c. each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

d. at least one (1) business day prior to the Auction, each Qualified Bidder must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the conclusion of the Sale Hearing, unless such Qualified Bid is selected as a Successful Bid or Back Up Bid, which shall remain binding as provide for herein;

e. at least one (1) day prior to the Auction, Debtors will provide copies of the Qualified Bid or combination of Qualified Bids that the Debtors believe in their reasonable discretion, after consultation with the Consultation Parties, is the highest or best bid (the "Starting Bid")[3] to Qualified Bidders and the Consultation Parties;

f. all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction; provided that all Qualified Bidders wishing to attend the Auction

---

[3] The Consultation Parties will be consulted on the Starting Bid.

US_Active\113755645\V-4

must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

g. the Debtors, after consultation with their advisors and the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code or Bankruptcy Rules, and (ii) disclosed to each other Qualified Bidder at the Auction;

h. bidding at the Auction will begin with the Starting Bid and the Qualified Bidders may submit subsequent bids (each a "Subsequent Bid") in increments of at least (i) $50,000 above the Starting Bid or Leading Bid (as defined below), as applicable, in the event such Starting Bid or Leading Bid is less than $1,000,000, (ii) $250,000 above the Starting Bid or Leading Bid, as applicable, in the event such Starting Bid or Leading Bid is between $1,000,000 and $5,000,000, or (iii) $500,000 above the Starting Bid or Leading Bid, as applicable, in the event such Starting Bid or Leading Bid is greater than $5,000,000, considering that any bid by a Stalking Horse Purchaser shall be deemed to include the sum of the amount of any break-up fees, expense reimbursement, or other bid protections available to such Stalking Horse Purchaser. The Debtors retain the right to adjust the incremental bid amount during the Auction, as appropriate, in their discretion, after consultation with the Consultation Parties; and

i. after the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with the Consultation Parties, shall announce the bid that it believes to be the highest or otherwise better offer with respect to the Assets subject thereto (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

## I. Selection of Successful Bid

21. After bidding has ceased, the Debtors, after consultation with its advisors and the Consultation Parties, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer or offers are the highest or otherwise best from among the Qualified Bidders submitted at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and communicate to the Qualified Bidders the identity of the Successful Bidder and the details of the

13

Successful Bid. The Successful Bid may consist of a single Qualified Bid or multiple Qualified Bids. The determination of the Successful Bid by the Debtors, after consultation with the Consultation Parties, shall be subject to approval by the Bankruptcy Court.

22.     Within one (1) business day following the conclusion of the Auction, the Debtors shall file a notice identifying the Successful Bidder with the Bankruptcy Court and shall serve such notice by fax, email, or overnight mail to all counterparties whose contracts or leases are to be assumed and assigned.

23.     Unless otherwise agreed to by the Debtors, after consultation with the Consultation Parties, and the Successful Bidder, within two (2) business days after the conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

24.     The Debtors will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, approval of the Washington Attorney General, if necessary, and satisfaction of any other closing conditions set forth in the Successful Bidder's Purchase Agreement.[4]

## J.     Deposits

25.     All deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder no later than three (3) business days

---

[4] Pursuant to the agreement between Piper Jaffray and the Debtors, Piper Jaffray is entitled to a restructuring fee (the "Restructuring Fee") or a financing fee (the "Financing Fee") equal to $1,500,000, payable promptly upon consummation of a Restructuring or Financing, plus a bond issuance fee ("Bond Issuance Fee") equal to an underwriting discount of two percent (2%) of the gross proceeds received by the Debtors on all sales of the Securities payable at closing, as appropriate. *See Debtors' Application for Entry of an Order Authorizing Employment of Piper Jaffray & Co., as Investment Banker to the Debtors Nunc Pro Tunc to July 2, 2019* [Docket No. 394 at ¶ 16]. This fee cannot be paid absent Bankruptcy Court approval, but the Debtors intend to escrow the funds after payment by the Successful Bidder until approval is obtained.

US_Active\113755645\V-4

following the conclusion of the Sale Hearing. The deposit of the Back-up Bidder shall be returned on the earlier of (i) the closing of the Sale with the Successful Bidder, or (ii) the date that is thirty (30) days after entry of the Sale Order.

26. Within one business day after the conclusion of the Auction, the Successful Bidder(s) and any Back-Up Bidder(s) shall deliver an additional deposit payment so that each such bidder's total deposit amount is equal to ten percent (10%) of the cash amount of the Successful Bidder's bid or Back-Up Bidder's bid as applicable. The deposit of the Successful Bidder or, if appropriate, the Back-up Bidder, shall be applied to the Purchase Price for the Sale.

27. In the case of a breach or failure to perform on the part of the Successful Bidder (including any Back-up Bidder designated as a Successful Bidder), the Debtors' remedies include but are not limited to the forfeiture of the defaulting Successful Bidder's deposit.

## K. Back-Up Bidder

28. If an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment and after consultation with the Consultation Parties, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until the earlier of (i) the closing of the Sale with the Successful Bidder, or (ii) the date that is thirty (30) days after entry of the Sale Order. If the Successful Bidder fails to consummate the approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, after consultation with the Consultation Parties, to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court.

## L. Sale Hearing

29. The Debtors will seek entry of the Sale Order from the Bankruptcy Court at the Sale Hearing to begin on **February 13, 2020, at 10:00 a.m. (prevailing Pacific Time)** (or at another date and time convenient to the Bankruptcy Court) to approve and authorize the sale transaction to the Successful Bidder(s) on terms and conditions determined in accordance with the Bidding Procedures (the "Sale Hearing").

15

## III.  Reservation

The Debtors reserve the right, as they may determine in their discretion and in accordance with their business judgment to be in the best interest of their estates, after consultation with their advisors and the Consultation Parties, to: (i) modify the Bidding Procedures to discontinue incremental bidding and then require that any and all bidders or potential purchasers must submit their sealed, highest and best offer for the Assets; (ii) determine which Qualified Bid is the highest or otherwise best bid and which is the next highest or otherwise best bid; (iii) waive terms and conditions set forth herein with respect to all Potential Bidders; (iv) impose additional terms and conditions with respect to all Potential Bidders; (v) extend the deadlines set forth herein; (vi) continue or cancel the Auction and/or Sale Hearing in open Bankruptcy Court without further notice; and (vii) implement additional procedural rules that the Debtors determine, in their reasonable business judgment and after consultation with their advisors and the Consultation Parties, will better promote the goals of the bidding process; provided that such modifications are (a) not inconsistent with the Bankruptcy Code and Bankruptcy Rules; and (b) disclosed to each Qualified Bidder participating in the Auction.

16

# Exhibit 2

## (Significant Dates)

## SIGNIFICANT DATES

- **Service of Notice of Sale Procedures, Auction and Sale Hearing:**
  December 11, 2019
- **Service of Assumption/Cure Notice:** January 3, 2020
- **Assumption/Cure Objection Deadline:** January 24, 2020, at 4:00 p.m. (prevailing Pacific Time)
- **Stalking Horse Agreement Objection Deadline:**
  January 29, 2020, at 10:00 a.m. (prevailing Pacific Time)
- **Stalking Horse Agreement Hearing:** January 30, 2020, at 9:00 a.m. (prevailing Pacific Time)
- **Bid Deadline:** January 30, 2020, at 4:00 p.m. (prevailing Pacific Time)
- **Auction:** February 5, 2020, at 10:00 a.m. (prevailing Pacific Time)
- **Sale Objection Deadline:** February 6, 2020, at 4:00 p.m. (prevailing Pacific Time)
- **Sale Hearing:** February 13, 2020, at 10:00 a.m. (prevailing Pacific Time)

# Exhibit 3

## (Procedures Notice)

1  JAMES L. DAY (WSBA #20474)
   THOMAS A. BUFORD (WSBA #52969)    HONORABLE WHITMAN L. HOLT
2  BUSH KORNFELD LLP
   601 Union Street, Suite 5000
3  Seattle, WA 98101
   Tel: (206) 292-2110
4  Email: jday@bskd.com
          tbuford@bskd.com
5
   SAMUEL R. MAIZEL (Admitted *Pro*
6  *Hac Vice*)
   DENTONS US LLP
7  601 South Figueroa Street, Suite 2500
   Los Angeles, California 90017-5704
8  Tel: (213) 623-9300
   Fax: (213) 623-9924
9  Email: samuel.maizel@dentons.com

10 SAM J. ALBERTS (WSBA #22255)
   DENTONS US LLP
11 1900 K. Street, NW
   Washington, DC 20006
12 Tel: (202) 496-7500
   Fax: (202) 496-7756
13 Email: sam.alberts@dentons.com

14 *Attorneys for the Chapter 11 Debtors and*
   *Debtors In Possession*

15        **UNITED STATES BANKRUPTCY COURT**
16         **EASTERN DISTRICT OF WASHINGTON**

17  In re:                          Chapter 11
                                     Lead Case No. 19-01189-11
18  ASTRIA HEALTH, *et al.*,         Jointly Administered

19         Debtors and              **NOTICE OF SALE PROCEDURES,**
           Debtors in               **AUCTION DATE, AND SALE HEARING**
20         Possession.[1]

21

22

23

24  ─────────────────
   [1] The Debtors, along with their case numbers, are as follows: Astria Health (19-
25 01189-11), Glacier Canyon, LLC (19-01193-11), Kitchen and Bath Furnishings,
   LLC (19-01194-11), Oxbow Summit, LLC (19-01195-11), SHS Holdco, LLC (19-
26 01196-11), SHC Medical Center - Toppenish (19-01190-11), SHC Medical Center -
   Yakima (19-01192-11), Sunnyside Community Hospital Association (19-01191-11),
27 Sunnyside Community Hospital Home Medical Supply, LLC (19-01197-11),
   Sunnyside Home Health (19-01198-11), Sunnyside Professional Services, LLC (19-
28 01199-11), Yakima Home Care Holdings, LLC (19-01201-11), and Yakima HMA
   Home Health, LLC (19-01200-11).

DENTONS US LLP                          BUSH KORNFELD LLP
601 South Figueroa Street, Suite 2500        LAW OFFICES
Los Angeles, CA 90017-5704              601 Union St., Suite 5000
Phone: (213) 623-9300                   Seattle, Washington 98101-2373
Fax: (213) 623-9924                     Telephone (206) 292-2110
113795499\V-1

**PLEASE TAKE NOTICE** that Astria Health ("Astria") and the above-referenced affiliated debtors (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Chapter 11 Cases"), by and through the undersigned counsel, moved (the "Motion") the Court for entry of an order pursuant to §§ 105(a), 363(b) and 365 of title 11 of the United States Code (the "Bankruptcy Code"),[2] Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 5005-1, 6004-1, 6006-1, 9013-1, and 9029-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Washington (the "LBR") for: (i) an order substantially in the proposed form attached to the Motion as **Exhibit A** (the "Bidding Procedures Order") (a) approving procedures in connection with the sale of any or all of the Assets (the "Bidding Procedures," which are attached as **Exhibit 1** to the proposed Bidding Procedures Order); (b) scheduling the related auction and hearing to consider approval of such sale; (c) approving procedures related to the assumption of certain executory contracts and unexpired leases; (d) approving the form and manner of notice thereof; and (ii) an order, substantially in the proposed form attached to the Motion as **Exhibit B** (the "Sale Order") (a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as otherwise may be provided in a

---

[2] All references to "§" herein are to sections of the Bankruptcy Code.

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Phone: (213) 623-9300
Fax: (213) 623-9924

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110

113795499\V-1

purchase agreement memorializing such a sale (a "Purchase Agreement") and (b) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto; and, in each case, (iii) granting such other and further relief as is just and proper under the circumstances.[3]  The Debtors seek, among other things, to sell some or substantially all of the Debtors' assets (the "Assets") to the successful bidder(s) (the "Successful Bidder"), at an auction free and clear of all liens, claims, encumbrances and other interests pursuant to §§ 363 and 365 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that, on December ___, 2019, the Bankruptcy Court entered an order [Docket No. ___] (the "Bidding Procedures Order") approving the Motion and the bidding procedures (the "Bidding Procedures"), which set the key dates and times related to the Sale of the Assets.  All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures.  To the extent that there are any inconsistencies between the Bidding Procedures Order (including the Bidding Procedures) and the summary description of its terms and conditions contained in this Notice, the terms of the Bidding Procedures Order shall control.

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Phone: (213) 623-9300
Fax: (213) 623-9924

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110

113795499\V-1

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures, an auction (the "Auction") to sell the Assets will be conducted on **February 5, 2020, at 10:00 a.m. (prevailing Pacific Time)** at the Hilton Garden Inn, Yakima, Washington, 401 E. Yakima Avenue, Yakima, WA 98901 or at such other place, date, and time as shall be identified in a notice filed with the Bankruptcy Court at least 24 hours before the Auction. Within twenty four (24) hours of the conclusion of the Auction, the Debtors shall file a notice with the Bankruptcy Court identifying the Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Assets to the Successful Bidder (the "Sale Hearing") before the Honorable Whitman Holt, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of Washington, 402 East Yakima Avenue, Second Floor Courtroom, Yakima, WA 98901, on **February 13, 2019, at 10:00 a.m. (prevailing Pacific Time),** or at such time thereafter as counsel may be heard or at such other time as the Bankruptcy Court may determine. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing. Objections to the Sale shall be filed with the Bankruptcy Court and served so as to be received no later than **4:00 p.m. (prevailing Pacific Time) on February 6, 2020** by i) Counsel to the Debtors: Dentons US LLP, 601 S. Figueroa Street, Suite 2500, Los Angeles, CA 90017, Attn: Samuel R. Maizel

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Phone: (213) 623-9300
Fax: (213) 623-9924

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110

113795499\V-1

(samuel.maizel@dentons.com) and Sam J. Alberts (sam.alberts@dentons.com); ii) the Debtors' Investment Banker: Piper Jaffray, Teri Stratton, Attn: teri.l.stratton@pjc.com; (iii) Counsel to JMB Capital Partners Lending, LLC: Arent Fox, LLP, 1301 Avenue of the Americas, NY 10019, Attn: Robert Hirsh (robert.hirsh@arentfox.com) and Jordana Renert (jordana.renert@arentfox.com); (iv) Counsel to UMB Bank, N.A. and Lapis Advisors, LP: Mintz Levin, One Financial Center, Boston, MA 02111, Attn: William Kannel (wkannel@mintz.com) and Ian Hammel (iahammel@mintz.com); (v) Counsel to Lapis Advisors, LP: Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, NY 10019-6079, Attn: Michael D. Sirota (msirota@coleschotz.com) and Ryan Jareck (rjareck@coleschotz.com); (vi) Office of the United States Trustee: 920 West Riverside, Room 593, Spokane, WA 99201, Attn: Gary Dyer (Gary.W.Dyer@doj.gov); and (vii) Counsel to the Official Committee of Unsecured Creditors: Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com) (collectively, the "Notice Parties").

**PLEASE TAKE FURTHER NOTICE** that this Notice of the Auction and Sale Hearing is subject to the full terms and conditions of the Motion, Bidding Procedures Order and Bidding Procedures, which Bidding Procedures Order shall control in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Any party that has not received a copy of

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Phone: (213) 623-9300
Fax: (213) 623-9924

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110

113795499\V-1

19-01189-WLH11    Doc 807    Filed 12/06/19    Entered 12/06/19 16:03:06    Pg 40 of 97

the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion, the Bidding Procedures Order (including all exhibits thereto), and the Bidding Procedures, may make such a request in writing to Dentons US LLP, Attn: Samuel R. Maizel, 601 S. Figueroa St., Suite 2500, Los Angeles, CA 90017 or by emailing samuel.maizel@dentons.com or calling (301) 892-2910, or Sam J. Alberts, 1900 K Street, NW, Washington, DC 20036 or by emailing sam.alberts@dentons.com or calling (202) 408-7004.

Dated:                                          DENTONS US LLP
                                                SAMUEL R. MAIZEL
                                                SAM J. ALBERTS


                                                By   /s/ Samuel R. Maizel
                                                     SAMUEL R. MAIZEL

                                                *Attorneys for Astria Health*

113795499\V-1

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Phone: (213) 623-9300
Fax: (213) 623-9924

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110

19-01189-WLH11    Doc 807    Filed 12/06/19    Entered 12/06/19 16:03:06    Pg 41 of 97

# Exhibit 4

## (Cure Notice)

US_Active\113755970\V-2

JAMES L. DAY (WSBA #20474)
THOMAS A. BUFORD (WSBA #52969)
BUSH KORNFELD LLP
601 Union Street, Suite 5000
Seattle, WA 98101
Tel: (206) 292-2110
Email: jday@bskd.com
       tbuford@bskd.com

SAMUEL R. MAIZEL (Admitted *Pro Hac Vice*)
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300
Fax: (213) 623-9924
Email: samuel.maizel@dentons.com

SAM J. ALBERTS (WSBA #22255)
DENTONS US LLP
1900 K. Street, NW
Washington, DC 20006
Tel: (202) 496-7500
Fax: (202) 496-7756
Email: sam.alberts@dentons.com

*Attorneys for the Chapter 11 Debtors and Debtors In Possession*

HONORABLE WHITMAN HOLT

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>ASTRIA HEALTH, *et al.*,<br><br>Debtors and Debtors in Possession.[1] | Chapter 11<br>Lead Case No. 19-01189-11<br>Jointly Administered<br><br>**NOTICE TO COUNTERPARTIES TO CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS THAT MAY BE ASSUMED AND ASSIGNED PURSUANT TO § 365 OF THE BANKRUPTCY CODE** |

---

[1] The Debtors, along with their case numbers, are as follows: Astria Health (19-01189-11), Glacier Canyon, LLC (19-01193-11), Kitchen and Bath Furnishings, LLC (19-01194-11), Oxbow Summit, LLC (19-01195-11), SHS Holdco, LLC (19-01196-11), SHC Medical Center - Toppenish (19-01190-11), SHC Medical Center - Yakima (19-01192-11), Sunnyside Community Hospital Association (19-01191-11), Sunnyside Community Hospital Home Medical Supply, LLC (19-01197-11), Sunnyside Home Health (19-01198-11), Sunnyside Professional Services, LLC (19-01199-11), Yakima Home Care Holdings, LLC (19-01201-11), and Yakima HMA Home Health, LLC (19-01200-11).

2

**PLEASE TAKE NOTICE** that Astria Health ("Astria") and the above-referenced affiliated debtors (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Chapter 11 Cases"), by and through the undersigned counsel, moved (the "Motion")[2] the Court for entry of an order pursuant to §§ 105(a), 363(b) and 365 of title 11 of the United States Code (the "Bankruptcy Code"),[3] Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 5005-1, 6004-1, 6006-1, 9013-1, and 9029-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Washington (the "LBR") for: (i) an order substantially in the proposed form attached to the Motion as **Exhibit A** (the "Bidding Procedures Order") (a) approving procedures in connection with the sale of any or all of the Debtors' assets (the "Bidding Procedures," which are attached as **Exhibit 1** to the proposed Bidding Procedures Order); (b) scheduling the related auction and hearing to consider approval of such sale; (c) approving procedures related to the assumption of certain executory contracts and unexpired leases; (d) approving the form and

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3] All references to "§" herein are to sections of the Bankruptcy Code.

US_Active\113755970\V-2

manner of notice thereof; and (ii) an order, substantially in the proposed form attached to the Motion as **Exhibit B** (the "Sale Order") (a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as otherwise may be provided in a purchase agreement memorializing such a sale (a "Purchase Agreement") and (b) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto; and, in each case, (iii) granting such other and further relief as is just and proper under the circumstances.

PLEASE TAKE FURTHER NOTICE that, on December __, 2019, the Court entered an Order (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures requested in the Motion, which Bidding Procedures Order governs (i) the bidding process for the sale of substantially all of the Debtors' assets (the "Assets") and (ii) procedures for the assumption and assignment of certain of the Debtors' Contracts and Leases.

PLEASE TAKE FURTHER NOTICE that the Motion also seeks Court approval of the sale (the "Sale") of the Assets to the Successful Bidder(s), free and clear of all liens, claims, interests and encumbrances pursuant to § 363 of the Bankruptcy Code, including the assumption by the Debtors and assignment to the buyer(s) of certain Contracts and Leases pursuant to § 365 of the Bankruptcy Code (the "Assumed Agreements"), with such liens, claims, interests and encumbrances

4

to attach to the proceeds of the Sale with the same priority, validity and enforceability as they had prior to such Sale. Within twenty four (24) hours following the conclusion of the Auction, the Debtors shall file a notice identifying the Successful Bidder(s) with the Bankruptcy Court and serve such notice by fax, email or overnight mail to all counterparties whose Contracts and Leases are to be assumed and assigned. Any counterparty to an Assumed Agreement that wishes to receive such notice by email or fax, must provide their email address or fax number to Dentons US LLP, Attn: Samuel R. Maizel, 601 S. Figueroa St., Suite 2500, Los Angeles, CA 90017 or by emailing samuel.maizel@dentons.com or calling (301) 892-2910, or Sam J. Alberts, 1900 K Street, NW, Washington, DC 20036 or by emailing sam.alberts@dentons.com or calling (202) 408-7004 before the Auction.

**PLEASE TAKE FURTHER NOTICE** that an evidentiary hearing (the "Sale Hearing") to approve the Sale and authorize the assumption and assignment of the Assumed Agreements will be held on **February 13, 2020, at 10:00 a.m. (prevailing Pacific Time)**, before the Honorable Whitman Holt, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of Washington, 402 East Yakima Avenue, Second Floor Courtroom, Yakima, WA 98901. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

US_Active\113755970\V-2

**PLEASE TAKE FURTHER NOTICE** that, consistent with the Bidding Procedures Order, the Debtors may seek to assume a Contract or Lease to which <u>you may be a party</u>. The Assumed Agreements are described on **Schedule A** attached to this Notice. The amount shown on **Schedule A** attached hereto as the "<u>Cure Amount</u>" is the amount, if any, which the Debtors assert is owed to cure any defaults existing under the Assumed Agreement.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the Cure Amount shown for the Assumed Agreements on **Schedule A** to which you are a party, you must file in writing with the United States Bankruptcy Court for the Eastern District of Washington, 402 East Yakima Avenue Suite 200, Yakima, WA 98901, an objection on or before **January 24, 2020, at 4:00 p.m. (prevailing Pacific Time)**. Any objection must set forth the specific default or defaults alleged and set forth any cure amount as alleged by you. If a Contract or Lease is assumed and assigned pursuant to a Court order approving the same, then unless you properly file and serve an objection to the Cure Amount contained in this Notice, you will receive at the time of the closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount set forth herein, if any. Any counterparty to an Assumed Agreement that fails to timely file and serve an objection to the Cure Amounts shall be forever barred from asserting that a Cure Amount is owed in an amount in excess of the amount, if any, set forth in the attached **Schedule A**.

US_Active\113755970\V-2

**PLEASE TAKE FURTHER NOTICE** that if you have any other objection to the Debtors' assumption and assignment of the Assumed Agreements to which you may be a party, you also must file that objection in writing no later than **4:00 p.m. (prevailing Pacific Time) on January 24, 2020** <u>provided</u>, <u>however</u>, that if any Successful Bidder is <u>not</u> the Stalking Horse Bidder, any counterparty to an Assumed Agreement may raise an objection to the assumption and assignment of the Assumed Agreement solely with respect to such Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Agreement at the Sale Hearing, or any time before the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that any objection you may file must be served so as to be received by the following parties by the applicable objection deadline date and time: i) Counsel to the Debtors: Dentons US LLP, 601 S. Figueroa Street, Suite 2500, Los Angeles, CA 90017, Attn: Samuel R. Maizel (samuel.maizel@dentons.com) and Sam J. Alberts (sam.alberts@dentons.com); ii) the Debtors' Investment Banker: Piper Jaffray, Teri Stratton, Attn: teri.l.stratton@pjc.com; (iii) Counsel to JMB Capital Partners Lending, LLC: Arent Fox, LLP, 1301 Avenue of the Americas, NY 10019, Attn: Robert Hirsh (robert.hirsh@arentfox.com) and Jordana Renert (jordana.renert@arentfox.com); (iv) Counsel to UMB Bank, N.A. and Lapis Advisors, LP: Mintz Levin, One Financial Center, Boston, MA 02111, Attn: William Kannel (wkannel@mintz.com)

US_Active\113755970\V-2

and Ian Hammel (iahammel@mintz.com); (v) Counsel to Lapis Advisors, LP: Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, NY 10019-6079, Attn: Michael D. Sirota (msirota@coleschotz.com) and Ryan Jareck (rjareck@coleschotz.com); (vi) Office of the United States Trustee: 920 West Riverside, Room 593, Spokane, WA 99201, Attn: Gary Dyer (Gary.W.Dyer@doj.gov); and (vii) Counsel to the Official Committee of Unsecured Creditors: Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com) (collectively, the "Notice Parties").

**PLEASE TAKE FURTHER NOTICE** that the Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under § 365(b) and (f) of the Bankruptcy Code, in connection with the proposed assignment of any Assumed Agreement. The Court shall make its determinations concerning adequate assurance of future performance under the Assumed Agreements pursuant to 11 U.S.C. § 365(b) and (f) at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that, in the event that the Debtors and the counterparty cannot resolve the Cure Amount, the Debtors shall segregate from the proceeds of sale any disputed Cure Amounts ("Disputed Cure Amounts") pending the resolution of any such disputes by the Court or mutual agreement of the

US_Active\113755970\V-2

parties. Assumption Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before or after the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that, except to the extent otherwise provided in the Purchase Agreement with the Successful Bidder(s), pursuant to § 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved of all liability accruing or arising after the effective date of assumption and assignment of the Assumed Agreements.

**PLEASE TAKE FURTHER NOTICE** that nothing contained herein shall obligate the Debtors to assume any Assumed Agreements or to pay any Cure Amount.[4]

PLEASE TAKE FURTHER NOTICE THAT IF YOU DO NOT TIMELY FILE AND SERVE AN OBJECTION AS STATED ABOVE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITH NO FURTHER NOTICE.

---

[4] "Assumed Agreements" are those Contracts and Leases that the Debtors believe may be assumed and assigned as part of the orderly transfer of the Assets; however, the Successful Bidder may choose to exclude certain of the Debtors' Contracts or Leases from the list of Assumed Agreements as part of its Qualifying Bid, causing such Contracts and Leases not to be assumed by the Debtors.

9

ANY COUNTERPARTY TO ANY ASSUMED AGREEMENT WHO
DOES NOT FILE A TIMELY OBJECTION TO THE CURE AMOUNT FOR
SUCH ASSUMED AGREEMENT IS DEEMED TO HAVE CONSENTED TO
SUCH CURE AMOUNT.

Dated:

DENTONS US LLP
SAMUEL R. MAIZEL
SAM J. ALBERTS


By  /s/ Samuel R. Maizel
    SAMUEL R. MAIZEL

Attorneys for Astria Health

US_Active\113755970\V-2

# EXHIBIT B

## (Sale Order)

US_Active\113756107\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WASHINGTON**

In re:

ASTRIA HEALTH, *et al.*,

Debtors and
Debtors in
Possession.[1]

Chapter 11
Lead Case No. 19-01189-11
Jointly Administered

**ORDER (A) AUTHORIZING THE SALE
OF ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS; (B)
APPROVING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND
(C) GRANTING RELATED RELIEF**

[1] The Debtors, along with their case numbers, are as follows: Astria Health (19-01189-11), Glacier Canyon, LLC (19-01193-11), Kitchen and Bath Furnishings, LLC (19-01194-11), Oxbow Summit, LLC (19-01195-11), SHS Holdco, LLC (19-01196-11), SHC Medical Center - Toppenish (19-01190-11), SHC Medical Center - Yakima (19-01192-11), Sunnyside Community Hospital Association (19-01191-11), Sunnyside Community Hospital Home Medical Supply, LLC (19-01197-11), Sunnyside Home Health (19-01198-11), Sunnyside Professional Services, LLC (19-01199-11), Yakima Home Care Holdings, LLC (19-01201-11), and Yakima HMA Home Health, LLC (19-01200-11).

US_Active\113756107\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

This matter coming before the Court on the motion (the "Motion")[2] of Astria Health ("Astria") and the above-referenced affiliated debtors (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Chapter 11 Cases"), for the entry of an order pursuant to §§ 105(a), 363(b) and 365 of title 11 of the United States Code (the "Bankruptcy Code"),[3] Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 5005-1, 6004-1, 6006-1, 9013-1, and 9029-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Washington (the "LBR") for: (i) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as otherwise may be provided in a purchase agreement memorializing such a sale (a "Purchase Agreement"), (ii) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto; and (iii) granting such other and further relief as is just and proper under the circumstances; the Court having reviewed the Motion and the Court having found that (i) the Court has jurisdiction and power to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iv) notice of the Motion was sufficient under the circumstances; and after due deliberation the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; and good and sufficient cause having been shown;

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3] All references to "§" herein are to sections of the Bankruptcy Code.

- 2 -

US_Active\113756107\V-2

**AND IT IS FURTHER FOUND AND DETERMINED THAT:**

A.     The Debtors' notice of the Bidding Procedures, the Cure Procedures, the Auction and the hearing to approve any sale of the Assets (the "Sale Hearing") was appropriate and reasonably calculated to provide all interested parties with timely and proper notice, and no other or further notice is required.

B.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

C.     To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED THAT:**

1.     The Motion is **GRANTED** as set forth herein.

2.     All objections and responses to the Motion that have not been overruled, withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied.

3.     Any Successful Bidder's offer for some or all of the Assets, as embodied in the any Successful Bidder's Purchase Agreement, is the highest and best offer for the correlative portion of the Assets and is hereby approved.

4.     Each Successful Bidder's Purchase Agreement annexed hereto as **Exhibit 1** is hereby approved pursuant to § 363(b) of the Bankruptcy Code, and the Debtors are authorized to consummate and perform all of their obligations under any Successful Bidder's Purchase Agreement and to execute such other documents and take such other actions as are necessary or appropriate to effectuate the Successful Bidder's Purchase Agreement.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\113756107\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

5.      Pursuant to § 363(f) of the Bankruptcy Code, the Assets may be sold and transferred free and clear of all liens, claims, interests and encumbrances, (collectively, "Liens"), except as otherwise provided in any Successful Bidder's Purchase Agreement, with any and all such Liens to attach to proceeds of such sale with the same validity, priority, force, and effect such Liens had on the Assets immediately prior to the Sale and subject to the rights, claims, defenses, and objections, if any, of the Debtors and all interested parties with respect to any such asserted Liens.

6.      Pursuant to §§ 105(a) and 363(b) of the Bankruptcy Code, the Sale by the Debtors to the Successful Bidder(s) of the Assets and transactions related thereto, upon the closing under any Successful Bidder's Purchase Agreement, are authorized and approved in all respects.

7.      Pursuant to § 365 of the Bankruptcy Code, the assignment and assumption of the Assumed Agreements of the Debtors, as identified in the Successful Bidder's Purchase Agreement(s), by any Successful Bidder, is hereby authorized and approved in all respects.

8.      The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Order shall be effective immediately upon its entry.

9.      The terms of this Order shall be binding on the Successful Bidder and its or their successors, the Debtors, creditors of the Debtors, and all other parties in interest in these Chapter 11 Cases, and any successors of the Debtors, including any trustee or examiner appointed in these cases or upon a conversion of these cases to Chapter 7 of the Bankruptcy Code.

10.      The Successful Bidder is or are a good faith purchaser entitled to the benefits and protections afforded by § 363(m) of the Bankruptcy Code.

11.      With respect to the transactions consummated pursuant to this Order, this Order shall be sole and sufficient evidence of the transfer of title to

- 4 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

any particular purchaser, and the sale transaction consummated pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the property sold pursuant to this Order, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state, and local officials, and each of such persons and entities is hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

12.     This Court retains the jurisdiction and power to interpret, implement and enforce the provisions of, and resolve any disputes arising under or related to, this Order and any Successful Bidder's Purchase Agreement, all amendments thereto, any waivers and consents thereunder and each of the agreements executed in connection therewith.

13.     The failure specifically to include any particular provision of any Successful Bidder's Purchase Agreement or any of the documents, agreements, or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, agreement, or instrument, it being the intent of the Court that any Successful Bidder's Purchase Agreement and each document, agreement, or instrument be authorized and approved in its entirety.

14.     Any Successful Bidder's Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof

- 5 -

without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

///End of Order///

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\113756107\V-2

PRESENTED BY:

 /s/ Sam J. Alberts
SAM J. ALBERTS (WSBA #22255)
SAMUEL R. MAIZEL (Admitted *Pro Hac Vice*)
DENTONS US LLP

JAMES L. DAY (WSBA #20474)
THOMAS A. BUFORD (WSBA #52969)
BUSH KORNFELD LLP

*Attorneys for the Chapter 11*
*Debtors and Debtors In Possession*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 7 -

US_Active\113756107\V-2

# Exhibit C

## (Form Purchase Agreement)

# ASSET PURCHASE AGREEMENT

## By and Among

**Astria Health, _____**

### and

_____

**Dated _____, 20__**

10867342\\V-1
US_Active\113632740\V-3
6848512
US_Active\113632740\V-4

**TABLE OF CONTENTS**

ARTICLE 1 SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING .............. 1

    1.1    Purchase Price ................................................................................................. 1
    1.2    Deposit ............................................................................................................ 2
    1.3    Closing Date .................................................................................................... 2
    1.4    Items to be Delivered by Seller at Closing .................................................... 2
    1.5    Items to be Delivered by Purchaser at Closing .............................................. 3
    1.6    Prorations and Utilities ................................................................................... 4
    1.7    Transfer of Seller Assets ................................................................................ 5
    1.8    Excluded Assets .............................................................................................. 7
    1.9    Assumed Obligations ...................................................................................... 9
    1.10   Excluded Liabilities ...................................................................................... 10
    1.11   Designation of Assumed Contracts and Assumed Leases ............................. 10
    1.12   Disclaimer of Warranties; Release ............................................................... 11

ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF SELLER ...................... 11

    2.1    Authorization ................................................................................................ 11
    2.2    Binding Agreement ....................................................................................... 12
    2.3    Organization and Good Standing; No Violation ........................................... 12
    2.4    Contracts ....................................................................................................... 12
    2.5    Brokers and Finders ...................................................................................... 12
    2.6    Seller Knowledge .......................................................................................... 12

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 12

    3.1    Authorization ................................................................................................ 13
    3.2    Binding Agreement ....................................................................................... 13
    3.3    Organization and Good Standing .................................................................. 13
    3.4    No Violation .................................................................................................. 13
    3.5    Brokers and Finders ...................................................................................... 13
    3.6    Representations of Seller ............................................................................... 13
    3.7    Legal Proceedings ......................................................................................... 13
    3.8    No Knowledge of Seller's Breach ................................................................ 14
    3.9    Ability to Perform ......................................................................................... 14
    3.10   Purchaser Knowledge .................................................................................... 14

ARTICLE 4 COVENANTS OF SELLER ........................................................................ 15

    4.1    Access and Information; Inspections ............................................................ 15
    4.2    Cooperation ................................................................................................... 15
    4.3    Other Bidders ................................................................................................ 16
    4.4    Seller's Efforts to Close ................................................................................ 16
    4.5    Termination Cost Reports ............................................................................. 16

108673421\V-1
US_Active\113632740\V-3
6848512
US_Active\113632740\V-4

# TABLE OF CONTENTS
(continued)

ARTICLE 5 COVENANTS OF PURCHASER ................................................................. 16

   5.1   Purchaser's Efforts to Close ................................................. 17
   5.2   Required Governmental Approvals ................................... 17
   5.3   Certain Employee Matters ................................................. 17
   5.4   Excluded Assets ................................................................... 18
   5.5   Waiver of Bulk Sales Law Compliance ........................... 18
   5.6   Attorney General Filings ................................................... 18
   5.7   Conduct Pending Closing ................................................... 18
   5.8   Resale Certificate ............................................................... 18
   5.9   Cure Costs ............................................................................ 19
   5.10  HSR Filing .......................................................................... 19

ARTICLE 6 SELLER'S BANKRUPTCY AND BANKRUPTCY COURT APPROVAL ........ 19

   6.1   Bankruptcy Court Approval .............................................. 19
   6.2   Appeal of Sale Order .......................................................... 20

ARTICLE 7 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ..................... 20

   7.1   Signing and Delivery of Instruments ............................... 20
   7.2   No Restraints ....................................................................... 20
   7.3   Performance of Covenants ................................................. 20
   7.4   Governmental Authorizations ........................................... 20
   7.5   Attorney General Approval ............................................... 21
   7.6   Bankruptcy Court Approval .............................................. 21

ARTICLE 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER ............. 21

   8.1   Governmental Authorizations ........................................... 21
   8.2   Bankruptcy Court Approval .............................................. 21
   8.3   Signing and Delivery of Instruments ............................... 21
   8.4   Performance of Covenants ................................................. 21
   8.5   No Restraints ....................................................................... 21
   8.6   Attorney General Approval ............................................... 22
   8.7   Medicare and Medicaid Provider Agreements ............... 22

ARTICLE 9 TERMINATION ....................................................................................... 22

   9.1   Termination ......................................................................... 22
   9.2   Termination Consequences ................................................ 23

ARTICLE 10 POST-CLOSING MATTERS .................................................................. 23

   10.1  Excluded Assets ................................................................... 23
   10.2  Preservation and Access to Records After the Closing ... 24
   10.3  Closing of Financials ......................................................... 26
   10.4  Medical Staff ....................................................................... 26

-ii-

108673421\V-1
US_Active\113632740\V-3
6848512
US_Active\113632740\V-4

ARTICLE 11 DEFAULT, TAXES AND COST REPORTS .................................................. 26

11.1    Purchaser Default ........................................................................... 26

11.2    Seller Default ................................................................................. 27

11.3    Tax Matters; Allocation of Purchase Price ................................. 27

11.4    Cost Report Matters ...................................................................... 27

ARTICLE 12 MISCELLANEOUS PROVISIONS ......................................................... 28

12.1    Further Assurances and Cooperation ........................................... 28

12.2    Successors and Assigns ................................................................. 28

12.3    Governing Law; Venue ................................................................. 28

12.4    Amendments .................................................................................. 28

12.5    Exhibits, Schedules and Disclosure Schedule ............................. 28

12.6    Notices ........................................................................................... 29

12.7    Headings ........................................................................................ 30

12.8    Publicity ......................................................................................... 30

12.9    Fair Meaning ................................................................................. 30

12.10    Gender and Number; Construction; Affiliates ............................ 30

12.11    Third Party Beneficiary ................................................................ 30

12.12    Expenses and Attorneys' Fees ..................................................... 31

12.13    Counterparts .................................................................................. 31

12.14    Entire Agreement .......................................................................... 31

12.15    No Waiver ...................................................................................... 31

12.16    Severability ................................................................................... 31

12.17    Time is of the Essence .................................................................. 31

108673421\V-1

US_Active\113632740\V-3
6848512
US_Active\113632740\V-4

19-01189-WLH11    Doc 807    Filed 12/06/19    Entered 12/06/19 16:03:06    Pg 64 of 97

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is made and entered into as of the \_\_ day of _____, 20\_\_ (the "**Signing Date**") by and among Astria Health, a Washington nonprofit corporation and its affiliate _____, a Washington nonprofit corporation (collectively "**Seller**") and _____, a _____ ("**Purchaser**").

## R E C I T A L S :

A.     Seller engages in the business of the operation of the assets being sold known as _____, an asset being sold that is owned and operated by Seller and located at _____, including the _____ [i.e., assets being sold, pharmacy, laboratory, emergency department, medical office buildings, clinics] owned or operated by Seller and described more fully below (collectively, the "**Assets being sold**").

B.     Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, _____ (as defined more fully in Section 1.7 below) (the "**Assets**") owned by Seller and used with respect to the operation of the Assets being sold, for the consideration and upon the terms and conditions contained in this Agreement.

C.     Seller has filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Eastern District of Washington (the "**Bankruptcy Court**"), commencing Lead Case No. 19-01189-11, jointly administered with its affiliates (the "**Bankruptcy Case**"), and the Bankruptcy Court entered an order approving procedures in connection with the sale of the Seller's Assets, Docket No. _____, which requests that the Bankruptcy Court enter a "**Sale Order**" following an auction and selection of a successful bidder.

D.     The parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets approved by the Bankruptcy Court, pursuant to Section 363 of Chapter 11 of Title 11 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

## ARTICLE 1

## SALE AND TRANSFER OF ASSETS;
## CONSIDERATION; CLOSING

1.1     <u>Purchase Price</u>¶ Subject to the terms and conditions of this Agreement, the purchase price ("**Purchase Price**") shall consist of the following:

(a)   Cash   payment   to   Seller   (the   "**Cash   Consideration**")   of
_____ ($_____); and

(b)   Payment of Cure Costs (defined below) associated with any Assumed
Leases and/ or Assumed Contracts.

1.2   <u>Deposit</u>¶   Purchaser   has   made   a   good   faith   deposit   in   the   amount   of
_____   ($_____)   (the   "**Deposit**")   by   wire   transfers   to   an   account
designated by Seller.  Purchaser has agreed to increase the Deposit by $_____, for a
total deposit of $_____ upon entry of an order approving this transaction.  The Deposit
shall be non-refundable in all events, except in the event the Closing does not occur due to (i)
Seller accepting the bid of and closing of the sale with a rival bidder (provided Purchaser is not
in breach of this Agreement) or (ii) Seller materially breaching its obligations under this
Agreement.  Upon Closing, the Deposit will be credited against the Purchase Price.

1.3   <u>Closing Date</u>¶   The consummation of the transactions contemplated by this
Agreement (the "**Closing**") shall take place at _____ local time at the offices of Dentons US
LLP, 601 South Figueroa St., Suite 2500, Los Angeles, CA 90017-5704 (the day on which
Closing actually occurs, the "**Closing Date**") within five (5) business days following the
satisfaction or waiver of the conditions set forth in <u>ARTICLE 7</u> and <u>ARTICLE 8</u>, other than
those conditions that by their nature are to be satisfied at Closing but subject to fulfillment or
waiver of those conditions.  The Closing shall be deemed to occur and to be effective as of 12:00
a.m. Pacific time on the day immediately after the Closing Date (the "**Effective Time**").

1.4   <u>Items to be Delivered by Seller at Closing</u>¶ At or before the Closing, Seller shall
deliver, or cause to be delivered, to Purchaser the following:

1.4.1   a Bill of Sale substantially in the form of **Exhibit 1.4.1** attached hereto
(the "**Bill of Sale**"), duly executed by Seller;

1.4.2   Real Estate Assignment and Assumption Agreements (the "**Real Estate
Assignments**") in the form of **Exhibit 1.4.2** attached hereto with respect to (i) the Leased Real
Property, and (ii) the Tenant Leases, each duly executed by Seller;

1.4.3   a Quitclaim Deed (the "**Deed**") in the form of **Exhibit 1.4.2** attached
hereto with respect to the real property listed in Schedule 1.4.3 (the "**Owned Real Property**")
duly executed by Seller;

1.4.4   an Assumption Agreement (the "**Assumption Agreement**") in the form of
**Exhibit 1.4.2** attached hereto with respect to the Assumed Liabilities duly executed by Seller;

1.4.5   favorable original certificates of good standing, of Seller, issued by the
State of Washington, dated no earlier than a date which is fifteen (15) calendar days prior to the
Closing Date;

1.4.6   a duly executed certificate of an officer of Seller certifying to Purchaser (i)
the incumbency of the officers of Seller on the Signing Date and on the Closing Date and bearing

2

the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (ii) the due adoption and text of the resolutions or consents of the Board of Directors of Seller authorizing (I) the transfer of the Assets and transfer of the Assumed Obligations by Seller to Purchaser and (II) the due execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.4.7    a certified copy of the Sale Order (as defined below); and

1.4.8    Any such other instruments, certificates, consents or other documents which Purchaser and Seller mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.5    Items to be Delivered by Purchaser at Closing¶    At or before the Closing, Purchaser shall deliver or cause to be delivered to Seller the following:

1.5.1    payment of the Cash Consideration subject to credits or plus payment to Seller of all amounts as provided under Section 1.6;

1.5.2    evidence of payment of all Cure Costs required hereunder to be paid by Purchaser;

1.5.3    a duly executed certificate of the Secretary of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions of the Board of Directors of Purchaser authorizing the execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.5.4    favorable original certificate of good standing, of Purchaser, issued by the appropriate Secretary of State dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

1.5.5    the Bill of Sale, duly executed by Purchaser;

1.5.6    the Real Estate Assignment(s), duly executed by Purchaser;

1.5.7    the Assumption Agreement, duly executed by Purchaser; and

1.5.8    any such other instruments, certificates, consents or other documents which Purchaser and Seller mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

3

1.6    <u>Prorations and Utilities</u>¶  All items of income and expense listed below with respect to the Assets shall be prorated in accordance with the principles and the rules for the specific items set forth hereafter:

        1.6.1   All transfer, conveyance, sales, use, stamp, similar state and local taxes arising from the sale of the Assets hereunder shall be the responsibility of, and allocated to, Purchaser.

        1.6.2   Other than the Utility Deposits (defined below), which are governed by <u>Section 1.8(j)</u>, and other than with respect to Cure Costs payable by Purchaser, the following costs and expenses shall be prorated based upon the payment period (*i.e.*, calendar or other tax fiscal year) to which the same are attributable: all real estate and personal property lease payments, real estate and personal property taxes, real estate assessments and other similar charges against real estate, and power and utility charges (collectively, the "**Prorated Charges**") on the Assets.  Seller shall pay at or prior to the Closing (or Purchaser shall receive credit for) any unpaid Prorated Charges attributable to periods or portions thereof occurring prior to the Effective Time, and Purchaser shall assume as an Assumed Liability or, to the extent previously paid by Seller, pay to Seller at the Closing all Prorated Charges attributable to periods or portions thereof occurring from and after the Effective Time.  In the event that as of the Closing Date the actual tax bills for the tax year or years in question are not available and the amount of taxes to be prorated as aforesaid cannot be ascertained, then rates, millages and assessed valuation of the previous year, with known changes, shall be used.  The parties agree that if the real estate and personal property tax prorations are made based upon the taxes for the preceding tax period, the prorations shall be re-prorated after the Closing.  As to power and utility charges, "final readings" as of the Closing Date shall be ordered from the utilities; the cost of obtaining such "final readings," if any, shall be paid by Purchaser.

        1.6.3   Seller shall be entitled to all rents and other payments under Tenant Leases, if any, accruing for the period prior to the Effective Time ("**Pre Effective Time Lease Amounts**"), and Purchaser shall be entitled to all rents and other payments under tenant leases, if any, accruing for the period after the Effective Time ("**Post Effective Time Lease Amounts**" and together with the Pre Effective Time Lease Amounts, the "**Lease Amounts**").  All Lease Amounts that are collected prior to the Closing shall be prorated as of the Closing in accordance with the immediately preceding sentence.  All Lease Amounts that are accrued but unpaid as of the Closing (including, without limitation, rents and other payments accrued prior to the Closing but payable in arrears after the Closing) (collectively, the "**Unpaid Amounts**") shall belong to Seller, and Purchaser shall, upon receipt of said rents and other payments, receive the same in trust for Seller and shall promptly remit any of such amounts to Seller within ten (10) days after Purchaser's receipt of same.

        1.6.4   All prorations and payments to be made under the foregoing provisions shall be agreed upon by Purchaser and Seller prior to the Closing and shall be binding upon the parties; provided, however, with respect to the Unpaid Amounts, in the event any proration, apportionment or computation shall prove to be incorrect for any reason, then either Seller or Purchaser shall be entitled to an adjustment to correct the same, provided that said party makes written demand on the party from whom it is entitled to such adjustment within thirty (30)

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

calendar days after the erroneous payment or computation was made, or such later time as may be required, in the exercise of due diligence, to obtain the necessary information for proration. This <u>Section 1.6</u> shall survive Closing.

1.7    <u>Transfer of Seller Assets</u>¶ On the Closing Date and subject to the terms and conditions of this Agreement, Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all liens and encumbrances other than the Permitted Exceptions (defined below), and Purchaser shall acquire, all of Seller's right, title and interest in and to only the following assets and properties, as such assets shall exist on the Closing Date, with respect to the operation of the Hospital, to the extent not included among the Excluded Assets, such transfer being deemed to be effective at the Effective Time (collectively, the "**Assets**"):

(a)    all of the tangible personal property owned by Seller and used by Seller in the operation of the assets being sold, including equipment, furniture, machinery, vehicles and office furnishings (the "**Personal Property**");

(b)    all of Seller's rights, to the extent assignable or transferable, to all licenses, provider numbers, permits, approvals, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to Seller for use in the operation of the assets being sold (the "**Licenses**"), including, without limitation, the Licenses and Medicare and Medicaid Provider Numbers set forth on **Schedule 1.7(b)**;

(c)    all of Seller's interest in and to the Owned Real Property and all of Seller's interest, to the extent assignable or transferable, in and to all of the following (the "**Assumed Leases**"): (i) personal property leases with respect to the operation of the assets being sold, (ii) the real property leases for all real property leased by Seller and set forth on **Schedule 1.7(c)(ii)** (the "**Leased Real Property**"), and (iii) the real property leased or subleased by Seller to a third party and set forth on **Schedule 1.7(c)(iii)** (the "**Tenant Leases**");

(d)    all of Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the assets being sold that have been designated by Purchaser as a contract to be assumed pursuant to <u>Section 1.11</u> (the "**Assumed Contracts**");

(e)    to the extent assignable or transferable, all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (i) located at the Assets being sold or (ii) used in the operation of the assets being sold (the "**Inventory**") except as set forth in <u>Section 1.8(e)</u>;

(f)    to the extent assignable or transferrable, all of the following that are not proprietary to Seller and/or owned by or proprietary to Seller's affiliates: operating manuals, files and computer software with respect to the operation of the assets being sold, including, without limitation, all patient records, medical records, employee records, financial records, equipment records, construction plans and specifications, and medical and administrative libraries;

5

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

(g)     any patient records and medical records which are not required by law to be maintained by Seller or Purchaser as of the Effective Time;

(h)     to the extent assignable or transferable, all rights in all warranties of any manufacturer or vendor in connection with the Personal Property;

(i)     the right to use the name "_____";

(a)     all goodwill of the assets being sold evidenced by the Assets;

(b)     to the extent transferable or assignable, Seller's right or interest in the telephone and facsimile numbers used with respect to the operation of the assets being sold;

(c)     to the extent assignable or transferable, Seller's Medicare and Medicaid provider agreements and numbers, and lock box account(s);

(d)     *all accounts and interest thereupon, notes and interest thereupon and other receivables of Seller, including, without limitation, accounts, notes or other amounts receivable, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, disproportionate share payments and Seller Cost Report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the assets being sold, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by Seller prior to the Effective Time whether payable by Medicare, Medicaid, or any other payor (including an insurance company), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source (collectively, "**Accounts Receivable**"), which shall not include any claims and causes of action against Seller's revenue cycle vendors and any of such vendors' affiliates, subsidiaries, agents or representatives, and the proceeds thereof, as set forth in section 1.8(h));*

(e)     *all documents, records, correspondence, work papers and other documents, other than patient records, primarily relating to the Accounts Receivable;*

(a)     *(i) all rights, claims and causes of action of Seller to the extent related to and/or to the extent arising out of the Accounts Receivable and rights to settlements and retroactive adjustments, if any, whether arising under a Seller Cost Report or otherwise, for any reporting periods ending on or prior to the Effective Time, whether open or closed, arising from or against the United States government under the terms of the Medicare program or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services), which shall not include any claims and causes of action against Seller's revenue cycle vendors and any of such vendors' affiliates, subsidiaries, agents or representatives, and the proceeds thereof, as set forth in section 1.8(h)); and (ii) causes of action under Sections 544, 547, 548, and 550 of the Bankruptcy Code against the counterparties to the Assumed Contracts and Assumed Leases listed on **Schedule 1.8(aa)**;*

6

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

(b)    *all payments, including but not limited to, all Disproportionate Share Hospital Payments ("DSH"), from the State of Washington or any of its administrative entities or other entitles to support the assets being sold (together with Medicare and Medicaid supplemental payments, the "Supplemental Payments") received on and after the Effective Time regardless of the state fiscal year for which the Supplemental Payments are made in reference to and regardless of the state fiscal year for which the data was derived to calculate eligibility for such payments;*

**[NOTE TO POTENTIAL BIDDERS: Allocation of the assets described in the above four paragraphs between included or excluded assets may vary depending on the nature of the assets being acquired and purpose of the acquisition of the assets (i.e., are they purchased as a going concern). While potential bidders can, obviously, assign assets between included and excluded assets as they deem appropriate, these assets may be particularly sensitive.]**

(c)    except for the Excluded Assets, to the extent assignable or transferable, any other assets owned by Seller (which are not otherwise specifically described above in this Section 1.7) that are used in the operation of the assets being sold.

As used herein, the term "**Permitted Exceptions**" means (i) the Assumed Obligations; (ii) liens for taxes not yet due and payable (iii) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property; and (iv) other imperfections of title or encumbrances, if any, which are not monetary in nature and that are not, individually or in the aggregate, material to the business of the assets being sold.

1.8    Excluded Assets¶ Notwithstanding anything to the contrary in Section 1.7, Seller shall retain all interests, rights and other assets owned directly or indirectly by it (or any of Seller's affiliates) which are not among the Assets, including, without limitation, the following interests, rights and other assets of Seller (collectively, the "**Excluded Assets**"):

(a)    cash, cash equivalents and short-term investments;

(b)    all Seller employee benefit plans and the assets of all Seller employee benefit plans and any asset that would revert to the employer upon the termination of any Seller employee benefit plan, including, without limitation, any assets representing a surplus or overfunding of any Seller employee benefit plan;

(c)    all contracts that are not Assumed Contracts;

(d)    all leases that are not Assumed Leases;

(e)    the portions of Inventory, prepaid expenses and deposits, and other assets disposed of, expended or canceled, as the case may be, by Seller after the Signing Date and prior to the Effective Time in the ordinary course of business;

(f)    assets owned and provided by vendors of services or goods to the assets being sold;

7

(g)     all of Seller's organizational or corporate record books, minute books and tax records;

(h)     except as otherwise provided herein, all claims, counterclaims and causes of action of Seller or Seller's bankruptcy estate (including parties acting for or on behalf of Seller's bankruptcy estate, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Case (the "Committee")), including, without limitation, (i) any claims and causes of action arising under chapter 5 of the Bankruptcy Code and any related applicable non-bankruptcy law and state law equivalents, except for causes of action under Chapter 5 of the Bankruptcy Code against counterparties to any Assumed Contracts or Assumed Leases; (ii) any causes of action and rights to challenge liens, claims or interests asserted against property of the Seller's bankruptcy estate, including, but not limited to, liens, claims or interests attaching to the Purchase Price paid to the Seller, (iii) any commercial or other tort claims arising on or before the closing date of the Sale, including, but not limited to, claims (a) against present or former directors and officers of the Seller and/or any of their affiliates, (b) against direct and indirect equity holders of the Seller and/or their affiliates, and (c) of the Seller's bankruptcy estate against any of its affiliates' bankruptcy estates; (iv) any claims and causes of action against Seller's revenue cycle vendors and any of such vendors' affiliates, subsidiaries, agents or representatives, and (v) the proceeds of any of the foregoing;

(i)     all insurance policies and contracts and coverages obtained by Seller or listing Seller as insured party, a beneficiary or loss payee, including prepaid insurance premiums, and all rights to insurance proceeds under any of the foregoing, and all subrogation proceeds related to any insurance benefits arising from or relating to Assets prior to the Closing Date;

(j)     all deposits made with any entity that provides utilities to the assets being sold (the "**Utility Deposits**");

(k)     all refunds, deposits, prepayments, and similar amounts of any kind or nature attributable to periods prior to the Effective Time, regardless of time of receipt;

(l)     all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat laws;

(m)     all bank accounts of Seller;

(n)     all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection;

(o)     the rights of Seller to receive mail and other communications with respect to Excluded Assets or Excluded Liabilities;

(p)     all director and officer insurance policies and proceeds thereof;

(q)     all tax refunds of Seller;

8

(r)  any rights or documents relating to any Excluded Liability or other Excluded Asset;

(s)  any rights or remedies provided to Seller under this Agreement and each other document executed in connection with the Closing;

(t)  any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the business of the assets being sold as conducted before the Closing or that relate to any of the Assets; (iii) documents which Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents). With respect to documents necessary to prepare cost reports, Purchaser shall receive the original document and Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(u)  all deposits or other prepaid charges and expenses paid in connection with or relating to any other Excluded Assets; and

(v)  any assets identified in **Schedule 1.8(dd)**.

For the avoidance of doubt, Purchaser is not acquiring any asset owned by any affiliate of Seller, including Astria Health.

1.9  Assumed Obligations¶ On the Closing Date, Seller shall assign, and Purchaser shall assume and agrees to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations of Seller and only the following liabilities and obligations (collectively, the "**Assumed Obligations**"):

(a)  the Assumed Contracts and all liabilities of Seller under the Assumed Contracts, including related Cure Costs;

(b)  the Assumed Leases and all liabilities of Seller under the Assumed Leases, including related Cure Costs;

(c)  all liabilities and obligations arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Purchaser of the assets being sold or any of the Assets on or after the Effective Time;

(d)  all accrued paid time off pay;

(e)  all liabilities and obligations of Seller related to the Hired Employees arising on or following the Effective Time;

9

(f)     all unpaid real and personal property taxes, if any, that are attributable to the Assets after the Effective Time, subject to the prorations provided in Section 1.6;

(g)     all liabilities and obligations relating to utilities being furnished to the Assets, subject to the prorations provided in Section 1.6;

(h)     any documentary, sales and transfer tax liabilities of Seller incurred as a result of the consummation of the transaction contemplated by this Agreement;

(i)     any and all liabilities and obligations arising under the law or bankruptcy court order(s) relating to any collective bargaining agreement or other contract with any labor union or labor relations entity applicable to and/or covering employees of the assets being sold;

(j)     all liabilities or obligations provided for in Section 5.3;

(k)     any other obligations and liabilities identified in **Schedule 1.9(k)**.

1.10    Excluded Liabilities¶ Purchaser shall not assume or become responsible for any of Seller's duties, obligations or liabilities that are not assumed by Purchaser pursuant to the terms of this Agreement, the Bill of Sale, the Assumption Agreement or the Real Estate Assignment(s) (the "**Excluded Liabilities**"), and Seller shall remain fully and solely responsible for all of Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Assets or the assets being sold unless assumed by Purchaser under this Agreement, in the Bill of Sale, the Assumption Agreement or in the Real Estate Assignment(s).

1.11    Designation of Assumed Contracts and Assumed Leases¶

(a)     Except as provided in Section 1.11(b), all contracts and leases will be subject to evaluation by Purchaser for assumption or rejection (collectively "**Evaluated Contracts**"). Not later than ten (10) days after entry of the Sale Order (i) Purchaser shall notify Seller in writing of which Evaluated Contracts are to be assumed by Seller and assigned to Purchaser and (ii) Purchaser shall notify Seller in writing signed and dated by Purchaser of which Evaluated Contracts are to be rejected by Seller (collectively, the "**Rejected Contracts**"). Seller shall file such motions in the Bankruptcy Court and take such other actions as are reasonably necessary to ensure that final and non-appealable orders (x) assuming and assigning the Assumed Contracts or Assumed Leases to Purchaser are entered and (y) rejecting the Rejected Contracts are entered. With respect to each Assumed Lease, Seller shall execute and deliver to Purchaser an Assignment and Assumption of Lease. Notwithstanding anything to the contrary set forth in this Agreement, the Rejected Contracts shall constitute part of the Excluded Assets pursuant to, and as defined in, this Agreement.

(b)     At Closing and pursuant to an order of the Bankruptcy Court, Seller will assume and immediately assign to Purchaser the leases for Leased Real Property and the Tenant Leases.

10

1.12    Disclaimer of Warranties; Release¶

(a)    THE ASSETS TRANSFERRED TO PURCHASER WILL BE SOLD BY SELLER AND PURCHASED BY PURCHASER IN THEIR PHYSICAL CONDITION AT THE EFFECTIVE TIME, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND WITH RESPECT TO THE LEASED REAL PROPERTY WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, INCLUDING, WITHOUT LIMITATION, THE LAND, THE BUILDINGS AND THE IMPROVEMENTS. ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLER INCLUDED IN THE ASSETS AND THE ASSUMED OBLIGATIONS ARE BEING SOLD OR ASSUMED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS. ALL OF THE TANGIBLE ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE EFFECTIVE TIME.

(b)    Purchaser acknowledges that Purchaser has examined, reviewed and inspected all matters which in Purchaser's judgment bear upon the Assets, the Seller, the assets being sold, the business of the assets being sold and their value and suitability for Purchaser's purposes and is relying solely on Purchaser's own examination, review and inspection of the Assets and Assumed Obligations.    Purchaser releases Seller and its affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the business of the assets being sold or the Assets, or their suitability for any purpose whatsoever.  Purchaser further acknowledges that the representations and warranties of Seller contained in ARTICLE 2 of this Agreement are the sole and exclusive representations and warranties made by Seller to Purchaser (including with respect to the assets being sold, the Assets and the Assumed liabilities) and shall expire, and be of no further force or effect at the Closing.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents, warrants and covenants to Purchaser as to the following matters, except as disclosed in the disclosure schedule as of the Signing Date, as may be amended pursuant to the terms of this Agreement, (the "**Disclosure Schedule**") hereby delivered by Seller to Purchaser:

2.1    Authorization¶ Seller has all necessary corporate power and authority to enter into this Agreement and, subject to Bankruptcy Court approval, to carry out the transactions contemplated hereby.

11

2.2  <u>Binding Agreement</u>¶ This Agreement has been duly and validly executed and delivered by Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

2.3  <u>Organization and Good Standing; No Violation</u>¶

(a)  Seller is a non-profit corporation duly organized, validly existing and in good standing under the laws of the State of Washington.  Seller has all necessary power and authority to own, operate and lease its properties and to carry on its businesses as now conducted.

(b)  Neither the execution and delivery by Seller of this Agreement nor the consummation of the transactions contemplated hereby by Seller nor compliance with any of the material provisions hereof by Seller, will violate, conflict with or result in a breach of any material provision of Seller's articles of incorporation or bylaws or any other organizational documents of Seller.

2.4  <u>Contracts</u>¶ Except as set forth in **Schedule 2.4**, upon entry of the Sale Order and Purchaser's payment of the Cure Costs, to Seller's knowledge, Seller will not be in breach or default of the Assumed Contracts or Assumed Leases.  No provision of this <u>Section 2.4</u> shall apply to any failure to cure non-monetary defaults or obtain consents to the assignment of the Assumed Contracts and Assumed Leases from third parties to the Assumed Contracts and Assumed Leases for which consent is required to assign the Assumed Contracts and Assumed Leases to Purchaser (the "**Contract and Lease Consents**").

2.5  <u>Brokers and Finders</u>¶ Except as set forth on **Schedule 2.5**, neither Seller nor any affiliate thereof, nor any officer or director thereof, have engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder.

2.6  <u>Seller Knowledge</u>¶ References in this Agreement to "Seller's knowledge or "the knowledge of Seller" means the actual knowledge of the Chief Executive Officer or Chief Financial Officer of Seller, without independent research.  No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Seller as to the following matters as of the Signing Date and, except as otherwise

12

provided herein, shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date:

3.1 <u>Authorization</u>¶ Purchaser has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby. No additional internal consents are required in order for Purchaser to perform its obligations and agreements hereunder.

3.2 <u>Binding Agreement</u>¶ This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

3.3 <u>Organization and Good Standing</u>¶ Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of _____, is or will be duly authorized to transact business in the State of Washington, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

3.4 <u>No Violation</u>¶ Except as set forth in **Schedule 3.4**, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Purchaser is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

3.5 <u>Brokers and Finders</u>¶ Neither Purchaser nor any affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

3.6 <u>Representations of Seller</u>¶ Purchaser acknowledges that it is purchasing the Assets on an "AS IS, WHERE IS" basis (as more particularly described in <u>Section 1.12</u>), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement (but subject to the provisions of <u>Section    </u>). Purchaser further acknowledges that Seller is not making any representations or warranties herein relating to the Assets or the operation of the assets being sold on and after the Effective Time.

3.7 <u>Legal Proceedings</u>¶ Except as described on **Schedule 3.7**, there are no claims, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened relating to or affecting Purchaser or any affiliate of Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would

13

19-01189-WLH11    Doc 807    Filed 12/06/19    Entered 12/06/19 16:03:06    Pg 77 of 97

materially adversely affect the properties, business condition (financial or otherwise) of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby. Neither Purchaser nor any affiliate of Purchaser is subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any affiliate of Purchaser which materially adversely affects the condition (financial or otherwise), operations or business of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

3.8 <u>No Knowledge of Seller's Breach</u>¶ Neither Purchaser nor any of its affiliates has knowledge of any breach of any representation or warranty by Seller or of any other condition or circumstance that would give Purchaser a right to terminate this Agreement pursuant to <u>Section 9.1(c)</u>. If information comes to Purchaser's attention on or before the Closing Date (whether through Seller or otherwise and whether before or after the Signing Date) which indicates that Seller has breached any of its representations and warranties under this Agreement, then the effect shall be as if the representations and warranties had been modified in this Agreement in accordance with the actual state of facts existing prior to the Effective Time such that there will be no breach under Seller's representations and warranties in relation to such information; *provided, however*, that Purchaser must immediately notify Seller if any such breach comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Seller shall constitute a waiver by Purchaser of Seller's breach, if any, of any representation or warranty. If any such information comes to Purchaser's attention on or before the Closing Date (whether through Seller or otherwise, including through updated schedules, and whether before or after the Signing Date) that would give Purchaser a right to terminate this Agreement pursuant to <u>Section 9.1(c)</u>, Purchaser must immediately notify Seller if any such information comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Seller shall constitute a waiver of such right in relation to the relevant breach.

3.9 <u>Ability to Perform</u>¶ Purchaser has current assets in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and otherwise has the wherewithal to satisfy the Assumed Obligations and consummate the transactions contemplated by this Agreement.

3.10 <u>Purchaser Knowledge</u>¶ References in this Agreement to "Purchaser's knowledge" or "the knowledge of Purchaser" means the actual knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Operating Officer of Purchaser, without independent research. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

3.11 <u>Investigation</u>. Purchaser has been afforded reasonable access to, and has been provided adequate time to review, the books, records, information, operations, facilities and personnel of Seller and the Assets being sold for purposes of conducting a due diligence investigation of Seller and the Assets being sold. Purchaser has conducted a reasonable due diligence investigation of Seller and the Assets being sold and has received satisfactory answers to all inquiries it has made respecting Seller and the Assets being sold and has received all

14

information it considers necessary to make an informed business evaluation of Seller and the Assets being sold. In connection with its due diligence investigation of Seller and the Assets being sold, Purchaser has not relied upon any books, records, information, operations, facilities and personnel provided by Seller, including in making its determination to enter into this Agreement and/or consummate the transactions contemplated hereby.

## ARTICLE 4

## COVENANTS OF SELLER

4.1     Access and Information; Inspections¶

4.1.1     From the Signing Date through the Effective Time, (a) Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonable access during normal business hours at Seller's corporate headquarters in Yakima, Washington to, and the right to inspect, the books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Assets being sold and the plant and property of the Assets being sold at the Assets being sold and (b) Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's possession as to businesses and properties of the Assets being sold as Purchaser or its representatives may from time to time reasonably request; *provided, however*, that Seller is not obligated to disclose information which is proprietary to Seller and would not be essential to the ongoing operation of the Assets being sold by Purchaser; *provided, further*, that all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller. Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of Seller or the Assets being sold.

4.1.2     Notwithstanding anything contained herein, Seller shall not be required to provide Purchaser or its representatives or agents access to or disclose information where such access or disclosure would violate the rights of its patients, jeopardize the attorney-client or similar privilege with respect to such information or contravene any law, judgment, fiduciary duty or contract entered into prior to or on the date of this Agreement with respect to such information.

4.2     Cooperation¶

4.2.1     Seller shall reasonably cooperate with Purchaser and its authorized representatives and attorneys: (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Purchaser's efforts to effectuate the assignment of Assumed Contracts to Purchaser as of the Closing Date. Except as

15

may be otherwise requested by Seller in order to comply with applicable law or regulatory guidance, notwithstanding anything contained herein, other than Bankruptcy Court orders and authorizations, it shall be Purchaser's sole responsibility (including payment of any fees, expenses, filings costs or other amounts) to obtain the Contract and Lease Consents, as well as all governmental consents, approvals, assignments, authorizations, clearances and licenses required to (x) carry out the transactions contemplated by this Agreement, including but not limited to medical licenses and/or (y) transfer any of the Assets, including any Licenses. To the extent Purchaser needs certain information and data which is in the possession of Seller in order for Purchaser to complete Purchaser's license and permit approval applications, Purchaser shall receive, upon request, reasonable assistance from Seller in connection with the provision of such information.

4.2.2 Notwithstanding any provision to the contrary contained in this Agreement, Seller shall not be obligated to obtain the approval or consent to the assignment, to Purchaser, of any Assumed Contracts or Assumed Leases, from any party to any of the Assumed Contracts or Assumed Leases even if any such contract or lease states that it is not assignable without such party's consent.

4.3     Other Bidders¶ Purchaser expressly acknowledges and agrees that Seller has an obligation to seek out and determine the best and highest offer reasonably available for the Seller's assets in accordance with the Bankruptcy Code, and nothing herein shall amend, modify, alter, diminish or affect such obligation.

4.4     Seller's Efforts to Close¶ Seller shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or materially influence the satisfaction of such conditions; provided, however, that Seller shall not be required to pay or commit to pay any amount to (or incur any obligation in favor of) any person (other than filing or application fees).

4.5     Termination Cost Reports¶ Seller shall file all Medicare, Medicaid and any other termination cost reports required to be filed as a result of the consummation of (a) the transfer of the Assets to Purchaser and (b) the transactions contemplated by this Agreement, provided that Purchaser shall fund reasonable costs and expenses of preparation, filing and audit of such reports. Purchaser shall permit Seller access to all Assets being sold books and records to prepare such reports and shall assist Seller in the process of preparing, filing, and reviewing the termination cost reports. All such termination cost reports shall be filed by Seller in a manner that is consistent with current laws, rules and regulations. Seller shall be responsible for filing governmental cost reports for the period _____ through the Closing Date. Purchaser shall be responsible for their own cost report filings relating to the Assets being sold beginning on the day immediately following the Effective Time.

## ARTICLE 5

## COVENANTS OF PURCHASER

16

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

5.1    Purchaser's Efforts to Close¶  Purchaser shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Seller's obligations under this Agreement to the extent that Purchaser's action or inaction can control or materially influence the satisfaction of such conditions.

5.2    Required Governmental Approvals¶  Purchaser (a) shall use its best efforts to secure, as promptly as practicable before the Closing Date, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled, and (b) will provide such other information and communications to governmental and regulatory authorities as Seller or such authorities may reasonably request.  Purchaser is responsible for all filings with and requests to governmental authorities necessary to enable Purchaser to operate the Assets being sold at and after the Effective Time.  Purchaser shall, promptly, but no later than thirty (30) business days after the entry of the Sale Order or sooner if required by applicable governmental or regulatory authorities, file all applications, licensing packages and other similar documents with all applicable governmental and regulatory authorities which are a prerequisite to obtaining the material licenses, permits, authorizations and provider numbers described in Section 8.1. Purchaser shall be entitled, but not obligated, to obtain the Contract and Lease Consents.  Purchaser shall be entitled, but not obligated, to solicit and obtain estoppel certificates from any third party to any Leased Real Property.  Purchaser's failure to obtain any or all of the Contract and Lease Consents or estoppel certificates as of the Closing Date shall not be a condition precedent to either party's obligation to close the transactions contemplated by this Agreement.

5.3    Certain Employee Matters¶

(a)    Purchaser agrees to make offers of employment, effective as of the Effective Time, to substantially all persons (whether such persons are full time employees, part-time employees, on short-term or long-term disability or on leave of absence, military leave or workers compensation leave) (the "**Assets being sold Employees**") who, immediately prior to the Effective time are: (i) employees of Seller; (ii) employees of any affiliate of Seller which employs individuals at the **Assets being sold** and are listed on **Schedule 5.3**; or (iii) employed by an affiliate of Seller and are listed on **Schedule 5.3**.  For the avoidance of doubt, the **Assets being sold** Employees shall not include any employees of Astria Health or any other affiliate of Seller unless such individual is listed on **Schedule 5.3**.  Any of the **Assets being sold** Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "Hired Employees." All employees who are Hired Employees shall cease to be employees of Seller or its affiliates as of the Closing Date.

(b)    Purchaser shall give all Hired Employees full credit for paid time off pay to such employees as of the Closing Date, either by (i) crediting such employees the time off reflected in the employment records of Seller and/or any of its affiliates immediately prior to the Effective Time or (ii) by making full payments to such employees of the amounts which such employees would have received had they taken such paid time off.

17

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

(c)     After the Closing Date, Purchaser's human resources department will give reasonable assistance to Seller and its affiliates with respect to Seller's and Seller's affiliates' post-Closing administration of Seller's and Seller's affiliates' pre-Closing employee benefit plans for the Assets being **sold** Employees.   Within five (5) days after the Closing Date, Purchaser shall provide to Seller a list of all the Assets being **sold** Employees who were offered employment by Purchaser but refused such employment along with a list of all Hired Employees (which such list Purchaser shall periodically update).

(d)     With respect to any collective bargaining agreements or labor contract with respect to any union employees, Purchaser shall comply with the applicable laws and bankruptcy court orders relating to collective bargaining agreements or labor contracts.

(e)     The provisions of this <u>Section 5.3</u> are solely for the benefit of the parties to this Agreement, and no employee or former employee or any other individual associated therewith or any employee benefit plan or trustee thereof shall be regarded for any purpose as a third party beneficiary of this Agreement, and nothing herein shall be construed as an amendment to any employee benefit plan for any purpose.

5.4     <u>Excluded Assets</u>¶ As soon as practicable after the Closing Date, Purchaser shall deliver to Seller or Seller's designee any Excluded Assets found at the Assets being sold on and after the Effective Time, without imposing any charge on Seller for Purchaser's storage or holding of same on and after the Effective Time.

5.5     <u>Waiver of Bulk Sales Law Compliance</u>¶ Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Assets are located and all other laws applicable to bulk sales and transfers.

5.6     <u>Attorney General Filings</u>¶ Promptly after entry of the Sale Order, Seller and Purchaser shall cooperate in obtaining any required review and consent by the Washington Attorney General to the sale of the Purchased Assets to Purchaser in accordance with this Agreement and the Sale Order pursuant to applicable provisions of Washington state laws and regulations, including without limitation, preparing and submitting to the Washington Attorney General a notice of the transactions contemplated by this Agreement within ten (10) calendar days after entry of the Sale Order, participating in any required Attorney General or public meetings, and negotiating any conditions proposed by the Attorney General for the consummation of such transactions.

5.7     <u>Conduct Pending Closing</u>¶   Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement pursuant to its terms, unless Seller shall otherwise consent in writing, Purchaser shall not take any action or fail or omit to take any action which would cause any of Purchaser's representations and warranties set forth in <u>ARTICLE 4</u> to be inaccurate or untrue as of the Closing.

5.8     <u>Resale Certificate</u>¶ Purchaser agrees to furnish to Seller any resale certificate or certificates or other similar documents reasonably requested by Seller to comply with or obtain an exemption from pertinent excise, sales and use tax laws.

18

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

5.9    <u>Cure Costs</u>¶ Purchaser, upon entry of the Bankruptcy Court order approving the assumption and assignment of the relevant Assumed Contract and Assumed Lease shall pay the Cure Costs for each Assumed Contract and Assumed Lease may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code. For purposes of this Agreement, "**Cure Costs**", means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of the Assumed Contracts and Assumed Leases to Purchaser as provided herein.

5.10    <u>HSR Filing</u>¶ If necessary, Purchaser and Seller will as promptly as practicable, and in any event no later than five business days after the date of the Sale Order, file with the Federal Trade Commission and the Department of Justice the notification and report forms required for the transactions contemplated hereby and any supplemental information that may be reasonably requested in connection therewith pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), which notification and report forms and supplemental information will comply in all material respects with the requirements of the HSR Act. Purchaser shall pay all filing fees required with respect to the notification, report and other requirements of the HSR Act. Each of Purchaser and Seller shall furnish to the other such information and assistance as the other shall reasonably requires in connection with the preparation and submission to, or agency proceedings by, any governmental authority under the HSR Act, and each of Purchaser and Seller shall keep the other promptly apprised of any communications with, and inquires or requests for information from, such governmental authorities. Purchaser shall take such action (including divestitures or hold separate arrangements) as may be required by any governmental authority in order to resolve with the minimum practicable delay any objections such governmental authorities may have to  the transactions contemplated by this Agreement under the HSR Act.

## ARTICLE 6

## SELLER'S BANKRUPTCY AND BANKRUPTCY COURT APPROVAL

6.1    <u>Bankruptcy Court Approval</u>¶

(a)    Seller and Purchaser acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases are subject to Bankruptcy Court approval, and that this Agreement is subject to termination in the event Seller receives a better and higher offer for Seller's assets in accordance with the Bankruptcy Code.

(b)    Seller shall exercise reasonable efforts at the Sale Hearing to obtain a "Sale Order" approving this Agreement, subject to its obligations in respect of any better and higher offer for Seller's assets in accordance with the Bankruptcy Code. For purposes of this Agreement, the term "Sale Order" shall mean an order of the Bankruptcy Court authorizing the sale of the Assets (including the assumption and assignment of the Assumed Contracts and Assumed Leases) to Purchaser consistent with this Agreement and in a form reasonably satisfactory to Purchaser.

19

(c)     Seller agrees to proceed in good faith to obtain Bankruptcy Court approval of the sale contemplated herein with a determination that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code and to file such declarations and other evidence as may be required to support a finding of good faith.

(d)     Seller shall seek an order from the Bankruptcy Court retaining jurisdiction over all matters relating to claims against Seller as debtor solely in the Bankruptcy Court.

6.2     <u>Appeal of Sale Order</u>¶  In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.  In the event of an appeal of the Sale Order, Seller shall, if, in its discretion it elects to do so, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

Seller's obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Seller in whole or in part at or prior to the Closing:

7.1     <u>Signing and Delivery of Instruments</u>¶  Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement.

7.2     <u>No Restraints</u>¶  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

7.3     <u>Performance of Covenants</u>¶  Purchaser shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

7.4     <u>Governmental Authorizations</u>¶  Purchaser shall have obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits and authorizations not

20

actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies).

 7.5 <u>Attorney General Approval</u>¶ The Washington Attorney General shall have approved the transactions contemplated by this Agreement.

 7.6 <u>Bankruptcy Court Approval</u>¶ The Bankruptcy Court shall have entered the Sale Order.

 7.7 <u>HSR Act</u>. The applicable waiting period, if any, under the HSR Act shall have expired or been earlier terminated.

## ARTICLE 8

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

 Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

 8.1 <u>Governmental Authorizations</u>¶ Purchaser shall have obtained licenses, permits and authorizations from governmental agencies or governmental bodies that are required for operation of the Assets being sold, except in such case where failure to obtain such license, permit or authorizations from a governmental agency or governmental body does not have a material adverse effect.

 8.2 <u>Bankruptcy Court Approval</u>¶ The Bankruptcy Court shall have entered the Sale Order and made a finding that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

 8.3 <u>Signing and Delivery of Instruments</u>¶ Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement.

 8.4 <u>Performance of Covenants</u>¶ Seller shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller on or prior to the Closing Date; *provided, however*, this condition will be deemed to be satisfied unless (a) Seller was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within fifteen (15) business days after receipt of such notice and (b) the respects in which such obligations, covenants, agreements and conditions have not been performed have had or would more likely than not result in a material adverse effect on the Assets.

 8.5 <u>No Restraints</u>¶ No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any governmental

21

body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

8.6     <u>Attorney General Approval</u>¶   The Washington Attorney General shall have approved the transactions contemplated by this Agreement on terms and conditions and in form and substance acceptable to Purchaser in Purchaser's reasonable business judgment.

8.7     <u>Medicare and Medicaid Provider Agreements</u>¶   Following consultation with Purchaser, Seller shall have obtained agreements with the Medicare and Medicaid agencies with respect to the assumption and assignment of Seller's provider agreements with such agencies, transferring the Provider Agreements, or, obtained a court order providing for the transfer of the Provider Agreements.

8.8     <u>HSR Act</u>.   If applicable, the applicable waiting period under the HSR Act shall have expired or been earlier terminated.

## ARTICLE 9

## TERMINATION

9.1     <u>Termination</u>¶ This Agreement may be terminated at any time prior to Closing:

(a)     by the mutual written consent of the parties;

(b)     by Seller if a material breach of this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within fifteen (15) business days after service by Seller upon Purchaser of a written notice which describes the nature of such breach; *provided*, *however*, Seller shall not be permitted to terminate this Agreement pursuant to this <u>Section 9.1(b)</u> if Seller is also in material breach of this Agreement;

(c)     by Purchaser if a material breach of this Agreement has been committed by Seller and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser upon Seller of a written notice which describes the nature of such breach; *provided*, *however*, Purchaser shall not be permitted to terminate this Agreement pursuant to this <u>Section 9.1(c)</u> if Purchaser is also in material breach of this Agreement;

(d)     by Purchaser if satisfaction of any condition in <u>ARTICLE 8</u> is or becomes impossible and Purchaser has not waived such condition in writing (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Purchaser to comply with its obligations under this Agreement or (ii) Seller's failure to provide its closing deliveries on the Closing Date as a result of Purchaser not being ready, willing and able to close the transaction on the Closing Date);

22

(e)     by Seller if any of the conditions in <u>ARTICLE 7</u> have not been satisfied as of _____, or if satisfaction of any such condition in <u>ARTICLE 7</u> is or becomes impossible and Seller has not waived such condition in writing on or before _____ (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Seller to comply with their obligations under this Agreement or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date as a result of Seller not being ready, willing and able to close the transaction on the Closing Date);

(f)     by either Purchaser or Seller if the Bankruptcy Court enters an order dismissing the Bankruptcy Case or fails to approve the sale of the Assets to Purchaser; or

(g)     by Seller if, in connection with the Bankruptcy Case, Seller receives a better and higher offer for the Seller's assets in accordance with the Bankruptcy Code;

(h)     by either Purchaser or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before _____ (the "**Termination Date**"). The Termination Date may be extended to _____ by mutual consent of the Seller and Purchaser.

9.2     <u>Termination Consequences</u>¶ If this Agreement is terminated pursuant to <u>Section 9.1</u>: (a) all further obligations of the parties under this Agreement shall terminate, provided that the provisions of <u>ARTICLE 12 and paragraphs 11.1 and 11.2</u>, shall survive, and (b) each party shall pay the costs and expenses incurred by it in connection with this Agreement; provided, in the case of any termination based on <u>Sections 9.1(b)</u> or (c), the consequences of such termination shall be determined in accordance with Sections 11.1 and 11.2 hereof. Each Party acknowledges that the agreements contained in this <u>Section 9.2</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

<h1 style="text-align:center">ARTICLE 10</h1>

<h1 style="text-align:center">POST-CLOSING MATTERS</h1>

10.1    <u>Excluded Assets</u>¶

Subject to <u>Section 10.2</u> hereof, any Excluded Asset (or proceeds thereof) (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by the Bankruptcy Court, which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall, within five (5) business days following receipt, be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to Seller. Purchaser (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to Seller under this <u>Section 10.1</u> against, nor the right to contest its obligation to transfer, assign and

23

convey to Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against Seller.  If Purchaser does not remit any monies included in the Excluded Assets (or proceeds thereof) to Seller in accordance with the first sentence of this Section 10.1, such withheld funds shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "**Excluded Asset Due Date**") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to Seller.

    10.2    Preservation and Access to Records After the Closing¶

    (a)    From the Closing Date until one (1) year after the Closing Date or such longer period as required by law (the "**Document Retention Period**"), Purchaser shall keep and preserve all medical records, patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets.  Purchaser will afford to the representatives of Seller, any of its affiliates, the Official Committee of the Unsecured Creditors of the Seller, Seller's estate representative or any liquidating trustee of the Seller's bankruptcy estate ("**Seller Parties**"), including their counsel and accountants, full and complete access to, and copies (including, without limitation, color laser copies) of, such records with respect to time periods prior to the Effective Time (including, without limitation, access to records of patients treated at the Assets being sold prior to the Effective Time) during normal business hours after the Effective Time, to the extent reasonably needed by any Seller Party for any lawful purpose.  Purchaser acknowledges that, as a result of entering into this Agreement and operating the Assets being sold, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality.  Purchaser shall abide by any such rules and regulations relating to the confidential information it acquires.  Purchaser shall maintain the patient and medical staff records at the Assets being sold in accordance with applicable law and the requirements of relevant insurance carriers.  After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents described in this Section 10.2(a), Purchaser shall provide written notice to Seller of Purchaser's intention no later than thirty (30) calendar days prior to the date of such intended destruction or disposal.  Any of the Seller Parties shall have the right, at its sole cost, to take possession of such documents during such thirty (30) calendar day period.  If any of the Seller Parties does not take possession of such documents during such thirty (30) calendar day period, Purchaser shall be free to destroy or otherwise dispose of such documentation upon the expiration of such thirty (30) calendar day period.

    (b)    Provided that Purchaser shall not incur any out of pocket costs, Purchaser shall give full cooperation to the Seller Parties in connection with the administration of Seller's estate, including, without limitation, in connection with all claims adjudication process, plan confirmation process, actions, causes of action or audits relating to the Excluded Assets, Excluded Liabilities or pre-Closing operation of the Seller or the Assets being sold that any Seller Party may elect to pursue, dispute or defend, in respect of events occurring prior to the Effective Time with respect to the operation of the     Such cooperation shall include, without limitation, making the Hired Employees available for interviews, depositions, hearings and trials

24

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

and other assistance in connection with the administration of Seller's estate and such cooperation shall also include making all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done without payment of any fees or expenses to Purchaser or to such employees). In addition, Seller Parties shall be entitled to remove from the Assets being sold originals of any such records, but only for purposes of pending litigation involving the persons to whom such records refer, as certified in writing prior to removal by counsel retained by Seller Parties in connection with such litigation. Any records so removed from the Assets being sold shall be promptly returned to Purchaser following Seller's or its applicable affiliate's use of such records.

(c)     In connection with (i) the transition of the Assets being sold pursuant to the transaction contemplated by this Agreement, (ii) Seller's rights to the Excluded Assets, (iii) in connection with any claim, audit, or proceeding, including, without limitation, any tax claim, audit, or proceeding and (iv) the Seller's obligations under the Excluded Liabilities, Purchaser shall after the Effective Time give Seller Parties access during normal business hours to Purchaser's books, personnel, accounts and records and all other relevant documents and information with respect to the assets, liabilities and business of the Assets being sold as representatives of Seller and Seller's affiliates may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of the Hospital.

(d)     Purchaser and its representatives shall be given access by Seller during normal business hours to the extent reasonably needed by Purchaser for business purposes to all documents, records, correspondence, work papers and other documents retained by Seller pertaining to any of the Assets prior to the Effective Time (excluding confidential employee information, privileged materials and patient records), all in such manner as to not interfere unreasonably with Seller. Such documents and other materials shall be, at Seller's option, either (i) copied by Seller for Purchaser at Purchaser's expense, or (ii) removed by Purchaser from the premises, copied by Purchaser and promptly returned to Seller.

(e)     Purchaser shall comply with, and be solely responsible for, all obligations under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164) promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 with respect to the operation of the Assets being sold on and after the Effective Time.

(f)     Purchaser shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Assets being sold and other information required by Seller for reporting to HFAP for the remainder of the quarterly period in which the Closing has occurred.

(g)     To the maximum extent permitted by law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including without limitation, documents relating to the operations of any of the Assets being sold or any of the Hospital's committees prior to the Effective Time, prior to any disclosure of such documents, Purchaser shall notify Seller and shall provide Seller with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

19-01189-WLH11     Doc 807     Filed 12/06/19     Entered 12/06/19 16:03:06     Pg 89 of 97

(h)    <u>Provision of Benefits of Certain Contracts</u>.    Notwithstanding anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract or Assumed Lease, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would constitute a breach thereof or in any way negatively affect the rights of Seller or Purchaser, as the assignee of such Assumed Contract or Assumed Lease, as the case may be, thereunder.  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, Seller will cooperate with Purchaser in any reasonable arrangement designed to both (a) provide Purchaser with the benefits of or under any such Assumed Contract or Assumed Lease, and (b) cause Purchaser to bear all costs and obligations of or under any such Assumed Contract or Assumed Lease.

10.3    <u>Closing of Financials</u>¶  Purchaser shall cause the individual acting as the chief financial officer of the Assets being sold after the Effective Time (the "**Post-Effective Time CFO**") to cooperate with Seller's representatives in order to complete the standardized closing of Seller's financial records through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "**Closing of Financials**").  Purchaser shall cause the Post-Effective Time CFO to use his or her good faith efforts to cooperate with Seller's representatives in order to complete the Closing of Financials by no later than the date which is thirty (30) calendar days after the Closing Date.  The Post-Effective Time CFO and other appropriate personnel shall be reasonably available to Seller for a period of no less than one hundred eighty (180) calendar days after the Closing Date to assist Seller in the completion of Seller's post-Closing audit, such assistance not to interfere unreasonably with such Post-Effective Time CFO's other duties.

10.4    <u>Medical Staff</u>¶  To ensure continuity of care in the community, Purchaser agrees that the Hospital's medical staff members in good standing as of the Effective Time shall maintain medical staff privileges at the Assets being sold as of the Effective Time.  On and after the Effective Time, the medical staff will be subject to the Hospital's Medical Staff Bylaws then currently in effect, provided that such Bylaws are in compliance with all applicable laws and regulations and contain customary obligations.

# ARTICLE 11

## DEFAULT, TAXES AND COST REPORTS

11.1    <u>Purchaser Default</u>¶  If Purchaser commits any material default under this Agreement, Seller shall be entitled to retain the Deposit, and Seller may, in addition thereto, pursue any rights or remedies that Seller may have under this Agreement or applicable law, including the right to sue for damages or specific performance.

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

11.2    Seller Default¶ If Seller commits any material default under this Agreement, Purchaser shall have the right to demand and receive a refund of the Deposit, and Purchaser may, in addition thereto, pursue any rights or remedies that Purchaser may have under applicable law, including the right to sue for damages or specific performance.

11.3    Tax Matters; Allocation of Purchase Price¶

(a)     After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax liabilities or potential tax liabilities attributable to Seller with respect to the operation of the Assets being sold for all periods prior to the Effective Time and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof. The parties shall also make available to each other to the extent reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters and as Seller reasonably may request in connection with the completion of any post-Closing audits of the Hospital.

(b)     Within 20 days after the Signing Date, Purchaser shall deliver to Seller for Seller's review a schedule setting forth the allocation of the Purchase Price (including any liabilities that are considered to be an increase to the Purchase Price for United States federal income Tax purposes) among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (such schedule, as may be amended as contemplated below in this Section 11.3(b), the "**Allocation Schedule**"). The Allocation Schedule shall be deemed final and binding upon the parties upon Seller's approval thereof. The parties shall cooperate in good faith to finalize the Allocation Schedule within 10 days after delivery of the initial draft of the schedule by Purchaser to Seller. If within such 10 day period (or such other period as the parties may agree), the parties are unable to reach agreement on a final Allocation Schedule, the parties shall have no further obligations under this Section 11.3(b). If the parties are able to agree on an Allocation Schedule, the parties shall refrain from taking any position that is inconsistent with the Allocation Schedule.

(c)     For the avoidance of doubt, any allocation pursuant to this Agreement shall not be binding on the Committee or Seller's creditors for purpose of the Bankruptcy Case.

11.4    Cost Report Matters¶

(a)     Consistent with Section 4.5, Seller shall, at Purchaser's expense, prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medicaid, and other third party payors which settle on a cost report basis (the "**Seller Cost Reports**").

(b)     Upon reasonable notice and during normal business office hours, Purchaser will cooperate reasonably with Seller in regard to Seller's preparation and filing of the Seller Cost Reports. Such cooperation shall include, at no cost to Seller, obtaining access to files

27

at the Assets being sold and Purchaser's provision to Seller of data and statistics, and the coordination with Seller pursuant to reasonable notice of Medicare and Medicaid exit conferences or meetings. Seller shall have no obligations after the Effective Time with respect to Seller Cost Reports except for preparation and filing thereof.

<h1 align="center">ARTICLE 12</h1>

<h2 align="center">MISCELLANEOUS PROVISIONS</h2>

12.1    <u>Further Assurances and Cooperation</u>¶  Seller shall execute, acknowledge and deliver to Purchaser any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by Purchaser at any time and shall take any and all other actions reasonably requested by Purchaser at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Purchaser, the Assets. After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

12.2    <u>Successors and Assigns</u>¶  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; *provided, however,* that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties.

12.3    <u>Governing Law; Venue</u>¶  This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of Washington (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. For so long as Seller or any successor, including any liquidating trustee, is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens.

12.4    <u>Amendments</u>¶  This Agreement may not be amended other than by written instrument signed by the parties hereto, and approved by the Bankruptcy Court.

12.5    <u>Exhibits, Schedules and Disclosure Schedule</u>¶  The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein. From the Signing Date until the Closing, the parties agree that Seller may update the Disclosure Schedule as necessary upon written notice to Purchaser, and the applicable representation and warranty shall thereafter be deemed amended for all purposes by such updated Disclosure Schedule. Notwithstanding the foregoing, should any exhibit or schedule not be completed and attached hereto as of the Signing Date, Seller and Purchaser shall promptly

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Seller and Purchaser in their reasonable discretion prior to being attached hereto. Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply. The headings, if any, of the individual sections of the Disclosure Schedule are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement. The Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article III merely for convenience, and the disclosure of an item in one section of the Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such disclosure, notwithstanding the presence or absence of an appropriate section of the Disclosure Schedule with respect to such other representations or warranties or an appropriate cross reference thereto.

12.6    Notices¶ Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

|  |  |
|---|---|
| If to Seller: | Astria Health<br>900 West Chestnut Ave.<br>Yakima, WA 98902<br>Attention: John Gallagher, CEO<br>Telephone:<br>Facsimile: |
| With a copies to:<br>(which copies shall<br>not constitute notice) | Dentons US LLP<br>601 South Figueroa St., Suite 2500<br>Los Angeles, CA 90017-5704<br>Attention:  Samuel R. Maizel, Esq.<br>Telephone: 213-892-2910<br>Facsimile: 213-623-9924 |
| If to Purchaser: | <br>Attention:<br>Telephone:<br>Facsimile: |

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

<pre>
With a copy to:
(which copies shall
not constitute notice)
                            Attention:
                            Telephone:
                            Facsimile:
</pre>

or at such other address as one party may designate by notice hereunder to the other parties.

      12.7   <u>Headings</u>¶ The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

      12.8   <u>Publicity</u>¶ Prior to the Closing Date, Seller and Purchaser shall consult with each other as to the form and substance of any press release or other public disclosure materially related to this Agreement or any other transaction contemplated hereby and each shall have the right to review and comment on the other's press releases prior to issuance; *provided*, *however*, that nothing in this <u>Section 12.8</u> shall be deemed to prohibit either Seller or Purchaser from making any disclosure that its counsel deems necessary or advisable in order to satisfy either party's disclosure obligations imposed by law subject to reasonable prior notice to the other party thereof.

      12.9   <u>Fair Meaning</u>¶ This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

      12.10   <u>Gender and Number; Construction; Affiliates</u>¶ All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable. Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation." Any reference in this Agreement to an "affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with a second Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. A "Person" shall mean any natural person, partnership, corporation, limited liability company, association, trust or other legal entity.

      12.11   <u>Third Party Beneficiary</u>¶ None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement, except for the parties' successors and permitted assigns, and except for any liquidating trustee or plan administrator for Seller's estate.

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

12.12   <u>Expenses and Attorneys' Fees</u>¶ Except as otherwise provided in this Agreement, each party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby are consummated. The parties expressly agree that (a) all sales, transfer, documentary transfer and similar taxes, fees, surcharges and the like in connection with the sale of the Assets shall be borne by Purchaser. If any action is brought by any party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover its court costs and reasonable attorneys' fees.

12.13   <u>Counterparts</u>¶ This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto. The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

12.14   <u>Entire Agreement</u>¶ This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "**Superseded Agreements**"), which Superseded Agreements shall be of no further force or effect.

12.15   <u>No Waiver</u>¶ Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition. The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance. The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

12.16   <u>Severability</u>¶ If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12.17   <u>Time is of the Essence</u>¶ Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

31

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

*[REMAINDER OF PAGE IS BLANK]*

108673421\V-1
US_Active\113632740\V-3
6848512 v3
US_Active\113632740\V-4

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

Signature By:_____
Print Name:_____
Title:_____
Date:_____

**SELLER:**

Signature By:_____
Print Name:_____
Title:_____
Date:_____

33