**So Ordered.**

**Dated: December 20th, 2019**

Whitman L. Holt
Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

IN RE:

ASTRIA HEALTH, et al.

Debtors.[1]

Lead Case No. 19-01189-11

Jointly Administered

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN REPLACEMENT POSTPETITION FINANCING; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED CREDIT PARTIES; (IV) MODIFYING**

---

[1] The Debtors, along with their case numbers, are as follows: Astria Health (19-01189-11), Glacier Canyon, LLC (19-01193-11), Kitchen and Bath Furnishings, LLC (19-01194-11), Oxbow Summit, LLC (19-01195-11), SHC Holdco, LLC (19-01196-11), SHC Medical Center-Toppenish (19-01190-11), SHC Medical Center-Yakima (19-01192-11), Sunnyside Community Hospital Association (19-01191-11), Sunnyside Community Hospital Home Medical Supply, LLC (19-01197-11), Sunnyside Home Health (19-01198-11), Sunnyside Professional Services, LLC (19-01199-11), Yakima Home Care Holdings, LLC (19-01201-11), and Yakima HMA Home Health, LLC (19-19-01200-11).

Interim DIP/Cash Collateral
Order

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

**THE AUTOMATIC STAY; (V) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH LAPIS ADVISERS, L.P.; (VI) AUTHORIZING USE OF CASH COLLATERAL; (VII) SCHEDULING A FINAL HEARING; AND (VIII) GRANTING RELATED RELIEF**

THIS MATTER having come before the Court upon the motion (the "**Motion**")[2] of the above-captioned debtors (the "**Debtors**" or the "**Borrowers**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101 *et seq.*, as amended, the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 4001-3 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Washington ("**LBR**"), seeking entry of an interim order (this "**Interim Order**") and a final order (the "**Final Order**") granting, *inter alia*:

    i.    authority, pursuant to sections 105, 363, and 364(c) and 364(d) of the Bankruptcy Code, for each of the Debtors, jointly and severally, to obtain senior secured post-petition replacement financing ("**DIP Facility**") in an aggregate

---

[2] Unless stated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Loan Agreement (as defined below), as applicable.

Interim DIP/Cash Collateral Order    - 2 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

principal amount of up to $43,100,000 (of which (x) the Initial Funding (as defined below) plus $700,000 of Committed Advances (as defined below) shall be made available to the Debtors upon entry of this Interim Order upon satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents (as defined below) and (y) subject to the entry of a the Final Order, the balance of Committed Advances and Additional Funding Advances shall be made available to the Debtors at intervals and in amounts set forth in the DIP Loan Agreement (as defined below));

ii.    authority (a) for the Debtors to enter into that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, among the Debtors as Borrowers, the non-filing affiliates of the Debtors party thereto as guarantors, and Lapis Advisers, L.P., as agent for the lenders party thereto (collectively, the "**DIP Lenders**") in substantially the same form as attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Loan Agreement**" and, together with any ancillary, collateral or related documents and agreements, the "**DIP Loan Documents**");

iii.    authority for the Debtors to use the DIP Facility and the proceeds thereof in accordance with the DIP Loan Documents to (a) replace the existing post-petition financing facility with JMB Capital Partners Lending, LLC ("**JMB Capital**") approved in these Chapter 11 Cases, (b) fund the post-petition working capital needs

Interim DIP/Cash Collateral Order          - 3 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

of the Debtors during the pendency of these Chapter 11 Cases, (c) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents, and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Loan Documents (including the amended Budget attached hereto as **Exhibit 2**), this Interim Order and the Final Order;

iv.       authority for the Debtors to grant to the DIP Lenders valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in the DIP Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), to secure all DIP Obligations (as defined below), as more fully set forth in this Interim Order, subject only to the Carve-Out (as defined below);

v.       waiver by the Debtors of all rights to surcharge against the collateral of the DIP Lenders pursuant to section 506(c) of the Bankruptcy Code;

vi.       waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lenders;

Interim DIP/Cash Collateral Order          - 4 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

vii.    providing adequate protection to the Lapis Secured Parties to the extent set forth herein;

viii.    modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

ix.    the scheduling of a final hearing (the "**Final Hearing**") on the Motion for January 22, 2020, at 11:00 a.m. (Pacific Time) to consider entry of the Final Order inter alia, authorizing borrowings under the DIP Facility on a final basis and approving notice procedures with respect thereto; and

x.    related relief.

The Court having considered the Motion and the exhibits attached thereto, the evidence submitted or adduced and the arguments of counsel made at the hearing held on December 18, 2019 (the "**Interim Hearing**") and having found that due and proper notice (the "**Notice**") of the Motion and the Interim Hearing having been served by the Debtors in accordance with Bankruptcy Rule 4001 and 9006 and LBR 2002-1 on (i) the Office of the United States Trustee for the Eastern District of Washington, (ii) counsel to the Lapis Secured Creditors, (iii) counsel to JMB Capital, (iv) counsel to the DIP Lenders, (v) all alleged secured creditors, (vi) counsel to the Committee (defined below), (vii) the thirty largest general unsecured creditors appearing on the list filed in accordance with Bankruptcy Rule 1007(d), and (viii) any parties requesting special notice; and the Interim Hearing to consider the interim

Interim DIP/Cash Collateral Order        - 5 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

relief requested in the Motion having been held and concluded; and no objections were received by the deadline of 12:00 p.m. (Pacific Time) on December 20, 2019, to object to the Employee Carve-Out (as defined below); and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid potential immediate and irreparable harm to the Debtors and their estates and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses and represents a sound exercise of the Debtors' business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND EVIDENCE SUBMITTED PRIOR TO AND DURING THE INTERIM HEARING**:[3]

A.    *Petition Date*.  On May 6, 2019 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States

---

[3] To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.

Interim DIP/Cash Collateral Order          - 6 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

19-01189-WLH11    Doc 841    Filed 12/20/19    Entered 12/20/19 15:29:20    Pg 6 of 121

Bankruptcy Court for the Eastern District of Washington (the "**Court**") commencing these Chapter 11 Cases.

B. *Debtors in Possession*. The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

C. *Notice*. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors to certain parties in interest, including on (i) the Office of the United States Trustee for the Eastern District of Washington, (ii) counsel for the Lapis Secured Creditors, (iii) counsel for JMB Capital, (iv) counsel for the DIP Lenders, (v) all alleged secured creditors, (vi) counsel for the Committee, (vii) the thirty largest general unsecured creditors appearing on the list filed in accordance with Rule 1007(d), and (viii) any parties requesting special notice.

D. *Jurisdiction and Venue*. This Court has core jurisdiction over the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

E. *Committee Formation*. On May 23, 2019, the United States Trustee for the Eastern District of Washington (the "**U.S. Trustee**") appointed an official

Interim DIP/Cash Collateral Order        - 7 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "**Committee**").

F.     *No Credit Available on More Favorable Terms*.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code and have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by the DIP Lenders pursuant to the DIP Loan Documents.

G.     *Best Interests of Estates*.  It is in the best interests of the Debtors' estates and creditors that the Debtors be allowed to enter into the DIP Facility to obtain post-petition secured financing from the DIP Lenders under the terms and conditions set forth herein and in the DIP Loan Documents, as such financing is necessary to avoid immediate and irreparable harm to the Debtors' estates and for the continued operation of the Debtors' businesses.

H.     *Good Faith*.  The extension of credit and financial accommodations under the DIP Loan Documents are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  Accordingly, the DIP Lenders are entitled to the protections of section 364(e) of the Bankruptcy Code.

Interim DIP/Cash Collateral Order     - 8 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

I.      *Good Cause*. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors, and (2) avoid potential immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

J.      *Necessity of DIP Facility Terms*. The terms of the DIP Loan Documents and this Interim Order assuring that the liens and the various claims, superpriority claims, and other protections granted in this Interim Order will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the post-petition financing arrangement contemplated in the DIP Loan Documents, are necessary in order to induce the DIP Lenders to provide post-petition financing to the Debtors.

K.      *Need for Post-Petition Financing*. The Debtors do not have sufficient and reliable sources of working capital, including cash collateral, to continue to operate their businesses in the ordinary course of business without the financing requested in the Motion. In addition, the Debtors require the DIP Facility to pay off the existing DIP financing with JMB Capital, which matures on December 31, 2019.

Interim DIP/Cash Collateral Order        - 9 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Absent payment of the existing DIP financing with JMB Capital before December 31, 2019, the Debtors will be forced to incur a significant eight percent (8%) fee during a time where the Debtors' liquidity is strained.  That fee will now be deferred to the Maturity Date of the DIP Facility.  The ability of the Debtors to obtain sufficient and stable working capital and liquidity through the proposed post-petition financing arrangements with the DIP Lenders as set forth in this Interim Order and the DIP Loan Documents is vital to the preservation and maintenance of the going concern value of each Debtor.  Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to preserve and maximize the value of the assets of the Debtors' bankruptcy estates in order to maximize the recovery to all creditors of the estates.

L.  *Need to Use Cash Collateral*.  The Debtors need to use Cash Collateral in order to, among other things, preserve, maintain and maximize the value of their assets and businesses.  The ability of the Debtors to maintain liquidity through the use of Cash Collateral is vital to the Debtors and their efforts to maximize the value of their assets.  Accordingly, the Debtors have demonstrated good and sufficient cause for the relief granted herein.

M.  *Sections 506(c) and 552(b)*.  As a material inducement to the DIP Lenders to agree to provide the DIP Facility, and in exchange for the DIP Lenders' agreement to subordinate their superpriority claims to the Carve-Out, this Court

Interim DIP/Cash Collateral Order       - 10 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

approves (i) the waiver by the Debtors of any equities of the case exceptions under section 552(b) of the Bankruptcy Code, and (ii) the waiver by the Debtors of the provisions of section 506(c) of the Bankruptcy Code.

N.    *Priming of Prepetition Liens*.  The priming of the Lapis Subordinated Sunnyside Liens and Lapis Subordinated A/R Liens by the DIP Lenders under section 364(d)(1) of the Bankruptcy Code, solely to the extent set forth in the DIP Loan Documents and as further described below, will enable the Debtors to obtain the DIP Facility and, among other benefits, continue to operate their businesses for the benefit of their estates and stakeholders.

O.    *Pre-Petition Debt*.  The Debtors were, prior to the Petition Date, party to the following agreements, with the following parties (collectively, the "**Prepetition Secured Parties**"):

(a)    *Banner Bank Prepetition Debt*.

a.    Prior to the commencement of the Chapter 11 Cases, Sunnyside Community Hospital Association ("**Sunnyside**") entered into various Business Loan Agreements, dated December 30, 2010, May 19, 2015, March 21, 2016, August 2, 2016, October 6, 2016, March 21, 2017, and May 4, 2018, each between Banner Bank and Sunnyside (as each such agreement has been amended, modified, or supplemented to date, the "**Banner Bank Loan Documents**"), providing Sunnyside with financing in the aggregate principal amount of $27,006,225.  The advances made pursuant to the Banner Bank Loan Documents were secured by a first priority lien (the "**Banner Senior Sunnyside Liens**") on all personal property and certain real property of Sunnyside as set forth

Interim DIP/Cash Collateral Order    - 11 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

in the Banner Bank Loan Documents and associated documents (such assets the "**Banner Bank Collateral**"). As of the Petition Date, Sunnyside was indebted to Banner Bank in the approximate principal amount of $10.6 million. The proceeds of the existing DIP facility with JMB Capital (the "**JMB DIP Facility**") was partially used to pay off and satisfy the Debtors' obligations to Banner Bank.

    (b)   *MidCap Financial Prepetition Debt.*

        a.    Prior to the commencement of the Chapter 11 Cases, SHC Holdco, LLC ("**Holdco**"), SHC Medical Center – Yakima ("**Yakima**"), SHC Medical Center – Toppenish "**Toppenish**", Yakima Home Care Holdings, LLC, and Yakima HMA Home Health, LLC, as co-borrowers (collectively, the "**MidCap Borrowers**"), entered into that certain Credit and Security Agreement dated September 18, 2017 (the "**MidCap Credit Agreement**") and those related loan documents (all as amended, modified, or supplemented to date, collectively with the MidCap Credit Agreement, the "**MidCap Loan Documents**"), with the lenders party thereto (the "**MidCap Lenders**") and MidCap Financial Trust as agent for the MidCap Lenders (the "**MidCap Agent**"), providing the MidCap Borrowers with a revolving loan facility in the maximum principal amount of $15 million. The advances made pursuant to the MidCap Credit Agreement were secured by a properly perfected first priority lien and security interest (the "**MidCap Senior A/R Liens**") on the assets of the MidCap Borrowers set forth in Schedule 9.1 to the MidCap Credit Agreement (such assets, the "**MidCap A/R Collateral**"). As of the Petition Date, the MidCap Borrowers were indebted to the MidCap Lenders in the approximate principal amount of $10.7 million. The proceeds of the JMB DIP Facility was partially used to pay off and satisfy the Debtors' obligations to the MidCap Lenders.

    (c)   *Lapis Prepetition Debt.*

        a.    Pursuant to that certain Bond Indenture, dated as of November 1, 2017, between Washington Health Care

Interim DIP/Cash Collateral Order    - 12 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Facilities Authority (the "**Authority**"), as issuer and UMB Bank, N.A. as the bond trustee (the "**Bond Trustee**") for the bondholders, certain entities affiliated with Lapis Advisers, L.P., the Authority issued $27 million of tax-exempt Washington Health Care Facilities Authority Revenue Bonds, Series 2017A (the "**Series 2017A Bonds**") and $8.4 million of tax-exempt Washington Health Care Facilities Authority Revenue Bonds, Series 2017B (the "**Series 2017B Bonds**" and, together with the Series 2017A Bonds, collectively the "**2017 Bonds**").

b.    Also on November 1, 2017, Yakima, Toppenish, Holdco, and Astria, as co-borrowers (the "**Lapis 2017 Loan Borrowers**"), entered into a Loan and Security Agreement (the "**Lapis 2017 Loan Agreement**") with the Authority, wherein the Authority loaned the proceeds of the sale of the 2017 Bonds ($35.4 million) (the "**Lapis 2017 Loan**") to the Lapis 2017 Loan Borrowers. Each of the other Debtors, as well as certain other non-filing affiliates, as guarantors (the "**Lapis 2017 Loan Guarantors**"), entered into a Continuing Guaranty (the "**Lapis 2017 Loan Guaranty**" and together with the Lapis 2017 Loan Agreement and all other documents evidencing or securing the Lapis 2017 Loan, the "**Lapis 2017 Loan Documents**"), dated November 1, 2017, wherein the Lapis 2017 Loan Guarantors agreed to guaranty the obligations of the Lapis 2017 Loan Borrowers under the Lapis 2017 Loan. The advances made pursuant to the Lapis 2017 Loan were secured by (i) a first priority lien (the "**Lapis 2017 SHC Holdco Liens**") on the non-accounts receivable assets of the Lapis 2017 Loan Borrowers at Yakima and Toppenish, (ii) a junior lien (the "**Lapis 2017 A/R Liens**") on the accounts receivable assets of the Lapis 2017 Loan Borrowers at Yakima and Toppenish subordinate and subject to the liens and security interests granted to JMB Capital as part of the existing JMB DIP Facility (the "**JMB DIP Liens**"), and (iii) a junior lien (the "**Lapis 2017 Sunnyside Liens**") on the assets of the Lapis 2017 Loan Guarantors at Sunnyside subordinate and subject to the JMB DIP Liens (collectively, the "**Lapis 2017 Loan**

Interim DIP/Cash Collateral Order        - 13 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Collateral"). As of the Petition Date, the amount of approximately $35.4 million of principal was outstanding under the Lapis 2017 Loan.

c. Prior to the commencement of the Chapter 11 Cases, Astria, Sunnyside, Sunnyside Professional Services, LLC, Sunnyside Community Hospital Home Medical Supply, LLC, Sunnyside Home Health, Kitchen and Bath Furnishings, LLC, Oxbow Summit, LLC and certain non-filing affiliates as co-borrowers (the "**Lapis 2019 Loan Borrowers**"), entered into a Credit Agreement dated January 18, 2019 (the "**Lapis 2019 Loan Agreement**") with Lapis Advisers LP (**"Lapis Prepetition Agent"**), as agent for lenders party thereto (the "**Lapis 2019 Loan Lenders**"), whereby the Lapis 2019 Loan Lenders agreed to make advances to the Lapis 2019 Loan Borrowers in the principal amount of up to $10 million (the "**Lapis 2019 Loan**"). The remaining Debtors, as well as certain other non-filing affiliates, as guarantors (the "**Lapis 2019 Loan Guarantors**"), entered into a Continuing Guaranty (the "**Lapis 2019 Loan Guaranty**" and together with the Lapis 2019 Loan Agreement, and all other documents evidencing or securing the Lapis 2019 Loan the "**Lapis 2019 Loan Documents**") dated January 18, 2019, wherein the Lapis 2019 Loan Guarantors agreed to guaranty the obligations of the Lapis 2019 Loan Borrowers under the Lapis 2019 Loan. The advances made pursuant to the Lapis 2019 Loan were secured by (i) a junior lien (the "**Lapis 2019 Sunnyside Liens**" and together with the Lapis 2017 Sunnyside Liens, the "**Lapis Subordinated Sunnyside Liens**") on the assets of the Lapis 2019 Borrowers subordinate and subject to the JMB DIP Liens, (ii) a junior lien (the "**Lapis 2019 SHC Holdco Liens**" and together with the Lapis 2017 SHC Holdco Liens, the "**Lapis Senior Holdco Liens**") on the assets of the Lapis 2019 Loan Guarantors not subject to the JMB DIP Liens as set forth in the Lapis 2019 Loan Documents, and (iii) a junior lien (the "**Lapis 2019 A/R Liens**" and together with the Lapis 2017 Priority A/R Liens, the "**Lapis Subordinated A/R Liens**") on the MidCap Priority Collateral (such assets, the "**Lapis**

Interim DIP/Cash Collateral Order - 14 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**2019 Collateral**" and together with the Lapis 2017 Loan Collateral, the "**Lapis Prepetition Collateral**").  As of the Petition Date, the amount of approximately $10 million of principal was outstanding under the Lapis 2019 Loan.

   d.    As used herein "**Prepetition Credit Liens**" shall mean the Lapis Senior Holdco Liens, Lapis Subordinated A/R Liens, and Lapis Subordinated Sunnyside Liens.  As used herein "**Prepetition Collateral**" shall mean the Lapis Prepetition Collateral.

   P.    *Adequate Protection*.  The Bond Trustee, on behalf of itself and the holders of the 2017 Bonds (the "**Bondholders**") and the Lapis Prepetition Agent, on behalf of itself and the Lapis 2019 Loan Lenders (collectively, the "**Lapis Secured Parties**") are entitled to receive adequate protection on account of their interests in the Prepetition Collateral pursuant to sections 361, 362, and 363 of the Bankruptcy Code solely to the extent of any diminution in the value of their interests in the Prepetition Collateral (including Cash Collateral).  As part of the adequate protection provided by this Interim Order, the Lapis Secured Parties shall receive, among other things, replacement liens, superpriority claims (to the extent that the Lapis Secured Parties had valid and perfected liens on and security interests in the Prepetition Collateral) and reporting information, subject and subordinate to the Carve-Out.  For the avoidance of doubt, the Lapis Secured Parties shall not receive replacement liens on any of the Excluded Avoidance Actions (defined below) or Commercial Tort Claims (defined below, provided no determination is made in this order concerning the legal character of any claims related to accounts receivable collections).  The

Interim DIP/Cash Collateral Order          - 15 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

terms of the Adequate Protection Obligations (defined herein) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and are sufficient to allow the Debtors' use of the Prepetition Collateral (including the Cash Collateral) and to permit the relief granted in this Interim Order. For the avoidance of doubt, nothing contained herein, including the provision of adequate protection provided to the Lapis Secured Parties, shall prejudice the rights of the Committee or any third party to challenge or object to any and all of the prepetition liens or claims of the Lapis Secured Parties, except as set forth herein and except as set forth in that certain *Order Approving Bidding Procedures for the Sale of the Debtors' Assets* [Docket No. 807] (the "**Bidding Procedures Order**"), which in the case of any inconsistency concerning challenge rights, the Bidding Procedures Order shall control.

Q.      *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      *DIP Facility Approval*. The Motion is granted on an interim basis and the DIP Facility is hereby approved. Any objections to the interim relief requested

Interim DIP/Cash Collateral Order          - 16 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

in the Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled, except as reserved on the record at the hearing on December 18, 2019. The Debtors are authorized, pursuant to section 364 of the Bankruptcy Code, to enter into and be a party to the DIP Facility pursuant to the DIP Loan Documents (with such changes, if any, as were authorized to be made as amendments to the DIP Loan Documents in accordance with this Interim Order), to perform under the DIP Loan Documents and such other and additional documents necessary or desired to implement the DIP Facility or the DIP Loan Documents, and to obtain postpetition secured financing from the DIP Lenders, to avoid immediate and irreparable harm to the Debtors' estates.

2. *DIP Obligations*. The DIP Loan Documents shall constitute and evidence the valid and binding effect of the Debtors' obligations under the DIP Facility, which DIP Obligations shall be legal, valid, and binding obligations of the Debtors party thereto and enforceable against the Debtors, their estates, any successors thereto, including, without limitation, any trustee appointed in any of the Debtors' cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any such cases, or in any other proceedings superseding or related to any of the foregoing, any successors thereto, and any party determined to be the beneficial owner of the DIP Collateral by this Court. The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced

Interim DIP/Cash Collateral Order          - 17 -

US_Active\113848219\V-2
59939\0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

pursuant to the DIP Loan Documents, together with interest thereon, at the times and in the amounts set forth in the DIP Loan Documents and all Obligations as defined and provided for in the DIP Loan Agreement (collectively, the "**DIP Obligations**"). No obligation, payment, transfer or grant of security under the DIP Loan Documents, this Interim Order, with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

3. *Authorization to Borrow*. Upon entry of this Interim Order and during the period prior to entry of a Final Order, the Debtors are immediately authorized to borrow from the DIP Lenders under the DIP Facility, the amount sufficient to pay off and replace the existing JMB DIP Facility (the "Initial Funding," as further defined in the DIP Loan Agreement) plus $700,000 of Committed Advances (as defined in the DIP Loan Agreement) to fund working capital needs of the Debtors, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order. Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, the Debtors are authorized to use Cash Collateral until the earlier of (a) the Maturity Date, and (b) the date upon which the Debtors' right to use Cash Collateral is terminated hereunder as a result of an Event of Default (as defined in the DIP Loan Agreement) which remains continuing and has not been waived by the

Interim DIP/Cash Collateral Order      - 18 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1   DIP Lenders.  Once repaid, the DIP Facility Loans (as defined below) incurred may

2   not be re-borrowed.

3       4.    *Use of Proceeds*.  The Debtors shall use advances of credit under the

4   DIP Facility (the "**DIP Facility Loans**") only for the express purposes specifically

5   set forth in this Interim Order and the DIP Loan Documents.  The Debtors are

6   authorized to use the proceeds of the DIP Facility Loans to (a) replace the existing

7   JMB DIP Facility approved in these Chapter 11 Cases, (b) fund the post-petition

8   working capital needs of the Debtors during the pendency of these Chapter 11 Cases,

9   (c) pay fees, costs and expenses of the DIP Facility on the terms and conditions

10  described in the DIP Loan Documents, and (d) pay the allowed administrative costs

11  and expenses of the Chapter 11 Cases, in each case, solely in accordance with the

12  DIP Loan Documents (including, but not limited to, the Budget) and this Interim

13  Order.  For the avoidance of doubt, upon the Closing Date, the DIP Lenders shall pay

14  the Initial Funding amount directly to JMB to pay all amounts owing under the JMB

15  DIP Facility.  Notwithstanding anything herein, the extensions of credit under the

16  DIP Facility shall not constitute cash collateral of the Prepetition Secured Parties.

17      5.    *Reservation of Rights and Committee Standing*.  Nothing in this Interim

18  Order or any of the DIP Loan Documents shall constitute an acknowledgement or

19  admission by the Committee of the validity, extent and/or priority of any of the

20  Prepetition Credit Liens and/or any other liens, claims, encumbrances, or obligations

21  Interim DIP/Cash Collateral Order        - 19 -

US_Active\113848219\V-2
59939\0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

of the Lapis Secured Parties.  Except as otherwise expressly set forth in this Interim Order, nothing in this Interim Order or any of the DIP Loan Documents shall limit the rights of the Committee to assert any challenges, rights, claims, defenses and/or objections the Debtors' estates or the Committee may hold against the Lapis Secured Parties and all such challenges, rights, claims, defenses and/or objections against the Lapis Secured Parties are, on the terms of this Interim Order, expressly reserved and preserved.  To the extent such challenges, rights, claims, defenses and/or objections belong to the Debtors' estates, the Committee is hereby granted standing to pursue such challenges, rights, claims, defenses and/or objections against the Lapis Secured Parties.  Nothing contained herein shall be construed or deemed a waiver of any claims or defenses that the Lapis Secured Parties may have in response to any claims asserted by the Debtors' estates or the Committee.

6. _Challenges_.  Except as set forth with respect to a Lien Challenge (as defined in the Bidding Procedures, attached as Exhibit 1 to the Bid Procedures Order [Docket No. 807]), nothing in this Interim Order shall in any way limit the rights of the Committee to assert any other challenges, claims or causes of action against the Lapis Secured Parties, including those arising under chapter 5 of the Bankruptcy Code to the extent not constituting a Lien Challenge, and all such other claims and causes of action are expressly reserved and preserved (each an "**Additional Challenge**").  Notwithstanding the forgoing, the Committee or any other party-in-

Interim DIP/Cash Collateral Order         - 20 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

interest must assert an Additional Challenge no later than confirmation of a plan of
reorganization or liquidation in these Chapter 11 Cases, or shall forever be barred.

7. _**Budget and Reporting**_. Except as otherwise provided herein or
approved by the DIP Lenders, the proceeds of the DIP Facility shall be used only in
compliance with the terms of the DIP Loan Documents, including the amended
Budget. The Debtors shall comply with the reporting requirements and obligations
set forth in the DIP Loan Agreement.

8. _**Payment of DIP Fees and Expenses**_. The (a) Commitment Fee; (b)
Funding Fee; (c) Exit Fee; and (d) Stated Maturity Fee are each hereby approved, as
modified herein, and the Debtors are hereby authorized and directed to and shall pay
such fees in accordance with, and on the terms set forth in this Interim Order and the
DIP Loan Documents. The Debtors are also hereby authorized and directed to pay
upon demand, all other reasonable fees, costs, expenses and other amounts payable
under the terms of this Interim Order and the DIP Loan Documents and all other
reasonable fees and out-of-pocket costs and expenses of the DIP Lenders in
accordance with the terms of this Interim Order and the DIP Loan Documents
(including, without limitation, the reasonable and documented fees and out-of-pocket
costs and expenses of Cole Schotz P.C. as counsel and
Miller Nash Graham & Dunn LLP as local counsel to the DIP Lenders), subject to
receiving a written invoice therefor. None of such reasonable fees, costs, expenses

Interim DIP/Cash Collateral Order     - 21 -

59939\0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

19-01189-WLH11    Doc 841    Filed 12/20/19    Entered 12/20/19 15:29:20    Pg 22 of 121

or other amounts shall be subject to Court approval except as otherwise provided herein or required to be submitted in any particular format, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; <u>provided</u>, <u>however</u>, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and the Committee; <u>provided</u>, <u>further</u>, <u>however</u>, that such invoices provided to the Committee may be redacted to the extent necessary to delete any information subject to the attorney-client privilege or any information constituting attorney work product (the "**Redactions**"), and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. If the U.S. Trustee or the Committee objects to the reasonableness of the fees and expenses of the DIP Lenders, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the U.S. Trustee or the Committee may file with the Court and serve on the DIP Lenders an objection to the reasonableness of such fees and expenses (each, a "**Reasonableness Fee Objection**"). Without limiting the foregoing, if the Committee objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the DIP Lenders shall file with the Court and serve on the Debtors, the Committee and the U.S. Trustee a request for Court resolution of the disputes concerning the propriety of the disputed Redactions (each, a "**Redaction Fee Objection**," and each Reasonableness Fee Objection and

Interim DIP/Cash Collateral Order — 22 —

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Redaction Fee Objection may be referred to herein generally as a "**Fee Objection**"). The Debtors shall pay, in accordance with the terms and conditions of this Interim Order and the Final Order, within ten (10) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed. All such unpaid reasonable fees, costs, expenses and other amounts owed or payable to the DIP Lenders shall be secured by the DIP Collateral, subject and subordinate to the Carve-Out, and afforded all of the priorities and protections afforded to the DIP Obligations (subject to and subordinate to the Carve-Out) under this Interim Order and the DIP Loan Documents, until such time as the unpaid reasonable fees, costs, expenses and other amounts owed or payable to the DIP Lenders have been paid or disallowed pursuant to an order of the Court resolving any such Fee Objection.

9. *Indemnification*. The Debtors are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Lenders and their affiliates, directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing the DIP Lenders solely relating to the Obligations as defined in the Loan Documents (collectively, an "**Indemnified Party**") from and against: (a) all obligations, demands, claims, damages, losses and liabilities (including, without limitation, reasonable fees and disbursements of counsel) (collectively, "**Indemnity**

Interim DIP/Cash Collateral Order          - 23 -

59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

19-01189-WLH11    Doc 841    Filed 12/20/19    Entered 12/20/19 15:29:20    Pg 23 of 121

**Claims**") as set forth in the DIP Loan Documents including those asserted by any other party in connection with the transactions contemplated by the DIP Loan Documents; and (b) all losses or expenses incurred, or paid by the DIP Lenders from, following, or arising from the transactions contemplated by the DIP Loan Documents (including reasonable and documented attorneys' fees and expenses), except, with respect to (a) and (b) above, for (i) any fees, costs, expenses and other amounts disallowed pursuant to an Order of the Court resolving any Fee Objections, and (ii) Indemnity Claims and/or losses directly caused by the DIP Lenders' gross negligence, willful misconduct or bad faith. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors or any of their respective directors, security holders or creditors, or any other Person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's gross negligence, willful misconduct or bad faith. All

Interim DIP/Cash Collateral Order        - 24 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

indemnities of the Indemnified Parties shall constitute DIP Obligations secured by the DIP Collateral subject and subordinate to the Carve-Out and afforded all of the priorities and protections afforded to the DIP Obligations (subject to and subordinate to the Carve-Out) under this Interim Order, the Final Order and the DIP Loan Documents.

10. *Use of Cash Collateral*. The Debtors are authorized to use Cash Collateral in accordance with and pursuant to this Interim Order and the DIP Loan Documents. Prior to the Maturity Date and until indefeasible payment in full of the DIP Obligations, the Debtors agree that they will not use or seek to use Cash Collateral other than pursuant to the terms of this Interim Order.

11. *DIP Superpriority Claims*. In accordance with section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed senior administrative expense claims against each Debtor and their estates (the "**DIP Superpriority Claims**") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become



BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

19-01189-WLH11 Doc 841 Filed 12/20/19 Entered 12/20/19 15:29:20 Pg 25 of 121

secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject and subordinate to only the Carve-Out; provided, further that, subject and subordinate to the Carve-Out, the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates (except Excluded Avoidance Actions (defined below)) and all DIP Collateral, and all proceeds thereof, including (a) all prepetition and postpetition commercial tort claims and the related proceeds, including but not limited to, all claims and causes of action (i) against the Debtors' officers and directors, and (ii) related to accounts receivable collections (the "**Commercial Tort Claims**"), and (b) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "**Sale Deposit**") subject, however, only to the senior lien rights of a purchaser, if any, and such stalking horse bid protections, if any, as may be approved by this Court; provided, however, that the DIP Lenders shall use their best efforts to satisfy the DIP Superpriority Claims from the assets constituting DIP Collateral other than the Commercial Tort Claims before seeking payment of the DIP Superiority Claim from the Commercial Tort Claims.

12. *DIP Liens*.

(a) Effective immediately as of the entry of this Interim Order, as security for the DIP Obligations, the DIP Lenders are granted, continuing, valid,

Interim DIP/Cash Collateral Order     - 26 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "**DIP Liens**") on all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the Stated Maturity Date, by acceleration, or otherwise) of the DIP Obligations, subject and subordinate to the Carve-Out.  The term "**DIP Collateral**" means collectively all pre-petition and post-petition real property and all pre-petition and post-petition tangible and intangible personal property of each Borrower, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, Commercial Tort Claims, leases and leaseholds and rents, together with all proceeds of each of the forgoing, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable); provided, however, that to the extent that assets constituting DIP Collateral other than the Commercial Tort Claims are available to satisfy the DIP Obligations in full, the DIP Lenders shall use their best efforts to satisfy the DIP Obligations from the assets constituting DIP Collateral other than the Commercial Tort Claims before seeking payment of the DIP Obligations from the Commercial Tort Claims.  Notwithstanding the foregoing, nothing herein shall prevent the DIP Lenders from immediately and indefeasibly satisfying the DIP

Interim DIP/Cash Collateral Order        - 27 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Obligations from the Commercial Tort Claims. The DIP Collateral shall not include any and all causes of action and the proceeds thereof arising under chapter 5 of the Bankruptcy Code or applicable state law equivalents (the "**Excluded Avoidance Actions**"). For the avoidance of doubt, the Excluded Avoidance Actions shall not include any claims or causes of action and the proceeds thereof related to accounts receivable collections regardless of whether certain claims arise under chapter 5 of the Bankruptcy Code or applicable state law equivalents.

(b) To the fullest extent permitted by the Bankruptcy Code or applicable law, and except as otherwise set forth herein, any provision of any lease other than a real property lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any entity in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lenders in accordance with the terms of the DIP Loan Documents or this Interim Order, subject and subordinate to the Carve-Out.

13. *Priority of DIP Liens.*

Interim DIP/Cash Collateral Order       - 28 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

(a)     To secure the DIP Obligations, immediately upon and effective as of the entry of this Interim Order, the DIP Lenders are hereby granted on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens in and on the DIP Collateral as follows, in each case subject and subordinate to the Carve-Out:

(i)     *Liens Priming the Prepetition Credit Liens.* Pursuant to 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens and security interests in all DIP Collateral, regardless of where located, which senior priming liens and security interests in favor of the DIP Lenders shall be senior to all Prepetition Credit Liens other than the Lapis Senior Holdco Liens. For the avoidance of doubt, as a result of the priming of the Prepetition Credit Liens (other than the Lapis Senior Holdco Liens) pursuant to this Interim Order, the DIP Lenders shall have a first priority senior priming lien and security interest in the Debtors' assets including, but not limited to, the Debtors' prepetition and post-petition commercial tort claims, including but not limited to all claims and causes of action (i) against the Debtors' officers and directors, and (ii) related to accounts receivable collections, and the proceeds thereof (regardless of whether such proceeds arise from damages to the Prepetition Collateral).

(ii)     *Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to any Permitted Prior Lien. As used herein, the term "**Permitted Prior Lien**" shall mean any valid, enforceable, and non-avoidable liens on and security interests in the DIP Collateral that (A) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), (B) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (C) are senior in priority to the DIP Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements; provided, however,

Interim DIP/Cash Collateral Order     - 29 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

that the DIP Liens shall have priority over all Prepetition Credit Liens other than the Lapis Senior Holdco Liens; provided further, that any properly perfected liens on the Debtors' assets held by (i) TIAA Commercial Finance, Inc., (ii) Lower Valley Credit Union, and (iii) Med One Capital Funding, LLC are Permitted Prior Liens and shall not be primed by the DIP Liens; and

(iii) *Liens Junior to Certain Other Liens.* Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Lapis Senior Holdco Liens, the Permitted Prior Liens and the Carve-Out.

(b) Except as expressly set forth herein, and subject and subordinate to the Carve-Out, the DIP Liens and the DIP Superpriority Claims shall not be made junior to or *pari passu* with (1) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal or conversion of any of the Chapter 11 Cases or any successor cases, (2) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise; (3) any intercompany or affiliate lien or claim; and (4) any liens arising after the Petition Date excluding any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, or board for any liability of the Debtors.

Interim DIP/Cash Collateral Order      - 30 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

(c) *Existing Liens.* TIAA Commercial Finance, Inc., Lower Valley Credit Union and Med One Capital Funding, LLC have asserted secured claims against property of the Debtors. Notwithstanding any statement herein that is contrary to the existence or priority of such secured claims, any grant of a security interest to the DIP Lenders is junior and subordinate in priority to any properly perfected liens on the DIP Collateral held by TIAA Commercial Finance, Inc., Lower Valley Credit Union and Med One Capital Funding, LLC. Notwithstanding anything to the contrary contained herein, all rights, claims, defenses and/or objections of the Committee and any third party with respect to any asserted liens on and security interests in the Debtors' property, including without limitation those asserted by TIAA Commercial Finance, Inc., Lower Valley Credit Union, and Med One Capital Funding, LLC, are expressly reserved and preserved and all such asserted liens and security interests (except those asserted by TIAA Commercial Finance, Inc., Lower Valley Credit Union, and Med One Capital Funding, LLC) are subject and subordinate to the Carve-Out.

14. *Adequate Protection of Lapis Secured Parties*. The Lapis Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all the Prepetition Collateral (to the extent that the Lapis Secured Parties had valid and perfected liens on and security interests in the Prepetition Collateral), including Cash Collateral, in

Interim DIP/Cash Collateral Order     - 31 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

an amount equal to the aggregate diminution in value of the Lapis Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for the reasons provided under the Bankruptcy Code, subject and subordinate to the Carve-Out. In consideration for the foregoing, the Lapis Secured Parties are hereby granted the following in the amount of such diminution (collectively, the "**Adequate Protection Obligations**"), subject to the Carve-Out:

(a) *Lapis 2017 Loan Adequate Protection Liens.* The Bond Trustee, on behalf of itself and the Bondholders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any mortgages, security agreements, pledge agreements, financing statement or other agreements) in the amount equal to the aggregate diminution in value of the interests in the Lapis 2017 Loan Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code (the "**Lapis 2017 Loan Adequate Protection Claim**"), a valid, perfected replacement security interest in and lien upon any and all assets subject (i) to the Lapis 2017 SHC Holdco Liens, subordinate to the Carve-Out, and (ii) to the Lapis 2017 Sunnyside Liens and Lapis 2017 A/R Liens, subordinate to (A) the DIP Liens and (B) the Carve-Out (the "**Lapis 2017 Loan Replacement Liens**"). The 2017 Lapis Loan Replacement Liens granted pursuant to this paragraph shall be senior to the 2019 Lapis Loan Replacement Liens,

Interim DIP/Cash Collateral Order      - 32 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

provided nothing herein shall affect the terms of any intercreditor arrangements between the Lapis Secured Parties.

        (b)    *Lapis 2019 Loan Adequate Protection Liens.* The Lapis Prepetition Agent, on behalf of itself and the Lapis 2019 Loan Lenders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any mortgages, security agreements, pledge agreements, financing statement or other agreements), in the amount equal to the aggregate diminution in value of the interests in the Lapis 2019 Loan Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code (the "**Lapis 2019 Loan Adequate Protection Claim**"), a valid, perfected replacement security interest in and lien upon any and all assets subject (i) to the Lapis 2019 SHC Holdco Liens, subordinate to the Carve-Out, and (ii) to the Lapis 2019 Sunnyside Liens and Lapis 2019 A/R Liens, subordinate to (A) the DIP Liens and (B) the Carve-Out (the "**Lapis 2019 Loan Replacement Liens**" and together with the Lapis 2017 Loan Replacement Liens, the "**Adequate Protection Liens**").

        (c)    *Lapis 2017 Loan 507(b) Claims.* The Bond Trustee, on behalf of itself and the Bondholders, is hereby granted, an allowed superpriority administrative expense claim as provided in section 507(b) of the Bankruptcy Code in the amount of Lapis 2017 Loan Adequate Protection Claim with, except as set forth in this

Interim DIP/Cash Collateral Order      - 33 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Lapis 2017 Loan 507(b) Claims**").  The Lapis 2017 Loan 507(b) Claims shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims. The Lapis Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Lapis 2017 Loan 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments terminated.  The 2017 Lapis Loan 507(b) Claims shall be senior to the Lapis 2019 Loan 507(b) Claims, provided nothing herein shall affect the terms of any intercreditor arrangements between and among the Lapis Secured Parties.

(d) *Lapis 2019 Loan 507(b) Claims.* The Lapis Agent, on behalf of itself and the Lapis 2019 Loan Lenders, is hereby granted, an allowed superpriority administrative expense claim as provided in section 507(b) of the Bankruptcy Code in the amount of Lapis 2019 Loan Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Lapis 2019 Loan 507(b) Claims**").  The Lapis 2019 Loan 507(b) Claims shall be subject and subordinate only to the Carve-Out, the DIP Superpriority Claims and the Lapis 2017 Loan 507(b) Claims.  The Lapis Secured Parties shall not receive

Interim DIP/Cash Collateral Order          - 34 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

or retain any payments, property or other amounts in respect of the Lapis 2019 Loan 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments terminated.

(e)    *Lapis Secured Parties Information*.    As additional adequate protection of the Lapis Secured Parties' security interests in the Lapis Prepetition Collateral, the Debtors shall contemporaneously provide the Lapis Secured Parties with any reporting provided to the DIP Lenders under the DIP Loan Agreement.  The Lapis Secured Parties and the Committee shall each be deemed to be an additional notice party for purposes of the DIP Facility and all parties thereto shall provide the Lapis Secured Parties and the Committee contemporaneous copies of all notices pursuant thereto.  The Debtors shall additionally provide the Lapis Secured Parties and the Committee any reports and information as the Lapis Secured Parties and the Committee may reasonably request from time to time.

(f)    For the avoidance of doubt, the Excluded Avoidance Actions and the Commercial Tort Claims shall not be used as collateral for any Adequate Protection Obligations.

15.    *Carve-Out*.

(a)    *Carve-Out*.  As used in this Interim Order, the term "**Carve-Out**" means, collectively, the sum of:  (i) all fees required to be paid to the Clerk of the

Interim DIP/Cash Collateral Order        - 35 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) and 31 U.S.C. § 3717;
(ii) the reasonable fees and expenses up to $15,000 incurred by a trustee under section
726(b) of the Bankruptcy Code; (iii) up to $1,000,000 for the Debtors' accrued and
unpaid payroll obligations to employees (excluding management and consultants and
not including paid time off, severance, vacation or any other claims based upon state
or federal law) (the "**Employee Carve-Out**"); and (iv) the aggregate amount of
unpaid fees and expenses of the Debtors', the Committee and the Patient Care
Ombudsman under sections 327(a), 328 or 1103(a) of the Bankruptcy Code (the
"**Case Professionals**"), to the extent such fees and expenses are allowed and payable
pursuant to an order of the Court (which order has not been reversed, vacated or
stayed) ("**Allowed Professional Fees**"), and the reimbursement of out-of-pocket
expenses allowed by the Court and incurred by the members of the Committee in the
performance of their duties (but excluding fees and expenses of third party
professionals employed by such members) ("**Committee Expenses**"), which amount
under this clause (iv) shall not exceed the sum of: (x) an aggregate amount per week
limited to the amount set forth in the Budget for Allowed Professional Fees and
Committee Expenses incurred prior to the delivery of a Carve-Out Trigger Notice
(and if such amount exceeds the amount set forth in the Budget, each Case
Professional and/or Committee member shall receive the portion of its Allowed
Professional Fees and/or Committee Expenses, as appropriate, on a pro rata basis in

Interim DIP/Cash Collateral Order          - 36 -

US_Active\113848219\V-2
59939\0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

an amount not to exceed the Budget for Case Professionals) provided (i) the Maturity Date has not occurred or (ii) Event of Default has not occurred or continuing (the "**Pre Carve-Out Notice Trigger Cap**") *plus* (y) $120,000 for Allowed Professional Fees and Committee Expenses incurred from and after the delivery of the Carve-Out Trigger Notice (defined below) (the "**Post Carve-Out Notice Cap**" together, with the Pre Carve-Out Notice Trigger Cap, the "**Carve-Out Cap**"). No portion of the Carve-Out or any Cash Collateral may be used in violation of this Interim Order. Nothing in this Interim Order or otherwise shall be construed to increase the Carve-Out if actual (i) Allowed Professional Fees of any Case Professional or (ii) Committee Expenses are higher in fact than Carve-Out Cap amount. Any funds held by the Debtors upon the delivery of a Carve-Out Trigger Notice shall be applied dollar for dollar, against the Carve-Out. Nothing in this Interim Order shall be construed to increase the Employee Carve-Out if accrued and unpaid payroll obligations of the Debtors exceed the Employee Carve-Out.

(b) *Carve-Out Trigger Notice*. As used herein, the term "**Carve-Out Trigger Notice**" means a written notice provided by the DIP Lenders to the Debtors, the Committee, and the U.S. Trustee that the Post Carve-Out Notice Trigger Cap is invoked, which notice may be delivered following the occurrence and during the continuance of an Event of Default and/or acceleration of the DIP Obligations under the DIP Loan Documents. Upon delivery of the Carve-Out Trigger Notice to the

Interim DIP/Cash Collateral Order - 37 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Debtors (the "**Termination Declaration Date**"), the Debtors shall provide notice by email and facsimile to all Case Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) within one (1) day after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Case Professionals and Committee Expenses is subject to and limited by the Post Carve-Out Notice Trigger Cap.

(c)     *Payment of Allowed Professional Fees Prior to Termination Declaration Date.*  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees and Committee Expenses shall not reduce the Carve-Out.

(d)     *Payment of Carve-Out on or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees and Committee Expenses shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the

Interim DIP/Cash Collateral Order          - 38 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

(e)  *Objection Rights*.  Nothing contained herein or in the DIP Loan Documents, including the inclusion of line items in the Budget for Professional Fees, is intended to constitute, nor shall be construed as consent to the allowance of any Case Professional's fees, costs and expenses by any party and shall not affect the rights of the Debtors, the DIP Lenders, the Committee, the Lapis Secured Parties or any other party in interest to object to the allowance and/or payment of any such amounts incurred or requested.

(f)  *Payment of Compensation*.  Nothing contained herein or in the DIP Loan Documents shall affect the rights of the Case Professionals to seek allowance and payment of fees and expenses in excess of the amounts set forth in the Carve-Out and Budget.  Upon the indefeasible payment in full in cash and discharge of the DIP Obligations, nothing contained herein shall affect the rights of the Debtors to pay such amounts as approved by the Court.

(g)  *Carve-Out Priority*. The Carve-Out shall be senior in all respects to the DIP Liens, the DIP Superpriority Claims, the Prepetition Credit Liens, the liens and/or claims of the Lapis Secured Parties, and any and all other forms of adequate protection, liens or claims securing the DIP Obligations, the Adequate Protection

Interim DIP/Cash Collateral Order          - 39 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Obligations and/or the obligations of any Prepetition Secured Parties or Lapis Secured Parties.

16.  *Bankruptcy Code Sections 506(c) and 552(b) Waivers*. Without limiting the Carve-Out, the Debtors irrevocably waive and shall be prohibited from asserting (i) any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lenders upon the DIP Collateral and the Lapis Secured Parties upon the Prepetition Collateral and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against the DIP Lenders or the Lapis Secured Parties or their respective claims or liens (including any claims or liens granted pursuant to this Interim Order), and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Facility, the Lapis 2017 Loan or the Lapis 2019 Loan.

17.  *Application of Proceeds*.  In no event shall the DIP Lenders be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral, and all proceeds thereof shall be received and used in accordance with this Interim Order.

18.  *Disposition of Collateral*.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the

Interim DIP/Cash Collateral Order          - 40 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ordinary course of business or in connection with the payments contemplated under this Interim Order, including the Carve-Out, without the prior written consent of the DIP Lenders (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lenders) or Order of this Court; provided that for the avoidance of doubt, the Debtors shall comply with section 6.4 of the DIP Loan Agreement. Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of DIP Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve-Out and the lien priorities outlined in paragraph 13 herein, be used to immediately satisfy the DIP Obligations.

19. _Restrictions on Granting Postpetition Liens_. Other than the Carve-Out or as otherwise provided in this Interim Order, the Final Order or the DIP Loan Documents, no claim or lien having a priority superior or _pari passu_ with those granted by this Interim Order and the DIP Loan Documents to the DIP Lenders shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, and the Debtors will not grant any such mortgages, security interests or liens in the DIP Collateral (or any portion thereof) or to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise, while (i) any portion of the DIP Facility, any DIP Facility Loans or any other DIP Obligations, are outstanding, or (ii) the DIP Lenders has any Commitment under the DIP Loan Documents. For the avoidance of doubt, there shall be no restriction and this

Interim DIP/Cash Collateral Order     - 41 -

US_Active\113848219\V-2
59939\0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1  paragraph shall not apply and excludes any liens or security interests granted in favor

2  of any federal, state, municipal or other governmental unit, commission, board or

3  court for any liability of the Debtors.

4          20.    *Automatic Effectiveness of Liens*.  The DIP Liens shall not be subject to

5  a challenge and shall attach and become valid, perfected, binding, enforceable, non-

6  avoidable and effective by operation of law as of the date of the entry of this Interim

7  Order on a final basis, without any further action by the Debtors and the DIP Lenders,

8  respectively, and without the necessity of execution by the Debtors or the filing or

9  recordation, of any financing statements, security agreements, deposit control

10  agreements, vehicle lien applications, mortgages, filings with a governmental unit

11  (including, without limitation, the U.S. Patent and Trademark Office or the Library

12  of Congress), or other documents or the taking of any other actions.  All DIP

13  Collateral shall be free and clear of other liens, claims and encumbrances, except as

14  provided in the DIP Loan Documents and this Interim Order.  If the DIP Lenders

15  hereafter request that the Debtors execute and/or deliver to the DIP Lenders financing

16  statements, control agreements, mortgages, or other documents considered by the

17  DIP Lenders to be reasonably necessary or desirable to further evidence the

18  perfection of the DIP Liens, the Debtors are hereby authorized and directed to execute

19  and/or deliver such financing statements, control agreements, mortgages, and

20  documents, and the DIP Lenders are hereby authorized to file or record such

21  Interim DIP/Cash Collateral Order          - 42 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1   documents in their discretion without seeking modification of the automatic stay

2   under section 362 of the Bankruptcy Code, in which event all such documents shall

3   be deemed to have been filed or recorded at the time and on the date of the entry of

4   this Interim Order; provided, however, no such filing or recordation shall be

5   necessary or required in order to create or perfect the DIP Liens.  The DIP Lenders,

6   in their sole discretion, may file a photocopy of this Interim Order as a financing

7   statement with any filing or recording office or with any registry of deeds or similar

8   office, in addition to, or in lieu of, such financing statements, notices of liens or

9   similar statements.[4]

10      21.   *Protection Under Section 364(e) of the Bankruptcy Code*.  The DIP

11  Lenders have acted in good faith in connection with this Interim Order and its reliance

12  on this Interim Order is in good faith.  The reversal or modification on appeal of the

13  authorizations under section 364 of the Bankruptcy Code contained in this Interim

14  Order does not affect the validity of any DIP Obligation or the DIP Liens, whether

15  or not the DIP Lenders knew of the pendency of the appeal, unless such authorization

16  and incurrence of the DIP Obligations and the DIP Liens and advance of the DIP

17  Facility under 364 of the Bankruptcy Code in this Interim Order and the Final Order,

18  were stayed pending appeal.

19

20

21
---
[4] The provisions of section 1146(a) of the Bankruptcy Code do not apply herein.
Interim DIP/Cash Collateral Order      - 43 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

22.  *Reservation of Rights of the DIP Lender*.  Notwithstanding any other provision of this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (i) any of the rights of the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of such parties to (a) request modification of the automatic stay of section 362 of the Bankruptcy Code, (b) request dismissal of any of these Chapter 11 Cases, conversion of any of these Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of these Chapter 11 Cases, (c) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (ii) any other rights, claims, or privileges (whether legal or equitable or otherwise) of the DIP Lenders.  The delay in or failure of the DIP Lenders to seek relief or otherwise exercise their respective rights and remedies shall not constitute a waiver of any of the DIP Lenders' rights and remedies.

23.  *Right to Credit Bid*.

(a)  *DIP Lender*.  Pursuant to section 363(k) of the Bankruptcy Code, unless the Court orders otherwise for cause as provided under section 363(k) of the Bankruptcy Code, the DIP Lenders shall have the right to credit bid the total of the DIP Obligations for any or all of the DIP Collateral at a sale, lease or other disposition of such DIP Collateral outside the ordinary course of business (including any auction

Interim DIP/Cash Collateral Order         - 44 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

or similar sales), whether pursuant to a plan of reorganization or a motion pursuant to section 363 of the Bankruptcy Code or otherwise (which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner).

(b)     A credit bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such credit bid holds a perfected security interest.   The DIP Lenders shall be considered a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by credit bid as set forth in the Bidding Procedures Order.

24.     _Remedies and Notice Upon the Occurrence of Maturity Date or Event of Default_.  Upon prior written notice by the DIP Lenders to counsel for the Debtors, counsel for the Committee, and the U.S. Trustee of the occurrence of an Event of Default (each as defined in the DIP Loan Documents and incorporated herein by reference) and without further order of the Court, the DIP Lenders may (i) declare the DIP Obligations to be immediately due and payable; (ii) terminate the DIP Lenders' commitment under the DIP Facility (other than the Carve-Out) or use of Cash Collateral; (iii) charge default rate interest; and/or (iv) upon five (5) business days' notice to counsel to the Debtors, counsel to the Committee and the U.S. Trustee, exercise all default-related rights and remedies against the DIP Collateral, without further order of or application or motion to the Bankruptcy Court, and without

Interim DIP/Cash Collateral Order          - 45 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, <u>provided</u> <u>however</u>, that during the five (5) business day notice period, any party in interest shall have the right to file a pleading in opposition to the DIP Lenders' exercise of rights and remedies including the delivery of the Carve-Out Trigger Notice; <u>provided</u> <u>further</u> that, unless otherwise ordered by the Court, the only issue that may be raised by any party in such pleading shall be whether in fact, an Event of Default has occurred and is continuing; <u>but provided further that</u>, if an Event of Default occurs as a result of the Debtors' failure to indefeasibly satisfy the DIP Obligations by the Stated Maturity Date (as defined in the DIP Loan Documents), the above referenced five (5) day notice period shall not apply and the Debtors and all other interested parties shall not have any challenge rights, except as may be otherwise ordered by the Court.

25. *Modification of Stay*. Subject to the terms set forth herein, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order and the DIP Loan Documents, including, without limitation, to permit the DIP Lenders to exercise all rights and remedies provided for in the DIP Loan Documents and take any and all actions provided therein, in each case, in accordance with paragraph 24 of this Interim Order.

Interim DIP/Cash Collateral Order      - 46 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

26.     *Survival of DIP Liens, DIP Superpriority Claims, and Other Rights*.  If, in accordance with section 364(e) of the Bankruptcy Code, this Interim Order does not become a final non-appealable order, if a trustee terminates this Interim Order, or if any of the provisions of this Interim Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect the priority, validity, enforceability or effectiveness of (or subordination to the Carve-Out of) any lien, security interests or any other benefit or claim authorized hereby with respect to any DIP Obligations or Adequate Protection Obligations incurred prior to the effective date of such termination or subsequent order.  All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders and the Lapis Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted herein, including the liens and priorities granted herein, with respect to any DIP Facility Loan and Adequate Protection Obligations, subject to the Carve-Out and any and all challenges, rights, claims, defenses and/or objections of the Committee and any third parties as set forth herein.

27.     *Survival of this Interim Order*.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the

Interim DIP/Cash Collateral Order          - 47 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Loan Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged or otherwise treated under a plan of reorganization, which is reasonably acceptable to the DIP Lenders. In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Loan Documents unless agreed to by and among the Debtors and the DIP Lenders.

28.    *Modifications of DIP Loan Documents*.    The Debtors and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications to the DIP Loan Documents without further notice, motion or application to, order of or hearing before, this Court, upon notice to counsel for the Committee. Any material modification or amendment to the DIP Loan Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon five (5) days' notice to the U.S. Trustee and counsel to the Committee, each of whom reserves all rights and objections with

Interim DIP/Cash Collateral Order         - 48 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

respect to any such material modification or amendment; <u>provided</u>, that any forbearance from, or waiver of, (i) a breach by the Debtors of a covenant, representation or any other agreement, or (ii) a default or an Event of Default, in each case under the DIP Loan Documents shall not require an order of this Court; <u>provided</u>, that the Debtors or the DIP Lenders provide notice of such forbearance or waiver to counsel to the Committee. In the event of any inconsistency between this Interim Order and the DIP Loan Agreement, this Interim Order shall control.

29. *Insurance Policies*. Upon entry of this Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Lenders shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (ii) the DIP Lenders shall be and shall be deemed to be, without any further action by or notice to any person, named as loss payee for DIP Collateral on which the DIP Lenders hold a first priority lien. The Debtors are hereby authorized on a final basis to and shall take any actions necessary to have the DIP Lenders be added as an additional insured and loss payee on each insurance policy maintained by the Debtors consistent with this Interim Order and the DIP Loan Agreement, which in any way relates to the DIP Collateral.

30. *Financial Information*. The Debtors shall deliver to the DIP Lenders and the Committee such financial and other information concerning the business and affairs of the Debtors and any of the DIP Collateral as may be required pursuant to

Interim DIP/Cash Collateral Order        - 49 -

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

the DIP Loan Documents and/or as the DIP Lenders or the Committee shall reasonably request from time to time. The Debtors shall allow the DIP Lenders access to the premises in accordance with the terms of the DIP Loan Documents for the purpose of enabling the DIP Lenders to inspect and audit the DIP Collateral and the Debtors' books and records.

31. *Proofs of Claim*. Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, the DIP Lenders and Lapis Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases.

32. *Exclusivity*. The DIP Lenders, in their capacity as such, are not Exempt Parties, as defined in the *Order Granting Debtors' Motion for Entry of an Order Pursuant to Section 1121 of the Bankruptcy Code for Second Extension of the Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances* [Docket No. 802] (the "Order Extending Exclusivity"). Therefore, the exclusivity periods within which the Debtors may file a plan of reorganization and obtain acceptances of such plan of reorganization are extended through and including January 31, 2020, and through and including March 31, 2020, respectively, with respect to the DIP Lenders in their capacity as such.

33. *Immediate Effect of Order*. The terms and conditions of this Interim Order shall be effective and immediately enforceable upon its entry by the Clerk of

Interim DIP/Cash Collateral Order          - 50 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

the Court notwithstanding any potential application of Bankruptcy Rule 6004(h) or otherwise. Furthermore, to the extent applicable, the notice requirements and/or stays imposed by Bankruptcy Rules 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient cause. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

///End of Order///

PRESENTED BY:

_/s/ James L. Day_
JAMES L. DAY (WSBA #20474)
BUSH KORNFELD LLP

SAMUEL R. MAIZEL (*Pro Hac Vice* pending)
SAM J. ALBERTS (WSBA #22255)
DENTONS US LLP

*Attorneys for the Chapter 11*
*Debtors and Debtors In Possession*

Interim DIP/Cash Collateral Order     - 51 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

19-01189-WLH11    Doc 841    Filed 12/20/19    Entered 12/20/19 15:29:20    Pg 52 of 121

1

2

3

4

5

6

7

8                                   **EXHIBIT 1**

9                          **DIP LOAN AGREEMENT**

10

11

12

13

14

15

16

17

18

19

20

21 Interim DIP/Cash Collateral Order    - 52 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

**by and among**

**THE BORROWERS AND GUARANTORS PARTY HERETO**

**and**

**THE FINANCIAL INSTITUTIONS OR FUNDS PARTY HERETO, as Lenders**

**and**

**LAPIS ADVISERS, LP,
as Agent for all Lenders**

**Dated as of December [____], 2019**

59939/0001-18582872v2
US_Active\113854804\V-5

**TABLE OF CONTENTS**

1. DEFINITIONS AND CONSTRUCTION. .................................................................. 2
   1.1 Definitions. ..................................................................................................... 2
   1.2 Accounting Terms .......................................................................................... 13
   1.3 UCC ............................................................................................................... 13
   1.4 Construction. .................................................................................................. 13
   1.5 Schedules and Exhibits. ................................................................................. 14
2. LOAN AND TERMS OF PAYMENT ............................................................... 14
   2.1 Agreement to Lend; Delayed Draw; Security Documents and Loan
       Documents. ..................................................................................................... 14
   2.2 Borrowing Procedures. ................................................................................... 15
   2.3 Payments; Reductions of the Commitment; Prepayments. ............................ 15
   2.4 Interest Rates and Rates, Payments and Calculations .................................... 16
   2.5 Payments by Borrowers ................................................................................. 17
   2.6 Designated Account ....................................................................................... 18
   2.7 Maintenance of Loan Account; Statements of Obligations ........................... 18
   2.8 Fees. ............................................................................................................... 18
   2.9 Sharing of Payments, Return of Payments, Etc. ........................................... 18
   2.10 Defaulting Lenders. ....................................................................................... 19
3. CONDITIONS; TERM OF AGREEMENT ........................................................ 19
   3.1 Conditions Precedent to Advancing the Commitment .................................. 19
   3.2 Conditions Precedent to all Extensions of Credit ......................................... 20
   3.3 Maturity .......................................................................................................... 21
   3.4 Effect of Maturity. ......................................................................................... 21
4. REPRESENTATIONS AND WARRANTIES .................................................... 21
   4.1 Due Organization and Qualification .............................................................. 21
   4.2 Due Authorization .......................................................................................... 22
   4.3 Binding Obligations ....................................................................................... 22
   4.4 Existing Prepetition Liens ............................................................................. 22
   4.5 Jurisdiction of Formation; Location of Chief Executive Office;
       Organizational; Identification Number; Commercial Tort Claims ................ 22
   4.6 Litigation ........................................................................................................ 23
   4.7 Fraudulent Transfer ........................................................................................ 23

59939/0001-18582872v2
US_Active\113854804\V-5

| 4.8 | Indebtedness | 23 |
|---|---|---|
| 4.9 | Payment of Taxes | 23 |
| 4.10 | Budget | 23 |
| 4.11 | Guarantor Representations | 23 |

| 5. | AFFIRMATIVE COVENANTS. | 23 |
|---|---|---|
| 5.1 | Financial Statements, Reports, Certificates | 23 |
| 5.2 | Reporting | 24 |
| 5.3 | Material Contracts; Sale Offers | 24 |
| 5.4 | Existence | 24 |
| 5.5 | Maintenance of Properties; Permits | 24 |
| 5.6 | Taxes | 25 |
| 5.7 | Insurance | 25 |
| 5.8 | Inspection | 25 |
| 5.9 | Environmental | 26 |
| 5.10 | Compliance with Laws | 26 |
| 5.11 | Disclosure Updates | 26 |
| 5.12 | Formation of Subsidiaries | 26 |
| 5.13 | Further Assurances | 26 |
| 5.14 | Staffing | 27 |
| 5.15 | Budget | 27 |

| 6. | NEGATIVE COVENANTS | 27 |
|---|---|---|
| 6.1 | Indebtedness | 27 |
| 6.2 | Liens | 27 |
| 6.3 | Restrictions on Fundamental Changes | 27 |
| 6.4 | Disposal of Assets | 27 |
| 6.5 | Change Name | 28 |
| 6.6 | Nature of Business | 28 |
| 6.7 | Prepayments and Amendments | 28 |
| 6.8 | Change of Control | 28 |
| 6.9 | Accounting Methods | 28 |
| 6.10 | Transactions with Affiliates | 28 |
| 6.11 | Use of Advances | 28 |
| 6.12 | Limitation on Capital Expenditures | 28 |

| | 6.13 | Chapter 11 Case | 28 |
| | 6.14 | Plan | 28 |
| 7. | | GUARANTY | 29 |
| | 7.1 | Guaranty | 29 |
| | 7.2 | Separate Obligation | 29 |
| | 7.3 | Limitation of Guaranty | 29 |
| | 7.4 | Liability of Guarantors | 29 |
| | 7.5 | Consents of Guarantors | 30 |
| | 7.6 | Guarantor's Waivers | 31 |
| | 7.7 | Continuing Guaranty | 31 |
| | 7.8 | Reinstatement | 31 |
| 8. | | EVENTS OF DEFAULT | 31 |
| | 8.1 | Event of Default | 31 |
| | 8.2 | Rights and Remedies | 33 |
| | 8.3 | Application of Proceeds upon Event of Default | 34 |
| | 8.4 | Remedies Cumulative | 34 |
| 9. | | PRIORITY AND COLLATERAL SECURITY | 35 |
| | 9.1 | Superpriority Claims; Subordination in favor of Lenders Liens | 35 |
| | 9.2 | Grant of Security Interest in the Collateral | 35 |
| | 9.3 | Representations and Warranties in Connection with Security Interest | 36 |
| | 9.4 | Covenants with Respect to Collateral | 37 |
| | 9.5 | Agent's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral | 37 |
| | 9.6 | Filing of Financing Statements | 37 |
| | 9.7 | No Discharge; Survival of Claims | 38 |
| 10. | | WAIVERS; INDEMNIFICATION | 38 |
| | 10.1 | Demand; Protest; etc | 38 |
| | 10.2 | Lender's Liability for Collateral | 38 |
| | 10.3 | Indemnification | 38 |
| 11. | | NOTICES | 39 |
| 12. | | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. | 40 |
| 13. | | AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION | 41 |
| | 13.1 | Amendments and Waivers | 41 |

19-01189-WLH11    Doc 841    Filed 12/20/19    Entered 12/20/19 15:29:20    Pg 56 of 121

| 13.2 | No Waivers; Cumulative Remedies | 41 |
| 13.3 | Successors | 41 |
| 14. | AGENT. | 42 |
| 14.1 | Appointment and Authorization; "Agent" | 42 |
| 14.2 | Delegation of Duties | 42 |
| 14.3 | Liability of Agent | 42 |
| 14.4 | Reliance by Agent | 42 |
| 14.5 | Notice of Default | 43 |
| 14.6 | Credit Decision | 43 |
| 14.7 | Indemnification of Related Persons | 43 |
| 14.8 | Successor Agent | 44 |
| 14.9 | Collateral Matters | 44 |
| 15. | GENERAL PROVISIONS. | 45 |
| 15.1 | Effectiveness | 45 |
| 15.2 | Section Headings | 45 |
| 15.3 | Interpretation | 45 |
| 15.4 | Severability of Provisions | 45 |
| 15.5 | Debtor-Creditor Relationship | 45 |
| 15.6 | Counterparts; Electronic Execution | 45 |
| 15.7 | Revival and Reinstatement of Obligations | 45 |
| 15.8 | Lender Expenses | 46 |
| 15.9 | Integration | 46 |
| 16. | JOINT AND SEVERAL LIABILITY AMONG BORROWERS. | 46 |
| 16.1 | Inducement | 46 |
| 16.2 | Combined Liability | 46 |
| 16.3 | Separate Exercise of Remedies | 46 |

Exhibits

Exhibit A – Commitments and Pro Rata Shares; Additional Funding Advances

Exhibit B – Form of Compliance Certificate

Exhibit C – Budget

Exhibit D – Reporting Requirements

iv

Exhibit E – Form of Request for Advance

<u>Schedules</u>

Schedule A-1 – Loan Account

Schedule A-2 – Authorized Persons

Schedule D-1 – Designated Account and Designated Account Bank

Schedule 4.1(a) –Organizational Chart

Schedule 4.1(b) – Loan Parties and Equity Ownership

Schedule 4.4 – Existing Prepetition Liens

Schedule 4.5 – Uniform Commercial Code Filing Information

Schedule 4.6 – Litigation

Schedule 4.8 – Existing Indebtedness

Schedule 4.9 – Taxes

Schedule 5.5 – Maintenance of Properties; Permits

Schedule 9.4(e) – Collateral Locations

59939/0001-18582872v2
US_Active\113854804\V-5

# SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
# LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of December _____, 2019 (the "Effective Date"), by and among the borrowers signatory hereto (collectively, the "Borrowers"), the guarantors signatory hereto (collectively, the "Guarantors" and together with the Borrowers, the "Loan Parties"), and those persons from time to time party to this Agreement as lenders (collectively, the "Lenders"; individually, each a "Lender"), and LAPIS ADVISERS, LP, as Agent for the Lenders (in such capacity, the "Agent").

**WHEREAS**, on May 6, 2019 (the "Petition Date"), the Borrowers commenced voluntary bankruptcy proceedings, under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for Eastern District of Washington (the "Bankruptcy Court"), which cases shall be administratively consolidated with the lead case filed by Astria Health, Case No. 19-01189-11 (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases");

**WHEREAS**, the Loan Parties and JMB Capital Partners Lending, LLC, as Lender, previously entered into a Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement dated as of May 10, 2019 (the "Existing DIP Credit Agreement");

**WHEREAS**, the Borrowers remain in possession of their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Loan Parties have requested that Lenders provide financing to Borrowers consisting of a senior secured super-priority term loan in a principal amount of up to Forty-Three Million One Hundred Thousand Dollars ($43,100,000) (the "Facility") pursuant to Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code, the proceeds from which will repay all outstanding amounts due and payable under the Existing DIP Credit Agreement and provide working capital to the Borrowers;

**WHEREAS**, Lenders have indicated their willingness to agree to extend the Facility to Borrowers, all on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code, so long as the Obligations are (i) secured by Liens on the Collateral granted by the Loan Parties as hereinafter provided, and (ii) given superpriority status as provided in the Interim Order and Final Order as applicable; and

**WHEREAS**, the Loan Parties have agreed to grant to the Agent on behalf of the Lenders a security interest in all their assets as Collateral, and the Borrowers have further agreed that the Agent on behalf of the Lenders shall have Superpriority Claims in their Chapter 11 Cases for the repayment of the Obligations pursuant to the Interim Order and Final Order, subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

<center>1</center>

# 1. DEFINITIONS AND CONSTRUCTION.

**1.1** **Definitions**. As used in this Agreement, the following terms shall have the meanings specified below:

"Acceptable Plan" means a plan of reorganization or liquidation for the Chapter 11 Cases that (i) provides for the termination of the unused Commitment under this Agreement, (ii) provides for the indefeasible payment in full in cash of the Obligations, in exchange for full discharge thereof, on or prior to the effective date of the plan as a condition to the effectiveness thereof, and (iii) contains releases, exculpations, waivers and indemnification for the Agent and Lenders solely with respect to the Obligations, in form and substance acceptable to the Agent in its reasonable discretion.

"Additional Documents" has the meaning specified in Section 5.13.

"Additional Funding Advances" means the Advances that each Lenders agrees to fund in excess of the Lender's Commitment in accordance with Section 2.1(b).

"Advances" means the Committed Advances and the Additional Funding Advances.

"Affiliate" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of twenty-four percent (24%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Astria Health" means Astria Health, a Washington non-profit corporation.

"Authorized Person" means any one of the individuals identified on Schedule A-2, as such schedule is updated from time to time by written notice from Loan Parties to Agent.

"Avoidance Actions" has the meaning specified in Section 9.1(a)(i).

"Avoidance Action Proceeds" means the proceeds and recoveries from Avoidance Actions.

"Bankruptcy Code" has the meaning specified in the recitals hereto.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Borrowers" has the meaning set forth in the preamble to the Agreement.

59939/0001-18582872v2
US_Active\113854804\V-5

"Budget" means an initial budget, prepared by Borrowers, that sets forth in reasonable detail all of the Borrowers' projected receipts and disbursements on a weekly basis, separated into line items for each category of receipt or disbursement, and is otherwise in form and substance reasonably acceptable to Agent, and is attached hereto as Exhibit C.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" has the meaning ascribed to it in the Interim Order and Final Order, as applicable.

"Cash Collateral" has the meaning ascribed to it in the Interim Order and Final Order, as applicable.

"Change of Control" means, except with respect to the consummation of a Sale, whether under a plan of reorganization or under Section 363 of the Bankruptcy Code, or as otherwise approved by Agent:

(i) the result caused by the occurrence of any event or series of events which results in Astria Health owning (beneficially, legally or otherwise), in the aggregate, less than one hundred percent (100%) of any class of the issued and outstanding equity interests of any other Loan Party;

(ii) the pledge, hypothecation or encumbrance of any direct or indirect equity interests in any Loan Party; and

(iii) John M. Gallagher ceases for any reason to be the President and Chief Executive Officer of Astria Health or to otherwise be involved in the day to day operation of Astria Health and each Borrower.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Chapter 11 Plan" means a chapter 11 plan that provides for, *inter alia*, payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnification to the extent acceptable to Agent, in its reasonable discretion.

"Closing Date" means the date upon which the first Advance is made under Section 2.1.

"Collateral" means, collectively, all pre-petition and post-petition real property and all pre-petition and post-petition tangible and intangible personal property of each Loan Party, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property,

3

19-01189-WLH11    Doc 841    Filed 12/20/19    Entered 12/20/19 15:29:20    Pg 61 of 121

machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, leases and leaseholds and rents, avoidance actions under Section 549 of the Bankruptcy Code and related recoveries under Section 550 of the Bankruptcy Code, together with all proceeds of each of the foregoing, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable), except for the Avoidance Actions and any proceeds and recoveries thereof.

"Committed Advances" has the meaning specified in Section 2.1(a).

"Commitment" means as to each Lender the amount set forth on Exhibit A, which in aggregate for all Lenders totals Forty Million Six Hundred Thousand Dollars ($40,600,000).

"Commitment Fee" means the fee of 1.50% of the amount of any Additional Funding Advances made by a Lender, which fee shall be earned and payable upon the Lender's making of any such Additional Funding Advance and which shall be paid to the Lender from the proceeds of such Additional Funding Advance.

"Compliance Certificate" means a certificate substantially in the form of Exhibit B delivered by the Authorized Person of Borrowers to Agent.

"Control Agreement" means, with respect to each Deposit Account of a Borrower, an agreement in form and substance reasonably satisfactory to the Agent, pursuant to which the depository institution maintaining such Deposit Account agrees to comply with the Agent's instructions with respect to disposition of funds in such Deposit Account without further consent by the relevant Borrower.

"Daily Balance" means, as of any date of determination and with respect to any fixed monetary Obligations, the amount of such Obligations owed at the end of such day.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Rate" has the meaning specified in Section 2.4(b).

"Defaulting Lender" shall mean any Lender that has failed to pay to Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due.

"Deposit Account" means any deposit account, as that term is defined in the UCC.

"Designated Account" means the Deposit Account of Borrowers identified on Schedule D-1.

"Designated Account Bank" has the meaning specified in Schedule D-1.

"Dollars" or "$" means United States dollars.

59939/0001-18582872v2
US_Active\113854804\V-5

"Equipment Senior Liens" means the liens granted pre-petition by Borrowers in favor of TIAA Commercial Finance, Inc., Lower Valley Credit Union, and Med One Capital Funding, LLC, in specific equipment of the Borrowers described in equipment lease or equipment financing agreements.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral; (b) from adjoining properties or businesses of any real property that constitutes Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by any Loan Party.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on the Borrowers, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Event of Default" has the meaning specified in Section 8.1.

"Exit Fee" means the fee of 5.00%, as applicable (i) of any outstanding principal amount of any Additional Funding Advance that is prepaid pursuant to Section 2.3(c) or (d), or (ii) without duplication of any amounts paid pursuant to clause (i), of the amount of any Additional Funding Advances on the Maturity Date, in each case to be repaid in cash and without further order of the Bankruptcy Court.

"Existing DIP Credit Agreement" has the meaning specified in the recitals to the Agreement.

"Existing DIP Lender" means JMB Capital Partners Lending, LLC.

"Facility" has the meaning specified in the recitals to the Agreement.

"Federal Funds Rate" means, for any day, the rate set forth in the weekly statistical release designated as H.15(519), or any successor publication, published by the Federal Reserve Bank of New York (including any such successor, "H.15(519)") on the preceding Business Day opposite

5

the caption "Federal Funds (Effective)"; or, if for any relevant day such rate is not so published on any such preceding Business Day, the rate for such day will be the arithmetic mean as determined by Agent of the rates for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York City time) on that day by each of three leading brokers of Federal funds transactions in New York City selected by Agent.

"Fees" means all fees due to the Agent under this Agreement, any Loan Document or the Interim Order and Final Order, as applicable, including the Commitment Fee, the Exit Fee, the Funding Fee and the Stated Maturity Date Fee.

"Funding Fee" means, with respect to each Additional Funding Advance, 1.50% of such Additional Funding Advance, payable in cash upon such funding by the Lenders.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guaranteed Obligations" has the meaning specified in Section 7.1.

"Guaranty" means the terms and provisions of Section 7.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of

6

this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified in Section 10.3.

"Indemnified Person" has the meaning specified in Section 10.3.

"Initial Funding" means an Advance in an amount sufficient to repay all outstanding amounts due and payable under the Existing DIP Credit Agreement, to be funded upon entry of the Interim Order.

"Interim Order" means that interim order entered by the Bankruptcy Court authorizing and approving the Borrowers' entry into this Agreement and the other Loan Documents, in form and substance satisfactory to the Agent, in its sole discretion, the Borrowers in their sole discretion, and their respective counsel.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Lapis 2017 Lenders" means the lenders under the Lapis 2017 Loan Agreement.

"Lapis 2017 Loan Agreement" means the Loan and Security Agreement dated as of November 1, 2017, by and among Regional Health (now Astria Health), SHC Holdco, LLC, SHC Medical Center – Yakima, SHC Medical Center – Toppenish, Yakima Home Care Holdings, LLC and Yakima HMA Home Health, LLC, as borrowers, and Washington Health Care Facilities Authority, as the authority / lender.

"Lapis 2017 Loan Documents" means (i) the Lapis 2017 Loan Agreement and (ii) each promissory note, security agreement, mortgage, or other instrument, agreement or document in connection with any obligations owed by the Loan Parties party thereto to any Lapis Lender or to Lapis Advisers, LP as agent for the Lapis 2017 Lenders, pursuant to the Lapis 2017 Loan Agreement.

"Lapis 2017 Loan Parties" means all the Loan Parties other than (i) Caravan Health ACO 19, LLC, dba Astria Health Clinically Integrated Network, LLC, a Missouri for-profit limited liability company and (ii) Home Supply, LLC, a Delaware for-profit limited liability company.

"Lapis 2017 Obligations" means all amounts owed, whether principal, interest, fees or otherwise, by any Lapis 2019 Loan Party under any Lapis 2017 Loan Document.

"Lapis 2019 Lenders" means the lenders under the Lapis 2019 Loan Agreement.

"Lapis 2019 Loan Agreement" means the Credit Agreement dated as of January 18, 2019, by and among Astria Health, Sunnyside and the other borrowers' signatory thereto, the subsidiaries

59939/0001-18582872v2
US_Active\113854804\V-5

of Astria Health party thereto as credit parties, the financial institutions party thereto as lenders, and Lapis Advisers, LP, as agent for the Lapis 2019 Lenders.

"Lapis 2019 Loan Documents" means the "Loan Documents" under and as such term is defined in the Lapis 2019 Loan Agreement.

"Lapis 2019 Loan Parties" means all the Loan Parties.

"Lapis 2019 Obligations" means all amounts owed, whether principal, interest, fees or otherwise, by any Lapis 2019 Loan Party under any Lapis 2019 Loan Document.

"Lapis Senior Holdco Liens" has the meaning given to such term in the Order.

"Lead Borrower" means Astria Health, a Washington non-profit corporation.

"Lenders" has the meaning set forth in the preamble to the Agreement.

"Lender Designated Professionals" means (1) one primary law firm (currently, Cole Schotz P.C.), (2) one local law firm (currently, Miller Nash Graham & Dunn LLP) and (3) one financial advisor (currently, Solic Capital Management, LLC), or any substitution thereof.

"Lender Expenses" means, in each case solely to the extent incurred by Agent in its capacity as Agent hereunder or by any Lender as a credit party under a Loan Document, all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by the Borrowers under any of the Loan Documents that are paid, advanced, or incurred by Agent and Lenders, (b) reasonable and actual out-of-pocket fees or charges paid or incurred by Agent and Lenders in connection with its transactions with the Borrowers under any of the Loan Documents, including, but not limited to, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) reasonable and actual out-of-pocket costs and expenses incurred by Agent and Lenders in the disbursement of funds to Borrowers (by wire transfer or otherwise) under this Agreement, (d) out-of-pocket charges paid or incurred by Agent and Lenders resulting from the dishonor of checks payable by or to any Loan Party under this Agreement, (e) reasonable and actual out-of-pocket costs, fees (including attorneys' fees) and expenses paid or incurred by Agent to correct any default or enforce any provision of the Loan Documents, including during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable out-of-pocket audit fees and expenses of Agent and Lender (including travel, meals, and lodging) related to any inspections or audits, (g) reasonable and actual out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by Agent and Lenders in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Agent's and Lender's relationship with the Borrowers, (h) Agent's and Lenders' reasonable and actual out of pocket costs and expenses (including reasonable attorneys' fees) incurred in advising, structuring,

8

19-01189-WLH11    Doc 841    Filed 12/20/19    Entered 12/20/19 15:29:20    Pg 66 of 121

drafting, reviewing, administering (including travel, meals, and lodging), or amending the Loan Documents, (i) reasonable out-of-pocket fees and expenses of Agent and Lenders (including travel, meals, and lodging) related to any due diligence in connection with the Facility or meetings with Borrowers in connection with the Facility, and (j) Agent's and Lenders' reasonable costs and expenses (including reasonable and actual attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding concerning any Borrower or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral. The Agent and Lenders are entitled to reimbursement of reasonable fees and expenses of the Lender Designated Professionals with respect to activities directly related to the Loan Documents and Obligations, but not with respect to any prepetition loans, claims, liens or other obligations. Further, no other person, professional or service firm other than a Lender Designated Professional is entitled to reimbursement of fees and costs under this Agreement. "Lender Related Person" means, Agent and each Lender, together with Agent and each Lender's Affiliates, officers, directors, employees, attorneys, and agents. For the avoidance of doubt, the definition of Lender Related Person does not expand or alter the meaning of Lender Designated Professional.

"Lenders' Liens" means the Liens granted by Borrowers in and to the Collateral in favor of Agent as the representative of the Lenders.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan Account" means the Deposit Account of Lender identified on Schedule A-1.

"Loan Documents" means the Agreement, the Interim Order, the Final Order, the Control Agreements, the Additional Documents and any other notes, account control agreements, or mortgages executed by Borrowers in connection with the Agreement and payable to Lenders, any other agreement entered into, now or in the future, by the Borrowers or Agent on behalf of the Lenders in connection with the Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"Material Adverse Change" means (a) except as a result of the commencement of the Chapter 11 Cases, a material adverse change in the business, operations, results of operations, assets, liabilities or financial condition of the Borrowers with respect to the Collateral (b) a material impairment of the Borrowers' ability to perform their respective obligations with respect to the Collateral under the Loan Documents or of Agent's ability to enforce the Obligations or realize upon the Collateral or (c) a material impairment of the enforceability or priority of Agent's Liens with respect to a material portion the Collateral as a result of an action or failure to act on the part of the Borrowers, all determined at the Agent's discretion.

59939/0001-18582872v2
US_Active\113854804\V-5

"Maturity Date" means the earliest of (i) the Stated Maturity Date; (ii) the effective date of a plan of reorganization; (iii) entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Cases; (iv) the closing of a Sale of all, or substantially all, the assets of all Borrowers; and (v) the acceleration of the outstanding Obligations or termination of the Commitment as a result of the occurrence and continuation of an Event of Default.

"Net Cash Proceeds" means with respect to any sale or disposition of Collateral by any Borrower, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Borrower, in connection therewith, after deducting therefrom only (i) amounts required to be paid to holders in respect of any Existing Prepetition Liens, to the extent applicable, (ii) reasonable (as determined by the Agent) fees, commissions, and expenses related thereto and required to be paid by such Borrower in connection with such sale or disposition and (iii) taxes paid or payable to any taxing authorities by such Borrower in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are payable to a Person that is not an Affiliate of such Borrower, and are properly attributable to such transaction; provided however for the avoidance of doubt, that such reasonable fees, commissions and expenses shall exclude fees and expenses of estate professionals.

"Obligations" means all loans, Advances, debts, principal, interest, contingent reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Loan Account pursuant to the Agreement), obligations (including indemnification obligations), Fees (including, without limitation the Commitment Fee, Funding Fee and Exit Fee and Stated Maturity Date Fee), Lender Expenses, guaranties, covenants, and duties of any kind and description owing by any Loan Party, to the Agent and Lenders pursuant to or evidenced by the Loan Documents and/or pursuant to or in connection with any one or more documents, instruments or agreements described in clause (i) of the definition of Lender Expenses and, in each case, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, including without limitation in connection with the collection or enforcement of or preservation of rights under the Loan Documents. For the avoidance of doubt, Obligations do not include the Lapis 2017 Obligations or the Lapis 2019 Obligations.

"Order" means an order of the Bankruptcy Court authorizing and approving the Borrowers' entry into this Agreement and the other Loan Documents, in form and substance satisfactory to Agent in its sole discretion.

"Ordinary Course" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement

59939/0001-18582872v2
US_Active\113854804\V-5

and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company, and (d) any agreement between any Loan Party and its shareholders, members, partners or its equity owners, or among any of the foregoing.

"Permits" means any license, lease, power, permit, franchise, certificate, authorization or approval issued by a Governmental Authority.

"Permitted Indebtedness" means:

(i) Indebtedness evidenced by the Agreement and the other Loan Documents;

(ii) Indebtedness outstanding as of the Petition Date;

(iii) Indebtedness, including any unsecured guarantees, incurred in the Ordinary Course with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, statutory bonds, completion guarantees and similar obligations; and

(iv) Indebtedness for purchase money obligations incurred after the Petition Date for equipment used in the ordinary course of the Borrowers' business in an aggregate principal amount not to exceed at any time $500,000.

"Permitted Prior Lien" has the meaning specified in Section 9.2(b).

"Permitted Protest" means the right of any Loan Party to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Borrower's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party in good faith and (c) Agent is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lenders' Liens.

"Permitted Variance" means a variance of (i) net cash flow in the Budget of no more than 10%, which variance shall be tested weekly on a rolling four-week cumulative basis, as opposed to a line-by-line basis; provided that, for the avoidance of doubt, the calculation of any net cash flow variance includes any disbursements in connection with estate professional fees, and (ii) a variance with respect to cash collections of no more than 15% on a rolling four-week cumulative basis, tested at the end of each two week period.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" means May 6, 2019.

59939/0001-18582872v2
US_Active\113854804\V-5

"Prepetition Credit Liens" has the meaning given to such term in the Interim Order and upon entry thereof, the Final Order.

"Pro Rata Share" means, as to any Lender at any time, such (i) with respect to the Committed Advance, Lender's pro rata percentage of the aggregate amount of the Commitment as set forth on Exhibit A hereto, and (ii) with respect to any Additional Funding Advances, such Lender's percentage that such Lender's Additional Funding Advance represents of all the Additional Funding Advances.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Required Lien Priority" has the meaning set forth in Section 9.2.

"Sale" means the sale of all or substantially all of any of the assets of any Borrower or any subsidiary thereof (including any Collateral transferred to another Borrower), to any party, including the Agent on behalf of the Lenders, pursuant to the provisions of Section 363 of the Bankruptcy Code or pursuant to an Acceptable Plan.

"Sale Deposit" has the meaning specified in Section 9.1(a)(i).

"Schedules" means those certain schedules annexed hereto and made a part hereof.

"Security Documents" means (i) all UCC financing statements, or amendments or continuations thereof, and (ii) any other documents or filings in connection with the perfection of the Liens hereunder.

"Stated Maturity Date" means June 30, 2020, subject to extension in accordance with Section 3.3.

"Stated Maturity Date Fee" means the fee of 8.00% of the amount of the funded Committed Advances of the Facility made between Closing Date and the Stated Maturity Date; provided, however, the Stated Maturity Date Fee shall increase thereafter to 10% of the Committed Advances of the Facility, which shall be due and payable in cash, without further order of the Bankruptcy Court, immediately upon the day following the Stated Maturity Date in the event that the Obligations are not indefeasibly paid in full on or before the Stated Maturity Date.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which more than fifty percent (50%) of

59939/0001-18582872v2
US_Active\113854804\V-5

the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Sunnyside" means Sunnyside Community Hospital Association, a Washington non-profit corporation.

"Superpriority Claim" has the meaning specified in Section 9.1(a)(i).

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" means the United States of America.

"Weekly Budget Variance Report" has the meaning specified in Section 5.2.

1.2    **Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Borrowers notify Agent that Borrowers requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if Agent notifies Borrowers that Agent requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Agent and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of Agent and Lenders and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers on a consolidated basis, unless the context clearly requires otherwise.

1.3    **UCC**.  Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.4    **Construction**.Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The

59939/0001-18582872v2
US_Active\113854804\V-5

words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been paid in full in cash). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

**1.5    Schedules and Exhibits.** All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**2.    LOAN AND TERMS OF PAYMENT.**

**2.1    Agreement to Lend (Committed Amount); Delayed Draw; Security Documents and Loan Documents.**

(a)    Subject to the terms and conditions of this Agreement, Lenders agree, subject to the satisfaction or waiver of the conditions precedent in Section 3, to make advances to Borrowers (each, a "Committed Advance"); provided that in no event shall the Committed Advances made by each Lender exceed each Lender's Commitment. The first Committed Advance in the amount of the Initial Funding plus $700,000 shall be made upon entry of the Interim Order, the subsequent Committed Advances in an amount not to exceed the remaining Commitments of each Lender shall be made, subject to the satisfaction or waiver of the conditions precedent in Section 3 relating to such Committed Advances. The Initial Funding amount shall be paid directly from the DIP Lenders to the Existing DIP Lender.

(b)    Subject to the satisfaction or waiver of the conditions precedent in Section 3, and in the sole discretion of the Lenders and with no commitment or other obligation to do so, each Lender, based on such amounts as may be determined by the Lenders based on the Budget and the working capital requirements of the Borrowers, may make additional advances to Borrowers that are in excess of each Lender's Commitment (each, an "Additional Funding Advance") in an amount as to each Lender not to exceed the amount set forth under "Additional Funding Advances" on Exhibit A, which Additional Funding Advances shall not exceed in total Two Million Five Hundred Thousand Dollars ($2,500,000).

59939/0001-18582872v2
US_Active\113854804\V-5

(c)     Each Loan Party agrees that it is jointly and severally liable for the prompt payment and performance of all Obligations under the Loan Documents.  Borrowers promise to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full (including the Exit Fee) on the Maturity Date.

**2.2     Borrowing Procedures**. Each Advance under Section 2.1(a) shall be made by a written request substantially in the form of the Request for Advance attached hereto as Exhibit E executed by an Authorized Person of the Lead Borrower and delivered to the Agent no later than one (1) Business Day prior to the requested funding date (or such shorter period as the Agent may permit in its sole discretion); provided, that (i) Lead Borrower shall submit such requests only after approval of the Interim Order or the Final Order, as applicable, and (ii) the total amount of all Committed Advances of each Lender shall not exceed the Commitment of each Lender.  Upon satisfaction or waiver of the conditions precedent specified herein (and with respect to any Additional Funding Advances, which may be made in the sole discretion of each Lender), Lenders shall make the proceeds of the relevant Advance available to the Borrowers on the requested funding date by causing the principal amount of the relevant Advance to be credited to the Designated Account.

**2.3     Payments; Reductions of the Commitment; Prepayments**.

(a)     **Payments by Borrowers**.  Except as otherwise expressly provided herein, all payments by Borrowers shall be made to the Loan Account for the account of Agent and shall be made in immediately available funds, no later than 1:00 p.m. California time on the date specified herein.  Any payment received by Lender later than 1:00 p.m. California time shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b)     **Application of Payments and Proceeds**.  All payments remitted to Agent on behalf of the Lenders and all proceeds of Collateral received by Agent on behalf of the Lenders shall be applied as follows (unless otherwise directed by Agent):

(i)     first, to pay any Lender Expenses (including cost or expense reimbursements, such as attorneys' fees) then owed to the Agent or Lender Related Persons in accordance with the Order or indemnities then due to Lenders under the Loan Documents, until paid in full;

(ii)     second, to pay any Fees then due to Agent and/or Lenders under the Loan Documents until paid in full;

(iii)     third, to pay interest due in respect of the Advances until paid in full;

(iv)     fourth, to pay the principal of all Advances until paid in full;

(v)     fifth, to pay any other Obligations until paid in full; and

(vi)     sixth, to Borrowers (to be wired to the Designated Account) or as otherwise required by applicable law.

15

In the event of a direct conflict between the priority provisions of this Section 2.3(b) and any other provision contained in any other Loan Document (except for the Interim Order or Final Order, as applicable), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(b) shall control and govern. Notwithstanding the foregoing, to the extent there is a conflict between the Interim Order or Final Order, as applicable, and any other Loan Document, the Interim Order or Final Order, as applicable, shall control and govern.

(c) **Optional Prepayments**. Upon three Business Days' prior notice to Agent, Borrowers may prepay any Advance, in whole or in part, at any time, underlined provided that (i) the principal amount being prepaid shall be an amount not less than $1,000,000 and (ii) Borrowers shall also pay all accrued and unpaid interest on such principal amount and the Exit Fee as applied to the principal amount that was prepaid.

(d) **Mandatory Prepayments**.

(i) **Dispositions**. Within one (1) Business Day of the date of receipt by any Borrower of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation, confiscation, requisition, seizure or taking thereof or otherwise) of Collateral (other than sales in the Ordinary Course), such Borrower shall prepay such portion of the outstanding amount of the Obligations in accordance with Section 2.3(b) in an amount equal to 100% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions, plus the Exit Fee as applied to the amount of such prepayment. Nothing contained in this Section 2.3(d)(i) shall permit any Borrower to sell any Collateral other than in accordance with Section 6.4. In no event shall any amount paid to Lender under this Section 2.3(d)(i) exceed the outstanding amount of the Obligations.

(ii) **Indebtedness**. Within one (1) Business Day of the date of incurrence by any Borrower of any Indebtedness (other than Permitted Indebtedness), such Borrower shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.3(b) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness plus the Exit Fee as applied to the principal amount of such prepayment. The provisions of this Section 2.3(d)(ii) shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

**2.4** **Interest Rates and Rates, Payments and Calculations**.

(a) **Interest Rate**. Except as provided in Section 2.4(b), all Advances shall bear interest on the Daily Balance thereof at a rate equal to 12.00% per annum. For the avoidance of doubt, for the purpose of calculating interest for purposes of this Section 2.4(a), the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(b) **Default Rate**. Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate

16

19-01189-WLH11    Doc 841    Filed 12/20/19    Entered 12/20/19 15:29:20    Pg 74 of 121

equal to five percentage points (5%) above the per annum rate otherwise applicable hereunder upon notice from Lender of its election to impose interest at the default rate. Any such notice may impose interest at the default rate retroactively to the date of the occurrence of the related Event of Default. For the avoidance of doubt, for the purpose of calculating interest for purposes of this <u>Section 2.4(b)</u>, Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(c)      **Payment**.  Except to the extent provided to the contrary herein, interest, all Fees payable hereunder or under any of the other Loan Documents, and all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month at any time that Obligations or the Commitment are outstanding. Borrowers hereby authorize Agent, from time to time, without prior notice to Borrowers, to charge all interest and Fees payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all Fees provided for in <u>Section 2.8</u> (in each case, as and when due and payable), and all other payments as and when due and payable under any Loan Document to the Loan Account, which amounts thereafter shall constitute Obligations hereunder and shall accrue interest at the rate then applicable to Obligations.

(d)      **Computation**.  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)      **Intent to Limit Charges to Maximum Lawful Rate**.  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Loan Parties, Agent and Lenders, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; <u>provided</u>, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Loan Parties are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Loan Parties in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

**2.5      <u>Payments by Borrowers</u>**.

(a)      All payments to be made by Borrowers shall be made without set-off, recoupment or counterclaim. Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent for the account of the Lenders via wire transfer, and shall be made in dollars and in immediately available funds, no later than 1:00 p.m. (California time) on the date specified herein, and Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as expressly provided herein) of such payment in like funds as received. Any payment received by Agent later than 1:00 p.m. (California time) shall be deemed to have been received on the following Business Day and any applicable interest shall continue to accrue.

59939/0001-18582872v2
US_Active\113854804\V-5

(b)     Whenever any payment is due on a day other than a Business Day, such payment shall be made on the following Business Day, and such extension of time shall in such case be included in the computation of interest.

(c)     Unless Agent receives notice from Borrowers prior to the date on which any payment is due that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrowers have not made such payment in full to Agent, each Lender shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Federal Funds Rate for each day from the date such amount is distributed to such Lender until the date repaid.

**2.6     Designated Account**.

(a)     Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the Advances requested by Borrowers and made by Lenders hereunder in such Designated Account.

(b)     Borrowers agree to deposit all proceeds of sales of the Collateral into the Designated Account.

**2.7     Maintenance of Loan Account; Statements of Obligations**.  Agent shall maintain true, correct and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Borrowers to Lenders, in which Agent will record (i) the amount of all Advances made under this Agreement, (ii) the amount of any principal and/or interest due and payable and/or to become due and payable from the Borrowers to the Lenders under this Agreement and (iii) all amounts received by Agent or Lender under this Agreement from any Loan Party.

**2.8     Fees**.  Upon entry of the Order, Borrowers shall pay from the proceeds of the Facility to the Agent, the Commitment Fee and the Funding Fee as set forth in the Order.  All such fees shall be non-refundable and non-avoidable obligations of the Borrowers and shall be paid by the Borrowers in cash.

**2.9     Sharing of Payments, Return of Payments, Etc**.  If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Obligations in its favor any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) in excess of its Pro Rata Share (or other share contemplated hereunder), such Lender shall immediately (a) notify Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans as shall be necessary to cause such purchasing Lender to share the excess payment pro rata with each of them; provided, that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender, such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's Pro Rata Share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount

18

59939/0001-18582872v2
US_Active\113854804\V-5

so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered. Borrowers agree that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off). Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.9 and will in each case notify the Lenders following any such purchases or repayments. If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrowers and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind. If Agent determines at any time that any amount received by Agent under this Agreement or any other Loan Document must be returned to any Loan Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to Borrowers or such other Person, without setoff, counterclaim or deduction of any kind, and Agent will be entitled to set-off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

2.10 **Defaulting Lenders**. Notwithstanding anything set forth herein to the contrary, including Section 13, a Defaulting Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" for any voting or consent rights under or with respect to any Loan Document, provided that (a) the principal of a Defaulting Lender's Pro Rata Share of the Loans may not be reduced or forgiven, and (b) the interest rate applicable to Obligations owing to a Defaulting Lender may not be reduced in such a manner that by its terms affects such Defaulting Lender more adversely than other Lenders, in each case without the consent of such Defaulting Lender.

3. **CONDITIONS; TERM OF AGREEMENT**.

3.1 **Conditions Precedent to Advances**. Lenders shall not be required to advance the first Committed Advance unless and until all of the conditions specified below in this Section 3.1 (other than those pertaining to the second Committed Advance) and Section 3.2 shall have been satisfied or waived by Agent in its sole discretion. Lenders shall not be required to advance subsequent Committed Advances and will not make any Additional Funding Advances unless and until all of the conditions specified below in this Section 3.1 and in Section 3.2 shall have been satisfied or waived by Agent in its sole discretion. The making of any Committed Advance or any Additional Funding Advances by Lenders is conclusively deemed to be its satisfaction or waiver of the conditions precedent contained in this Section 3.1 or Section 3.2 with respect to such Advance.

(a) Agent shall have received a copy of the Budget.

(b) With respect to the extension of the first Committed Advance (the Initial Funding plus $700,000 of Committed Advances), the Bankruptcy Court shall have entered the Interim Order and such Interim Order shall be in full force and effect and shall not have been

59939/0001-18582872v2
US_Active\113854804\V-5

modified or amended, reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed (unless, in each case set forth above, otherwise agreed to by Agent). Borrowers, Agent and Lenders shall be entitled to rely in good faith upon the Interim Order and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

(c)     Lender shall have received evidence, in form and substance reasonably acceptable to Agent, that, Guarantors have made all necessary Uniform Commercial Code financing statements necessary to provide Agent with a valid, perfected security interest in the Collateral pledged by Guarantors in accordance with the Required Lien Priority, or (ii) to the extent such filings cannot be made until the effectiveness of this Agreement, final drafts of such Uniform Commercial Code financing statements, to be filed by Agent promptly upon the Effective Date.

(d)     Agent shall have received copies of UCC, tax, and judgment lien searches and title reports, in each case satisfactory to Agent in its sole discretion.

(e)     All fees required to be paid on the Closing Date under this Agreement shall have been paid or will be paid from such Advance.

(f)     All other documents in connection with the transactions contemplated by this Agreement shall have been delivered or executed and shall be in form and substance reasonably satisfactory to Agent.

**3.2     Conditions Precedent to all Extensions of Credit**. Lenders shall not be required to make any Advances unless and until all of the additional conditions specified below shall have been satisfied or waived by Agent in its sole discretion (the making of any Advance by Lenders being conclusively deemed to be its satisfaction or waiver of the conditions precedent contained in this Section 3.2 with respect to such Advance).

(a)     Borrowers shall be in compliance with the conditions precedent set forth in Section 3.1 of this Agreement.

(b)     The representations and warranties of Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(c)     No Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

(d)     No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Loan Party or Lenders; and

59939/0001-18582872v2
US_Active\113854804\V-5

(e)     No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents.

3.3     **Maturity**. This Agreement shall continue in full force and effect until the payment in full of the Obligations. All Obligations, including without limitation the outstanding unpaid principal balance and all accrued and unpaid interest on the Advances shall be due and payable on the Maturity Date; provided, that, for purposes of the definition of the Maturity Date, the Stated Maturity Date shall be subject to extension to a date that is not more than ninety (90) days after June 30, 2020, if the Borrowers have entered into an asset purchase agreement or other sale and purchase agreement that would result in net proceeds upon closing to pay the outstanding Obligations in full and the only remaining material conditions to the closing thereunder is to obtain the approval of the applicable state and federal healthcare Governmental Authorities and the Bankruptcy Court.

3.4     **Effect of Maturity**. On the Maturity Date, the Commitment of Lenders to provide any additional credit hereunder shall automatically be terminated and all Obligations immediately shall become due and payable without notice or demand. No termination of the obligations of Lenders (other than payment in full of the Obligations and termination of the Commitment) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Lenders' Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitment has been terminated. When all of the Obligations have been indefeasibly paid in full in immediately available funds and Lenders have no further obligation hereunder to make further Advances, Agent will, at the Borrowers' expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Lenders' Liens and all notices of security interests and Liens previously filed by Agent with respect to the Obligations.

## 4.     REPRESENTATIONS AND WARRANTIES.

In order to induce Lenders to enter into this Agreement, each Loan Party makes the following representations and warranties to Agent and Lenders. The Loan Parties further represent that such representations and warranties shall be true, correct, and complete, in all respects, as of the Closing Date, and shall be true, correct, and complete, in all respects, as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1     **Due Organization and Qualification**.

59939/0001-18582872v2
US_Active\113854804\V-5

(a)     Each Loan Party (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) where the ownership of Collateral requires such qualification, is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) subject to the Bankruptcy Court's entry of the Interim Order or Final Order, as applicable, and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.   Schedule 4.1(a) is an organizational chart showing the complete and accurate ownership structure of the Loan Parties.

(b)     Schedule 4.1(b) sets forth, for each Loan Party, its legal name (within the meaning of Section 9-503 of the UCC), jurisdiction of incorporation or formation, type of entity (for profit or non-profit), and equity owners.

**4.2**     **Due Authorization**. The execution, delivery, and performance by each Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of such Loan Party and, with respect to each Borrower, is only subject to the Bankruptcy Court's entry of the Interim Order or Final Order, as applicable.

**4.3**     **Binding Obligations**.  Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party pursuant to the Interim Order or Final Order, as applicable, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

**4.4**     **Existing Prepetition Liens**.  Except for the existing Liens of the Existing DIP Lender and the Loan Parties' pre-Petition Date lenders or creditors set forth on Schedule 4.4, each Loan Party has (i) good, sufficient and legal title to, and (ii) good and marketable title to (in the case of personal property), all of such Loan Party's right, interest and title in the Collateral.

**4.5**     **Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims**.

(a)     The name (within the meaning of Section 9-503 of the UCC), jurisdiction of formation, tax identification numbers and organizational identification number (if any) of each Loan Party are as set forth on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Loan Party to Lender).

(b)     The chief executive office of each Loan Party is located at the address indicated on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Loan Party to Lender).  Except with respect to potential claims with respect to accounts receivable collections, the Loan Parties have no actual knowledge of the existence by them of any commercial tort claims except as described on such Schedule 4.5.

59939/0001-18582872v2
US_Active\113854804\V-5

**4.6**   **Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of Loan Parties, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as set forth on Schedule 4.6, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Change.

**4.7**   **Fraudulent Transfer**.  No transfer of property is being made by a Loan Party and no obligation is being incurred by a Loan Party in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay or defraud either present or future creditors of any Loan Party.

**4.8**   **Indebtedness**.  Set forth on Schedule 4.8 is a true and complete list of all Indebtedness of each Loan Party outstanding immediately prior to the date hereof and as of the Petition Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of such dates.

**4.9**   **Payment of Taxes**.  Except as provided on Schedule 4.9, all United States federal, state and other material tax returns and reports of each Borrower required to be filed by any of them with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted Protest.  With respect to the Collateral, the Borrowers are not aware of any proposed tax assessment against a Borrower with respect to United States federal, state or municipal taxes.

**4.10**   **Budget**.  Attached to this Agreement as Exhibit C is a true and complete copy of the Budget.  The Budget may be amended from time to time with the written consent of the Agent.

**4.11**   **Guarantor Representations**.  Each Guarantor represents to the Agent that it has no assets or to the extent it has any assets, they are of inconsequential value.

**5.**   **AFFIRMATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of the Commitment and payment in full of the Obligations, it shall comply with each of the following:

**5.1**   **Financial Statements, Reports, Certificates**.  Lead Borrower shall deliver to Agent (a) promptly upon it or any Loan Party becoming aware of any Default, notice of such default; (b) promptly upon becoming aware of any litigation threatened in writing against any Loan Party or filed (other than any adversary proceeding filed in the Chapter 11 Cases), or any event (other than events of public knowledge in the Chapter 11 Cases) which could reasonably be expected to have a Material Adverse Change; and (c) at the time of a request for any Advance, a Compliance Certificate.  In addition, the Borrowers agree to maintain a system of accounting that enables the Borrowers to produce unaudited financial statements in accordance with GAAP.

59939/0001-18582872v2
US_Active\113854804\V-5

5.2     **Reporting**.  Each Loan Party shall comply with the agreements, requirements, covenants and undertakings applicable to it set forth in Exhibit D, in accordance with the terms thereof.  Each Borrower will: (a) commencing on the first Friday to occur after the entry of the Order and on the Friday of each week thereafter, prepare and deliver to Agent (x) a report showing actual cash receipts and disbursements of the entities covered by the Budget for the preceding Saturday through Friday certified in writing by an Authorized Person of Lead Borrower as being true and accurate, and (y) a written explanation of all material variances (the "Weekly Budget Variance Report"); (b) update and roll-forward the proposed Budget no less frequently than every four (4) weeks or at such other interval as agreed to by the Agent and the Borrowers, each such amended Budget to be delivered to Agent no later than the third Business Day of each week for the week immediately prior; and (c) participate in a weekly conference call, if required, commencing on the third Business Day of each week following the Petition Date regarding the Budget, management issues, sale process, and other matters.

5.3     **Material Contracts; Sale Offers**.  Lead Borrower shall deliver to Agent (a) promptly upon any Loan Party becoming aware of any default (other than the filing of the Chapter 11 Case) under any material contract to which any Loan Party is a party, notice of such defaults, and (b) promptly notify Agent upon and provide all documents that any Borrower shall have received with respect to any written offer by a third party to purchase substantially all of the assets of the Borrowers, or to purchase the equity of the Borrowers or to refinance the Facility. If requested by Agent, the chief restructuring officer and/or the chief financial officer of the Borrowers shall participate in a conference call with Agent and Lenders (as long as no Event of Default has occurred and is continuing, such call shall be no more often than weekly), following the Petition Date regarding management issues, sales or refinance offers and other matters. Notwithstanding the foregoing, in the event that the Agent or any Lender participates as a potential purchaser in the sales process to purchase substantially all assets of the Borrowers, the Borrowers shall no longer be subject to this Section 5.3 as regards to such sale transaction or process.

5.4     **Existence**.  At all times, each Borrower shall (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of incorporation or formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits could not reasonably be expected to result in a Material Adverse Change.

5.5     **Maintenance of Properties; Permits**.  Except where the failure to do so could not be expected to result in a Material Adverse Change, each Loan Party shall (a) maintain and preserve the Collateral that is necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted, (b) comply with the material provisions of all material leases, if any, related to the Collateral pledged by it, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest; and (c) maintain, comply with and keep in full force and effect its Permits with respect to the Collateral pledged by it, except as could not be expected to result in a Material Adverse Change.  Except as set forth on Schedule 5.5, each Borrower is in compliance with, and has, all Permits required for the operation of its business as it relates to the Collateral except for any noncompliance which could not reasonably be expected to have a Material Adverse Change, and for the execution, delivery and performance by, and enforcement against, such Borrower of each Loan Document.  Except as set forth in Schedule 5.5, no Borrower is in breach of or default under the provisions of any such

24

59939/0001-18582872v2
US_Active\113854804\V-5

Permit, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing, which in each case could reasonably be expected to have a Material Adverse Change.

**5.6** **Taxes**. Each Loan Party shall cause all assessments and taxes imposed, levied, or assessed after the Petition Date against any Collateral to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that any such assessments and taxes shall be paid as part of a plan of reorganization approved by Agent.

**5.7** **Insurance**. At the relevant Borrower's expense, each Borrower shall maintain insurance with respect to the Collateral in which such Borrower has any right, interest or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses and consistent with Borrower's insurance policies in effect on the Petition Date. Each Borrower shall maintain general liability, director's and officer's liability insurance, fiduciary liability insurance, employment practices liability insurance, title insurance as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to Agent. All property insurance policies and title insurance policies covering the Collateral are to be made payable to Agent for the benefit of Lenders, in case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully protect Agent's interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to Agent, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Agent and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation. If any Borrower fails to maintain the insurance required by this Section 5.7, Agent's may arrange for such insurance, but at such Borrower's expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Each relevant Borrower shall give Agent prompt notice of any loss covered by its casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

**5.8** **Inspection**. Each Loan Party shall permit Agent and Lenders and each of its duly authorized representatives or agent to visit any of its properties and inspect any of its Collateral or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Agent may reasonably require and, so long as no Default or Event of Default exists, with reasonable prior notice to the

59939/0001-18582872v2
US_Active\113854804\V-5

applicable Loan Party. Such inspections shall not occur more than once every three (3) months; provided that no such limitation shall apply in the event that a Default or Event of Default exists.

5.9    **Environmental**. Each Loan Party shall:

(a)    Keep the Collateral owned or operated by it free of any Environmental Liens,

(b)    Comply with all applicable Environmental Laws, except where the failure to so comply could not reasonably be expected result in a Material Adverse Change.

(c)    Promptly notify Agent of any release of which such Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party that could reasonably be expected to result in a Material Adverse Change, and

(d)    Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Agent with written notice of any of the following: (i) written notice that an Environmental Lien has been filed against any of the Collateral, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan Party, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

5.10    **Compliance with Laws**. Each Loan Party shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

5.11    **Disclosure Updates**. Each Loan Party shall promptly and in no event later than three (3) Business Days after obtaining actual knowledge thereof, notify Agent if any written information, exhibit, or report (other than materials marked as drafts and forward-looking information and projections and information of a general economic nature and general information about such Loan Party's industry) furnished to Agent contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

5.12    **Formation of Subsidiaries**. No Loan Party may form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the consent of Agent, in its sole discretion. Any Subsidiary that is formed after the Closing Date shall be considered a Borrower and execute any documentation reasonably requested by Agent.

5.13    **Further Assurances**. Upon reasonable written notice from Agent, each Borrower shall execute or deliver to Agent any and all financing statements, fixture filings, endorsements of certificates of title, mortgages, deeds of trust, and all other documents (collectively, the

59939/0001-18582872v2
US_Active\113854804\V-5

"Additional Documents") that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect, and continue perfected or to better perfect Lenders' Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

**5.14** **Staffing**. Each Borrower shall maintain at all times an appropriate and necessary staff to carry out its business with respect to the Collateral in compliance with all other applicable laws and with training and experience and in number equal to or greater than would be customarily maintained by businesses engaging in similar activities, except where the failure to maintain such staff could not, after taking into account any formal or informal compliance deadline extensions granted by applicable regulatory authorities in effect, reasonably be expected to result in a Material Adverse Change.

**5.15** **Budget**. Borrowers shall comply with the Budget and the Permitted Variance.

## 6. NEGATIVE COVENANTS.

Each Loan Party covenants and agrees that, until termination of the Commitment and payment in full of the Obligations, such Loan Party will not do any of the following without the prior consent of Lender in its reasonable discretion:

**6.1** **Indebtedness**. Except for Permitted Indebtedness, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral.

**6.2** **Liens**. Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Liens (a) created by the Loan Documents, (b) set forth on Schedule 4.4 and (c) any other Lien that is the subject of a Permitted Protest.

**6.3** **Restrictions on Fundamental Changes**. Except in connection with a plan of reorganization or a Sale or Sales approved by the Bankruptcy Court or otherwise with the prior written consent of Lender:

(a) no Loan Party shall enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests,

(b) no Borrower shall liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), and

(c) no Borrower shall suspend or close a substantial portion of its business.

**6.4** **Disposal of Assets**. Convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral held by any Loan Party, other than in the Ordinary Course. For the avoidance of doubt, any proceeds of such disposed Collateral shall be used to satisfy the Obligations consistent with Section 2.3(d)(i).

27

59939/0001-18582872v2
US_Active\113854804\V-5

**6.5** **Change Name**. Change any Loan Party's name, state of organization, organizational identity or, to the extent applicable, organizational identification number.

**6.6** **Nature of Business**. Make any change in the nature of any Loan Party's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent any Loan Party from (i) engaging in any business that is reasonably related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code.

**6.7** **Prepayments and Amendments**. Change or modify the material terms of any material lease or contract in connection with Collateral except in a manner that could not reasonably be expected to result in a Material Adverse Change, or materially alter any Organizational Documents, except, in each case, with the prior written consent of Lender.

**6.8** **Change of Control**. Cause, permit, or suffer, directly or indirectly, any Change of Control, except pursuant to an order of the Bankruptcy Court.

**6.9** **Accounting Methods**. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

**6.10** **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any other Loan Party or any Affiliate of any Loan Party, except for transactions that are in the Ordinary Course of such Loan Party's business, including intercompany transactions among Loan Parties and their Affiliates.

**6.11** **Use of Advances**. Use the proceeds of the Advances for any purpose other than to pay (i) the Fees and Lender's Expenses, (ii) to pay in full all amounts owing to the Existing DIP Lender under the Existing DIP Credit Agreement, and (iii) such other costs, expenses and fees for Borrowers' conduct of their respective businesses and operations and other post-Petition Date expenses, including the fees and expenses of the administration of the Borrowers' Chapter 11 Cases in accordance with the Budget.

**6.12** **Limitation on Capital Expenditures**. Except for Permitted Indebtedness, make or incur any Capital Expenditure.

**6.13** **Chapter 11 Case**. Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Interim Order or Final Order, as applicable; (ii) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of Lender in respect to the Collateral; and (iii) any Lien on Collateral having a priority equal or superior to the Liens in favor of Lender in respect of the Obligations, other than as required under a purchase agreement with respect to the good faith deposit thereunder.

**6.14** **Plan**. Propose and/or support any plan or reorganization that fails to pay in full in cash all Obligations on the effective date of said plan or is otherwise not reasonably acceptable to the Agent as it solely relates to the Obligations.

59939/0001-18582872v2
US_Active\113854804\V-5

## 7. GUARANTY.

**7.1 Guaranty**. Each Guarantor unconditionally and irrevocably guarantees to the Agent on behalf of the Lenders the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations (the "Guaranteed Obligations").

**7.2 Separate Obligation**. Each Guarantor acknowledges and agrees that, in providing benefits to Borrowers, the Agent on behalf of the Lenders is relying upon the enforceability of this Section 7 and the Guaranteed Obligations. The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of Borrowers and Guarantors and shall in no way impair or adversely affect the rights or benefits of the Agent on behalf of the Lenders under this Section 7.

**7.3 Limitation of Guaranty**. To the extent that any court of competent jurisdiction shall impose by final judgment under applicable Laws (including Sections 544 and 548 of the Bankruptcy Code) any limitations on the amount of any Guarantor's liability with respect to the Guaranteed Obligations that the Agent and Lenders can enforce under this Section 7, Agent and Lenders accept such limitation on the amount of such Guarantor's liability hereunder only to the extent needed to make this Section 7 fully enforceable and non-avoidable.

**7.4 Liability of Guarantors**. The liability of each Guarantor under this Section 7 shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that might constitute a discharge of a surety or Guarantor other than the indefeasible payment and performance in full of all Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a) such Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Guarantor and shall not be contingent upon the Agent's exercise or enforcement of any remedy it may have against Borrowers or any other Person, or against any Collateral or any security for any Guaranteed Obligations;

(b) this guarantee is a guaranty of payment when due and not merely of collectability;

(c) such Guarantor's payment of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(d) such Guarantor's liability with respect to the Guaranteed Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Guarantor be exonerated or discharged by, any of the following events:

(i) any proceeding under the Bankruptcy Code (except to the extent set forth in Section 7.3);

59939/0001-18582872v2
US_Active\113854804\V-5

(ii)     any limitation, discharge, or cessation of the liability of Borrowers or any other Person for any Guaranteed Obligations due to any applicable law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Loan Documents;

(iii)     any merger, acquisition, consolidation or change in structure of Borrowers, any Subsidiary thereof or any other Guarantor or Person, or any sale, lease, transfer or other disposition of any or all of the assets of Borrowers or any other Person;

(iv)     any assignment or other transfer, in whole or in part, of any Lender's interests in and rights under this Agreement (including this <u>Section 7</u>) or the other Loan Documents;

(v)     any claim, defense, counterclaim or setoff, other than that of prior performance, that Borrowers, such Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Loan Documents;

(vi)     the amendment, modification, renewal, extension, cancellation or surrender of any Loan Document or any Guaranteed Obligations; or

(vii)     the Agent's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations.

**7.5**     **Consents of Guarantors**.  Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Guarantor:

(a)     the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of Borrowers under the Loan Documents may be incurred and the time, manner, place or terms of any payment under any Loan Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Loan Document or otherwise;

(b)     the time for Borrowers' (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Loan Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as the Agent may deem proper;

(c)     the Agent may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(d)     the Agent may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against Borrowers.

59939/0001-18582872v2
US_Active\113854804\V-5

7.6 **Guarantor's Waivers**. Each Guarantor waives and agrees not to assert:

(a) any defense arising by reason of any lack of corporate or other authority or any other defense of Borrowers, such Guarantor or any other Person;

(b) any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations. The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty. Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon Borrowers, each Guarantor or any other Person with respect to the Guaranteed Obligations.

7.7 **Continuing Guaranty**. This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Guarantor until termination of the Commitment and payment and performance in full of the Guarantied Obligations.

7.8 **Reinstatement**. This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guarantied Obligations by or on behalf of Borrowers (or receipt of any proceeds of Collateral) shall be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to Borrowers, its estate, trustee, receiver or any other Person (including under the Bankruptcy Code), or must otherwise be restored by any Lender in the Chapter 11 Cases of the Borrowers.

## 8. EVENTS OF DEFAULT.

8.1 **Event of Default**. Any one or more of the following events shall constitute an event of default following giving of any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "Event of Default") under this Agreement:

(a) Any Loan Party shall fail to pay any Obligation to the Agent when due, including, but not limited to, the payment of principal, interest or any fees or costs due to the Agent under this Agreement or any Loan Document;

(b) Any Loan Party shall fail to comply with its obligations under Sections 5.1, 5.2, 5.3, 5.4, 5.8, 5.11, 5.12, Section 6, Section 7 and/or Section 9;

(c) Other than as set forth in any other sub-section of this Section 8.1, any Loan Party, as applicable, shall fail to perform, or otherwise breach, any of its respective covenants or obligations contained in this Agreement, which failure or breach shall continue for ten (10) Business Days after the earlier to occur of (i) the date on which such failure to comply is known or reasonably should have become known to any officer of the relevant Loan Party, or (ii) the date on which Agent shall have notified the relevant Loan Party of such failure; provided, however, that such ten (10) Business Day period shall not apply in the case of any failure which is not capable of being cured at all or within such ten (10) Business Day period;

(d) Any representation or warranty made by any Loan Party in this Agreement or in any agreement, certificate, instrument or financial statement or other statement delivered to

31

59939/0001-18582872v2
US_Active\113854804\V-5

the Agent pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when made or deemed made, which failure or breach shall continue for ten (10) Business Days after the date upon which such default is known or reasonably should have become known to any officer of the relevant Loan Party or it has received a written notice of such failure or breach from the Agent;

(e)     Except upon the Agent's prior written request or with the Agent's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the Agent), any Loan Party shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Order, or any of the Loan Documents;

(f)     Borrowers shall file or obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization that does not propose to pay in full in cash all Obligations on the effective date of said plan;

(g)     Any Loan Party shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Agent on behalf of the Lenders under the Interim Order or Final Order, as applicable, or with respect to the Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Interim Order or Final Order, as applicable;

(h)     the Interim Order or Final Order, as applicable, shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(i)     The occurrence of any default or event of default under the Interim Order or Final Order, as applicable, and the continuance thereof after any grace or cure period provided in such order or granted by order of a court in the Bankruptcy Cases;

(j)     The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lender (other than any creditor having a Lien on specific equipment that is senior to the Lender), to realize upon, or to exercise any right or remedy with respect to, the Collateral;

(k)     Conversion of the Chapter 11 Cases to Chapter 7 cases under the Bankruptcy Code, or dismissal of the Chapter 11 Cases or any subsequent Chapter 7 cases either voluntarily or involuntarily and the Obligations are not simultaneously indefeasibly paid in full;

(l)     the Interim Order or Final Order, as applicable, is modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent);

59939/0001-18582872v2
US_Active\113854804\V-5

(m)     A trustee or an examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code;

(n)     A chapter 11 plan is confirmed that does not provide for the payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnifications for the Lender and Lender Related Persons with respect to the Obligations solely;

(o)     The occurrence of a Change of Control;

(p)     Following ninety (90) days from the entry of the Interim Order, the failure of the Borrowers to have (i) filed an Acceptable Plan or (ii) presented an alternative going forward strategy for resolving the Chapter 11 Cases that is acceptable to the Agent, in its sole discretion; or

(q)     Following one hundred and fifty (150) days from the entry of the Interim Order, the failure of the Borrowers to have (i) effectuated an Acceptable Plan or (ii) obtained final court approval of an alternative transaction acceptable to the Agent, in its sole discretion.

**8.2     Rights and Remedies**.

(a)     Upon the occurrence and during the continuance of an Event of Default, and notwithstanding Section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court or the initiation of any further proceeding with the Loan Parties except as provided in this Section 8.2, in addition to any other rights or remedies provided for hereunder or under any other Loan Document (including the Interim Order or Final Order, as applicable) or by the UCC or any other applicable law, the Agent may do any one or more of the following:

(i)     declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Loan Parties;

(ii)     upon three (3) Business Days' notice to the Loan Parties, Borrowers' lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, terminate the Borrowers' ability to use Cash Collateral other than amounts used for purposes and in a manner otherwise permitted by this Agreement and held in operating accounts subject to deposit account control agreements in favor of Agent until such time as Borrowers are no longer in possession of its hospitals and other revenue generating properties;

(iii)     charge interest at the Default Rate;

(iv)     upon five (5) days' prior written notice (which period shall be deemed to be reasonable notice) to the Loan Parties, Borrower's lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, obtain and liquidate the Collateral. If notice of disposition of Collateral is required by law, ten (10) days prior notice by the Agent to the Loan Parties designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed

59939/0001-18582872v2
US_Active\113854804\V-5

to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and the Loan Parties waive any other notice. The Agent on behalf of the Lenders may bid for and purchase the Collateral at any public sale. The Agent on behalf of the Lenders may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(v)     require the applicable Loan Party to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;

(vi)     upon five (5) days' prior written notice (which period shall be deemed to be reasonable notice) to the Loan Parties and the Borrowers' lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, take possession of all Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and

(vii)     exercise any of its other rights under the Loan Documents, any rights granted under the Interim Order or Final Order, as applicable, and applicable law.

(b)     To the extent an Event of Default occurs as a result of the Loan Parties' failure to indefeasibly satisfy the Obligations in full by the Maturity Date, the Loan Parties waive any right to any notice period set forth in Section 8.2 (except to the extent a notice period is required by operation of law) and (b) to challenge (i) whether or not the Maturity Date or an Event of Default has occurred, (ii) the Lender's exercise of its rights and remedies against the Collateral, including without limitation, any foreclosure through a state court proceeding, and (iii) the applicability of the Default Rate or the Stated Maturity Date Fee.

**8.3     Application of Proceeds upon Event of Default**. Agent shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (i) first, to Lender Expenses consisting of reasonable attorneys' fees and all expenses (including, but not limited to, court costs, advertising expenses, auctioneer's fees, premiums for any required bonds, auditor's fees, amounts advanced for taxes and other expenses) incurred by the Agent and Lenders in attempting to enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; (ii) second, to the discharge of any accrued but unpaid Fees (including, but not limited to, the Exit Fee and the Stated Maturity Date Fee), (iii) third, to the discharge of any accrued but unpaid interest on the Obligations, (iv) fourth, to the outstanding principal balance of any Obligations, (v) fifth, to the satisfaction of the other security interests and liens of record which are inferior to the security interest created by this Agreement, in order of their priority; and (vi) sixth, to pay any remaining surplus to Lead Borrower, on behalf of the Loan Parties collectively.

**8.4     Remedies Cumulative**. The rights and remedies of Agent under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Agent shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Agent of one right or remedy shall be deemed an election, and no waiver by Agent of any Event of Default shall be deemed a continuing waiver. No delay by Agent shall constitute a waiver, election, or acquiescence by it.

59939/0001-18582872v2
US_Active\113854804\V-5

## 9. PRIORITY AND COLLATERAL SECURITY.

### 9.1 Superpriority Claims; Subordination in favor of Lenders Liens.

(a)     Each Borrower warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the Interim Order or Final Order, as applicable, the Obligations of any Borrower under the Loan Documents:

(i)     Shall, in accordance with section 364(c)(1) of the Bankruptcy Code, constitute allowed senior administrative expense claims against each Borrower and their estates (the "Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the Superpriority Claims shall be subject to and subordinate to only the Carve-Out; provided, further that the Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all Collateral and all proceeds thereof, including (a) prepetition tort claims, including claims against the Debtors' current and former officers and officers (if any) and the proceeds thereof and (b) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "Sale Deposit"), except for any and all avoidance power claims or causes of action of the Debtors under Sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (the "Avoidance Actions") and the proceeds thereof; subject, however, only to the rights of a stalking horse purchaser and such stalking horse bid protections as may be approved by the Bankruptcy Court;

(ii)     shall be secured by valid, enforceable, non-avoidable and perfected liens on and security interests in favor of the Agent on behalf of the Lenders in all Collateral in which any Borrower has any right, title or interest, in accordance with the Required Lien Priority.

(b)     In the event any of the Collateral is transferred to any Borrower, such transfer shall be subject in all respects to the Lender's Liens.

(c)     The Superpriority Claims referred to in this Section 9.1 shall have the priority afforded to such Superpriority Claims in the Interim Order and upon entry thereof, the Final Order.

### 9.2 Grant of Security Interest in the Collateral.
To secure the payment and performance of the Obligations, each Borrower hereby grants, collaterally pledges and assigns to Lender the following:

(a)     *Liens Priming the Prepetition Credit Liens.*  Pursuant to Section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens and security interests in all Collateral, regardless of where located, which senior priming liens and security interests in favor of the Agent on behalf

59939/0001-18582872v2
US_Active\113854804\V-5

of the Lenders shall be senior to all Prepetition Credit Liens other than the Lapis Senior Holdco Liens and Equipment Senior Liens. For the avoidance of doubt, as a result of the priming of the Prepetition Credit Liens (other than the Lapis Senior Holdco Liens and Equipment Senior Liens) pursuant to the Interim Order, the Agent on behalf of the Lenders shall have a first priority senior priming lien and security interest in the Borrowers' assets (other than those assets subject to the Lapis Senior Holdco Liens and Equipment Senior Liens) including, but not limited to, the Borrowers' prepetition and post-petition commercial tort claims, including but not limited to all claims and causes of action (i) against the Borrowers' officers and directors, and (ii) related to accounts receivable collections, and the proceeds thereof (regardless of whether such proceeds arise from damages to the Prepetition Collateral).

(b)     *Liens on Unencumbered Property*. Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all Collateral that is not otherwise subject to any Permitted Prior Lien. As used herein, the term "Permitted Prior Lien" shall mean any valid, enforceable, and non-avoidable liens on and security interests in the Collateral that (A) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), (B) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (C) are senior in priority to the Lenders' Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements; provided, however, that the Lenders' Liens shall have priority over all Prepetition Credit Liens other than the Lapis Senior Holdco Liens and Equipment Senior Liens; and

(c)     *Liens Junior to Certain Other Liens*. Pursuant to Section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Lapis Senior Holdco Liens, Equipment Senior Liens and the Permitted Prior Liens.

The Lien priorities set forth above shall be referred to as the "Required Lien Priorities".

**9.3     Representations and Warranties in Connection with Security Interest**. Each Loan Party represents and warrants to the Agent and Lenders as follows:

(a)     Such Loan Party has full right and power to grant to the Agent a perfected, security interest and Lien, in accordance with the Required Lien Priority, on such Loan Party's respective interests in the Collateral pursuant to this Agreement and the other Loan Documents, and with respect to Borrowers upon entry of the Order.

(b)     Upon (i) the execution and delivery of this Agreement, (ii) with respect to any Guarantor, the filing of the necessary financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, and (iii) with respect to any Borrower, upon entry of the Interim Order, the Agent will have a good, valid and perfected Lien and security interest in the Collateral granted by the applicable Loan Party, in accordance with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person.

59939/0001-18582872v2
US_Active\113854804\V-5

(c)     As of the Closing Date, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by such Loan Party is on file in any public office except those on behalf of the Lender, other than the filings made by the Loan Parties' pre-Petition Date lenders or creditors as referenced in <u>Schedule 4.4</u>.

(d)     As of the Closing Date, such Loan Party is not party or otherwise subject to any agreement, document or instrument that conflicts with this <u>Section 9.3</u>.

**9.4     <u>Covenants with Respect to Collateral</u>**.     As long as any Obligations are outstanding, each Loan Party covenants and agrees as follows:

(a)     Such Loan Party shall not sell, transfer, give, assign or in any other manner dispose of all or any portion of, or any interest in, any of the Collateral, except to the extent permitted by this Agreement.  Such Loan Party shall not permit or suffer to exist any Liens or security interests encumbering any of the Collateral other than as permitted under this Agreement.

(b)     Lead Borrower shall inform the Agent of any default or event of default under any agreement comprising the Collateral that materially and adversely impacts the Collateral or its value as soon as practicable upon any Loan Party becoming aware of any such default or event of default, and shall exercise remedies thereunder at the instruction of, or with the prior written consent of, the Agent.

(c)     Such Loan Party shall not consolidate with or merge with or into any other corporation, or liquidate or dissolve, without the prior written consent of the Agent.  Such Loan Party shall not sell all or substantially all of its assets, except as otherwise permitted by this Agreement or otherwise with the prior written consent of the Agent.

(d)     Such Loan Party shall not change the jurisdiction of its formation without the prior written consent of the Agent.  Such Loan Party shall not change its name or the location of its principal executive office without giving the Agent thirty (30) days' prior written notice.

(e)     The Collateral shall be kept only at the locations set forth on <u>Schedule 9.4(e)</u> and shall not be moved from such locations without the prior consent of the Agent, except for ordinary course activities incidental to the operation of the Loan Parties businesses.

(f)     With respect to any Deposit Account of a Loan Party, the relevant Loan Party shall cause the depositary institution maintaining such account to enter into a Control Agreement in favor of the Agent within thirty (30) days after the funding of the first Advance, as such date may be extended by the Agent in its reasonable discretion.

**9.5     <u>Agent's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral</u>**.  The Agent shall have the right, but not the obligation, to perform on such Loan Party's behalf any or all of such Loan Party's obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account and at the sole risk of the applicable Loan Party.

**9.6     <u>Filing of Financing Statements</u>**.  Each Loan Party irrevocably authorizes the Agent to prepare and file financing statements provided for by the UCC, including, without

limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect the Agent's security interest in the Collateral, in all jurisdictions in which the Agent believes in its sole opinion that such filing is appropriate. Each Loan Party also irrevocably authorizes the Agent to file such continuation statements and amendments and to take such other action as may be required or appropriate, in either case in Agent's sole judgment, in order to perfect and to continue the perfection of Agent's security interests in the Collateral, unless prohibited by law.

**9.7** **No Discharge; Survival of Claims**. Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrowers hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the indefeasible payment in full in cash of the Obligations under this Agreement.

## 10. WAIVERS; INDEMNIFICATION.

**10.1** **Demand; Protest; etc.**. To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, each Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Agent or Lenders on which such Loan Party may in any way be liable.

**10.2** **Lender's Liability for Collateral**. As long as Agent complies with its obligations, if any, under the UCC, neither Agent nor any Lender shall in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person. All risk of loss, damage, or destruction of the Collateral shall be borne by the Loan Parties, except any thereof resulting from the gross negligence, bad faith or willful misconduct of Agent as finally determined by a court of competent jurisdiction.

**10.3** **Indemnification**. Each Loan Party shall pay, indemnify, defend, and hold the Lender Related Persons (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and actual damages, and all reasonable and documented out-of-pocket fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Loan Parties' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under,

59939/0001-18582872v2
US_Active\113854804\V-5

to or from any Collateral or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, the Loan Parties shall have no obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that does not relate to the Obligations or that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Loan Party was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Loan Party with respect thereto. **WITHOUT LIMITATION OF THE FOREGOING, THE INDEMNITY ABOVE SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON.**

11.    **NOTICES.**

All notices or demands relating to this Agreement or any other Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith). In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to any Loan Party:

> Astria Health
> 1806 Yakima Valley Hwy
> Sunnyside, WA 98944-1261
> Attn:  Cary Rowan, Chief Financial Officer
> Telephone: 509-837-1356
> Email: cary@astria.health

With a copy, which shall not constitute notice to:

> Dentons US LLP
> 1900 K Street, NW
> Washington, DC 20006
> Attn:  Sam Alberts
> Telephone:  202-408-7004
> Email:  sam.alberts@dentons.com

If to Agent:

> LAPIS Advisers, LP
> 265 Magnolia Avenue, Suite 100

59939/0001-18582872v2
US_Active\113854804\V-5

Larkspur, CA 94939
Attn: Kjerstin Hatch
Telephone: 415-376-6280
Facsimile: 415-376-6281

with copies to:

Cole Schotz P.C.
1325 Avenue of the Americas
19th Floor
New York, NY 10019

Attn: Michael D. Sirota, Esq.
Telephone: 646-563-8942
Email: msirota@coleschotz.com

Attn: Marc P. Press, Esq.
Telephone: 201-525-6271
Email: mpress@coleschotz.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function. If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

12.     **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a)     THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)     THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE

40

BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH LOAN PARTY AND LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM NON CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>; <u>PROVIDED</u>, <u>FURTHER</u>, <u>HOWEVER</u>, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASE REMAINS PENDING.

(c)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH LOAN PARTY AND LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH LOAN PARTY AND LENDER REPRESENT THAT EACH SUCH PARTY HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

## 13.     AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION.

**13.1     <u>Amendments and Waivers</u>**.  No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by Agent, Lenders and Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

**13.2     <u>No Waivers; Cumulative Remedies</u>**.  No failure by Agent or Lenders to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or Lenders in exercising the same, will operate as a waiver thereof.  No waiver by Agent or Lenders will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Agent or Lenders on any occasion shall affect or diminish Agent's or Lender's rights thereafter to require strict performance by Loan Parties of any provision of this Agreement.  Agent's or Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or Lenders may have.

**13.3     <u>Successors</u>**.  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; <u>provided</u> that no Loan Party may assign this Agreement or any rights or duties hereunder without Agent's prior written consent and such consent shall not, unless otherwise provided in such consent, release any Loan Party from its Obligations.  Any assignment by Loan Party which is not explicitly permitted hereunder shall be

59939/0001-18582872v2
US_Active\113854804\V-5

absolutely void *ab initio*. Each Lender may assign all or part of its rights and duties hereunder without consent from any other party. Each Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder or assign any Advances or Commitment (in whole or in part) to an Affiliate without notice to or consent of any Loan Party.

## 14. AGENT.

**14.1** **Appointment and Authorization; "Agent"**. Each Lender hereby irrevocably appoints, designates and authorizes Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Agreement with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

**14.2** **Delegation of Duties**. Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects with reasonable care.

**14.3** **Liability of Agent**. No Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by any Loan Party or any Subsidiary or Affiliate of a Loan Party, or any officer thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or for the value of or title to any Collateral, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of a Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Subsidiaries or Affiliates of any Loan Party.

**14.4** **Reliance by Agent**. Agent and shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram,

59939/0001-18582872v2
US_Active\113854804\V-5

19-01189-WLH11    Doc 841    Filed 12/20/19    Entered 12/20/19 15:29:20    Pg 100 of 121

facsimile, email, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Loan Parties), independent accountants and other experts selected by Agent. Agent shall be fully justified in taking or failing or refusing to take any action under this Agreement or any other Loan Document as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

**14.5** **Notice of Default**. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to Agent for the account of the Lenders, unless Agent shall have received written notice from a Lender or a Loan Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." Agent will notify the Lenders of its receipt of any such notice. Agent shall take such action with respect to such Default or Event of Default or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interest of the Lenders.

**14.6** **Credit Decision**. Each Lender acknowledges that no Related Person has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of any Loan Party or any of its Subsidiaries, shall be deemed to constitute any representation or warranty by any Related Person to any Lender. Each Lender represents to Agent that it has, independently and without reliance upon any Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Subsidiaries, the value of and title to any Collateral, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers hereunder. Each Lender also represents that it will, independently and without reliance upon any Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties. Except for notices, reports and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Loan Parties which may come into the possession of any Related Person.

**14.7** **Indemnification of Related Persons**. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so), based on its Pro Rata Share, from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to Related Persons of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's Pro Rata Share of any costs or out-of-pocket expenses (including

59939/0001-18582872v2
US_Active\113854804\V-5

Attorney Costs) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that Agent is not reimbursed for such expenses by or on behalf of the Loan Parties. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

**14.8** **Successor Agent**. Agent may, at its sole discretion, resign as Agent upon 30 days' notice to the Lenders. If Agent resigns under this Agreement, the Lenders shall appoint from among the Lenders a successor agent for the Lenders. If no successor agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders and the Loan Parties, a successor agent from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers and duties of the retiring Agent and the term "Agent" shall mean such successor agent and the retiring Agent's appointment, powers and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor agent has accepted appointment as Agent by the date which is 30 days following a retiring Agent's notice of resignation, such resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor agent as provided for above.

**14.9** **Collateral Matters**.

(a) Agent is authorized on behalf of all the Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or the Collateral Documents which may be necessary to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Collateral Documents.

(b) The Lenders irrevocably authorize Agent, at its option and in its discretion, to release any Lien granted to or held by Agent upon any Collateral (i) upon payment in full of the Advances and all other Obligations known to Agent and payable under this Agreement or any other Loan Document; (ii) constituting property sold or to be sold or disposed of as part of or in connection with any disposition permitted hereunder; (iii) constituting property in which any Loan Party or any of its Subsidiaries owned no interest at the time the Lien was granted or at any time thereafter; (iv) constituting property leased to any Loan Party or any of its Subsidiaries under a lease which has expired or been terminated in a transaction permitted under this Agreement or is about to expire and which has not been, and is not intended by the Loan Party or such Subsidiary to be, renewed or extended; or (v) consisting of an instrument evidencing Indebtedness or other debt instrument, if the indebtedness evidenced thereby has been paid in full. Upon request by Agent at any time, the Lenders will confirm in writing Agent's authority to release particular types or items of Collateral pursuant to this section, provided that the absence of any such confirmation for whatever reason shall not affect Agent's rights under this section.

59939/0001-18582872v2
US_Active\113854804\V-5

## 15.  GENERAL PROVISIONS.

**15.1  Effectiveness**.  This Agreement shall be binding and deemed effective when executed by the Loan Parties, Agent and Lenders.

**15.2  Section Headings**.  Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

**15.3  Interpretation**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or any Loan Party, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

**15.4  Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**15.5  Debtor-Creditor Relationship**.  The relationship between Agent and Lenders, on the one hand, and each Loan Party, on the other hand, is solely that of creditor and debtor, as applicable.  Agent and Lenders do not have (and shall not be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Agent and Lenders, on the one hand, and Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

**15.6  Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

**15.7  Revival and Reinstatement of Obligations**.  If the incurrence or payment of the Obligations by Loan Parties or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Agent or any Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable and actual out-of-pocket costs, expenses, and

59939/0001-18582872v2
US_Active\113854804\V-5

attorneys' fees of Lender related thereto, the liability of Loan Parties automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

**15.8** **Lender Expenses**.  Notwithstanding the Work Fee, the Borrowers agree to pay any and all Lender Expenses (exclusive of those covered by the Work Fee) promptly after written demand therefor by Agent and that such Obligations shall survive payment or satisfaction in full of all other Obligations.

**15.9** **Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

# 16. JOINT AND SEVERAL LIABILITY AMONG BORROWERS.

Each Borrower acknowledges, represents and warrants the following:

**16.1** **Inducement**.  Each Lender has been induced to make the Advances to Borrowers in part based upon the assurances by each Borrower that such Borrower desires that the Advances be honored and enforced as separate obligations of such Borrower, should Agent desire to do so.

**16.2** **Combined Liability**.  Notwithstanding the foregoing, the Advances and the other Obligations constitute the joint and several obligations of each and every Borrower, and Lender may at its option enforce the entire amount of the Advances and the other obligations of any Borrower against any one or more Borrowers.

**16.3** **Separate Exercise of Remedies**.  Agent may exercise remedies against each Borrower and its property separately, whether or not Agent exercises remedies against any other Borrower or its property.  Agent may enforce one or more Borrower's Obligations without enforcing any other Borrower's Obligations.  Any failure or inability of Agent to enforce one or more Borrower's Obligations shall not in any way limit Agent's right to enforce the Obligations of any other Borrower.  If Agent forecloses or exercises similar remedies on any Collateral, then such foreclosure or similar remedy shall be deemed to reduce the balance of the Advances only to the extent of the cash proceeds actually realized by Agent from such foreclosure or similar remedy or, if applicable, Agent's credit bid at such sale, regardless of the effect of such foreclosure or similar remedy on the Advances secured by such Collateral under the applicable state law.

[Signature pages follow.]

59939/0001-18582872v2
US_Active\113854804\V-5

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

<div align="center"><u>**BORROWERS**</u>**:**</div>

**Astria Health**, a Washington non-profit corporation

By:_____
Name:  John Gallagher
Title:    President and Chief Executive Officer

**Glacier Canyon, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:    Authorized Signatory

**Kitchen and Bath Furnishings, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:    Authorized Signatory

**Oxbow Summit, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:    Authorized Signatory

<div align="center">[Signature Page to Astria DIP Loan and Security Agreement]</div>

**SHC Holdco, LLC**, a Washington non-profit
Limited Liability Company


By:_____
Name:  John Gallagher
Title:    Authorized Signatory


**SHC Medical Center – Toppenish**, a Washington
non-profit corporation


By:_____
Name:  John Gallagher
Title:    Authorized Signatory


**SHC Medical Center – Yakima**, a Washington
non-profit corporation


By:_____
Name:  John Gallagher
Title:    Authorized Signatory


**Sunnyside Community Hospital Association**, a
Washington non-profit corporation


By:_____
Name:  John Gallagher
Title:    Authorized Signatory


**Sunnyside Community Hospital Home Medical
Supply, LLC**, a Washington for-profit limited
liability company


By:_____
Name:  John Gallagher
Title:    Authorized Signatory

[Signature Page to Astria DIP Loan and Security Agreement]

**Sunnyside Home Health**, a Washington non-profit corporation


By:_____
Name:  John Gallagher
Title:   Authorized Signatory


**Sunnyside Professional Services, LLC**, a Washington non-profit limited liability company


By:_____
Name:  John Gallagher
Title:   Authorized Signatory


**Yakima HMA Home Health, LLC**, a Washington for-profit limited liability company


By:_____
Name:  John Gallagher
Title:   Authorized Signatory


**Yakima Home Care Holdings, LLC**, a Delaware for-profit limited liability company


By:_____
Name:  John Gallagher
Title:   Authorized Signatory


[Signature Page to Astria DIP Loan and Security Agreement]

59939/0001-18582872v2
US_Active\113854804\V-5

**GUARANTORS:**

**Astria Health Clinically Integrated Network, LLC**, a Missouri for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory


**Bridal Dreams, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory


**Depot Plus, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory


**Home Supply, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory


**Kitchen Appliance, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory


[Signature Page to Astria DIP Loan and Security Agreement]

**Northwest Health, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory

**Pacific Northwest ASC Management, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory

**Sunnyside Hospital Service Corp.**, a Washington for-profit corporation

By:_____
Name:  John Gallagher
Title:   Authorized Signatory

**Sunnyside Medical Center, LLC**, a Washington for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory

**Wedded Bliss, LLC**, a Delaware for-profit limited liability company

By:_____
Name:  John Gallagher
Title:   Authorized Signatory

[Signature Page to Astria DIP Loan and Security Agreement]

**AGENT:**

**LAPIS ADVISERS, LP**

By:_____
Name:   Kjerstin Hatch
Title:   Managing Member

**LENDERS:**

[**_____**]


By:_____
Name:      Name
Title:      Title

59939/0001-18582872v2
US_Active\113854804\V-5

## EXHIBIT A

### Commitments and Pro Rata Shares

| Lender | Commitment | ProRata Shares |
|---|---|---|
| | $_____ | _____%|
| **Total** | **$40,600,000** | 100% |

### Additional Funding Advances and Pro Rata Shares

| Lender | Commitment | ProRata Shares |
|---|---|---|
| | $_____ | _____%|
| **Total** | **$2,500,000** | 100% |

[Signature Page to Astria DIP Loan and Security Agreement]

59939/0001-18582872v2
US_Active\113854804\V-5

## EXHIBIT B

## Form of Compliance Certificate

Date: _____, 2019

This Compliance Certificate (this "Certificate") is given to Lapis Advisers, LP (together with its successors and assigns, the "Agent"), by Astria Health, a Washington non-profit corporation, in its capacity as Lead Borrower, pursuant to Section 5.1 of that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Securities Agreement dated as of December ___, 2019 (as the same has been amended through the date hereof, the "Loan Agreement") among Astria Health and the other Borrowers party thereto, their Affiliates party thereto as Guarantors, and Lapis Advisers, LP, as Agent, and the Lenders party thereto. Capitalized terms used and not defined herein have the meanings set forth in the Loan Agreement.

The Lead Borrower hereby certifies that:

(a)     Borrowers are in compliance with the conditions precedent set forth in Section 3.1 and 3.2 of the Loan Agreement.

(b)     The representations and warranties of the Loan Parties contained in the Loan Agreement and in the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(c)     No Default or Event of Default shall have occurred and be continuing on the requested funding date, nor shall either result from the making thereof.

(d)     The the Interim Order or Final Order, as applicable, has been entered by the Bankruptcy Court in form and substance satisfactory to Lender in its sole discretion, and remains in full force and effect on the date hereof and has not been, from the time of the entry of such order, modified or amended (unless otherwise approved by the Lender), reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed.

(e)     No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, has been issued by any Governmental Authority against any Loan Party or Lender.

(f)     No action, proceeding, investigation, regulation or legislation has been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of the Loan Agreement or any of the other Loan Documents or the consummation of the transactions contemplated thereby.

Exhibit B-1

**IN WITNESS WHEREOF**, the Lead Borrower has caused this Certificate to be executed this _____ day of _____, 2019.

**Astria Health**, a Washington non-profit corporation, as Lead Borrower

By:_____
Name:
Title:

59939/0001-18582872v2
US_Active\113854804\V-5

**<u>EXHIBIT C</u>**

**<u>Budget</u>**

See attached.

Exhibit C - 1

59939/0001-18582872v2
US_Active\113854804\V-5

($ in thousands)

Privileged and Confidential

| Week | 31 (A) | | | 32 (P) | 33 (P) | 34 (P) | 35 (P) | 36 (P) | 37 (P) | 38 (P) | 39 (P) | 40 (P) | 41 (P) | 42 (P) | 43 (P) | 44 (P) | 45 (P) | 46 (P) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week-ending date | 12/7 | Actual | + / - | 12/14 | 12/21 | 12/28 | 1/4 | 1/11 | 1/18 | 1/25 | 2/1 | 2/8 | 2/15 | 2/22 | 2/29 | 3/7 | 3/14 | 3/21 |
| **Beginning operating cash balance** | **6,041** | **6,041** | | **4,467** | **4,844** | **4,282** | **2,539** | **1,000** | **2,027** | **2,515** | **2,172** | **1,080** | **1,107** | **1,095** | **1,000** | **1,000** | **1,590** | **1,728** |
| **Collections** | | | | | | | | | | | | | | | | | | |
| Yakima / Toppenish | 1,600 | 1,617 | (17) | 2,000 | 2,000 | 1,500 | 1,500 | 2,200 | 2,200 | 2,200 | 2,200 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Topp Behavioral Adjustment | | | | | | | | | | | 1,000 | | | | | 200 | | |
| Sunnyside | 2,400 | 2,441 | (41) | 2,150 | 2,150 | 1,200 | 1,200 | 2,350 | 2,400 | 2,400 | 2,400 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 |
| Provider Tax | | | | | | 400 | 300 | 300 | 100 | | | | | | | | 150 | 150 |
| DIP Loan Borrowing | | | | | | | 676 | | | | | | | 1,550 | 1,678 | | | |
| **Total Collections** | **4,000** | **4,058** | **(58)** | **4,150** | **4,150** | **3,100** | **3,676** | **4,850** | **4,700** | **4,600** | **5,600** | **4,200** | **4,200** | **5,750** | **5,878** | **4,400** | **4,350** | **4,350** |
| **Disbursements** | | | | | | | | | | | | | | | | | | |
| Payroll, taxes, and other -Y/T | 1,500 | 1,671 | (171) | 740 | 1,500 | 740 | 1,500 | 740 | 1,500 | 740 | 1,500 | 740 | 1,500 | 740 | 1,800 | 740 | 1,500 | 740 |
| Payroll & Other ASH | 500 | 678 | (178) | 927 | 500 | 927 | 500 | 927 | 500 | 927 | 500 | 927 | 500 | 927 | 800 | 927 | 500 | 927 |
| Other Op Ex | 100 | 27 | 73 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Purchased services | 450 | 491 | (41) | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| Contract labor | 300 | 402 | (102) | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Rent | 93 | 73 | 20 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 106 | 93 | 106 | 106 |
| Medical professionals | 100 | | 100 | | | 300 | 100 | | | 300 | 100 | | | 300 | 100 | | | 300 |
| Utilities | 130 | 36 | 94 | | | 160 | 160 | | | 160 | 160 | | | 160 | 160 | | | |
| Prop Tax and Ins | | 299 | (299) | | 156 | 125 | | | 156 | 125 | | 350 | 156 | | 156 | 125 | | 156 | 125 |
| Supplies, pharma, and dietary | 850 | 615 | 235 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 |
| Corporate Overhead | 582 | 583 | (1) | | | 582 | | | | | 582 | | | 582 | | | | |
| Corporate Payroll | | | | | | | | | | | | | | | | | | |
| Provider Tax | | | | | | | | | | | 902 | | | 902 | | | | |
| CRO Fees | | | | | | | | | | | | | | | | | | |
| UMR Payments | 200 | 296 | (96) | 300 | 200 | 200 | 200 | 350 | 250 | 250 | 250 | 350 | 250 | 250 | 250 | 350 | 250 | 250 |
| Medicaid Repayment ASH | | 85 | (85) | | | | | | | | 85 | | | 85 | | | | 85 |
| Professional Fees | | 15 | (15) | | 550 | | 550 | | | | | | | 550 | | | | 550 |
| Cash Out for Loan Payoff | | | | | | | | | | | | | | | | | | |
| DIP Fees and expenses | | | | | | | 500 | | | | | | | | | | | |
| DIP Interest | 360 | 360 | - | | | | | | | | 380 | | | 380 | 380 | | | |
| Misc | | | | | | | | | | | | | | | | | | |
| UST Fees | | 3 | (3) | | | | | | | | 525 | | | | | | | |
| **Total Disbursements** | **5,165** | **5,632** | **(467)** | **3,773** | **4,712** | **4,843** | **5,215** | **3,823** | **4,212** | **4,943** | **6,692** | **4,173** | **4,212** | **5,845** | **5,878** | **3,810** | **4,212** | **4,783** |
| **WEEKLY NET CASH FLOW** | **(1,165)** | **(1,574)** | **409** | **377** | **(562)** | **(1,743)** | **(1,539)** | **1,027** | **488** | **(343)** | **(1,092)** | **27** | **(12)** | **(95)** | **-** | **590** | **138** | **(433)** |
| **ENDING CASH (ACTUAL)** | **4,876** | **4,467** | | **4,844** | **4,282** | **2,539** | **1,000** | **2,027** | **2,515** | **2,172** | **1,080** | **1,107** | **1,095** | **1,000** | **1,000** | **1,590** | **1,728** | **1,295** |

19-01189-WLH11   Doc 841   Filed 12/20/19   Entered 12/20/19 15:29:20   Pg 115 of 121

<u>**EXHIBIT D**</u>

<u>**Reporting Requirements**</u>

(a)      **Financial Reports**.  Lead Borrower shall furnish to Agent, in a form satisfactory to Agent, in its sole discretion, as soon as available and in any event within twenty-one (21) days after the end of each calendar month:

(i)      unaudited consolidated financial statements for such calendar month and/or quarter, as applicable, of the Borrowers consisting of a balance sheet, and related statements of income, retained earnings, cash flows and owners' equity, all of which shall be certified on behalf of the Borrowers by an Authorized Person as being in compliance with this paragraph (a);

(ii)      an operating report for Borrowers, including a detailed comparison of the actual year-to-date operating results against the Budget; and

(iii)      solely with respect to the last month of each fiscal quarter, a management report signed by an Authorized Person of Borrowers, describing in reasonable detail the Borrowers' operations and financial condition for such month.

For the avoidance of doubt, the reports required under sub-sections (a)(i) and (a)(iii) above may consist of the monthly operating reports as filed in the Chapter 11 Case.

All financial statements shall be prepared, and shall be complete, correct and fairly presenting in all material respects, in each case in accordance with GAAP consistently applied with prior periods the financial position and results of operations of the Borrower (provided that interim financial statements shall not be required to have footnote disclosure and may be subject to normal year-end adjustments).

(b)      **Other Materials**.  The Loan Parties shall furnish to Agent, in form and substance satisfactory to Agent, as soon as available and in any event within five (5) Business Days after the preparation, receipt or issuance thereof or request therefor by Agent, (A) copies of any reports and management control letters provided by the Loan Parties' independent accountants and (B) such additional information, documents, statements, and other materials as Agent may request from time to time in its sole discretion.

(c)      **Notices**.  Lead Borrower or the Loan Parties for itself, promptly, and in any event within five (5) Business Days after any such Loan Party or any Authorized Person thereof obtains knowledge thereof, shall notify Lender in writing of:

(i)      any pending or threatened action, suit, proceeding or investigation involving a Loan Party or Subsidiary thereof, or any such Person's property to the extent the amount in controversy exceeds $250,000 in the aggregate or any injunctive relief is sought;

(ii)      (A) the receipt of any notice or request from any Governmental Authority regarding any liability or claim equal to or exceeding $250,000 in the aggregate or (B) any

Exhibit D - 1

material action taken or threatened to be taken by any Governmental Authority (or any notice of any of the foregoing);

(iii)     any notice regarding termination by the lessor of any lease of material real property (other than any such termination resulting from the scheduled expiration thereof, pursuant to the originally agreed upon terms) or of any senior officer, or the loss, termination or expiration of any material contract to which any Loan Party or its assets are bound which could reasonably be expected to result in a Material Adverse Change; and

(iv)     the filing, recording or assessment of any federal, state, local or foreign tax Lien against any Collateral (other than real estate taxes and municipal charges related to Collateral consisting of real property) or any Loan Party.

(d)     **Updates**.  The Loan Parties shall furnish to Agent revisions to the schedules to any Loan Document to the extent necessary or appropriate; provided, that delivery or receipt thereof by Agent shall not constitute a waiver by Agent or a cure of any Default or Event of Default resulting therefrom, or result in an amendment or modification of such schedules.

(e)     **Material Adverse Change**.  Promptly upon an Authorized Person of any Loan Party obtaining knowledge of any development or event pertaining to such Loan Party that has caused, or which could reasonably be expected to cause, a Material Adverse Change with respect to which notice is not otherwise required to be given pursuant to this Exhibit C, a certificate signed by an Authorized Person of Lead Borrower or the relevant Loan Party setting forth the details of such development or event and stating what action the relevant Loan Party has taken or proposes to take with respect thereto.

(f)     **Management Letters**.  Promptly after the receipt thereof by any Loan Party, copies of any management letters and any reports as to material inadequacies in accounting controls (including reports as to the absence of any such inadequacies) submitted to such Loan Party by its independent certified public accountants in connection with any audit of such Loan Party made by such accountants.

(g)     **Other Information**.  Any other information, including financial statements and computations, relating to the performance of any Loan Party that Agent may from time to time request in its sole discretion and which is reasonably capable of being obtained, produced or generated by such Loan Party.

Exhibit D - 2

# EXHIBIT E

## Request for Advance

Lapis Advisers, LP                                        Advance    Request    No.
265 Magnolia Avenue, Suite 100                    _____
Larkspur, CA 94939
Attention:  Kjerstin Hatch

Ladies and Gentlemen:

The undersigned, as Lead Borrower, executes and delivers this Request for Advance ("Request") in connection with the Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement, dated as of December ____, 2019 (as amended, restated, supplemented, replaced, renewed or otherwise modified from time to time, the "Loan Agreement") by and among Astria Health and the other Borrowers party thereto, their Affiliates party thereto as Guarantors, and Lapis Advisers, LP, as Agent and the Lenders party thereto.  Capitalized terms used in this Request without definition shall have the same meanings herein as they have in the Loan Agreement.  This Request constitutes a Loan Document.

Pursuant to Section 2.2 of the Loan Agreement, Borrowers hereby request an Advance in the amount of $_____ on _____, 2019.

Lead Borrower hereby represents, warrants to Lender as follows:

1.      As of this date, each Loan Party is in compliance with all of the terms and conditions of the Loan Agreement and the other Loan Documents and no default or Event of Default thereunder exists, nor shall result from the making of the Advance requested hereunder.

2.      Each Loan Party's representations and warranties set forth in the Loan Agreement, the other Loan Documents and any other related document are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

3.      As of the date of this Request, the sum of the outstanding principal under the Facility (after giving effect to the Advance and pledge to be made on such date pursuant to this Request) plus the amount requested in any outstanding but unfunded Request for Advances does not violate Section 2.1 of the Loan Agreement.

[Signature Page Follows]

59939/0001-18582872v2
US_Active\113854804\V-5

**<u>BORROWERS</u>:**

**Astria Health**, a Washington non-profit corporation

By:_____
Name:  John Gallagher
Title:   President and Chief Executive Officer

[Signature Page to Request for Advance]

**EXHIBIT 2**

**BUDGET**

Interim DIP/Cash Collateral Order      - 53 -

US_Active\113848219\V-2
59939/0001-18582951v2
US_Active\113848219\V-5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**Astria Health**
Weekly Cash Flow Budget

($ in thousands)

Privileged and Confidential

| Week | 31 (A) | | | 32 (P) | 33 (P) | 34 (P) | 35 (P) | 36 (P) | 37 (P) | 38 (P) | 39 (P) | 40 (P) | 41 (P) | 42 (P) | 43 (P) | 44 (P) | 45 (P) | 46 (P) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week-ending date | 12/7 | Actual | + / - | 12/14 | 12/21 | 12/28 | 1/4 | 1/11 | 1/18 | 1/25 | 2/1 | 2/8 | 2/15 | 2/22 | 2/29 | 3/7 | 3/14 | 3/21 |
| **Beginning operating cash balance** | **6,041** | **6,041** | | **4,467** | **4,844** | **4,282** | **2,539** | **1,000** | **2,027** | **2,515** | **2,172** | **1,080** | **1,107** | **1,095** | **1,000** | **1,000** | **1,590** | **1,728** |
| **Collections** | | | | | | | | | | | | | | | | | | |
| Yakima / Toppenish | 1,600 | 1,617 | (17) | 2,000 | 2,000 | 1,500 | 1,500 | 2,200 | 2,200 | 2,200 | 2,200 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Topp Behavioral Adjustment | | | | | | | | | | | 1,000 | | | | | 200 | | |
| Sunnyside | 2,400 | 2,441 | (41) | 2,150 | 2,150 | 1,200 | 1,200 | 2,350 | 2,400 | 2,400 | 2,400 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 |
| Provider Tax | | | | | | 400 | 300 | 300 | 100 | | | | | | | | 150 | 150 |
| DIP Loan Borrowing | | | | | | | 676 | | | | | | | 1,550 | 1,678 | | | |
| **Total Collections** | **4,000** | **4,058** | **(58)** | **4,150** | **4,150** | **3,100** | **3,676** | **4,850** | **4,700** | **4,600** | **5,600** | **4,200** | **4,200** | **5,750** | **5,878** | **4,400** | **4,350** | **4,350** |
| **Disbursements** | | | | | | | | | | | | | | | | | | |
| Payroll, taxes, and other -Y/T | 1,500 | 1,671 | (171) | 740 | 1,500 | 740 | 1,500 | 740 | 1,500 | 740 | 1,500 | 740 | 1,500 | 740 | 1,800 | 740 | 1,500 | 740 |
| Payroll & Other ASH | 500 | 678 | (178) | 927 | 500 | 927 | 500 | 927 | 500 | 927 | 500 | 927 | 500 | 927 | 800 | 927 | 500 | 927 |
| Other Op Ex | 100 | 27 | 73 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Purchased services | 450 | 491 | (41) | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| Contract labor | 300 | 402 | (102) | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Rent | 93 | 73 | 20 | 106 | 106 | 106 | 93 | 106 | 106 | 106 | 93 | 106 | 106 | 106 | 106 | 93 | 106 | 106 |
| Medical professionals | 100 | | 100 | | | 300 | 100 | | | 300 | 100 | | | 300 | 100 | | | 300 |
| Utilities | 130 | 36 | 94 | | | 160 | 160 | | | 160 | 160 | | | 160 | 160 | | | |
| Prop Tax and Ins | | 299 | (299) | | 156 | 125 | | | 156 | 125 | | 350 | 156 | 125 | | | 156 | 125 |
| Supplies, pharma., and dietary | 850 | 615 | 235 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 |
| Corporate Overhead | 582 | 583 | (1) | | | | 582 | | | | 582 | | | | 582 | | | |
| Corporate Payroll | | | | | | | | | | | | | | | | | | |
| Provider Tax | | | | | | | | | | | 902 | | | 902 | | | | |
| CRO Fees | | | | | | | | | | | | | | | | | | |
| UMR Payments | 200 | 296 | (96) | 300 | 200 | 200 | 200 | 350 | 250 | 250 | 250 | 350 | 250 | 250 | 250 | 350 | 250 | 250 |
| Medicaid Repayment ASH | | 85 | (85) | | | 85 | | | | 85 | | | | 85 | | | | 85 |
| Professional Fees | | 15 | (15) | | 550 | | | | | 550 | | | | 550 | | | | 550 |
| Cash Out for Loan Payoff | | | | | | | | | | | | | | | | | | |
| DIP Fees and Expenses | | | | | | 500 | | | | | | | | | | | | |
| DIP Interest | 360 | 360 | - | | | | 380 | | | | 380 | | | | 380 | | | |
| Misc | | | | | | | | | | | | | | | | | | |
| UST Fees | | 3 | (3) | | | | | | | | 525 | | | | | | | |
| **Total Disbursements** | **5,165** | **5,632** | **(467)** | **3,773** | **4,712** | **4,843** | **5,215** | **3,823** | **4,212** | **4,943** | **6,692** | **4,173** | **4,212** | **5,845** | **5,878** | **3,810** | **4,212** | **4,783** |
| **WEEKLY NET CASH FLOW** | **(1,165)** | **(1,574)** | **409** | **377** | **(562)** | **(1,743)** | **(1,539)** | **1,027** | **488** | **(343)** | **(1,092)** | **27** | **(12)** | **(95)** | **-** | **590** | **138** | **(433)** |
| **ENDING CASH (ACTUAL)** | **4,876** | **4,467** | | **4,844** | **4,282** | **2,539** | **1,000** | **2,027** | **2,515** | **2,172** | **1,080** | **1,107** | **1,095** | **1,000** | **1,000** | **1,590** | **1,728** | **1,295** |