**So Ordered.**

**Dated: January 22nd, 2021**



FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>ASTRIA HEALTH, et al.,<br><br>                Debtors. | Lead Case No. 19-01189-WLH11<br><br>(Jointly Administered)<br><br><br>**MEMORANDUM OPINION** |

      Chapter 11 plan releases are a perennial hot topic among bankruptcy professionals. In some cases, a plan's proposed release provisions receive more attention than most or even all other parts of the plan. The releases are not just a tail wagging the plan dog, they effectively become a separate dog altogether. Indeed, bankruptcy lore includes tales of chapter 11 cases filed with the targeted purpose of using the plan process to release claims (estate claims, nondebtor claims, or both) against nondebtors. Given the potentially broad consequences of plan releases, it is no surprise that they are and will remain an important issue.

      These cases involved a dispute about the release and exculpation provisions contained in a proposed chapter 11 plan. The United States trustee (the "UST") objected to confirmation of a plan proposed by the debtors and their primary secured lenders based on, among other issues, the asserted impropriety of the plan's exculpations and releases. During the confirmation hearing the court overruled the UST's objections and confirmed the proposed plan. The following details the bases for the court's ruling regarding the exculpation and release provisions.

# BACKGROUND & PROCEDURAL POSTURE

The joint debtors in these cases are part of the medical industry. When they filed bankruptcy petitions in May 2019, the debtors owned and operated three hospitals and several healthcare clinics in Yakima County, Washington. Not long after, the debtors closed one of the hospitals and some clinics. The debtors faced several other challenges as well, including the unprecedented effects of the COVID-19 situation.

The bankruptcy cases also featured several skirmishes with and among major stakeholders. Soon after the cases were filed, the debtors litigated a motion to obtain postpetition financing and use cash collateral with their main secured creditor (Lapis Advisers, LP in various capacities) and the unsecured creditors' committee. Over the next year, other assorted disputes arose among the debtors, Lapis, and the creditors' committee – as is typical in many chapter 11 cases, alliances shifted as the parties' positions and facts on the ground evolved.

The debtors eventually struck a restructuring deal with Lapis. In addition to Lapis' role as the major prepetition secured creditor, Lapis had become the debtor-in-possession lender through a mid-case refinancing. The bilateral settlement was detailed in a joint plan of reorganization for which both the debtors and Lapis parties were plan proponents.

The creditors' committee disliked this initial plan and threatened to litigate against its confirmation on various grounds. The costs and risks associated with the threatened legal warfare brought the parties to the negotiating table and resulted in a three-way deal among the debtors, the Lapis parties, and the creditors' committee. The parties sought to solicit votes on and confirm the revised plan, and voting classes accepted that plan by significant margins.[1]

The plan supported by all the major stakeholders included release and exculpation provisions as part of its proposed global resolution. In their final proposed forms,[2] the main features of these provisions are as follows:

---

[1] There were several one-off objections to confirmation and other wrinkles to the confirmation process (including last-minute revisions to create a toggle feature whereby Lapis would be replaced as a post-confirmation lender). The parties are familiar with the details, which are not relevant to this opinion.

[2] The exculpation and release provisions evolved over time, including as part of the creditors' committee's arrangement, in response to confirmation objections, and via an errata intended to clarify the releases' scope.

- Key case participants – including the debtors, Lapis parties, creditors' committee, members of the board of directors of the debtors and nondebtor affiliates, patient care ombudsman, and defined "Related Parties" of the foregoing[3] – are exculpated from "liability to any Entity for any postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Reorganized Debtors, liquidation of the Liquidating Debtors, or administration of the GUC Distribution Trust."[4] The exculpation provision includes a customary carveout for liability stemming "from any act or omission that is determined in a final order to have constituted gross negligence or willful misconduct."[5]

- The debtors and their respective bankruptcy estates release a similar set of "Released Parties" from all causes of action "arising from or related in any way to the Debtors, any of the Debtors' present or former assets, the Released Parties' interests in or management of the Debtors, the Plan, the Disclosure Statement, this Chapter 11 Case, or any restructuring of claims or interests undertaken prior to the Effective Date."[6]

- Various nondebtor "Releasing Parties" provide releases of similar scope (but including a separate carveout for any claims and causes of action for actual fraud, gross negligence, or willful misconduct) to the same "Released Parties."[7] The term "Releasing Parties" includes the "Released Parties" (thereby making the releases reciprocal) as well as any creditors "that (i) vote to accept the Plan, and (ii) do not affirmatively opt out of the third party release . . . pursuant to a duly executed Ballot."[8] Thus, individual creditors do not provide releases to any nondebtor party

---

[3] *See Modified Second Am. Joint Chapter 11 Plan* § I.A. ¶¶ 1.71, 1.138, ECF No. 2196.

[4] *Id.* § VII.E.

[5] *See id.*

[6] *See id.* § I.A. ¶ 1.139; § VII.F. ¶ 1 (all-caps font eliminated).

[7] *See id.* § VII.F. ¶ 2.

[8] *See id.* § I.A. ¶ 1.140.

**MEMORANDUM OPINION**      Page 3

unless those creditors take the voluntary act of voting for the plan and further do not opt out. The plan includes no reward for individual creditors who do not opt out and no punishment for those who do.

The UST objected to confirmation on, among other grounds, the basis that the plan's release and exculpation provisions are overbroad and inconsistent with Ninth Circuit authority.[9] As stated earlier, the court overruled the UST's objections and entered an order confirming the plan.[10]

## DISCUSSION

### *Jurisdiction & Power*

The court has subject matter jurisdiction regarding these bankruptcy cases pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.). The parties' dispute regarding confirmation of a bankruptcy plan is statutorily "core"[11] and "the action at issue stems from the bankruptcy itself."[12] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

### *Chapter 11 Plan Confirmation Generally*

The apex of many chapter 11 cases is confirmation. A chapter 11 plan provides a detailed framework for how a debtor's assets and liabilities are to be addressed, either through reorganization, liquidation, or a combination of the two. Bankruptcy plans vary in length and complexity; chapter 11 can operate as a tool to address simple overleverage as well as to resolve some of the world's most difficult and complex business and legal issues.

The Bankruptcy Code's drafters recognized the futility of any exercise to anticipate the boundless issues requiring treatment in a given chapter 11 plan. As a result of this recognition, Congress provided flexibility to accommodate case-specific provisions. Bankruptcy Code section 1123(b)(6) allows chapter 11 plans to "include any other appropriate provision not inconsistent with the applicable provisions of this title." This language invites creativity in drafting a plan and

---

[9] *See Obj. to Second Am. Plan* pp. 3-10, ECF No. 2068.

[10] The court explained the general basis for this decision on the record at the confirmation hearing, but indicated that this opinion would follow to develop more fully the reasoning behind the court's oral ruling.

[11] *See* 28 U.S.C. § 157(b)(2)(L).

[12] *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

allows bankruptcy professionals to tailor a plan to the specific needs of the case so long as the plan terms are not inconsistent with specific provisions elsewhere in the Bankruptcy Code.[13]

With this background in mind, the court turns to the details of the plan proposed in these cases.

### *The Plan's Exculpation Provision Is Appropriate*

Nothing in the Bankruptcy Code forbids (or otherwise addresses) inclusion of an exculpation provision in a chapter 11 plan. As such, section 1123(b)(6) permits the inclusion of an appropriately tailored exculpation provision. Indeed, in *Blixseth v. Credit Suisse*, the Ninth Circuit Court of Appeals recently affirmed confirmation of a plan with an exculpation clause generally similar to the one at issue here.[14] The UST contends that the exculpation provision proposed here is inappropriately broader. The court disagrees.

---

[13] *See, e.g.*, *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (explaining that then section 1123(b)(5) – currently section 1123(b)(6) – provides "residual authority" for bankruptcy courts to approve plans containing features that are not explicitly authorized by statute "consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships"); *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 657 (7th Cir. 2008) (describing section 1123(b)(6) as working in tandem with section 105(a) to ensure "a bankruptcy court is also able to exercise [its] broad equitable powers within the plans of reorganization themselves"); *DJS Props., L.P. v. Simplot*, 397 B.R. 493, 504 (D. Idaho 2008) (noting that section 1123(b)(6) is one of "several Code provisions that grant sweeping power to plan proponents in creating reorganization plans that address the intricacies of a particular case"); *In re Scrub Island Dev. Grp. Ltd.*, 523 B.R. 862, 865 (Bankr. M.D. Fla. 2015) ("The Bankruptcy Code provides a chapter 11 debtor with great flexibility to formulate a plan—limited only by the debtor's creativity and the prohibition in § 1123(b)(6) that the plan provisions not be in [sic] 'inconsistent' with the Bankruptcy Code."); *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 19 (Bankr. S.D.N.Y. 2010) ("Section 1123(b)(6), by its terms, is plainly a broad grant of authority. As previously noted, reorganization plans, after they get the requisite assent, may allocate and distribute the value of debtors' estates by a broad array of means. The various interests of maintaining the necessary flexibility for plan proponents and other parties in interest, maintaining predictability in the bankruptcy courts of this district and elsewhere, and avoiding judicial legislation all suggest a construction of section 1123(b)(6) under which judges act with restraint in declaring plan provisions not to be appropriate based on anything short of bankruptcy caselaw, nonbankruptcy statutory or case law, or clear public policy concerns."). The residual authority now contained in sections 105(a) and 1123(b)(6) has a rich historical predicate. For example, in *American United Mutual Life Insurance Co. v. City of Avon Park*, the Supreme Court described the "control which the [bankruptcy] court has over the whole process of formulation and approval of plans of composition or reorganization, and the obtaining of assents thereto," highlighted "the range and type of the power which a court of bankruptcy may exercise in these proceedings," and observed that such power "is not dependent on express statutory provisions" but "inheres in the jurisdiction of a court of bankruptcy." *See* 311 U.S. 138, 145-46 (1940) (Douglas, J.).

[14] 961 F.3d 1074 (9th Cir. 2020). In the process, the court explained that nothing in the Bankruptcy Code precludes such a clause. *See id.* at 1081-85.

The UST first contends that the temporal scope of the exculpated acts and omissions exceeds the scope contemplated in *Blixseth*. The exculpation provision here expressly limits itself to "any postpetition act" and thus to a period during which the debtors and their affairs were subject to this court's supervision.[15] This is appropriate. An exculpation provision may sweep broadly and cover the entire period after the filing of a bankruptcy petition insofar as one function of such a provision is to calibrate "the standard of care in [the] bankruptcy proceeding which would preempt the assertion of any state law claims which seek to impose a different standard of care" – a task "within the bankruptcy court's power because the bankruptcy court has exclusive jurisdiction over the parties and their conduct in the bankruptcy proceedings."[16]

The UST also contends that the class of parties included in the exculpation clause is improperly broad. Again, the court determines that this aspect of the clause is appropriate. Each of the covered parties played a significant role during these cases and engaged in conduct potentially subject to second guessing or hindsight-driven criticism. For example, the debtors and the board members had difficult decisions forced upon them, including the closing of a hospital, reacting to the external and internal impacts of COVID-19, and responding to the conflicting demands of stakeholders; the patient care ombudsman filed papers reflecting views with which the debtors often publicly disagreed; and Lapis and the creditors' committee similarly took litigation positions that were contentious and debatable. The active role of each party regarding material aspects of these bankruptcy cases makes it appropriate for the plan to define the standard of care applicable to their activities.[17]

---

[15] *Cf. id.* at 1081 (describing exculpation provision as covering "liability for any act or omission in connection with, relating to or arising out of the Chapter 11 cases or bankruptcy filing" (internal quotation marks omitted), which would broadly encompass the postpetition period). The exculpation provision here was not initially limited to postpetition events, but the plan proponents added such limitation in response to the UST's objections.

[16] *Meritage Homes of Nev., Inc. v. JPMorgan Chase Bank, N.A. (In re S. Edge LLC)*, 478 B.R. 403, 415 (D. Nev. 2012). *See also, e.g.*, *In re Murray Metallurgical Coal Holdings, LLC*, 2021 Bankr. LEXIS 57, at *129 (Bankr. S.D. Ohio Jan. 11, 2021) ("Estate and third-party releases provide for the relinquishment of claims held by the debtor or third parties against certain nondebtor parties; by contrast, exculpatory clauses establish the standard of care that will trigger liability in future litigation by a non-releasing party against an exculpated party for acts arising out of a debtor's restructuring."); *In re Friedman's, Inc.*, 356 B.R. 758, 764 (Bankr. S.D. Ga. 2005) (concluding that "it is appropriate that the exculpatory clause be included in the confirmed plan in order to affirm the scope of [the exculpated parties'] liability or non-liability for conduct that occurred throughout these proceedings").

[17] *See, e.g.*, *In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (explaining how "exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case").

In addition to the general breadth of the exculpatory provision, the UST specifically opposes extending protection to persons owing no fiduciary duties to the bankruptcy estates or to a constituency uniquely recognized by bankruptcy law (such as the creditors' committee), most notably Lapis. While courts in some other jurisdictions limit exculpation to estate fiduciaries,[18] this court rejects such a categorical limitation. One reason compelling this result is that the *Blixseth* court noted this particular issue and expressly declined to impose an "only fiduciaries" limitation.[19] Another reason is that such a limitation conflicts with analogous protections arising under Bankruptcy Code section 1125(e). Section 1125(e) limits the liability of a broad array of persons for acts related to soliciting votes for a plan – regardless whether the person is an estate fiduciary. If the Bankruptcy Code extends this protection to a creditor such as Lapis in its capacity as plan proponent, then logic and fairness would not be served by excluding that same creditor from participating in plan-based exculpation. This is especially true when, as is the case here, each exculpated party actively participated in and contributed to the progress of the bankruptcy.[20]

Finally, the UST expresses concern about the nature and degree of culpable conduct subject to the exculpation provision. The provision, however, properly and expressly carves out gross negligence or willful misconduct. This is consistent with the requirements several courts imposed to prevent exculpation provisions from transforming into overbroad releases.[21]

In sum, the plan's exculpation provision is reasonably tailored to the facts and history of these cases. Its scope and details comport with those approved by other courts and with the *Blixseth* decision. Accordingly, the provision is appropriately included in the plan pursuant to Bankruptcy Code section 1123(b)(6).

---

[18] *See, e.g.*, *In re Midway Gold US, Inc.*, 575 B.R. 475, 512-13 (Bankr. D. Colo. 2017); *In re Health Diagnostic Lab'y, Inc.*, 551 B.R. 218, 232-33 (Bankr. E.D. Va. 2016); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013).

[19] *See Blixseth*, 961 F.3d at 1085 n.8.

[20] *See, e.g.*, *In re Murray Metallurgical Coal Holdings*, 2021 Bankr. LEXIS 57, at *132-35; *In re Stearns Holdings, LLC*, 607 B.R. 781, 790-91 (Bankr. S.D.N.Y. 2019).

[21] *See, e.g.*, *Blixseth*, 961 F.3d at 1081-82; *In re Murray Metallurgical Coal Holdings*, 2021 Bankr. LEXIS 57, at *133-34; *In re Stearns Holdings*, 607 B.R. at 791. The UST argues that the absence of an exclusion for professional malpractice created an issue under Washington RPC 1.8(h), but debtors' counsel stated on the record at the confirmation hearing that the exculpation provision does not eliminate any such claims. Thus, the court need not decide what implications, if any, the rules of professional conduct might have. *Cf. In re Stearns Holdings*, 607 B.R. at 791 (overruling similar objection).

### *The Plan's Release of Estate Claims Is Appropriate*

A plan proposing to release causes of action belonging to the bankruptcy estate need not rely on Bankruptcy Code section 1123(b)(6). A more direct legal basis is available: section 1123(b)(3)(A) expressly authorizes "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Thus, chapter 11 plans can propose settlements that should be evaluated using the same factors applicable to any proposed settlement in bankruptcy.[22]

In the Ninth Circuit, bankruptcy courts reviewing settlements are generally to consider (1) the probability of success in potential litigation; (2) the difficulties, if any, to be encountered in the matter of collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.[23] Heightened scrutiny is warranted when an insider benefits from a compromise or release that a debtor in possession proposes on behalf of its bankruptcy estate.[24] Indeed, bankruptcy courts must prevent plan releases of estate claims from being served up by rote to every chapter 11 debtor's officers and directors.[25]

Here, the proposed estate releases satisfy the four considerations set forth above, including after applying heightened scrutiny to the releases for the debtors' directors. The debtors represent that they are aware of no colorable claims against

---

[22] *See, e.g.*, *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 772 (Bankr. D. Del. 2018) ("A bankruptcy court may approve settlements under Bankruptcy Rule 9019 or as part of a debtor's plan. The standards for approving settlements under Rule 9019 or as part of a plan are the same." (footnotes omitted)). Although Rule 9019 provides a procedural mechanism for proposing settlements, the substantive basis for releasing bankruptcy estate claims lies in Bankruptcy Code section 363(b)(1). *See, e.g.*, *In re Claar Cellars LLC*, 2020 Bankr. LEXIS 682, at *11 n.24 (Bankr. E.D. Wash. Mar. 13, 2020).

[23] *See, e.g.*, *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986).

[24] *See, e.g.*, *In re Drexel Burnham Lambert Grp.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) ("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable."). The application of "rigid scrutiny" to insider dealings with debtors in bankruptcy has a robust heritage. *See, e.g.*, *Sawyer v. Hoag*, 84 U.S. (17 Wall.) 610, 623 (1873).

[25] *See In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 726-27 (Bankr. S.D.N.Y. 2019) ("[R]eleases are not a merit badge that somebody gets in return for making a positive contribution to a restructuring. They are not a participation trophy, and they are not a gold star for doing a good job. Doing positive things in a restructuring case – even important positive things – is not enough."). The frustration evident in Bankruptcy Judge Wiles' opinion stemmed from the transformation of relief circuit courts describe as "extraordinary" into a routine part of nearly every chapter 11 case. *See id.* This is an example of the Lake Wobegon effect whereby many ordinary and average things are postured as extraordinary, causing the very concept of extraordinariness to lose meaning. *See, e.g.*, *Szymanski v. County of Cook*, 468 F.3d 1027, 1031-32 (7th Cir. 2006).

any released party and no potential claims have been suggested by others. Absent initially colorable claims, there necessarily is no prospect of success associated with litigation. With no chance of success, the expense, inconvenience, and delay of such a process necessarily outweigh the benefit and the prospects of collection become irrelevant. In addition to the debtors' *ipse dixit* that their estates are conceding nothing of value, Lapis and the creditors' committee have also closely considered the categories of released parties and concluded that the balance struck by the plan is appropriate (indeed, as part of bringing the committee on board with a global settlement, the list of released parties shrank).

Each of the released parties has also contributed to these bankruptcy cases, including by making difficult decisions that preserved value and by facilitating the consensual resolution set forth in the plan. Consensual plans are strongly favored. This is particularly true in large, complex cases such as these where a fully litigated outcome requires a bankruptcy estate to bear millions of dollars in additional professional fees, creates significant uncertainty for stakeholders, and delays distributions to creditors. Furthermore, the bankruptcy process has a general need for speed.[26] In complex cases, that need is met only through good-faith efforts by the primary and rational actors to engage in negotiation and reach consensual outcomes. In the instant cases, the plan's global settlement, including the releases of estate claims, is in the paramount interest of creditors as evidenced by key stakeholder support for confirmation and the overwhelming acceptance of the plan by voting classes. These economic actors' reasonable views in the premises warrant deference and further demonstrate that the release of estate claims is appropriate. Because the proposed releases and overall settlement terms satisfy the standards for approval, they may properly be included in the plan pursuant to Bankruptcy Code section 1123(b)(3)(A).

---

[26] *See, e.g.*, *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1694 (2015) ("[E]xpedition is always an important consideration in bankruptcy."); *Katchen v. Landy*, 382 U.S. 323, 328-29 (1966) (describing longstanding recognition "that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period'" (quoting *Ex parte Christy*, 44 U.S. (3 How.) 292, 312 (1845))); *Wiswall v. Campbell*, 93 U.S. (3 Otto) 347, 350-51 (1876) (emphasizing how "[p]rompt action is everywhere required by law," and that this principle requires quick resolutions of claims against a bankruptcy estate, as "[w]ithout it there can be no dividend"); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346-47 (1875) (discussing how "[i]t is obviously one of the purposes of the Bankrupt law, that there should be a speedy disposition of the bankrupt's assets," which is a goal "only second in importance to securing equality of distribution").

*The Plan's Release of Nondebtor Claims Is Appropriate*

The plan includes releases of nondebtors' claims against other nondebtors, which prompts consideration of Bankruptcy Code section 524(e). This section provides that, subject to a narrow exception, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." For many years, some incorrectly believed that section 524(e) categorically prohibits nondebtor releases based on a reading of a series of decisions by the Ninth Circuit Court of Appeals.[27]

The *Blixseth* court has clarified and corrected this misguided conventional wisdom. There, the appellate court tightly construed section 524(e)'s text and, in the process, confined the prior opinions suggesting a broader construction. More specifically, the court described how the limitation in section 524(e) applies only to "**such debt**" – i.e., a debt owed by the debtor – and thereby "prevents a bankruptcy court from extinguishing claims of creditors against non-debtors over the very debt discharged through the bankruptcy proceedings."[28] The court then emphasized "the distinction between claims for the underlying debt and other claims" and explained that section 524(e) operates only on the former category to "prevent[] a reorganization plan from inappropriately circumscribing a creditor's claims against a debtor's co-debtor or guarantors over the discharged debt."[29] Based on this crucial distinction, then, section 524(e) prevents a chapter 11 plan from releasing a nondebtor co-obligor of the debtor from liability on a common claim, but is inapplicable to the release of other claims against the nondebtor.[30] A release of

---

[27] *See, e.g.*, *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995) ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *New Falls Corp. v. Tullo*, 2009 Ariz. App. Unpub. LEXIS 452, at *18 (Ariz. Ct. App. Apr. 28, 2009) ("Despite a split of authority between federal courts on this issue, the Ninth Circuit has consistently held that bankruptcy courts have no authority to discharge the liabilities of non-debtors, including guarantors."); 1 COLLIER BANKRUPTCY PRACTICE GUIDE ¶ 20.10 (noting how courts are "split as to whether section 524(e) prohibits the release of a nondebtor" and stating that "the Ninth Circuit held that any nondebtor releases, even if the releases are part of a confirmed plan, are impermissible under section 524(e)"); Peter E. Meltzer, *Getting Out of Jail Free: Can the Bankruptcy Plan Process Be Used to Release Nondebtor Parties?*, 71 AM. BANKR. L.J. 1, 5-6 (1997) (asserting that the Ninth Circuit "has rebuffed all attempts to use the plan process to release nondebtor third parties" and adopts a bright-line rule that "any attempts to release nondebtor parties under a plan are invalid under all circumstances").

[28] *Blixseth*, 961 F.3d at 1082.

[29] *Id.* at 1083.

[30] *See id.* at 1083-84.

these other claims is therefore permissible using the bankruptcy court's residual reorganizational powers if appropriate under the circumstances.[31]

Here, the debtors represented that the nondebtor releases relate to no liability common to any debtor and the released parties. This is unsurprising as the factual posture makes it unlikely that parties such as Lapis or the board of directors would be a guarantor or other surety for any of the debtors' obligations. In any event, no party has disagreed with the debtors' representations or specified any claims on which a nondebtor is co-liable. As such, section 524(e) has no relevance to the court's evaluation of the plan's nondebtor releases.[32]

Beyond section 524(e), courts disagree about the precise mechanics that render nondebtor releases contextually inappropriate. For example, courts are split about whether creditors must affirmatively "opt in" to such releases or whether it is sufficient to give creditors a chance to "opt out."[33] This court need not wade into that debate today. The nondebtor releases here are entirely consensual under any framework. Individual creditors do not provide a release unless they affirmatively vote in favor of the plan *and* separately do not opt out of the releases. Moreover, there is no feature of the plan creating even arguable coercion for the nondebtor releases to be provided – a creditor who declines to give the releases suffers no penalty and a creditor who gives the releases receives no reward.[34] Because any releases in the plan are freely and fairly given to the nondebtor beneficiaries, nothing in bankruptcy law or policy renders the releases inappropriate or unenforceable.[35] As such, the nondebtor releases are a feature permissibly included in the plan pursuant to Bankruptcy Code section 1123(b)(6).

---

[31] *See id.* at 1084-85.

[32] *Cf. In re Claar Cellars LLC*, 2021 Bankr. LEXIS 85, at *24-25 (Bankr. E.D. Wash. Jan. 14, 2021) (concluding that chapter 11 plan was unconfirmable because, among other things, the plan would effectively restructure obligations of co-liable nondebtors in violation of section 524(e)).

[33] *Compare, e.g.*, *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 285 (Bankr. D. Del. 2016), *and In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014), *with, e.g.*, *In re SunEdison, Inc.*, 576 B.R. 453, 458-61 (Bankr. S.D.N.Y. 2017), *and In re Washington Mut., Inc.*, 442 B.R. 314, 354-55 (Bankr. D. Del. 2011).

[34] This construct makes it irrational for any individual creditor to provide a release. A purely rational actor would view the release mechanic as proposing to eliminate *something* (albeit perhaps something of negligible value) in exchange for *nothing* and hence would decline the trade. Nevertheless, individual actors often behave in ways not theoretically optimal for an array of reasons. The important point for present purposes is that the choice was available to each creditor and was theirs alone under the plan's structure.

[35] *See, e.g.*, *In re PG & E Corp.*, 617 B.R. 671, 682-84 (Bankr. N.D. Cal. 2020).

**MEMORANDUM OPINION**				Page 11

19-01189-WLH11    Doc 2282    Filed 01/22/21    Entered 01/22/21 16:16:45    Pg 11 of 12

# SUMMATION

All features of the now confirmed joint plan in these difficult chapter 11 cases – specifically including the exculpation and release provisions of that plan – are permitted by law and otherwise appropriate. As such, the court granted the plan proponents' request to confirm their plan pursuant to Bankruptcy Code section 1129 in an order entered December 23, 2020.